Granite Peak Law, PLLC
Adam H. Owens, Esq.
Gregory G. Costanza, Esq.
201 W. Madison Ave., Ste 450
Belgrade, MT 59714
T: 406.586.0576
*adam@granitepeaklaw.com*
*gregory@granitepeaklaw.com*
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| MATTHEW MARSHALL, JOHN MAGUIRE, KEEGAN BONNET, AND ANTHONY AGUILAR, Individuals, | Cause No. |
| Plaintiffs | |
| v. | COMPLAINT |
| MICHAEL L. GOGUEN, an individual; The Trustee of the MICHAEL L. GOGUEN TRUST, a California Trust; WHITEFISH FRONTIERS, L.L.C., a Delaware limited liability company; VALLEY OAK, LLC, a Delaware limited liability company; PROOF RESEARCH, INC., a Delaware corporation; CASEY'S MANAGEMENT, LLC; TWO BEAR SECURITY, LLC; TWO BEAR AIR 1, LLC; CRYSTAL SLOPESIDE, LLC; TWO BEAR AIR RESCUE FOUNDATION, a Delaware non-profit corporation; KAREN VALLADAO, an individual; FRANK, RIMERMAN + CO. LLP, believed to be a California limited liability partnership; SHANE ERICKSON, an individual; | JURY TRIAL DEMANDED |

- 1 -

and DOES 1 through 100.

Defendants.

Plaintiffs Matthew Marshall, John Maguire, Keegan Bonnet, and Anthony Aguilar ("Plaintiffs") hereby allege as follows:

## I. INTRODUCTION

1. Michael L. Goguen induced Matthew Marshall to leave his high integrity position at the U.S. State Department for a job with Two Bear Security, LLC and based on a promise by Goguen to fund a private security contracting business (which Marshall named "Amyntor"), to be built on Marshall's personal network and expertise, until such business became profitable.

2. Marshall recruited Plaintiffs John Maguire, Anthony Aguilar, and Keegan Bonnet, along with many others, to help grow the business of Amyntor. Together, Marshall invested five years of his time and attention, along with Plaintiffs, to grow Amyntor into a flourishing business.

3. Goguen compromised Marshall's, Maguire's and Plaintiffs' activities by repeatedly seeking to commandeer and use Marshall, Marshall and Maguire's contacts, Amyntor's physical, technical, and personnel resources, and Goguen's numerous entities and employees to further Goguen's racketeering scheme to

destroy anyone who sought to expose Goguen for his prolific sexual misconduct (described herein as the "Goguen Sexual Enterprise").

4.     The Goguen Sexual Enterprise consists of a group of entities and individuals who engaged in an open-ended scheme and sought to profit or benefit from Goguen or companies associated with Goguen, while engaging as principals, co-conspirators, or accessories after the fact, in a pattern of prohibited racketeering activities as provided in 18 U.S.C. 1962 and as defined by 18 U.S.C. § 1961[1].

---

[1] A racketeering activity is defined as (1) "racketeering activity" means (A) any act or threat involving murder, ... , bribery, extortion, dealing in obscene matter, ... , which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), ... , sections 891–894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), ... , section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), ... , sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513

(relating to retaliating against a witness, victim, or an informant), ... , sections 1581–1592 (relating to peonage, slavery, and trafficking in persons), sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), ..., section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), ... sections 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), ... , ... , sections 2421–24 (relating to white slave traffic), ... (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title ), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

5.      Marshall and Maguire raised their concerns to Goguen based on independent legal analyses and other information indicating that Amyntor would not be able to obtain a U.S. Government facility security clearance because of the Goguen Sexual Enterprise.

6.      Goguen's personal ability to obtain a security clearance had been compromised by the Goguen Sexual Enterprise.

7.      The Goguen Sexual Enterprise jeopardized the business and reputation that Plaintiffs' had built between 2013-2018.

8.      After four years of increasingly fruitful investments of their time, resources, and collaboration with their professional network to build Amyntor, Plaintiffs were achieving profitability, and sought to buy-out Goguen's total investments at four times what he invested as a means to salvage the company they had been building, which was now being compromised by the Goguen Sexual Enterprise.

9.      Despite their offer, Goguen, knowing that Plaintiffs had provided extensive services and property for Goguen's benefit, maliciously:

**A.** Consistently underfunded Amyntor from 2014-2018 while allowing its operations, through the work of Plaintiffs and others, to continue while refusing to resolve the security clearance issue arising from the Goguen Sexual Enterprise;

**B.** dissolved Amyntor in late 2018 without regard to the relationships and agreements with third parties that Plaintiffs had entered on behalf of Amyntor based on Marshall's and Maguire's contacts and reputations;

**C.** impugned and defamed Marshall's and Maguire's character, integrity and credibility through a pattern of lies and deceit before state and federal law enforcement officials in furtherance of the Goguen Sexual Enterprise's purpose to destroy anyone who could expose Goguen for his prolific sexual misconduct.

10.     By orchestrating a corrupt scheme to use his business operations to commit illegal acts as part of the Goguen Sexual Enterprise, Defendants injured the business and property of Plaintiffs.

## II.     <u>JURISDICTION AND VENUE</u>

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

12.     Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because, *inter alia,* substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of this action is situated in the District and under 18 U.S.C. § 1965 because Goguen

and many of the Defendants reside in the District of Montana or in and around Flathead County, Montana.

### III.   PARTIES

13.     Plaintiff Matthew Marshall ("Marshall") is an individual residing in Flathead County in the State of Montana.

14.     Plaintiff John Maguire ("Maguire") is an individual residing in Whitefish, Montana.

15.     John Maguire is a 23-year veteran of the CIA. He served as a Clandestine Service Operations Officer and Specialist in Counter Terrorism. Maguire has been posted to numerous global trouble spots including Beirut, Cairo, Jordan, Afghanistan, El Salvador, Honduras and Iraq. He assisted in the creation of the CIA's Counter Terrorism Center (CTC), first as the Deputy, and then the Chief of the Counter Terrorism Incident Response Team (IRT).

16.     Maguire has served in command leadership positions in multiple Middle Eastern countries, Europe, and in senior command positions at CIA Headquarters, as a Senior Intelligence Service officer, which included regular contact with the Principals and Deputies committee, and Presidential access.

17.     In 1996, Maguire was directed to the Counter Espionage Group and the Washington FBI Field office for a special assignment. Because of his success in a

sensitive Counter-Intelligence operation he was named the Directorate of

Operations Manager of the Year. This achievement resulted in him being named an

instructor at the Clandestine Services Covert Training Facility and then designated

Chief of the Clandestine Operations Training Program.

18.     On the day after the 2001, 9-11 attacks Maguire was tasked to develop

and lead the Iraq Operations Group (IOG). He first served as Deputy Chief and

then assumed command as the Chief of the IOG. His intelligence collection and

covert action programs supported Operation Iraqi Freedom (OIF). In 2004, Maguire

was assigned as the Chief of Operations and Deputy Chief of Station in Baghdad.

19.     Following the Iraq assignment, Maguire became the Deputy Chief of

the Clandestine Services Training Base. He managed all operational and

paramilitary training delivered by the CIA to all staff and contract case officers and

operations officers, as well as all JSOC and SOCOM Tier One SOF personnel and

other government agencies. Maguire served in this position until he retired from

active duty with the Agency as a member of the Senior Intelligence Service (SIS) in

September 2005.

20.     John Maguire has been awarded the Distinguished Intelligence Medal,

Intelligence Medal of Merit, and four Meritorious Unit Citations: Serving in

Northern Iraq in the 90's; The IOG; Joint Operations in OIF with the United States

Marine Corps; and The CTC Incident Response Team. Mr. Maguire currently holds an active TS/SCI clearance inside JPAS.

21.     Marshall met Plaintiff Maguire at a restricted U.S. government training facility in the United States and Maguire supervised Marshall's training and work for the U.S. Government in Iraq and Afghanistan.

22.     Plaintiff Keegan Bonnet ("Bonnet") is an individual residing in Flathead County in the State of Montana. Bonnet served as an Executive Assistant to the CEO, Matthew Marshall, at Amyntor after working for Frontier Builders in Whitefish, Montana.

23.      Plaintiff Anthony Aguilar ("Aguilar") is an individual residing in Flathead County in the State of Montana. Aguilar has a background in information technology ("IT") services and was hired by Amyntor to provide such services.

24.     Defendant MICHAEL L. GOGUEN ("Goguen") is an individual residing in Flathead County in the State of Montana.

25.      Defendant TRUSTEE OF THE MICHAEL L. GOGUEN TRUST is believed to be Michael L. Goguen himself and/or other(s) who controlled the Michael L. Goguen Trust for purposes of the Goguen Sexual Enterprise, which is believed to have been formed in California when Michael L. Goguen resided there.

26.     Defendant WHITEFISH FRONTIERS, L.L.C. is a Delaware limited liability company with its principal place of business in Flathead County, Montana.

27.     Defendant VALLEY OAK, LLC is a Delaware limited liability company is believed to have its principal place of business in Flathead County, Montana.

28.     Defendant PROOF RESEARCH, INC. ("PROOF") is a Delaware corporation with its principal place of business in Flathead County, Montana. PROOF is a composite and carbon-fiber barrel rifle company based in Columbia Falls, Montana of which Goguen is the majority shareholder.

29.      Defendant CASEY'S MANAGEMENT, LLC is a Montana limited liability company with its principal place of business in Flathead County, Montana.

30.     Defendant TWO BEAR SECURITY, LLC is a Montana limited liability company with its principal place of business in Flathead County, Montana.

31.     Defendant TWO BEAR AIR 1, LLC, a Montana limited liability company, registered in Montana on June 24, 2013, with its principal place of business in Flathead County, Montana.

32.     Defendant TWO BEAR AIR RESCUE FOUNDATION, a Delaware non-profit corporation registered to do business in Montana on October 5, 2016, with its principal place of business in Flathead County, Montana.

33.     Defendant CRYSTAL SLOPESIDE, LLC, is a Montana Limited Liability Company with its principal place of business in Flathead County, Montana.

34.     Defendant Crystal Slopeside, LLC is believed to be owned by the Michael L. Goguen Trust and managed by the Defendant Trustee of the Michael L. Goguen Trust.

35.     Defendant Crystal Slopeside, LLC owns two residential condominiums located in Whitefish, Montana which are used by Goguen to have extra-marital sexual encounters with numerous women, including married women, strippers, and prostitutes, among others as part of the Goguen Sexual Enterprise.

36.     Defendant KAREN VALLADAO ("Valladao") is a partner with Defendant FRANK, RIMERMAN + CO. LLP in their firm's Tax Practice, working primarily out of their Palo Alto office.

37.     Valladao is Goguen's personal and business accountant, providing tax and financial accounting services to Goguen and his many businesses.

38.     Defendant FRANK, RIMERMAN + CO. LLP ("Frank Rimerman"), a California certified public accounting firm and a member of the global network of Baker Tilly International Ltd.

39.     Frank Rimerman has acted in furtherance of the Goguen Sexual Enterprise by overseeing and assisting Valladao and other agents or employees of

Frank Rimerman with respect to the Goguen transactions that comprise the Goguen Sexual Enterprise.

40.     SHANE ERICKSON ("Erickson") was a City of Whitefish, Montana Police Detective who was tasked with investigating the alleged criminal aggravated sexual assault of a PAM DOE[2] by Goguen.

41.     Mr. Erickson was forced to resign from his position as a Police Detective with the Whitefish Police Department for failing to investigate the alleged conduct by Goguen and improperly accepting gifts and other compensation from Defendant Goguen while employed with the Whitefish Police Department.

42.      DOE Defendants 1-100 are comprised of currently unknown individuals or entities who, with reckless or negligent indifference to the business and property of Plaintiffs, conspired or participated in the racketeering scheme orchestrated by Defendants (collectively "Defendants") in the predicate acts alleged herein.

43.     Any reference below to any of the above-named Defendants also refers to DOE Defendants 1-100.

## IV.     FACTS COMMON TO ALL CLAIMS

### A.     Marshall's Employment Background

---

[2] For privacy, the actual name of PAM DOE has been redacted from this Complaint.

44.     Marshall is a highly trained former Marine with specialized skills and extensive knowledge in Anti-Terrorism/Counter-Terrorism operations, overseas and domestic personal security operations, and operating in austere and non-permissive environments.

45.     Marshall has served in various senior leadership roles for the U.S. State Department Diplomatic Security Service, High Threat Protection Program as Team Leader, Deputy Detail Leader, Detail Leader for specialty teams, and as the Senior Lead Instructor for the High Threat Protection Program.

46.     Marshall served in multiple roles for the U.S. government in domestic and overseas roles and duty assignments where he was introduced to numerous high-level government contacts and gained valuable insight into the resources needed to plan and implement missions to protect persons and property.

47.     At the time Marshall and Goguen met, Marshall worked on contract for the United States Department of State (the "State Department") as the in-country Team Leader for the Global Ani-Terrorism Assistance Program in Mexico City, Mexico. Marshall also served in this leadership role in Amman, Jordan; Bogota, Colombia; and Erbil, Iraq.

B.      **Marshall's Introduction to Goguen**

48.     Goguen is a former partner of Silicon Valley, California venture capital firm Sequoia Capital, where he worked to fund cybersecurity and networking companies, taking many public during his tenure at Sequoia.

49.     In or around early 2012, while working in the Global Anti-Terrorism Assistance Program in Mexico City with the State Department, Marshall was introduced to Goguen by an acquaintance, actor Huntley Ritter, for the purpose of Marshall providing a comprehensive threat assessment for Goguen.

50.     In November of 2012, the CEO of Proof Research, Inc., Pat Rainey ("Rainey"), and Goguen, requested Marshall come to the next Shot Show event in January of 2013, a shooting, hunting and outdoor trade show in Las Vegas.

51.     Rainey asked Marshall to provide his professional assessment on the quality of PROOF's rifles and carbon fiber barrels based on Marshall's extensive firearms knowledge, during a private press event hosted by PROOF executives at an indoor facility known as "The Range 702" on the Las Vegas Strip.

52.     During this visit to Shot Show in 2013, Marshall was personally introduced to Defendant Michael L. Goguen by Ritter for the first time.

53.     Ritter set up an early morning coffee meeting that was scheduled for 30 minutes with Goguen. This coffee meeting lasted a couple of hours and ended with Goguen inviting Marshall out for dinner and drinks later that evening.

C.      **Goguen's Offer of Employment to Marshall**

54.      Marshall met Goguen for drinks, per Goguen's request, at the Spearmint Rhino, a well-known and exclusive Las Vegas topless strip club, where Goguen has been referred to as the "mayor."

55.      While having a drink at the Spearmint Rhino, Marshall and Goguen further discussed Goguen's desire to have Marshall travel to Whitefish, Montana and provide a comprehensive threat assessment for Goguen.

56.      During this conversation, Goguen retrieved a large roll of cash from his sock wrapped in a rubber band. Goguen then provided Marshall with $5,000 in cash, telling Marshall to spend it on lap dances, drinks, and to otherwise have fun at Spearmint Rhino, on the condition that any unused funds be returned to him at the end of the evening. Marshall obliged, not wanting to offend his generous yet unusual patron.

57.      After giving Marshall the $5,000 in cash, Goguen was then escorted away by a bevy of exotic dancers that had been waiting on Goguen, not to be seen by Marshall until several hours later.

58.      As Marshall waited for Goguen to return, not being much of a drinker, Marshall spent a few hundred dollars on drinks, at approximately $50 each, and sat and waited at a small table.

59.     Upon Goguen's return from a private room located in the rear of the strip club, Marshall thanked Goguen as they were escorted out a back exit by the club manager and put into a private vehicle that Goguen had waiting for them.

60.     While in the vehicle driving back to Marshall's hotel room, Marshall returned approximately $4,500 of Goguen's $5,000 in cash provided earlier. Goguen seemed surprised that Marshall returned the cash, stating in effect, "I've done this numerous times and no one has ever returned the cash."

61.     After departing from Las Vegas, Marshall and Goguen emailed and texted each other throughout January of 2013. During this correspondence, Goguen solicited Marshall to leave his U.S. Department of State job and work for him in Whitefish, Montana through Goguen's company, Defendant Two Bear Security, LLC, as the CEO, at a salary of $195,000 per year.

62.     Goguen further enticed Marshall with promises that included platinum level health insurance for Marshall and his family, a vehicle of her choosing for Marshall's wife, a vehicle of Marshall's choosing for himself, a yearly vacation for Marshall and his family fully paid for by Goguen, employment and performance bonuses, paid gym membership for Marshall and his family, a retirement program, and other perks to come work for him at Two Bear Security.

63.     The initial employment offer consisted of Marshall providing Goguen with a comprehensive threat assessment, making recommendations on how to increase his physical and personal security, evaluating current security personnel working for Two Bear Security, LLC, and doing a vulnerability assessment on a massive, 31,000 square foot fortified bunker project that was in the initial design and construction phase.

64.     Additionally, once on board, to discuss Marshall and Goguen partnering to form a new defense, security, and cyber-security company ("NewCo") which Marshall would manage as Chief Executive Officer and Goguen would fund until revenue was sufficient to sustain the business in a reasonable period of years.

65.     In February of 2013, Goguen invited Marshall to visit him in Whitefish, Montana. Marshall accepted and visited Goguen in Montana for several days.

66.     During this visit, Goguen gave Marshall a "grand tour of his kingdom" and encouraged Marshall to provide security work for him through Two Bear Security and again offered to help launch NewCo based on Marshall's experience and network, and Goguen's funding.

67.     Marshall informed Goguen during this visit that Goguen's employment proposal for Marshall to work with a starting salary of $195,000 was

generous but he had responsibilities in Mexico City working on the Global Anti-Terrorism Assistance Program as the in-country Team Leader where Marshall earned approximately $18,000 a month, inclusive of per diem, travel, and other incentives, while in Mexico working on the Global Anti-Terrorism Assistance Program.

68.     Marshall told Goguen that he would think about Goguen's offer, speak to his wife, and get back to him regarding the Two Bear Security employment and offer to start NewCo.

69.     At the conclusion of his trip, Marshall travelled back to Mexico City, Mexico from Montana and thereafter discussed Goguen's employment offer with his wife, Heather Marshall. They decided to visit Montana together so that Heather could get acquainted with Whitefish and explore the school system for their 10-year-old daughter.

70.     On or about the last week of February or the first week of March of 2013, Marshall and his wife visited Whitefish, Montana. During this trip, Marshall agreed to accept Goguen's offer of employment with Two Bear Security and future partnership in NewCo.

71.     Marshall returned to Mexico City to resign from his position with the Unites States Department of State GATA Program, do a handover of his position, and to collect his personal belongings.

D.     **Marshall's Initial Employment with Goguen**

72.     On or about March 15, 2013, Marshall returned to Whitefish,

Montana to perform Goguen's threat assessment and to begin the process of

forming Newco.

73.     Marshall initially stayed at the three-bedroom suite located in the main

house of Goguen's residence located in Whitefish, Montana.

74.     Goguen resides on 3,200 acres outside of Whitefish containing an

approximate 75,000 sq. ft. main house, an additional 25,000 sq. ft. underground

bunker equipped with several Andair AG nuclear blast doors and accommodations

for twenty to twenty-five people for up to a year. There is also a 10,000 sq. ft. lake

house, and three other houses located on Goguen's property used for family and

employee housing.

75.     When Marshall began working for Goguen, Goguen employed around

thirty to thirty-five people at his residence, including chefs, nannies, house keepers,

and security personnel, house manager, plus a couple hundred vendors and

contractors who routinely worked on the property due to the numerous

construction projects going on each day.

76.     Goguen also owned a dozen or more pieces of real property in and

around Flathead County, Montana that were used and maintained by various

employees, vendors, and contractors. These properties were typically used for housing employees of Goguen's multiple businesses.

77.     However, some of Goguen's properties were also used as "safe houses" for Goguen to have extra-marital sexual encounters with numerous women, including married women, strippers, and prostitutes, among others, some of whom Goguen trafficked to Montana via his personal $42 million private jet or other contracted private jet service companies (such occurrences contributing to and partially comprising the Goguen Sexual Enterprise).

78.     Generally, when Marshall arrived in March of 2013, Goguen had extensive business dealings outside of Montana, resulting in Goguen being in California or elsewhere on business during the week and typically only in Montana on the weekends.

79.     From the beginning of their relationship, Goguen expressed his intention for Marshall to be his "right-hand man" and introduced Marshall to many people by that title.

80.     Part of Marshall's compensation package included an agreement by Goguen to purchase and provide physical security upgrades and other renovations for a home where Marshall and his family would live, on the condition that if

Marshall stayed as an employee of Goguen for longer than three-years, Goguen would transfer title of the home to Marshall.

81.     Based on this agreement, Goguen and Marshall immediately began looking for a house for Goguen to purchase for Marshall's family.

82.     Goguen also promised Marshall a $200,000 signing bonus to cover his moving expenses, to purchase a new vehicle for both Marshall and his wife, to pay for a breast augmentation for Marshall's wife, a vacation for Marshall's family with a $40,000 budget, and to cover the earnest money down payment and some of the renovation expenses to be incurred at the home Goguen was to purchase for Marshall's family.

83.     The $200,000 signing bonus was received on March 18, 2013 by wire from the Michael L. Goguen Trust into Marshall's Old National Bank checking account.

84.     Concerned with the potential tax liability arising from the $200,000 initial signing bonus, Marshall inquired with Karen Valladao, Goguen's personal and business accountant, who assured Marshall that the total payment would be increased to offset any tax liability, with such payments to be reflected on Marshall's tax disclosure forms issued by Goguen's accountants at Defendant FRANK, RIMERMAN + CO. LLP.

85.     Marshall began looking for the home Goguen would purchase for him when he moved to Montana in March of 2013. Goguen eventually found a property located at 151 Missy Lane, Whitefish, Montana, which Goguen agreed to purchase.

86.     On or around April 19, 2013, Goguen, through the Crystal Tamarack Trust, closed on 151 Missy Lane, Whitefish, Montana, which was purchased as a residence for Marshall and his family for $2,150,000.

87.     Over the next few years, Marshall significantly renovated and improved the 151 Missy Lane property using personal funds that were later reimbursed by Goguen.

88.     Upon arriving in Montana, Marshall immediately began familiarizing himself with the inner workings of Goguen's life, including the operation of his home, personal and business activities, travel, businesses, employees, vendors, contractors, information technology, security systems, background checks, etc.

89.     As part of the threat assessment, Marshall initially had background checks conducted on Goguen's employees who had the most unrestricted access to Goguen and his immediate family. The next phase was vetting the vendors, and contractors who had unfettered access to the Property. This process was extensive in nature and required significant man hours. The final product presented to Goguen was massive in scope and included all of the aforementioned employees, their

personnel files, and identification pictures of everyone who had access to Goguen and his family.

90.    It took approximately six months for Marshall to familiarize himself with Goguen's personal and family life, household operations, business operations, and to run thorough background checks on all personnel working for Goguen or persons who routinely visited the Property.

91.     Marshall soon learned that Goguen's household operations and security in general had a number of weak points that needed to be remedied.

92.    There were two particular employees that had full access to Goguen and his family that required immediate intervention due to security concerns.

93.    One of these employees lived full-time on Goguen's property and not only had full access to Goguen, his family, and his main residence, but also flew Goguen and his family around in a Goguen owned multi-million-dollar helicopter that was stored in a hangar on the Property.

94.    This employee displayed a cavalier and reckless attitude and was often complained about by other Goguen staff employees. When Marshall conducted a thorough background check on this employee, it was determined he had embellished much of his experience. Marshall went to Goguen and gave him the

details on the background investigation and Goguen agreed to immediately terminate the employee.

95.     Another example was one of Goguen's security employees, who was a former police officer. This individual was making several inappropriate comments to Goguen's oldest female children and to a couple of family members who were visiting the property.

96.     Marshall inquired with Goguen if he had conducted a background check on said employee and Goguen indicated that he believed the property manager had done so.

97.     After confirming this had in fact been done by the property manager, Marshall initiated a more in-depth background investigation and learned there was a past history of sexual deviance and lewd and lascivious behavior at the security employee's prior employment.

98.     Marshall informed Goguen of this and recommended terminating the employee immediately.

99.     Goguen was very hesitant to allow Marshall to terminate the employee.

100.   When Marshall questioned Goguen as to why, he stated that the employee had been around for several years and, "knew too much about Goguen".

101.    When pressed by Marshall, Goguen agreed to let Marshall "retire" the employee and pay him a healthy severance to include platinum health insurance benefits solely contingent on the employee agreeing to sign a non-disclosure and non-disparagement agreement prepared by Goguen's personal attorneys.

102.    Goguen agreed to let Marshall "retire" this particular security employee and the subsequent severance was intended by Goguen to further the Goguen Sexual Enterprise by bribing and tampering with a witness who has knowledge and information relating to the Goguen Sexual Enterprise.

103.    In a short period of time, Marshall had made many changes to Goguen's household security and business operations, including but not limited to firing a number of employees, hiring highly qualified security personnel, hardening access points to the Property, and improving security hardware and communications, all of which significantly improved Goguen's security.

**E.    <u>Unexpected Additional Responsibilities</u>**

104.    Due to Marshall's initial success improving Goguen's security, Goguen began tasking Marshall with an ever-increasing amount of responsibility over other matters that went beyond the scope of what Marshall had initially agreed.

105.    Before long, Marshall was tasked with ensuring that each of Goguen's businesses and Goguen's household ran smoothly, including overseeing and

assisting in the management of Goguen's extensive real estate holdings in Montana, Goguen's staff, employees, vendors, and contractors, and a number of Goguen's businesses.

106.   Marshall was appointed by Goguen:

a) As Vice President of Casey's Management, LLC, which operated Casey's Bar in Whitefish;

b) As Trustee to the Michael L. Goguen Trust;

c) As Managing Member, Amyntas Ventures, LLC;

d) As Vice President and appointed agent of Crystal Slopeside, LLC;

e) As Vice President of Two Bear Services Group, LLC;

f) As Project Manager of NUH Strategically and Fortified Environments bunker project;

g) As Trustee of Old Towne Unit 250 Land Trust;

h) As Trustee of Old Towne Land Trust;

i) As Trustee of Agema Property Trust;

j) As Board Member, Chairman of the Board, and later acting interim Chief Executive Officer of PROOF Research, Inc.;

k) As Board Member of Defiance Machine;

l)   And to manage Goguen's extensive real estate holdings in and around

Flathead County.

107.   Marshall's influence over Casey's Management, LLC, PROOF

Research, Inc., Defiance Machine, and Goguen's many other businesses resulted in

much needed reform, helping to turn these businesses into more secure and

successful enterprises.

108.   Marshall was not compensated for the work he performed for Goguen

and these other entities.

109.   By 2014, Marshall was spending the majority of his time managing

Goguen related businesses and properties in the State of Montana, including

Goguen's household security.

110.   At times, Marshall was working 80 hours per week managing Goguen's

affairs, with the majority of duties falling outside the scope of Marshall's intended

work scope at Two Bear Security or building Amyntor.

111.   During the time that he provided services to Goguen, Marshall had

full visibility of expenditures by Goguen around Montana and his entities in

Flathead County, totaling approximately $5,000,000 per month.

F.   **Marshall's Payment of Goguen's Expenses and Reimbursements**

112.    Maintaining Goguen's extensive real estate holdings in Montana was a challenging task, requiring the coordination and arrangement of payment for plumbers, electricians, cleaners, landscapers, contractors, interior designers, and other vendors who were providing services to Goguen's properties and businesses.

113.    The majority of the time, Marshall was unable to reach Goguen to arrange advance payment for services performed in relation to the maintenance of Goguen's real estate holdings, resulting in Marshall often using personal funds to cover Goguen's expenses.

114.    Marshall would seek reimbursement of funds from Goguen by requesting them from Goguen's personal and business accountant, Defendant Karen Valladao ("Valladao"), of accounting firm FRANK, RIMERMAN + CO. LLP.

115.    At times, Marshall's covering of Goguen's expenses would exceed $100,000 or more before reimbursement from Goguen was received.

116.    Goguen would reimburse Marshall by wiring cash to Marshall's personal checking account or by having Valladao cut checks from the Goguen Trust.

117.    Many times, Goguen's wires would be comprised partially of reimbursements for funds already paid by Marshall from his personal account and additional funds to cover expected future expenses not yet incurred.

118.   These reimbursements and funds for future expenses were typically discussed initially by Marshall and Valladao, and then approved by Goguen, who would personally wire the funds into Marshall's account.

119.   The arrangement was not ideal for Marshall because Marshall was uncertain how Valladao would account for such payments, but it was the way that Goguen preferred.

120.   Marshall and Goguen agreed that Marshall could spend up to $1,000,000 at any given time to manage Goguen's entities before having a budget discussion.

121.   Marshall again expressed his concern to Goguen and Valladao of the potential tax implications for these wires.

122.   Valladao and Goguen again confirmed to Marshall that these payments would be properly accounted for to prevent Marshall from incurring any tax consequences therefrom.

123.   Goguen informed Marshall it was best to have him pay the property expenses, especially any expenses that were solely for Goguen's safe houses", out of his personal account to avoid his then wife Jordana from discovering that Goguen owned a number of properties that he used extensively for extramarital affairs because Jordana had visibility over Goguen's accounts at that time.

124.    In addition to the real property expenses, at Goguen's direction, Marshall was being asked to purchase, out of his personal accounts, vehicles, jewelry, and providing cash and other items for Goguen's mistresses and for hush-money payoffs to Goguen's acquaintances and employees who had "learned too much" about the Goguen Sexual Enterprise.

## G.    Formation and Operation of Amyntor Group

125.    By the Fall of 2013, Marshall started developing the branding and the process of forming Newco, which Marshall decided to call Amyntor Group, LLC ("Amyntor").

126.    On October 24, 2013, Amyntor was formed in the state of Delaware.

127.    Goguen and Marshall's plan was for Amyntor to be a defense, security, and cyber security company that would seek contracts with corporate and government clients, including the U.S. Government.

128.    Marshall's background in intelligence work and for the State Department's Global Anti-Terrorism Assistance Program ("GATA") and Advisory Task Force, and the Diplomatic Security Service High Threat Protection Program for the U.S. State Department, created a unique opportunity for Amyntor.

129.    GATA assists foreign partners to develop the capability for antiterrorism planning and coordination in support of U.S. antiterrorism and counterterrorism objectives.

130.    Marshall's work in this sphere gave him insight into contemporary government objectives that would be seeking third party contracting from companies such as Amyntor.

131.    Goguen indicated to Marshall that he understood that Amyntor would not be making a net profit immediately because of the associated costs with the ramp-up of personnel, infrastructure and logistics buildout, equipment and experience needed for Amyntor to bid on larger security contracts.

132.    Goguen expressed to Marshall that he was not concerned if Amyntor did not reach immediate profitability, which gave Marshall the confidence that Goguen was willing and able to fund Amyntor while Marshall and the other Plaintiffs pursued higher value and longer-term security contracts.

133.    By the end of 2013 and early 2014, Marshall began the process of building Amyntor, including but not limited to hiring employees, purchasing computers, communications equipment, tactical hardware, setting up secure communications and information technology systems, securing contacts within the

U.S. government, reaching out to corporate contacts, vetted foreign nationals, and elsewhere for the purpose of obtaining defense and security contracts for Amyntor.

134.    Goguen's initial investment in Amyntor was a $1.1M wire transfer to remodel, paint, and set up the Amyntor office in Whitefish; purchase equipment, computers, servers, hardware, office furniture, etc., hire personnel, and to otherwise establish the company.

135.    Marshall's first hire was Shawn Lewis ("Lewis"), who was hired as President of Amyntor to establish and initiate required corporate registrations, identify, procure and manage U.S. government contracts that were available for open bid and other U.S. government contracts that did not require security clearances.

136.    Lewis landed some Department of Defense and private sector contracts within a short time of being hired. Though these contracts, some up to $100,000, were not considered high value contracts, they provided good exposure to support past performance metrics required for obtaining U.S. government contracts moving forward.

137.    In Mid-2014, Marshall also hired John Maguire ("Maguire") who worked for the Clandestine Services branch of the Central Intelligence Agency

("CIA") from 1982 to 2005 in the Middle East, Africa, South Asia, and Central America.

138.   Maguire was hired as Amyntor's Vice President of Special Programs working on CIA, Department of Defense, and other sensitive programs' contracts.

139.   It was around this time that Marshall had conversations regarding setting up a private jet service account for Amyntor with NetJets, to have the capability of flying personnel to and from time sensitive meetings and to fly Amyntor VIPs to Whitefish for secure meetings.

140.   Marshall suggested Goguen set up the NetJets contract as an Amyntor account and that Goguen capitalize Amyntor for the amount of the NetJets contract.

141.   On information and belief, the NetJets buy in was approximately $2,000,000 or more, plus an annual subscription and per flight charges.

142.   Instead of capitalizing Amyntor for this expense, Goguen decided to use Whitefish Frontiers, LLC to pay for the NetJets buy-in and gave Marshall account authorization to approve flights on the account.

143.   By the end of 2014, having identified a number of viable contracts, Amyntor was showing early signs of success requiring Marshall to jump into an expansion of personnel to fill critical needs positions to prepare the company for growth and to meet the requirements to qualify for U.S. Government contracts.

144.   At Goguen's direction, Marshall personally paid for gifts, such as Rolex and Panerai watches, and other expenses such as vacations, for these employees, and understood that Goguen would reimburse him for such expenses based on their previous dealings.

145.   Goguen did not reimburse Marshall for many of his out-of-pocket expenditures.

146.   By the end of 2014, Amyntor's Iraq office had been set up due to Maguire's and Marshall's U.S. Government and Middle East contacts.

147.   Amyntor's Mexico City Office was set up in mid-2015, primarily due to Marshall's connections with the Global Anti-terrorism Assistance and Advisory Task Force ("GATA").

148.   Amyntor was working with the Mexican government, due to Amyntor having hired Jaime Lopez, a former high-level Mexican government official.

149.   Christina Rieder, a former Director at Price Waterhouse Coopers, Mexico, and Lopez's wife, ran the Mexico City Office.

150.   Lopez was able to secure three contracts from the Mexican government with a combined value of $2,500,000. Considering Amyntor's Mexico City office had a modest annual overhead cost, these contracts were welcomed by Marshall.

151.    By this time, Amyntor was asked to bid on a number of contracts, including intelligence, logistics, security, and helicopter support domestically and abroad.

152.    Amyntor set up a liaison office in Fairfax, Virginia in June of 2015 for the purpose of securing State Department contracts.

153.    Amyntor hired Tom Williams and Dale E. "Chip" McElhattan, who both previously worked for the U.S. State Department, to run the Virginia office.

154.    The Virginia office, through Tom Williams, was able to secure a number of sensitive contracts through government subcontractors, and through McElhattan, secure a number of contract opportunities from the State Department.

155.    In 2016, Marshall set up an Amyntor office in Texas where Amyntor had secured certain corporate and high net worth security contracts.

156.    Marshall transferred Shawn Lewis to head the Texas office.

157.    In late 2016, Maguire received information from a high-level government official informing him that the Trump administration was looking for private defense contractors to provide intelligence services to the CIA on a few projects.

158.    Maguire and Marshall prepared proposals for three separate projects to present to the Director of Central Intelligence ("DCI"), based on information

provided by the late Duane "Dewey" Clarridge, a retired CIA Senior Operations Officer, and others.

159.   The DCI knew the administration was looking for the projects Amyntor was proposing and agreed to meet Amyntor personnel in the Fall of 2017.

160.   Maguire and Charlie Seidel helped present the three proposals at the Fall of 2017 meeting to the DCI.

161.   Impressed with Amyntor's proposals, the DCI wrote a handwritten note authorizing the contracting officer to prepare budget numbers for the projects to start the process of getting the programs running.

162.   An unnamed person made a copy of the DCI's handwritten note, which eventually landed in the hands of Pulitzer Prize winning author Aram Roston, who at the time worked for BuzzFeed as a national security reporter.

163.   Roston wrote an article about Amyntor and its proposals to the CIA which was released on November 30, 2017, entitled *The Trump Administration is Mulling a Pitch for a Private 'Rendition' and Spy Network.*"

164.   Roston's article frustrated the immediate ability of Amyntor to secure the three projects that it had proposed to the DCI in the Fall of 2017.

165.   Fortunately, Amyntor still had other ongoing contracts, including security work for a corporate client in Mexico City and computer hardening and

threat assessment for Mexico's national tax administration, the Servicio de Administracion Tributara ("SAT").

166.   Roston's article brought international attention to Amyntor.

167.   Roston spoke with Goguen about his involvement in Amyntor, which he supposedly downplayed as an "early investor" and pressured Roston to write a favorable article about him in the Baptiste affair, which Roston declined.

168.   Amyntor also had personal security contracts for corporate executives worth approximately $50,000 a month per assignment.

169.   Amyntor was starting to pull in significant revenue and had deposited over $2,500,000 in its bank account by 2017.

170.   Upon being informed that Amyntor was securing multiple contracts throughout the world that would bring in substantial revenue, Goguen expressed his excitement to Marshall that his funding of Amyntor would soon not be necessary.

## H.   The Goguen Sexual Enterprise Frustrates Plaintiffs' Business

171.   Unbeknownst to Marshall, Goguen had started to execute a plan to ruin Amyntor and Marshall due to Marshall's refusal to use Amyntor resources to hack into social media, email accounts and computers of Goguen's enemies, and to perform other illegal acts for Goguen in furtherance of the Goguen Sexual Enterprise.

172.   By January of 2018, Goguen began to communicate significantly less frequently with Marshall, failing to respond to messages, emails, phone calls, etc. from Marshall.

173.   Marshall, concerned with Goguen's behavior, paired back Amyntor's overhead to be as efficient as possible, closing the offices in Texas, Iraq, Virginia, and Mexico City.

174.   Had Marshall known that Goguen was going to cease funding Amyntor the way he did, Marshall would have focused Amyntor's efforts on the lucrative personal security contracts and likely survived Goguen's refusal to fund the company.

175.   Though the fallout of the Roston article and others about Amyntor had initially been difficult, Amyntor was still having positive communications with the DCI regarding the implementation of the projects that Amyntor had proposed to him in the Fall of 2017.

176.   Marshall continued to be confident about the prospects of these contracts working out, so despite the silence from Goguen, he spent approximately $300,000 of personal funds from his investment account to continue to pay Amyntor employee payroll and employment benefits outside of the Amyntor bank accounts to which Goguen still had access.

177.   Amyntor received continued assurances from high level government officials that if they could keep Amyntor afloat they would get the contract for one of the proposals presented to the DCI.

178.   By the Spring of 2018, Marshall was preparing to apply for a Facility Clearance ("FCL") for Amyntor from the U.S. Defense Security Services ("DSS"), now known as the Defense Counterintelligence and Security Agency, so that Amyntor could begin bidding on Secret and Top-Secret U.S. government contracts.

179.   There were also a number of other government contracts pending which, to be approved, required Amyntor to obtain an FCL.

180.   During the application process for Amyntor's FCL, Marshall was informed that because of Goguen's ownership interest in Amyntor, it was highly unlikely that the DSS would grant Amyntor an FCL.

181.   Marshall immediately contacted a longtime attorney advisor, who is "of counsel" with a prominent law firm in the Washington D.C. area specializing in DSS FCL, requesting their opinion on the likelihood of Amyntor receiving an FCL from DSS.

182.   Marshall obtained an opinion from this law firm on the likelihood of whether Amyntor would be approved for an FCL from the DSS.

183.   The law firm's opinions were consistent with what Marshall and his attorney advisor had already suspected, that there was likely no chance the DSS would issue Amyntor an FCL with Michael L. Goguen as a principal.

184.   On the brink of Amyntor potentially obtaining hundreds of millions of dollars from the CIA contracts, Marshall and Maguire tried to figure out how to detach Goguen from Amyntor to obtain an FCL and not jeopardize the contracting business Plaintiffs had built.

185.   Their plan was to approach Goguen and offer to buy him out of Amyntor for $40,000,000, a large return on Goguen's investment in Amyntor.

186.   In late June or early July of 2018, Marshall met with Goguen and informed him, based on the legal opinions he had obtained, that the pending U.S. Government defense and intelligence contracts would not be approved because the DSS would never approve Amyntor's FCL in light of Goguen's sexual proclivities and the public information available on Goguen, including the Amber Baptiste lawsuit.

187.   Marshall then offered to purchase Goguen's interest in Amyntor for $40,000,000 as a solution to the FCL problem posed by Goguen's personal inability to obtain a security clearance because of his participation in the Goguen Sexual Enterprise.

188.   Goguen responded to this offer by storming out of the room and refusing to continue the conversation with Marshall.

189.   After Goguen refused the offer, in July of 2018, Marshall requested written legal memorandums from this law firm on the likelihood of Amyntor obtaining an FCL from the DSS.

190.   Marshall received two legal memorandums on July 26, 2018, entitled "Facility Clearance Process" and "Facility Clearance Process Part II – Majority Owner-Specific."

191.   The legal memorandums provided:

   i.   To obtain an FCL, in addition to other requirements, all Key Management Personnel ("KMP") of the government contractor FCL applicant, must be eligible for a personnel security clearance ("PCL"). As the majority owner of Amyntor, Goguen would have been required to obtain a PCL at the clearance level of the Company's FCL on the basis that majority owners typically have the ability to bind the company, or overrule managers in key decisions, and thus exercise "control" as to its classified contracts. Essentially, the granting of an FCL would be dependent on the granting of PCLs to the required KMPs, such as Goguen and Marshall.

   ii.  The PCL application process involves the Office of Personnel Management performing an extensive background investigation of the PCL applicant, "focusing on thirteen areas; (i) allegiance to the U.S.; (ii) foreign influence; (iii) foreign preference; (iv) sexual behavior; (v) personal conduct; (vi) financial considerations; (vii) alcohol consumption; (viii) drug involvement; (ix) possible emotional, mental, and personal

disorders; (x) criminal conduct; (xi) security violations; (xii) outside activities; and (xiii) misuse of information technology systems."

192.   Based on the above criteria, the conclusion of the legal advice Marshall obtained regarding Goguen's PCL application was that, based on the information publicly available about Goguen, including the $40,000,000 Amber Baptiste lawsuit and the $10,000,000 hush payment Goguen made to her, the OPM will likely conclude that Goguen may be susceptible to exploitation, coercion, or duress and that, as a result, DSS will likely reject Goguen's PCL application, thus jeopardizing Amyntor's FCL application. At a minimum, the complexity of Goguen's PCL application would likely cause a material delay in an already lengthy FCL application process.

193.   Marshall made multiple unsuccessful attempts to arrange to meet with Goguen to personally give him the legal memorandums and to discuss his offer further. Failing in these efforts, Marshall emailed them to Goguen and Goguen's attorney.

194.   Marshall continued to reduce overhead costs, such as not renewing the Virginia office lease.

195.   Amyntor still had a number of revenue earning contracts on the books and many other valuable domestic and foreign agreements under negotiation.

196.   On September 6, 2018, Goguen sent out the Blanket Dissolution notice, abruptly pulling out of Amyntor out of fear that the Goguen Sexual Enterprise was again at risk of being exposed by persons who "knew too much" about Goguen's lurid affairs.

197.   Thereafter, Goguen worked to undermine and conceal the past illicit conduct and racketeering activities that he and his associates had engaged in to the detriment of Plaintiffs' business and property.

I.   **Marshall's equity involvement in PROOF Research**

198.   Goguen appointed Plaintiff Marshall as a Board Member in late 2013 to PROOF Research, then in March of 2015 he was appointed as Chairman of the Board.

199.   While Marshall was Chairman of the Board, due to circumstances that put PROOF at risk of massive lawsuits due to the behavior of PROOF's CEO, Marshall advised Goguen that there needed to be an immediate and dramatic intervention by Marshall to salvage the company.

200.   As the majority owner, Goguen authorized Marshall to do whatever was necessary. With Goguen's full support, Marshall began terminating several PROOF executives starting with the CEO.

201.   As a stop gap measure, Marshall was appointed interim CEO of PROOF to facilitate a more efficient process of conducting terminations, offering severance packages, and facilitating the eventual transfer of authority to the incoming CEO who would manage the company with Marshall's assistance and support.

202.   This entire process took several months and was an enormous undertaking that consumed a significant amount of Marshall's time away from his primary role as the CEO of Amyntor Group.

203.   When the Goguen Sexual Enterprise was at risk of exposure by Marshall and the other Plaintiffs, Goguen retaliated against Marshall by having him removed from the Board of PROOF.

204.   In the above-described officer and board roles, Marshall was provided equity ownership in the company.

205.   Marshall never received any monetary compensation for his efforts on behalf of PROOF Research, Inc.

206.   On August 15, 2018, Goguen removed Marshall from his role in PROOF Research Inc. out of fear that the Goguen Sexual Enterprise was again at risk of being exposed by persons who "knew too much" about Goguen's lurid affairs.

207.   Plaintiff Marshall suffered harm when Goguen retaliated against him by removing him from PROOF Research without justly compensating him for the services he provided and/or the equity he supposedly received.

## V.   CAUSES OF ACTION

### Claim One
### VIOLATION OF 18 U.S.C. § 1962(C)
### (ALL PLAINTIFFS VERSUS DEFENDANTS)

208.   Plaintiffs restate, reallege, and incorporate by reference all preceding paragraphs as if fully set forth herein.

209.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, among other things, provides a civil cause of action for "any person injured in his business or property by reason of a violation" of RICO's criminal provisions. See 18 U.S.C. § 1964(c).

210.   At all times material herein, each Defendant willfully and knowingly directly and indirectly participated in or associated with the Goguen Sexual Enterprise, an illicit enterprise.

211.   The Goguen Sexual Enterprise engaged in two or more occasions of conduct that constitute criminal predicate acts as defined by RICO, including, but not limited to, knowingly recruiting, transporting, transferring, harboring, receiving, providing, obtaining, isolating, maintaining, or enticing young women in the

furtherance of commercial sexual activity, sexual servitude, and state and federal crimes related to the concealment of evidence or the silencing of those persons who knew about or could expose Goguen's illicit sexual conduct.

212.   Defendants, through a pattern of criminal activity, acquired and maintained, directly or indirectly, an interest in or control of the Goguen Sexual Enterprise or real property related thereto.

213.   Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Goguen Sexual Enterprise.

214.   At all times material herein, Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Goguen Sexual Enterprise in violation of RICO.

215.   Goguen and his associates used or attempted to use Plaintiffs in furtherance of the Goguen Sexual Enterprise and to the detriment of Plaintiffs' legitimate business and property interests by diverting Plaintiffs' time and attention and the resources of Amyntor to target numerous persons described herein (and many others), which compromised Amyntor's ability to obtain a facility security clearance and Plaintiffs' ability to operate in their intelligence and security contracting business.

216.    Goguen's personal vendettas and those who willingly and knowingly participated in the Goguen Sexual Enterprise had nothing to do with the legitimate security contracting business being developed by Plaintiffs.

217.    Goguen pressured Marshall to help him resolve numerous issues, through legal and illegal means, arising from Goguen's and others' activities in the Goguen Sexual Enterprise.

218.    Marshall ignored Goguen's solicitations or suggestions that Marshall or others that Marshall knew commit illegal acts to avoid involvement in the Goguen Sexual Enterprise.

219.    However, as Goguen's "right-hand man," Marshall understood that Goguen sought to rely on Marshall and his expertise to quell issues arising from the Goguen Sexual Enterprise, which constantly affected the ability of Marshall and others to pursue their legitimate activities in the security contracting business.

220.    In the course of seeking Marshall's help settling his personal affairs, Goguen sought to have Marshall engage in criminal activities on his behalf, including murder, electronic interception, pay-offs for sexual acts or concealment of sexual acts, bribery, and other schemes each in violation of RICO's racketeering prohibitions.

221.    Goguen, through the Goguen Sexual Enterprise, diverted the time and attention from the security businesses that Plaintiffs were developing, directly harming their personal business and property.

222.    Goguen knew that Plaintiffs were continuing to solicit and attract security contract funding, yet Goguen maliciously and fraudulently ceased funding Amyntor after being offered a buy-out when he learned that the Goguen Sexual Enterprise had deeply compromised the ability of Amyntor to obtain a facility security clearance.

223.    Once it became clear that Amyntor, and the work of Plaintiffs, had been frustrated by the conduct of Goguen, Goguen then sought to destroy the character and reputation of Marshall by lying to federal officials about the purpose behind the payments that Goguen had been making to him.

224.    Goguen had been paying Marshall as reimbursement for the out-of-pocket expenditures that Marshall had been making on Goguen's behalf for Goguen's property expenses, business travel, business expenses, and business gifts to others.

225.    Goguen lied to the FBI about these payments to Marshall as a means to extort Marshall's silence and harm Marshall's credibility and reputation.

226.   Goguen occasionally reimbursed Marshall or expected Marshall to use Two Bear or Amyntor resources for Marshall's travel to silence women, to intimidate angry husbands, boyfriends, and other enemies of Goguen, and as payments for Marshall to purchase jewelry, vehicles, and other items on Goguen's behalf for Goguen's purpose of concealing the truth regarding the Goguen Sexual Enterprise.

227.   Plaintiffs have been injured in their business affairs and property interests by the conduct of Goguen and his associates, including Defendants, who co-opted and commandeered the time, attention and resources of Plaintiffs in the pursuit of vendettas by Goguen against those who held damaging information about the Goguen Sexual Enterprise, including several well-publicized cases involving Amber Baptiste and Bryan W. Nash.

A.     THE ASSOCIATION IN FACT

228.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Goguen Sexual Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

229.   The Goguen Sexual Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of the following:

i)     The Defendants Michael L. Goguen; the Trustee of the Michael L. Goguen Trust; Whitefish Frontiers, LLC; PROOF Research, Inc; Casey's

Management, LLC; Two Bear Management, LLC; Lakestream Property

Management, LLC; Two Bear Security, LLC; Two Bear Air 1, LLC; Two Bear

Air Rescue Foundation; the Trustee of the Crystal Tamarack Trust; Frank,

Rimerman + Co LLP; Karen Valladao; Shane Erickson; and Eric Payne, and

those employees and agents who participated in the Goguen Sexual Enterprise

directly or indirectly;

ii)     Entity or the Trustee/Trust Defendants that own or owned "safe

houses" for Goguen to have sexual encounters with numerous women,

including strippers, prostitutes, and others, including but not limited to

Defendant Crystal Slopeside, LLC which owns two residential condominiums

located in Whitefish, Montana;

iii)    Goguen, Goguen's accounting firm Defendant Frank, Rimerman + Co.

LLP, Karen Valladao, and the Trustee of the Michael L. Goguen Trust, all of

which helped pay off victims or others involved in the Goguen Sexual

Enterprise, conceal the activities of the Goguen Sexual Enterprise; or deduct

payments as false business expenses that were used to perpetuate the Goguen

Sexual Enterprise;

iv)    Intelligence Participants consisting of Gavin De Becker & Assoc. and

Paul McCaghren & Assoc. Inc. and other DOE defendants;

v)    Goguen's Trusts, the trustees of which are named herein as Defendants, from which some payments in respect of the Goguen Sexual Enterprise were made or used as a basis to falsely accuse Marshall of theft to the FBI;

vi)    DOE Defendants, including attorneys and law enforcement officials whom Goguen has paid and/or suborned to his will to perpetuate or cover-up the Goguen Sexual Enterprise.

230.   All Defendant "persons" are distinct from each other, Goguen, and the legitimate businesses operated by Plaintiffs.

231.   Defendant entities are associated with the Goguen Sexual Enterprise, sometimes through common ownership by Goguen himself, or through financial means that Goguen has paid to such entities, in return for favorable treatment, resources, money, housing, real property, investments, loans, or other benefits arising from their direct or indirect participation in Goguen Sexual Enterprise.

232.   The Defendants misused or sought to misuse the resources of Plaintiffs and the operation of Plaintiffs' business through Amyntor or through other entities in furtherance of the Goguen Sexual Enterprise.

233.   The Goguen Sexual Enterprise likely continues to this day, having already occurred over a substantial period of time, both preceding Plaintiffs'

relationship with Goguen and continuing throughout the time period that Plaintiffs sought to do business with Mr. Goguen.

234.   On information and belief, Goguen and his associates continue to perpetuate the Goguen Sexual Enterprise by destroying, stealing, altering, and fabricating evidence; by paying or threatening current or former law enforcement officials complicit in the Goguen Sexual Enterprise; by using attorneys to unlawfully silence women who knowingly participated in the Goguen Sexual Enterprise, and through other means.

## B.   THE COMMON PURPOSE

235.   The Goguen Sexual Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of one or more of the following purposes:

A. Associating with Michael L. Goguen in order to profit from his businesses and entities, while associating for the common purpose of sex-trafficking and/or benefitting from a venture that engages in sex-trafficking;

B. Facilitating Goguen's common practice of using his position of wealth and power to target women for sexual favors;

C. Intimidating, threatening, extorting, bribing, or misleading Goguen's victims, law enforcement, and the media to prevent the reporting, disclosure, or

prosecution of his sexual affairs, crimes, and misconduct in the Goguen Sexual

Enterprise;

**D.** Destroying, mutilating, or concealing records, documents, or other evidence

to prevent the use of such evidence to report (or prosecute) Goguen's sexual

offenses and the offenses of other persons or entities that participated in the

Goguen Sexual Enterprise;

**E.** Breaking and entering multiple residences for the purposes of destroying,

mutilating, or concealing records, documents, or other evidence to prevent the

use of such evidence to report (or prosecute) Goguen's sexual offenses and the

offenses of other persons or entities that participated in the Goguen Sexual

Enterprise;

## C.    THE ROLES OF THE PARTICIPANTS

236.   The Goguen Participants participated in the Goguen Sexual Enterprise

to fulfill the common purpose of profitability from Goguen, while either

participating in the Goguen Sexual Enterprise or assisting Goguen in the payment

and concealment of Goguen's sexual victims.

237.   Thus, throughout the period in which Plaintiffs worked for Goguen,

the complicit enablers of the Goguen Sexual Enterprise, including Defendants, were

aware of Goguen's misconduct and worked to conceal it so that they could continue to benefit from their lucrative collaborations with Goguen.

238.    When they joined the Goguen Sexual Enterprise, the Intelligence Participants targeted Goguen's sexual victims and those who knew of the Goguen Sexual Enterprise, such as Bryan Nash, Amber Baptiste, Larry Woods, and other victims, to gather information from them regarding Goguen's sexual offenses, by illegally recording conversations, and compiling psychological profiles that focused on the victims' personal or sexual histories that could be used to pressure and extort those individuals' silence.

239.    On information and belief, the Intelligence Participants also destroyed or concealed evidence, including but not limited to documents and recordings, obtained about the Goguen Sexual Enterprise.

240.    The Las Vegas participants, such as social connector DONALD DOE[3], delivered club and event access to the Goguen Sexual Enterprise, including young ladies for Goguen.

241.    The Casey's Management, LLC participants, including Eric Payne, allowed the Goguen Sexual Enterprise, directly or indirectly, to flourish by procuring narcotics and young women who would be targeted by Goguen and his associates for

_____

[3] For Privacy, the actual name of DONALD DOE has been redacted from this Complaint.

illicit sexual behavior in the "boom boom" room of Casey's Bar or in other locations owned or controlled by Goguen or Defendants.

242.   Law firm participants have likely provided documents containing confidentiality and non-disparagement clauses that are used to silence victims of the Goguen Sexual Enterprise and shield Goguen and his associates from criminal legal exposure that such persons could pose to the Goguen Sexual Enterprise, and to protect evidence of Goguen's misconduct under the guise of the attorney-client privilege or the doctrine of attorney work product when that was not the case.

243.   The accounting participants, such as Defendant Valladao, allowed the Goguen Sexual Enterprise to operate by facilitating the transfer of money and other items of value to women who participated in the Goguen Sexual Enterprise, and by concealing transactions or creating false deductions for expenses that could otherwise expose Goguen's role in the Goguen Sexual Enterprise.

244.   These participants interacted with and regularly reported their activities to Goguen in furtherance of the Goguen Sexual Enterprise.

## D.    PATTERN OF RACKETEERING AND PREDICATE ACTS

### "The Harem"

245.   Starting in 2013, Goguen started probing Marshall to see if Marshall would be accepting of Goguen's extramarital sex life involving tens of women at any given time, which Goguen referred to as "the harem."

246.   Marshall "played along" with Goguen to get more information from him and determine the operational risk Goguen's activities posed to their business.

247.   By March of 2014, Goguen was starting to volunteer more information, sending Marshall graphic pictures and sexually explicit descriptions of his encounters with certain women.

248.   Goguen admitted and showed to Marshall, which Marshall also previously learned from Huntley Ritter, that Goguen had a spreadsheet with some 5,000 women with whom he had sexual relations across multiple States for around two decades or longer.

249.   Goguen also admitted to Marshall that he had numerous phone numbers, "burner" phones, email accounts, alias accounts such as "batman 234" on Wickr, and apartments and condominiums to support his sexual activities and extra-marital affairs with numerous women.

250.   Goguen commonly gave women or promised to "gift" women vehicles, jewelry, cash, vacations, air travel, accommodations, alcohol, homes, education expenses, health care expenses, and other items of value, directly or indirectly in

exchange for them to "strip" and have sex with him, to perform other deviant sexual acts with him, and/or to maintain their silence as part of the Goguen Sexual Enterprise.

251.   It was also at this time that Goguen started to confide in Marshall regarding numerous issues that he was having with some of these women (his "most volatile list") and requested Marshall become involved to remedy these issues and to act as a "fixer" for the Goguen Sexual Enterprise.

252.   By 2014, Goguen was giving Marshall's phone number to women in the harem "if anything went wrong."

253.   Marshall started fielding calls from the harem regularly.

254.   In one early example, two Playboy "Playmates" were on a safari in Africa and lost their passports. Goguen offered to send Marshall to Africa to rescue them. These playmates claimed their passports had been lost or stolen.

255.   Marshall refused to go to Africa but did request help from his contacts in Africa who were willing to help him for free.

256.   From this point forward, Goguen increasingly sought Marshall's assistance dealing with his harem and the fallout from the Goguen Sexual Enterprise.

257.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Defendant Goguen has violated § 45-5-601(2)(b) and (4) MCA related to patronizing prostitution from multiple women on multiple occasions, in Montana and elsewhere, and with regard to Ms. Baptiste described below, Defendant Goguen knew or recklessly disregarded the fact that the person patronized was a victim of human trafficking.

**B.** Defendants Goguen, The Trustee of the Michael L. Goguen Trust, and Casey's Management have violated § 45-5-602(1)(b)-(h) MCA related to promoting prostitution in furtherance of the Goguen Sexual Enterprise.

258.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Defendants Goguen, The Trustee of the Michael L. Goguen Trust, Whitefish Frontiers, LLC, and Valley Oak, LLC have violated 18 U.S.C. § 1952 relating to interstate and foreign transportation of prostitutes in furtherance of the Goguen Sexual Enterprise.

**Amber Baptiste**

259.   Goguen groomed Baptiste to perform sex acts with him since she was a young woman after meeting her in a strip club in Texas where she was a dancer.

260.   Baptiste told Goguen that she had been trafficked to the United States from Canada as a teenager to be a stripper.

261.   Goguen promised to help Baptiste to get out from underneath the control of the sex traffickers.

262.   Goguen repeatedly promised to pay for Baptiste's higher education expenses as a means to wield control over her in order to continue his sexual abuse of her.

263.   Goguen plied her with money, gifts, flights, and expensive accommodations to continue his sexually dominant relationship with her.

264.   Baptiste grew frustrated over Goguen's false promises and the physical and mental abuse she was subjected to by Goguen over the years.

265.   This frustration and the complications of the Goguen Sexual Enterprise led to Baptist addressing confronting Goguen regarding the abuse and sexual servitude she had endured from Goguen for over decade.

266.   Goguen, in multiple conversations with Marshall, discussed the issues he was having with Amber Baptiste.

267.    On or about May 29, 2014, Goguen texted Marshall that he paid Baptiste "a zillion dollars to go away" and then "fucked one last goodbye time on Friday" and sent Marshall a racy photo of her in a bikini.

268.    On information and belief, Goguen often housed Baptiste at the Rosewood Sand Hill resort in Menlo Park, California, including around May of 2014 when he sought to enter an agreement to buy her silence about their affair.

269.    Goguen told Marshall that he had Baptiste setup an LLC and a 501(c)(3) in her name in order to pay her to remain silent.

270.    On information and belief, around 5:50 pm on May 30, 2014, Goguen made a wire transfer from his Valley Oak account of $9,700,000 to a Canadian bank where Baptiste was the beneficiary.

271.    Goguen made a separate transfer of $300,000 to another entity controlled by Baptiste.

272.    Goguen continued to keep Marshall apprised of issues he was having with Baptiste after he paid her the $10,000,000 portion of the $40,000,000 agreed upon settlement to "go away."

273.    When their affair did not quiet down due to Goguen failing to pay Baptiste the remainder of the negotiated settlement, Goguen sought Marshall's

assistance targeting Baptiste through cyber operations, reporting of immigration fraud, and other means.

274.   Goguen informed Marshall in person and on the phone on separate occasions that he was advised by his attorneys that if he could get Baptiste deported then his case with Baptiste would go away.

275.   On August 20, 2015, Goguen sought Marshall's help conducting his "first move" against Baptiste, which was to have her investigated for felony immigration fraud which "was left in limbo."

276.   Goguen told Marshall that if Baptiste "does press the nuke button then we should immediately pull all the strings we have to get a felony immigration fraud charge fired up to further hurt her credibility."

277.   Goguen sought to have Baptiste portrayed as an "unstable gold digger stripper extortionist felon" to protect the Goguen Sexual Enterprise from further exposure by Baptiste.

278.   Marshall observed the psychological pain and pressure that Goguen relentlessly applied to Baptiste.

279.   As their relationship deteriorated further, on March 8, 2016, Baptiste filed a lawsuit against Goguen that immediately garnered worldwide press coverage.

280.   The day after returning from a flight with Goguen to meet with Goguen's attorneys at Quinn Emanuel Urquhart & Sullivan in Los Angeles regarding Baptiste's complaint, Marshall visited Goguen's house in his office where Goguen told Marshall that he wanted this, referring to Baptiste, "finished."

281.   Based on Goguen's previous solicitation for Marshall to kill Nash, Marshall interpreted Goguen's statement that he wanted "this finished" as an instruction or encouragement for Marshall to kill Baptiste.

282.   Marshall did not follow through with Goguen's instruction or encouragement to kill Baptiste.

283.   About a week after the lawsuit was filed, on March 16, 2016, Goguen sent Marshall a text message where he asked Marshall to be his "full time fucking general, 1000x more aggressive than Patton was, to coordinate and make sure everything is happening that should be happening – PR firms, private investigators, criminal side, local PR, everything" with respect to the targeting of Amber Baptiste.

284.   In the same message, Goguen states to Marshall that he wants Marshall to "dedicate as many of the folks at Amyntor to it as well and get as many resources as you can or need, use Amyntor as HQ and let's get this bitch!"

285.   Goguen sought to have the intelligence and security resources of Amyntor target Amber Baptiste, and asked Marshall to use his expertise to "become absolutely obsessed with doing this … full time …"

286.   Through his conduct, Goguen indirectly threatened to have Ms. Baptiste harmed or murdered through the coordination and instrumentalities of Marshall, using the resources of Amyntor, Defendants and others.

287.   Instead of violating the law, Marshall sought other legal avenues to investigate Baptiste on Goguen's behalf, principally by hiring and overseeing the work of Gavin De Becker & Assoc. ("Gavin De Becker"), a private investigation firm located in Glendale, California.

288.   The expenses incurred by Gavin de Becker were paid for out of Amyntor bank accounts as directed by Goguen.

289.   When Amber Baptiste filed her civil complaint in the Superior Court of California, San Mateo County in March of 2016, including allegations that Goguen sexually abused her during their ten (10) year extra-marital relationship, Goguen was terminated by Sequoia Capital.

290.   At this time, due to Goguen being fired from Sequoia, Marshall assisted Goguen in paring down monthly expenses from approximately $5,000,000

to approximately $1,800,000 to $2,000,000 per month by selling properties, vehicles, furniture, and other items.

291.   Within a year after the Baptiste lawsuit concluded in Goguen's favor, Goguen's monthly expenses were again back to the $5,000,000 per month level.

292.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

A. Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging, or facilitating Marshall, knowing that Marshall was capable of doing so, to cause the homicide of Baptiste, an offense chargeable under state law § 45-5-102, MCA.

293.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

A. Specifically, Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated 18 U.S.C. § 1512 relating to tampering with a witness, victim, or informant by paying Baptiste to be silent about their affair;

**B.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Whitefish Frontiers, LLC, and Valley Oak, LLC have violated 18 U.S.C. § 1952 relating to interstate and foreign transportation in aid of the Goguen Sexual Enterprise by paying for the transportation of Baptiste domestically and internationally for prostitution;

**C.** Defendants Goguen, Trustee of the Michael L. Goguen Trust, and Valley Oak, LLC have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments in aid of the Goguen Sexual Enterprise, including but not limited to paying Baptiste $10,000,000 around May 30, 2014;

**D.** Defendants Goguen, the Trustee of the Michael L. Goguen, and Valley Oak, LLC, Trust have violated 18 U.S.C. § 1513 relating to retaliation of a witness, victim, or informant of the Goguen Sexual Enterprise, including by targeting Baptiste using the resources of Plaintiff Marshall for cyber operations to harass, intimidate and extort her silence around March 16, 2016;

**E.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC, have violated 18 U.S.C. § 2421 relating to interstate travel of Baptiste with the intent for her to engage in prostitution;

**F.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC have violated 18 U.S.C. § 2422 relating to

persuading or inducing someone to travel in interstate commerce to engage in prostitution;

**G.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC have violated 18 U.S.C. § 2424 relating to filing a statement about an individual kept, supported, maintained, or harbored for the purpose of prostitution.

**Bryan Nash**

294.   Goguen, in multiple conversations with Marshall, discussed the issues he was having with Bryan Gregg Waterfield Nash ("Nash").

295.   Nash knew Goguen from Goguen's past association with Sequoia Capital and they were good friends for a long period of time.

296.   During the time that Goguen lived in California and had a friendly association with Nash, Goguen, while married to his first then his second wife, started asking Nash to go to strip clubs and engaging in illicit sexual activity that made Nash increasingly uncomfortable.

297.   One day, Goguen brought his high school aged babysitter and his two daughters to Nash's house. Upon arriving, Goguen disappeared with the high school babysitter to Nash's guest cottage to engage in sexual acts.

298.   Nash later confronted Goguen over this incident, calling Goguen a "pedophile," which permanently soured their relationship.

299.   Goguen threatened to kill Nash if he "said anything to anybody" about his "character flaw," later telling Nash that he "owns Montana" and "supplies law enforcement."

300.   Goguen then began investigating Nash, had sex with Nash's then wife with whom Nash was divorcing, and paid for Nash's ex-wife's legal expenses in the divorce, making Nash's divorce longer and more expensive than it would have been otherwise.

301.   Goguen sought to use Marshall to carry out and direct some of the activities against Nash, including overseeing the work of Gavin de Becker & Associates, who tracked Nash's whereabouts and harassed him and his children.

302.   Nash attempted to report Goguen to local, state and federal authorities in Montana to no avail.

303.   Former detective Erickson threatened Nash, telling him he would be arrested if he came to Montana.

304.   On information and belief, Goguen may continue to orchestrate theft and other crimes to destroy evidence collected by Nash in the course of his dealings with Goguen and his ex-wife.

305.    Goguen discussed with Marshall the concerns he had with Nash and the need to investigate and silence Nash because of Nash's knowledge of the Goguen Sexual Enterprise, including Nash's personal knowledge that Goguen had an illicit sexual relationship with a high school aged girl and other young or underage women.

306.    On September 19, 2014, Goguen wrote to Marshall under the Wickr alias batman234, where he stated: "Nashfuck has pushed me too far and his occasional reminders he might help blow the lid off my personal life requires an extreme response. The cyber route isn't having the impact on him that I was hoping to achieve. Buddy, he's fucking with my life, career, etc. and the potential for me being destroyed if he gets traction with the authorities or press is significant. This requires an extreme response. He will fucking destroy the "bigger picture" for us if he's not stopped. He needs to be killed. I know that's a VERY big ask but we are in defcon 5. We can discuss details in person but we do NOT have conversations about this on our cell phones. Wickr only..."

307.    On the same day of September 19, 2014, Goguen seeks to have Marshall target Nash's burner phone number and real phone number for cyber-crimes, and inquires whether Marshall can find out Nash's other numbers "without leaving a trail." Goguen then states: "As a reminder, the burner phone number is:

[REDACTED] his real cell phone number is: [REDACTED]. He may have other phones registered to his name (I wonder if you had a channel to find out without leaving a trail?). Part of the mind fucking for these same message(s) we craft to go to both his burner phone and his real phone (or all his real phones, to freak him out even more)."

308.   Goguen then sends Marshall three addresses for Nash in California, telling Marshall "That last one is up in Lake Tahoe, which is a lot less populated than his other loc."

309.   Marshall did not follow through on Goguen's solicitation to have Nash hacked or murdered.

310.   Marshall explained to Goguen that it "doesn't work this way" and sought to dissuade Goguen from going to extreme measures against his enemies.

311.   Goguen found other means to silence Nash by accusing Nash, like he had successfully accused Baptiste, of trying to extort him based on the information they possessed about the Goguen Sexual Enterprise.

312.   Goguen's efforts reporting Nash to the FBI and other law enforcement for alleged extortion resulted in Nash being indicted federally based substantially on information provided to law enforcement by Goguen.

313.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging or facilitating Marshall, knowing that Marshall was capable of doing so, to cause the homicide of Nash, an offense chargeable under state law § 45-5-102, MCA.

**B.** Defendant Goguen violated § 45-5-203, MCA involving intimidation when, under circumstances that reasonably tend to produce a fear that it will be carried out, threatened to kill or otherwise inflict harm on Nash, or meant to cause reasonable apprehension of bodily injury in Nash.

314.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Specifically, Defendants Goguen violated 18 U.S.C. § 1512(d)(2)&(4) relating to tampering with a witness, victim or informant by (d) intentionally harassing Nash and thereby hindering, delaying, preventing, or dissuading Nash from: (2) reporting to a law enforcement officer the crimes Nash had learned with respect

to the Goguen Sexual Enterprise; and preventing Nash from (4) causing a

criminal prosecution to be sought for the crimes Nash had learned with respect

to the Goguen Sexual Enterprise.

**B.** Defendants Goguen violated 18 U.S.C. § 1513(b) relating to retaliation of a

witness, victim, or informant of the Goguen Sexual Enterprise, by threatening

Nash with the intent to retaliate against him for his providing information

relating to the commission or possible commission of a Federal offense arising

from the Goguen Sexual Enterprise.

**C.** Defendants Goguen violated 18 U.S.C. § 1958 relating to murder-for-hire, by

using the mail or other facilities of interstate commerce (electronic

communications), with intent that murder be committed in violation of § 45-5-

102, MCA as consideration for the receipt of money and other things of value

received, or to be received, by Marshall.

**<u>Lisa and Larry Woods</u>**

315.   Goguen invested money in a business idea that Larry and Lisa Woods,

husband and wife, brought to him for cancer research.

316.   Goguen relocated the Woods and their children to Whitefish,

Montana, bought them a home, and set up a company by the name of Left Side

Research, LLC ("LSR") and capitalized LSR with at least one and a half million dollars ($1,500,000).

317.   Within approximately six months of the Woods living in Whitefish, Goguen started asking Larry Woods to cyber-hack, digitally surveil, and harass victims of the Goguen Sexual Enterprise and enemies of Goguen.

318.   Goguen informed Marshall that Larry Woods was an exceptionally gifted hacker and that he had aimed Larry Woods at some of his problem women.

319.   Within a short time after Larry Woods started helping Goguen and after it was well underway, Larry started to realize the criminal nature of what Goguen had requested.

320.   Thereafter, Larry Woods contacted Marshall and one of Goguen's employees, Jordan White, telling them that he was very disturbed by what he was finding and that he could not continue to do this type of work for Goguen.

321.   Around this same time, Larry Woods also confronted Goguen and told him that he was no longer going to continue what Goguen had tasked him to do.

322.   When Goguen pushed back on Larry Woods for refusing to assist him with cyber-hacking, Larry threatened to report Goguen to law enforcement.

323.   Goguen immediately started applying as much pressure as he could on Larry and Lisa Woods.

324.   Goguen was also simultaneously enlisting the help of current LSR employees to give statements against Larry and Lisa Woods.

325.   Goguen promised the LSR employees that if they assisted in dissolving LSR and forcing the Woods' family to move out of the state of Montana, Goguen would pay all of the LSR employees a substantial severance package.

326.   Goguen also made an additional cash payment to a particular LSR employee in the approximate amount of $185,000.00.

327.   Goguen instructed Marshall to use Amyntor resources to have Larry Woods surveilled 24 hours a day, 7 days a week until further notice.

328.   Marshall, per Goguen's instructions, outsourced approximately 12 contractors to perform 24-hour surveillance on Larry and Lisa Woods.

329.   The cost of the Woods' surveillance crew was paid out of Amyntor funds per Goguen's instructions, in an approximate amount of $150,000.

330.   Goguen also reached out to Sheriff Chuck Curry who tried to apply some pressure on Larry Woods via the Sheriff's Office.

331.   This inflamed the situation and Larry started getting unpredictable and making additional threats of reporting Goguen to law enforcement.

332.   Goguen next reached out to the FBI, accusing Larry and Lisa Woods of a multitude of crimes with regards to the funding Goguen provided LSR.

333.   Goguen effectively had enormous pressure applied to the Woods through use of the surveillance team, the FBI, and an attorney, Randy Cox, from Missoula, and the LSR company accountant, Jim Rucker.

334.   A local FBI agent did an in-depth investigation on Woods that Marshall assisted with on Goguen's behalf.

335.   Often times Marshall would communicate directly with the FBI Agent giving him updates on activity and movements of the Woods.

336.   While the FBI investigation was ongoing, Larry Woods communicated to Goguen what information he had and that caused Goguen to panic.

337.   In response, on or about December 16, 2015, on behalf of the Michael L. Goguen Trust, Goguen had attorney Randy Cox send a prepared lawsuit and demand for jury trial to attorney Gary Crowe, who was representing the Woods in the matter, accusing the Woods of 10 counts of criminal conduct.

338.   Goguen asked Jordan White to apply enormous pressure on Larry, evict him and his family at Christmas time from the home Goguen had purchased for the Woods, and give Larry the ultimatum that he needed to pack up and leave the state.

339.   Lisa Woods stated on Larry Sticka's FaceBook page on December 3, 2015, that Goguen had pulled the plug on LSR, that the Woods' were not going to "stand for his strong-arm bullying tactics" including from the "entire Two Bear

Team" and that the Woods' possessed information about Goguen's "personal antics" that was likely related to the Goguen Sexual Enterprise.

340.   When Larry refused and Goguen knew he could not risk having the information Larry had uncovered revealed, Goguen asked Marshall to accompany Jordan White to Larry's residence to provoke and intimidate Woods.

341.   On November 30, 2015, Goguen's plan was for Jordan White to attempt to talk Larry Woods out of releasing the information he had on Goguen, and if unsuccessful, then Goguen directed that Marshall, since Woods was armed and aggressive, to just "gun him down."

342.   Based on Goguen having previously directed Marshall to kill Nash, Marshall interpreted Goguen's directing him to gun Larry down as Goguen soliciting him to commit deliberate homicide of Larry Woods.

343.   Marshall did not follow through with Goguen's solicitation to kill Larry Woods.

344.   It was common knowledge that Woods was almost always armed and emotionally charged because of the pressure Goguen was applying on Lisa and Larry Woods and their two young children during Christmas time.

345.   Goguen suggested Marshall take other Amyntor employees with him as "witnesses" and to further intimidate Woods.

346.    Goguen directed Marshall to make sure that they were heavily armed since Woods was in possession of several weapons, including several high-powered rifles.

347.    Marshall elected to take only one Amyntor employee, Gabriel Ruff, in an effort to minimize the possibility of provoking a violent response from Woods.

348.    Marshall reached out to Sheriff Curry because this was outside of the norm. Sheriff Curry told Marshall that he had talked to Goguen and he was comfortable with Amyntor's involvement should there be a violent confrontation with Larry and to call him directly if Marshall needed additional resources.

349.    Marshall and Ruff accompanied Jordan White to the Woods' residence.

350.    Marshall informed Amyntor employee Ruff what they were asked to do by Goguen but that they would not be getting out of the back of the Chevy Suburban since the windows were darkly tinted and Woods would be unable to see them inside of the vehicle.

351.    Marshall reconfirmed the rules of engagement to White and Ruff as they were turning into the driveway of the Woods residence and further clarified that unless White was in imminent danger, he and Ruff would stay concealed inside of the SUV to avoid further escalating the situation.

352.   Goguen knew Larry was heavily armed and requested Marshall to provoke a response from Woods, which Marshall did not respond to because of the potential harm that could befall Woods, White, Marshall, Ruff, and Woods' two young children.

353.   Goguen requested Marshall to send him a picture of Marshall and Ruff "jocked up" in combat gear before they went over to Woods' residence.

354.   A picture was taken of Marshall and Ruff "jocked up" at the staging point across the street at Two Bear River Ranch, another Goguen owned property.

355.   At the conclusion of the incident, Woods had been aggressive and angry with White, but did not become violent. Marshall attributes a peaceful outcome to the skilled handling of Woods by Jordan White. White's many years of law enforcement experience and de-escalation techniques were invaluable.

356.   The entire Woods debacle was resolved when Goguen offered Larry Woods cash and moving expenses provided they entered into a non-disclosure and non-disparagement agreement that was drafted by Goguen's attorneys.

357.   When Marshall questioned Goguen on what Larry Woods was doing and what Larry could possibly have on him, Goguen refused to discuss any specifics with Marshall.

358.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging, or facilitating Marshall and others, knowing that they were capable of doing so, to cause the deliberate homicide of Larry Woods, an offense chargeable under state law § 45-5-102, MCA.

**B.** Defendant Goguen and Two Bear Security, LLC violated § 45-5-203, MCA involving intimidation when, under circumstances that reasonably tend to produce a fear that it will be carried out, threatened to inflict harm on Larry Woods, or meant to cause reasonable apprehension of bodily injury in Larry Woods.

**C.** Defendant Goguen, the Trustee of the Michael L. Goguen Trust, and Two Bear Security, LLC have violated § 45-7-206, MCA for tampering with a witness for purposely or knowingly attempting to induce or otherwise cause Larry Woods to withhold testimony, documents, or information from an official proceeding.

359.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Specifically, Defendant Goguen and the Trustee of the Michael L. Goguen Trust violated 18 U.S.C. § 1510 by willfully endeavoring by means of bribery to obstruct, delay, or prevent Larry Woods' communication of information to a criminal investigator in relation to crimes committed by Goguen in violation of criminal statutes of the United States.

**B.** Specifically, Defendants Goguen and Two Bear Security, LLC violated 18 U.S.C. § 1512(d)(2)&(4) relating to tampering with a witness, victim or informant by (d) intentionally harassing Larry Woods and thereby hindering, delaying, preventing, or dissuading Larry Woods from: (2) reporting to a law enforcement officer the crimes Woods had learned with respect to the Goguen Sexual Enterprise; and (4) causing a criminal prosecution to be sought for the crimes Larry Woods had learned with respect to the Goguen Sexual Enterprise.

**C.** Defendants Goguen violated 18 U.S.C. § 1513(b) relating to retaliation of a witness, victim, or informant of the Goguen Sexual Enterprise, by threatening Larry Woods with the intent to retaliate against him for his providing

information relating to the commission or possible commission of a Federal offense arising from the Goguen Sexual Enterprise.

**D.** Defendants Goguen violated 18 U.S.C. § 1958 relating to murder-for-hire, by using the mail or other facilities of interstate commerce (electronic communications and vehicles), with intent that murder be committed in violation of § 45-5-102, MCA as consideration for the receipt of money and other things of value received, or to be received, by Marshall and other Two Bear Security, LLC personnel.

## Shane Erickson and the Cover-up of Crimes involving PAM DOE

360.   On April 24, 2018, Detective Shane Erickson of the Whitefish Police Department ("WFPD") informed Marshall that he was investigating allegations that Goguen had participated in the sexual assault of a teenage female, (referred to herein as "PAM DOE"), who had been provided alcohol, cocaine, and money by Goguen, Eric Payne, and a third individual.

361.   Erickson told Marshall that PAM DOE was introduced to Goguen by Eric Payne, who at the time was a friend and business associate of Mr. Goguen, with the intent to "party."

362.    Detective Erickson indicated that during the course of his interview with Goguen, he confirmed PAM DOE was consuming alcohol, snorting cocaine supplied by Mr. Payne and stripping because she was being paid a large sum of cash.

363.    Upon further questioning by Det. Erickson, Goguen admitted that towards the end of the evening he had sexual intercourse with PAM DOE and paid her $1,200.

364.    Erickson informed Marshall that he intended on following up with another interview of PAM DOE to complete a formal investigative report.

365.    Marshall told Erickson he would like Erickson to go with him to speak with the Federal Bureau of Investigation regarding information he had discovered about Goguen's conduct relating to the alleged sexual assault of PAM DOE and related matters.

366.    During the course of April, May and June 2018, Det. Erickson openly shared with Marshall the fact that he was spending time with Goguen, including having dinner at his house, spending time on Whitefish lake, going on a coyote hunt and doing other leisure activities with their families.

367.    During his conversations with Marshall, Erickson mentioned that Goguen had offered to take him on his yearly week-long ~$20,000 elk hunt in Colorado with private guides.

368.    Det. Erickson was adamant to Marshall that he would never accept a trip like that because it was inappropriate, and he could never afford to go on a hunting trip that was so expensive.

369.    Marshall cautioned Det. Erickson that he was treading in dangerous waters with Goguen and it could be used to influence Det. Erickson's criminal investigation into PAM DOE. Det. Erickson reassured Marshall that he had full command of the situation and that Goguen would never be able to compromise him.

370.    Marshall later saw Erickson at Goguen's one-year anniversary party at the Goguen residence. Erickson had obviously been drinking and was highly agitated that Goguen invited Eric Payne to the anniversary party.

371.    Erickson did accept the ~$20,000-dollar Elk hunting trip from Goguen in September of 2018, going with Goguen to Colorado via private jet.

372.    On Sept. 1, 2018, Marshall inquired to Chief Dial about the PAM DOE case that Detective Erickson had shared with him. Chief Dial indicated that he had no idea about the PAM DOE case.

373.    Marshall related to Chief Dial what he had learned about the matter from Erickson and later gave a statement around October 1st and 2nd 2018 to the Whitefish Police Department.

374.    Marshall later received corroborating evidence in the form of an email from PAM DOE to attorney Patricia Glaser who represented Amber Baptiste in her breach of contract lawsuit against Goguen. The email stated:

a)    "Hi, I've been reading the stories that have went out against Michael L. Goguen and this other lady and I don't think I can just sit here and keep this information to myself as hard as it is. I have information that may or may not help your case against him. When I was 17 years old, I was asked to pop out of a cake at a party at the whitefish Lake lodge in whitefish, MT. I was only 17 years old and agreed to do it for the money. I was fully dressed and it was a really nice party. I am almost 99% sure I was roofied that night by the guy who asked me to do it. He was very involved with Michael L. Goguen. After the cake party, I was asked to be an "escort" from multiple men who were texting me and I didn't know. Eric Payne asked me to come over to his townhouse (he was In partnership with mike goguen at the time) and asked me to "dance for them." He told me he would pay me a bunch of money. Going over there, I did what he said. Michael L. Goguen was there and he paid me $1,200 to have sex with him that night. I did not know it was him at the time and was told he was a friend of Eric's from

California and was visiting. I felt pressured because they told me I only had to dance with clothes on.. He gave me $1200 and the next day I was really worried I did something bad. I texted him saying I felt horrible about it and he texted me back saying I should be more careful in the future. I remember his face. I never knew his name and was lied to. I was 17 and no idea how old he was. Eventually as I turned 18 and older, I told them to never contact me again because I felt so disgusting. When I saw Michael L. Goguen's face all over Facebook I KNEW that was the guy I slept with that night for money.. I had a panic attack and ran to the bathroom to throw up. I had flashbacks in my mind, seeing his face. I believe the girl's story because I've been through it and I've seen how this man can act... With a 17 year old girl. I am now 23 and have two little girls and I'm a full time student and work full time and I look back on that in disgust. Seeing these allegations against him makes me happy that karma is coming back around because he took away an important part of my identity search as a teenager. I was afraid to come forward with this but I can't keep quiet about something that could ruin this girl's life forever. Thank you."

375.   On information and belief, PAM DOE recanted her story after being threatened by an attorney of Goguen, forced to sign a non-disclosure and non-disparagement agreement, and paid directly or indirectly by Goguen via an intermediary set up by Goguen or one of Goguen's legal representatives for the purpose of maintaining PAM DOE's silence or complicity.

376.   On information and belief, PAM DOE received legal assistance from Goguen.

377.   PAM DOE was part of the Goguen Sexual Enterprise by virtue of being paid by Goguen to have sex with him, then by being paid by Goguen to keep their illicit relationship quiet.

378.   Shane Erickson was part of the Goguen Sexual Enterprise by virtue of being offered and accepting things of value by Goguen to conceal or not investigate his illicit relationship with PAM DOE.

379.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Specifically, Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC, by knowingly offering or

conferring upon Shane Erickson and Shane Erickson knowingly accepting a pecuniary benefit in the form of an all-expense paid hunting trip and private jet travel to Colorado as consideration for a violation of Det. Erickson's duty to investigate the alleged sexual assault of PAM DOE by Defendants Goguen and Eric Payne, as part of a pattern of activity to conceal the Goguen Sexual Enterprise and in violation of § 45-7-101, MCA.

**B.** Defendant Goguen and Eric Payne have violated § 45-5-601, MCA relating to patronizing prostitution from PAM DOE, who at the time was a child under the age of 18, an offender of which shall be punished by imprisonment in a state prison for a term of 100 years.

**C.** Defendant Goguen and Eric Payne have violated § 45-5-602, MCA §45-5-603, MCA related to promoting prostitution by encouraging, inducing, or otherwise purposely causing PAM DOE, who at the time was a child under the age of 18, to become a prostitute and aggravated promotion of prostitution by compelling PAM DOE to engage in prostitution under fraud or coercion, an offender of which shall be punished by imprisonment in a state prison for a term of 100 years.

380.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Specifically, Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC have violated 18 U.S.C. § 1510 by having willfully endeavored by means of bribery to obstruct, delay, or prevent Shane Erickson from communicating information Marshall and Erickson had discovered about Goguen's conduct relating to the alleged sexual assault of PAM DOE and related matters to the FBI.

**B.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC have violated 18 U.S.C. § 1513(b) by corruptly persuading or attempting to persuade or by engaging in misleading conduct toward Shane Erickson with the intent to hinder, delay, or prevent Shane Erickson from communicating information relating to the Goguen Sexual Enterprise and the alleged sexual assault of PAM DOE to the FBI.

**C.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC have violated 18 U.S.C. § 1952 relating to interstate transportation of Shane Erickson via Goguen's Private jet, believed to be paid for and maintained by Valley Oak, LLC, Whitefish Frontiers, LLC and

the Trustee of the Michael L. Goguen Trust, to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the unlawful activity, among others, of bribing Erickson and in furtherance of the Goguen Sexual Enterprise.

**Eric Payne**

381.   Eric Payne is the former owner of Frontier Builders of Montana, LLC, which performed several construction projects for Goguen over the years, including building his large homes in Montana, PROOF Research, Casey's Bar, Two Bear Ranch and a multitude of other large projects.

382.   Payne and Goguen were close friends for years.

383.   Goguen gave Payne an "office" in the basement of Casey's Bar that was passcode protected, had a built-in full size stripper pole, and commonly referred to as the "boom boom" room where he and Payne could procure young women to engage in sexual acts with them for money, drugs or other items of value as part of the Goguen Sexual Enterprise.

384.   When Marshall arrived in Whitefish in 2013, he was informed that Payne had for years been overcharging Goguen tens of millions of dollars on the construction projects performed by his company Frontier Builders.

385.   Marshall and others approached Goguen about Payne stealing from Goguen. Goguen informed Marshall that he was aware of the overcharging by Payne but that exposing Payne through a lawsuit brought too much risk with it given their extensive past relationship.

386.   Marshall, who was still trying to get oriented and gain his footing within the Goguen organization, did not press Goguen for an explanation at the time and it took him a couple of years to figure out what Goguen meant by this comment.

387.   In or around 2013, scrutiny was brought on Casey's Bar, owned by Goguen, by the Northwest Montana Drug Task Force because of information that narcotics were being sold on and in the premises of Casey's.

388.   Eric Payne's son, Cody Payne, was implicated in the narcotics scrutiny received by Casey's Bar.

389.   Goguen used the implication of Cody Payne as leverage against Eric Payne and forced him to sell his interest in Frontier Builders of Montana, Inc. to Walter Wilkinson and move out of the state, not to return. Within weeks, Payne moved to Arizona where he lived for a number of years.

390.   A couple of years after Payne was forced out of town by Goguen, Marshall was riding with Goguen in Goguen's truck while Goguen was having a phone conversation with Payne about returning to Whitefish.

391.   At this time, Goguen was under a ton of scrutiny regarding allegations that he participated in the sexual assault of PAM DOE.

392.   Goguen expressed to Marshall that he was concerned about the allegations especially with the increasing stress he was under with the Amber Baptiste affair. Goguen further informed Marshall that Payne was with him during the night of the alleged sexual assault.

393.   During Goguen's call with Payne in Marshall's presence, Goguen offered to fund Payne to start up a new construction company in Whitefish if Payne agreed to back Goguen's version of the story about the sexual assault of PAM DOE should he be questioned by law enforcement or if it came up in a deposition in the Baptiste case.

394.   Payne accepted Goguen's offer and moved back to Whitefish shortly after his conversation with Goguen.

395.   Payne now owns nuWest Builders, Inc., which has done several large-scale projects for Goguen and is believed to be working on additional current projects for Goguen.

396.   After Goguen's phone call with Payne ended, Marshall asked Goguen if the allegations that he had sex with PAM DOE were true, to which Goguen responded affirmatively.

397.   Marshall also asked Goguen how old PAM DOE was, with Goguen responding "maybe 17 or 18."

398.   During Marshall's conversation with Goguen after his call with Payne, Goguen also informed Marshall that PAM DOE had made a couple of attempts to report the sexual assault to the Flathead County Sheriff's Office, but the reports were not pursued by the former Sheriff, Chuck Curry.

399.   According to Goguen, former Sheriff Curry informed him of PAM DOE's attempts to report the sexual assault to the Sheriff's Office, which prompted a series of phone calls between Payne and Goguen with Goguen offering to pay for Payne to return to Whitefish under the condition that Payne would back Goguen's version of the story regarding the sexual assault in civil and criminal proceedings.

400.   It is believed Goguen later repaid former Sheriff Curry for his loyalty by giving Curry, when he retired from the Sheriff's Office, a job working for Goguen at Two Bear Air Rescue, where Curry still works.

401.   On or about February 10, 2016 Goguen instructed Marshall to use his "general menacing demeanor" to "come down as hard as you want" on Payne to

force Payne to stop spreading false rumors about Marshall. If Payne refused, Goguen threatened to expose Payne for the "unscrupulous practices," "outright fraud" and "overcharging" he had experienced with Frontier Builders.

402.   Marshall did not come down "hard" on Payne.

403.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

A. Specifically, Defendant Goguen and Eric Payne have violated §§ 45-5-601, 602, and 603, MCA relating to the patronizing, promotion, and aggravated promotion of prostitution.

B. Defendant Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-7-206, MCA for tampering with a witness by purposely or knowingly attempting to induce Payne to withhold testimony, documents, or information from an investigation.

C. Payne, and Defendants Michael L. Goguen, and the Trustee of the Michael L. Goguen Trust have violated § 45-6-341, MCA for money laundering by receiving a benefit from Defendants Goguen or the Trustee of the Michael L. Goguen Trust in the form of money invested into a new construction business derived

from the unlawful activity of and Payne being tampered with as a witness in violation of § 45-7-206, MCA.

**D.** Defendant Goguen violated § 45-5-203, MCA involving intimidation when, under circumstances that reasonably tend to produce a fear that it will be carried out, threatened to inflict harm on Eric Payne through the instrumentalities of Two Bear Security and Amyntor, meant to cause reasonable apprehension of bodily injury in Eric Payne by putting pressure on Payne to sell his company and move to Arizona.

404.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust and Eric Payne have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments in aid of the Goguen Sexual Enterprise, by knowingly participating in financial transactions involving proceeds derived from the illegal conduct of Goguen and the Trustee of the Michael L. Goguen Trust tampering with Payne as a witness in violation of § 45-7-206, MCA.

**Shawn Lewis**

405.   In or around May of 2015, Marshall discovered that Shawn Lewis was using Amyntor and Two Bear Security, LLC funds to purchase expensive jewelry, clothing, artwork, furniture, and vacations for himself and his then girlfriend, now wife. Lewis was using Two Bear Security and Amyntor company credit cards to embezzle these funds.

406.   Marshall had also purchased a truck for Shawn's son out of his personal funds ($31,419 on February 24, 2015) and an engagement ring for Shawn's fiancé wife (which Shawn partially paid back but still owes $15,000).

407.   Marshall expected to be reimbursed for the funds he spent on Lewis, but when the relationship with Goguen soured, Marshall was never reimbursed.

408.   Marshall informed Goguen that Lewis was embezzling Amyntor funds and discussed his desire to fire Lewis, which Goguen refused to do because in Goguen's opinion Lewis had too much disparaging information on Goguen's sexual proclivities and illegal activities.

409.   In Goguen's view, firing Lewis would create too high of a risk that Lewis could distribute information he had about the Goguen Sexual Enterprise to the press or law enforcement.

410.   Marshall was left with no other recourse to remedy the issue other than a stern discussion with Lewis.

411.   After another incident of misconduct and unprofessional behavior by Lewis at a charity event in Whitefish, Marshall demoted Lewis from his role as President of Amyntor Group, cut his salary and transferred him to Texas where his only responsibility would be to manage the Mexico City, Mexico office.

412.   Goguen found out after the fact when Lewis informed him that he had been transferred to Texas.

413.   Goguen asked Marshall why he had not informed him of the demotion of Lewis and Marshall responded that as the CEO and Managing Member, it was in the best interests of the company.

414.   Shortly thereafter, Lewis set up a company in Guadalajara named Amyntor Guadalajara that Lewis owned outright without Marshall's knowledge.

415.   As a result of this information and the many other issues involving Lewis, Marshall requested Lewis to resign and sign a separation agreement.

416.   By the time that Goguen's and Marshall's relationship had irreconcilably deteriorated, Lewis called Marshall panicked and stated that "Goguen is all over me." Lewis also stated Goguen told him that Marshall had made accusations that Lewis had embezzled money from Two Bear Security and Amyntor.

417.   Lewis told Marshall he felt pressured by Goguen to support Goguen's efforts to damage Marshall's integrity and reputation by fabricating evidence against Marshall.

418.   Goguen let Lewis keep approximately $150,000 in Amyntor assets six months after Lewis had been fired by Marshall to buy his silence about his knowledge of the Goguen Sexual Enterprise.

419.   On information and belief, Goguen also paid Lewis an additional undisclosed amount of cash in an attempt to get Lewis to help Goguen turn other Amyntor employees against Marshall and to silence Lewis from disclosing damning information about the Goguen Sexual Enterprise.

420.   When Goguen dissolved Amyntor, Marshall attempted to retrieve the approximately $150,000 in Amyntor assets that Lewis had taken and the vehicle Marshall had purchased for Lewis's son, to no avail.

421.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust and other DOE defendants have violated § 45-6-341, MCA for money laundering by

giving or transferring proceeds that Lewis knew has been derived from unlawful activities.

**B.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust violated § 45-7-206, by tampering for purposely or knowingly attempting to induce or otherwise induce or otherwise cause Lewis as a witness to withhold testimony, testify falsely, elude testimony, and not appear at any proceeding or investigation to which Lewis has been summoned and in furtherance of the Goguen Sexual Enterprise.

422.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust and other DOE Defendants have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments derived from the proceeds of the unlawful tampering of Shawn Lewis in furtherance of the Goguen Sexual Enterprise.

**MARK DOE**[4]

---

[4] For privacy, the actual name of Mark Doe has been redacted from this complaint.

423.    In or around July of 2015, Goguen asked Marshall to resolve a problem he was having with a member of his harem named EMILY DOE[5] who was living in New York.

424.    EMILY DOE's boyfriend, MARK DOE, had caught Goguen in an affair with EMILY DOE and called Goguen extremely angry.

425.    MARK DOE threatened to contact Goguen's third wife and tell her about the affair and how much money Goguen had secretly been paying his girlfriend EMILY DOE to have sex with him and then remain silent.

426.    MARK DOE also threatened to reveal Goguen's payments to the Internal Revenue Service and to contact Goguen's then current employer, Sequoia Capital.

427.    When MARK DOE found more evidence of what was occurring, he called Goguen several times and told Goguen he needed to stop seeing his girlfriend.

428.    Goguen continued to see EMILY DOE and wire her money despite MARK DOE's angry pleas, and Goguen nearly got caught red-handed in New York by MARK DOE with EMILY DOE on one occasion in or around May or June of 2015.

---

[5] For privacy, the actual name of Emily Doe has been redacted from this complaint.

429.   On July 20, 2015, Goguen came to Marshall and told him that he was trying to help EMILY DOE and that MARK DOE was making threats to manipulate Goguen into giving him more money.

430.   On July 20, 2015, Goguen provided Marshall with copies of MARK DOE's New York State Driver's License and his permanent residence card that he somehow obtained, as well as email addresses and phone numbers for MARK DOE, and gave them to Marshall.

431.   Goguen asked Marshall to conduct cyber-attacks against MARK DOE "like w/ Nash."

432.   Marshall did not conduct cyber-attacks against MARK DOE.

433.   MARK DOE continued calling Goguen and threatened Goguen that if he did not stop contacting and seeing his girlfriend then he was going to contact Goguen's wife and Sequoia Capital to tell Goguen's colleagues about the unscrupulous behavior of Goguen.

434.   This threat by MARK DOE enraged Goguen and Goguen then told Marshall that if the cyber route was not working, he wanted Marshall to go pay MARK DOE a personal visit in New York and put an end to the situation.

435.   Marshall asked Goguen to be more specific and Goguen said he just wanted MARK DOE to be put out of play, permanently.

436.    Based on Goguen's previous command for Marshall to kill Nash, Marshall interpreted Goguen's request to put MARK DOE out of play permanently as an instruction or solicitation for Marshall to kill MARK DOE.

437.    Marshall did not follow through with Goguen's instruction and solicitation to kill MARK DOE.

438.    Soon after, Marshall was on a business trip to New York for Amyntor.

439.    Marshall arranged to meet with MARK DOE over a beer in an upper east side pub that Marshall knew.

440.    After buying MARK DOE a beer and having a cordial conversation with him at the pub, Marshall was able to convince MARK DOE to stop making threats against Goguen.

441.    The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

A. Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging, or facilitating Marshall, knowing that Marshall was capable of doing so, to cause the deliberate homicide of MARK DOE, an offense chargeable under state law § 45-5-102, MCA.

**B.** Defendant Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-5-601, MCA related to patronizing prostitution of EMILY DOE.

**C.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-5-602, MCA related to promoting prostitution of EMILY DOE.

**D.** Defendants Goguen and the Trustee of Michael L. Goguen have violated § 45-6-341, MCA for money laundering by facilitating the transfer of funds to EMILY DOE for an unlawful activity consisting of patronizing prostitution in violation of § 45-5-601, MCA and N.Y.P.C. Article 230.02; and prostitution in violation of N.Y.P.C. Article 230.00.

442.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust and other DOE Defendants have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments derived from the proceeds of the above-described unlawful activity of prostitution and patronizing prostitution in violation of the laws of New York and Montana.

**B.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated 18 U.S.C. § 1952 relating to interstate commerce, specifically

transportation of Defendant Goguen with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of prostitution in violation of New York Penal Code Article 230.00 and patronizing prostitution in violation of New York Penal Code Article 230.02 in furtherance of the Goguen Sexual Enterprise.

**C.** Defendant Goguen and DOE Defendants violated 18 U.S.C. § 1028(a)(7) relating to fraud and related activity in connection with sending multiple identification documents of MARK DOE to Marshall with the intent that Marshall engage in unlawful activity of cyber-crimes and acts of violence against MARK DOE.

**AUDRY DOE**[6]

443.    Goguen met AUDRY DOE in or around 2010 at a strip club in Las Vegas where she worked and lived.

444.    On information and belief, AUDRY DOE was an exotic dancer, stripper, and prostitute when Goguen met her.

445.    Upon meeting her, Goguen started having a sexual relationship with AUDRY DOE and in exchange provided her with money, expensive gifts and jewelry.

---

[6] For privacy, the real name of Audrey Doe has been redacted from this complaint.

446.   Goguen continued to have a relationship with AUDRY DOE, which likely continues to this day.

447.   Over the years, Goguen has paid AUDRY DOE tens of millions of dollars, including many times when Goguen had current events that affected Goguen's family, other mistresses, or issues with Amber Baptiste, Bryan Nash, etc. which AUDRY DOE used as moments to apply pressure on him.

448.   On numerous occasions, Goguen bragged to Marshall that he had an Excel sheet with 5,000 women on it with whom Goguen had sexual intercourse. Goguen showed this Excel sheet to Marshall from Goguen's iPad.

449.   Goguen apparently has organized this list from the most volatile women to the least volatile women.

450.   Many of these women were not even mentioned by name, but by locations they frequented, such as the "Starbucks Girl."

451.   AUDRY is listed as number one on the list as Goguen believes she is the most volatile member of his "harem."

452.   In February of 2015, at the request of Goguen, Marshall used NetJets to fly to Miami and meet AUDRY DOE at the Setai Miami Beach to pay her $250,000 in cash.

453.   AUDRY DOE was accompanied by two men whom AUDRY DOE identified as her cousin and uncle. Goguen told Marshall that he believed these men were potentially associated with organized crime.

454.   Marshall handed AUDRY DOE a leather duffle bag containing the $250,000 in cash.

455.   Upon receiving the duffle bag, AUDRY DOE took it to the women's restroom and transferred the cash to a different bag and after exiting the restroom handed Marshall the empty leather duffle bag.

456.   AUDRY DOE, still not satisfied by the pay-off, told Marshall she also wanted expensive watches for each of her "family" members "for their trouble" and Tiffany earrings for herself.

457.   Marshall called Goguen informing him of the jewelry request and received approval from Goguen to purchase the requested items.

458.   Marshall then used funds from his own personal account to purchase said items for AUDRY DOE and her supposed family associates, costing approximately $48,000 for the two watches and the set of earrings.

459.   Within a couple of days, Marshall again met with AUDRY DOE, giving her the requested jewelry.

460.   Goguen also bought AUDRY DOE a multi-million-dollar home in Santa Monica, California, through Defendant Michael L. Goguen Trust.

461.   Goguen apparently got AUDRY DOE pregnant multiple times. The first time AUDRY DOE got pregnant, Goguen paid her to have an abortion.

462.   AUDRY DOE was part of the Goguen Sexual Enterprise by engaging in prostitution or other lewd or immoral acts with Goguen.

463.   On information and belief, AUDRY DOE traveled in interstate commerce to Whitefish, Montana, staying at one of Goguen's safe houses owned by Crystal Slopeside, LLC, as recently as December 28, 2020.

464.   Goguen diverted the time and attention of Marshall and thereby injured Marshall in his business by having Marshall fly to Miami and pay AUDRY DOE for her silence and complicity in the Goguen Sexual Enterprise.

465.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-6-341, MCA for money laundering by facilitating the transfer of funds to AUDRY DOE for unlawful activity consisting of patronizing

prostitution in violation § 45-5-601, MCA and prostitution in violation of

Florida Statute § 796.07.

**B.** Defendant Goguen and the Trustee of the Michael L. Goguen Trust have

violated § 45-5-601, MCA related to patronizing prostitution of AUDRY DOE.

**C.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust have

violated § 45-5-602, MCA related to promoting prostitution of AUDRY DOE.

466.    The conduct and acts described above and elsewhere herein constitute

racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen

Sexual Enterprise and which are indictable offenses.

**A.** Defendants Goguen and the Trustee of the Michael L. Goguen Trust and

other DOE Defendants have violated 18 U.S.C. § 1956 relating to laundering of

monetary instruments derived from the proceeds of the above-described unlawful

activity of prostitution and patronizing prostitution in violation of State of

Florida and State of Montana law.

467.    Defendants Goguen and the Trustee of the Michael L. Goguen Trust

have violated 18 U.S.C. § 1952 relating to interstate commerce, specifically

transportation of Defendant Goguen and transportation of AUDRY DOE with the

intent to otherwise promote, manage, establish, carry on, or facilitate the promotion,

management, establishment, or carrying on, of prostitution in violation of Florida

Statute § 796.07 for prostitution and promotion of prostitution in violation of § 45-5-602, MCA in furtherance of the Goguen Sexual Enterprise.

**Karen Valladao**

468.   On information and belief, Goguen has made tens to hundreds of millions of dollars in wire transfers to women over the years to enable or cover-up the Goguen Sexual Enterprise.

469.   Defendant Karen Valladao and her accounting firm, Defendant Frank, Rimerman, allowed and implicitly agreed, by accepting payment from Goguen, to carry out acts in furtherance of the Goguen Sexual Enterprise.

470.   Vallado and Frank, Rimerman have facilitated the Goguen Sexual Enterprise by helping Goguen setup for profit and non-profit entities to be used by individuals as a way to conceal hush money payments to victims or participants of the Goguen Sexual Enterprise.

471.   Valladao and Frank, Rimerman have helped Goguen report fraudulent deductions to the Internal Revenue Service for payments that Goguen made through multiple business entities, including through Defendants and other DOE Defendants, which were used in furtherance of the Goguen Sexual Enterprise.

472.   Karen Valladao over the years became concerned that Goguen was violating federal tax law each time he made one of these transactions involving his harem for failing to file federal gift tax returns or for other tax fraud related offenses.

473.   Valladao expressed these concerns to Marshall in person on visits she made to Whitefish and requested Marshall attempt to help get Goguen to either stop making such payments or to start paying gift taxes on any future payments.

474.   Marshall repeatedly informed Goguen that he needed to be careful with these transactions and to start filing gift tax returns.

475.   After the Baptiste lawsuit was filed against Goguen, which included allegations of federal tax crimes against him, Valladao subsequently drafted hundreds of backdated loan documents for the tens to hundreds of millions of dollars in wire transfers Goguen has sent women and others in furtherance of the Goguen Sexual Enterprise to assist Goguen in mitigating his civil and criminal exposure arising from the Goguen Sexual Enterprise.

476.   Vallado and Frank, Rimerman have acted in furtherance of the Goguen Sexual Enterprise by assisting Goguen to make hush payments to individuals having knowledge of the Goguen Sexual Enterprise.

477.   Vallado and Frank, Rimerman have facilitated the Goguen Sexual Enterprise by helping Goguen create other documentation to fraudulently conceal

Goguen's failure to file gift tax returns for many of the hundreds of hush payments Goguen has made to individuals over the years.

478.   Vallado and Frank, Rimerman have also assisted Goguen in falsely accusing Marshall of wire fraud, money laundering, and tax evasion to U.S. Government law enforcement.

479.   On information and belief, in an effort to tidy up Defendant Goguen's years of hiding immoral activities and attempts to buy-off witnesses and victims of the Goguen Sexual Enterprise and Goguen's nefarious activities related to, Goguen has come to an agreement with his accountants, including Defendants Karen Valladao and Frank, Rimerman, to amend four years of tax returns after-the-fact to reflect $30,000,000 in payments made to at least thirty women, including strippers, escorts, prostitutes, married women and others.

480.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Defendants Valladao, Goguen, the Trustee of the Michael L. Goguen Trust, and Frank, Rimerman, have violated § 45-6-341, MCA for money laundering by facilitating the transfer of funds to Goguen's harem in the Goguen Sexual

Enterprise for unlawful activity consisting of patronizing prostitution in violation § 45-5-601, MCA and other state and federal statutes.

481.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Specifically, Goguen, Trustee of the Michael L. Goguen Trust, Valladao and Frank, Rimerman violated 18 U.S.C. § 1512(c) relating to tampering with a witness, victim or informant by corruptly altering, destroying, mutilating, or concealing a record, document, or other object or attempting to do so, with the attempt to impair the object's integrity or availability for use in any official proceeding or otherwise obstruct, influence or impede an official proceeding or attempts to do so by creating business documents and amending tax records as a means to conceal the activities of the Goguen Sexual Enterprise.

**B.** Defendants, Goguen, the Trustee of the Michael L. Goguen Trust, Valladao and Frank, Rimerman have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments in aid of the Goguen Sexual Enterprise to numerous women by directing the formation of entities used by Goguen to deposit pay-offs as described herein;

**C.** Such conduct by Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valladao, and Frank, Rimerman violated 18 U.S.C. **§** 1952 by using any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the establishment of an unlawful activity, particularly the Goguen Sexual Enterprise.

## Procurement of StingRay Device

482.   Sometime in 2016, Goguen's Two Bear Air Rescue helicopter participated in two joint exercises with the FBI, during which the FBI brought onto the helicopter a cell site simulator device (aka, a "StingRay"), which masquerades as a cell tower in order to intercept, locate, collect phone usage data, and monitor the communications, in order to test whether it would function properly on the helicopter without interference therefrom.

483.   After learning of the exercises with the FBI and use of the StingRay device on the helicopter, Goguen became interested in obtaining a StingRay device for himself because of its capabilities to locate, intercept, collect phone usage data, and monitor cellular phone communications.

484.   In or around the end of 2016, Goguen asked Marshall to look into obtaining a StingRay for him.

485.    Goguen later directed the head of Defendant Two Bear Air Rescue, Jim Pierce, to persuade Marshall into obtaining a Stingray device for Goguen, who texted Marshall on February 16, 20, and 21, 2017 about whether Marshall could obtain the StingRay.

486.    Goguen requested whether the Flathead County Sheriff's Office, specifically Sheriff Chuck Curry, would provide authorization for Goguen to use the StingRay device in the Two Bear Air Rescue Helicopter.

487.    On February 21, 2017, Marshall confirmed to Pierce and Goguen that a StingRay device is restricted government technology and that procuring and using a cell site simulator in the manner sought by Goguen is not permitted by law.

488.    Nonetheless, it is believed that Goguen was able to obtain a Stingray device for Goguen through Jim Pierce's contacts from a source in Europe.

489.    Thereafter, at Goguen's direction, the StingRay device was imported into the United States, potentially in violation of the U.S. International Traffic in Arms Regulations ("ITAR").

490.    Marshall later observed the StingRay device mounted inside of a Two Bear Air Rescue helicopter which is used to assist the Flathead County Sheriff's Office and conduct search and rescue operations.

491.   It is believed that employees with Two Bear Air, Two Bear Air Rescue Foundation or Two Bear Security routinely and unlawfully use the StingRay device to track cell phones and listen to conversations of individuals residing in Flathead County, Montana, including Marshall, Maguire, Whitefish Police Chief Bill Dial, and others who possess damaging information about the Goguen Sexual Enterprise.

492.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Two Bear Air Rescue, Two Bear Air 1, LLC and other Doe Defendants have violated § 45-8-213, MCA by purposely violating privacy in communications by repeatedly intercepting the electronic communications of Marshall, Maguire, and others and recording conversations therefrom without their knowledge.

493.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

**A.** Specifically, by attempting to obtain a StingRay device in a corrupt manner, and by obtaining the StingRay device, importing the StingRay device into the

United States, and using the StingRay device to monitor individuals' cell phone communications, Defendants Goguen, the Trustee of the Michael L. Goguen Trust Two Bear Air 1, LLC, and Two Bear Air Rescue Foundation, and other DOE DEFENDANTS violated 18 U.S.C. § 1029 based on acts of fraud and related activity in connection with access devices as part of his scheme to carry out or conceal the Goguen Sexual Enterprise.

**B.** Such conduct by Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Two Bear Air 1, LLC and Two Bear Air Rescue Foundation, and other DOE Defendants violates 18 U.S.C. § 1952 by using any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the establishment of an unlawful activity, specifically by Goguen and other DOE Defendants as a scheme to use the StingRay device to monitor the communications of those, including Plaintiffs, who possess information about the Goguen Sexual Enterprise.

## Transportation of Narcotics

494.   In or around late 2015 or early 2016, Marshall discovered that a regular passenger on Goguen's private jet had brought a kilo of cocaine into Whitefish, Montana.

495.   Due to the suspicious behavior of the passenger not letting any of the baggage handlers at Goguen's hangar handle this particular bag, and due to the comments and behavior of the other passengers with her, Marshall decided to look inside the bag when the passenger was not looking, in the interest of security.

496.   Inside the bag, Marshall saw a large saran wrapped package wrapped in clear packing tape. Based on Marshall's training and experience as a former State Police Drug Enforcement Detective, and from its appearance and the comments he heard from other passengers, Marshall strongly suspected that the package was a kilogram of cocaine.

497.   This particular incident was one of the reasons Marshall, with the assistance and facilitation of Detective Shane Erickson, wanted to present at a meeting that he was attempting to schedule with the FBI, among others.

498.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Enterprise and which are chargeable under state law and punishable by imprisonment for more than one year.

**A.** As part of the Goguen Sexual Enterprise, Goguen's regular passenger procured, possessed, or transported dangerous drugs in the form of a large quantity of cocaine in violation of § 45-9-102, MCA, which exposed Goguen and

Amyntor to a high degree of risk that such persons would not be able to obtain or maintain a security clearance. Such conduct thereby injured Plaintiffs' business.

499.    The conduct and acts described above and elsewhere herein, including by Defendants Goguen, Whitefish Frontiers, LLC and other DOE Defendants, constitute racketeering activities under 18 U.S.C. § 1961(1)(D) as offenses involving the felonious importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical as defined in section 102 of the Controlled Substances Act, punishable under any law of the United States and used in furtherance of the Goguen Sexual Enterprise.

### Fraudulent Dissolution of Amyntor and Theft of Trade Secrets

500.    Goguen failed to continue to fund Amyntor in the fall of 2018 for the purpose of destroying the company Plaintiffs had built, despite knowing that Plaintiffs were continuing to provide services and spending personal and business property to promote the company's business around the world.

501.    Goguen allowed resources to be drained or transferred from Amyntor to other Defendants to destroy the investments of time and money that Plaintiffs had expended to promote Amyntor's activities.

502.   When Marshall and Maguire confronted Goguen about the fact that Amyntor would likely not receive a facility security clearance as a result of the Goguen Sexual Enterprise, instead of working with his business partner to find a fair financial buyout plan, Goguen maliciously retaliated against Plaintiffs by dissolving Amyntor and removing Marshall from all responsibilities, despite the extensive efforts Plaintiffs had expended to build Amyntor's security and intelligence contracting business.

503.   Around late 2018, Marshall learned that Goguen had given and communicated, without authorization, Amyntor trade secrets by giving financial bank records containing confidential information about Amyntor's private contracts to Nic McKinley of Deliver Fund, to in turn give to Roston, which exposed Amyntor's sensitive private security contracts, knowing or recklessly disregarding the fact that this could injure Plaintiffs' reputation and business prospects.

504.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Enterprise and which are indictable offenses.

A. By dissolving Amyntor in the manner described herein, Defendant Goguen violated 18 U.S.C. § 1513 by retaliating against Plaintiffs as witnesses, victims, or informants of the Goguen Sexual Enterprise.

**B.** By leaking Amyntor trade secrets to Aram Roston, Defendant Goguen

violated 18 U.S.C. § 1832 based on his intent to convert Amyntor's trade

secrets without authorization and for purposes of damaging Plaintiffs'

business.

**Goguen's False Statements to the FBI**

505.   Goguen and other Defendants, out of fear of Plaintiffs' knowledge

regarding the Goguen Sexual Enterprise, then sought to destroy Plaintiffs'

reputations by falsely filing a false sworn affidavit alleging mismanagement and

Fraud by Plaintiffs to the Federal Bureau of Investigation ("FBI").

506.   Defendant Goguen falsely told the FBI that Marshall did not have the

experience and had stolen then laundered funds from him and by testifying in other

ways meant to obstruct law enforcement's discovery of the Goguen Sexual

Enterprise.

507.   The conduct and acts described above and elsewhere herein constitute

racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen

Sexual Enterprise and which are indictable offenses.

**A.** Defendant Goguen and other DOE defendants violated 18 U.S.C. § 1510 by

willfully endeavoring by means of bribery to obstruct, delay, or prevent the

communication of information relating to a violation of any criminal statute of

the United States by seeking to corruptly influence the investigation by the FBI into the Goguen Sexual Enterprise through offers of beneficial mutual association directly or indirectly funded or supported by Goguen;

**B.** Defendant Goguen and other DOE defendants violated 18 U.S.C. § 1513 by knowingly retaliating, including interfering with the lawful employment or livelihood of Plaintiffs, arising from Plaintiffs' exposure of the Goguen Sexual Enterprise in which Defendants agree to remain complicit enablers.

**C.** Defendant Goguen and other DOE defendants violated 18 U.S.C. § 1512(c) relating to tampering with a witness, victim or informant by corruptly altering, destroying, mutilating, or concealing a record, document, or other object or attempting to do so, with the attempt to impair the object's integrity or availability for use in any official proceeding or otherwise obstruct, influence or impede an official proceeding, specifically to impair, obstruct, or influence the investigation or proper administration of an FBI and other U.S. Government agency investigation;

**D.** Defendant Goguen and other DOE defendants have violated 18 U.S.C. § 1952 by using interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce with intent to promote, manage, establish, carry

on, or facilitate the promotion, management, establishment, or carrying on of the Goguen Sexual Enterprise.

**PROOF Research's Retaliation Against Marshall**

508.   For the conduct described above and herein with respect to PROOF Research's retaliation against Marshall as directed by its majority shareholder, Defendant Goguen, Defendant PROOF RESEARCH Inc. violated 18 U.S.C. § 1952 by using the mail or any facility in interstate or foreign commerce with the intent to promote, carry on, or facilitate the promotion or carrying on of the Goguen Sexual Enterprise.

### E.   Affected Interstate Commerce

509.   The Goguen Sexual Enterprise engaged in and affected interstate commerce, because, *inter alia*, Goguen and Defendants persuaded, transported, funded, texted, called, and committed other acts in furtherance of trafficking women who would have sex with and engage in other illicit sexual acts for money or other items of value from Goguen.

510.   The Goguen Sexual Enterprise engaged in and affected interstate commerce when it hired third parties to investigate, pay-off, intimidate, threaten, travel to, and harm the reputation and lives of Goguen's victims and enemies who had information about the Goguen Sexual Enterprise.

511.   On information and belief, Goguen was using the Amyntor NetJets account, other private jet accounts, and his personal private jet to fly prostitutes, strippers, escorts, or other extramarital women into Whitefish for sexual encounters (such occurrences contributing to and partially comprising the "Goguen Sexual Enterprise").

512.   Goguen often euphemistically referred to the women who participated in the Goguen Sexual Enterprise as "strippers" when Goguen was having sex with the "strippers" he met in Las Vegas or elsewhere.

513.   Goguen would tell Marshall that these "strippers" were in love with him, while continuing to traffic and pay for his harem of women to have sex with him, or to birth illegitimate children with him, often by purchasing for them cars, houses, and by giving cash or other items of value for these women to be a part of the Goguen Sexual Enterprise.

514.   Casey's Bar was used to lure women to participate in the Goguen Sexual Enterprise, by providing the "boom boom" room as a space that could be used to harbor, sequester, or maintain women for the purpose of committing illicit sexual activity in exchange for items of value given by Goguen or Defendants' employees or third-party hires.

515.   In these ways and through other means of communication, financial transactions, and other means of procurement, the Goguen Sexual Enterprise affected interstate commerce.

**F.   Operation and management**

516.   Defendants each exerted some measure of control over the Goguen Sexual Enterprise, and Defendants participants in the operation or management of the affairs of the Goguen Sexual Enterprise.

517.   Within the Goguen Sexual Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis, including by text message, Wickr, burner phones, and other encrypted messaging systems for the purpose of evading discovery of their criminal activities.

518.   The Goguen Sexual Enterprise used this common communication network for the purpose of enabling the sexual activities of Goguen, Payne, and others who participated in the Goguen Sexual Enterprise.

519.   Each participant in the Goguen Sexual Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing direct or indirect coordination of their activities.

520.   Through the Goguen Sexual Enterprise, the Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

521.   To achieve their common goals, the Defendants hid from the general public the unlawfulness of Goguen's conduct and suppressed and/or ignored warnings from third parties about his conduct.

522.   Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to conceal Goguen's activities and that of the Goguen Sexual Enterprise, which directly or indirectly harmed Plaintiffs' business and property interests.

523.   Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims.

524.   Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' business and property.

525.   The pattern of racketeering activity alleged herein and Goguen are separate and distinct from each other.

526.   The individual and entity Defendants named herein are separate and distinct from each other with respect to the role and means in which they enabled the Goguen Sexual Enterprise to occur.

527.   Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs or concealing the Goguen Sexual Enterprise.

**G.   RICO Injury**

528.   Plaintiffs have been injured in their property and business by reason of Defendants' conduct.

529.   Had members of the Goguen Sexual Enterprise not been complicit and had they revealed instead of concealed Goguen's predatory behavior, Plaintiffs would not have been injured. Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

530.   Goguen should have foreseen that the Goguen Sexual Enterprise would compromise his ability to obtain a security clearance, and by extension Amyntor's and Plaintiffs' ability to grow from the security contracts anticipated by the hiring of Maguire and others.

531.   Goguen did nothing to respond to Marshall's warnings about his behavior, as Marshall came to understand that Goguen was not making singular

errors of judgment but instead was engaging in a pattern of activity with multiple co-conspirators and based on the commission of high crimes or other serious felonies that directly injured Plaintiffs' business interests.

532.   Marshall exercised reasonable diligence in his discovery of the pattern of the Goguen Sexual Enterprise and has continued to suffer injury since the closing of Amyntor through the acts of Defendants arising from the Goguen Sexual Enterprise.

533.   Defendants interfered with Plaintiffs' current and prospective contractual relations as Plaintiffs lost business opportunities cultivated through Amyntor and in the current businesses that Plaintiffs have formed independent of Amyntor.

534.   Plaintiffs have lost business profits from their past and prospective business opportunities.

535.   Plaintiffs have lost past business wages and obtained judgments against Amyntor from the Montana Department of Labor and Industry ("DOL") and subsequent District Court affirmations of the DOL judgments from their past wages at Amyntor, but not for other entities for whom Marshall provided services.

536.   Plaintiff Marshall has lost direct personal distributions he would have otherwise received from Amyntor and other entities but for the operation of the

Goguen Sexual Enterprise and Goguen's retaliation against him and other Plaintiffs because of the potential exposure they brought to the Goguen Sexual Enterprise.

537.   Plaintiffs Marshall and Maguire have lost business commissions and fees charged in the security and defense contracting industry for the successful solicitation and award of security contracts, which Amyntor was fully poised to gain in 2017-2018 or from the prospective business opportunities that Plaintiffs have pursued independent of Amyntor but have now been tarnished through Plaintiffs' exposure to Goguen and the other Defendants.

538.   Goguen and those within the Goguen Sexual Enterprise have created a poisoned atmosphere which has harmed the business reputation of Plaintiffs and Plaintiffs' ability to be successfully awarded security contracts going forward.

539.   Plaintiffs' lost future wages from prospective business opportunities and suffered personal and business reputational harm when Plaintiffs Marshall and Maguire were named in a federal indictment of Marshall based on the false testimony by Goguen and others calculated to corruptly disturb, delay, obstruct the investigation of, and conceal the Goguen Sexual Enterprise.

540.   Plaintiffs' reputations, integrity and credibility have suffered harm by the actions of Defendants who acted to perpetuate or conceal the Goguen Sexual

Enterprise, after Plaintiffs have served honorably and with respect for the U.S. Government and her People in difficult environments around the world.

541.   Each of the Plaintiffs suffered injury to property and their business as a result of the racketeering activity of the Goguen Sexual Enterprise.

542.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorney's fees.

## Claim 2

## CONSPIRING TO VIOLATE RICO IN VIOLATION OF 18 U.S.C. § 1962(D) (ALL PLAINTIFFS VERSUS DEFENDANTS)

543.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

544.   RICO provides a conspiracy cause of action. See 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of [§ 1962]").

545.   Overt acts for such conspiracy claims must be "act[s] of racketeering or otherwise wrongful under RICO."

546.   Defendant Goguen conspired with the other Defendants to commit the above-described racketeering predicate acts to further the Goguen Sexual Enterprise.

547.   Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

548.   The object of this conspiracy has been and is to conduct or participate, directly or indirectly, in the conduct of the affairs of the Goguen Sexual Enterprise as described previously through a pattern of racketeering activity.

549.   As demonstrated in detail above, Defendants' co-conspirators, including, but not limited to, the Defendants, and others, including DOE Defendants, have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy that resulted in the Goguen Sexual Enterprise injuring Plaintiffs' business and property.

550.   Defendant Goguen, who often made payments as the Trustee of the Michael L. Goguen Trust, violated 18 U.S.C. §1962(d) by conspiring to violate the preceding sections of U.S.C §1962(c) as a primary perpetrator and culpable person by attempting to use the time and resources of Plaintiffs, the other Defendants, and others to commit racketeering activities as part of the Goguen Sexual Enterprise.

551.   Plaintiffs were injured by overt predicate acts of racketeering in furtherance of Goguen's conspiracy by losing their carefully built security business and tarnishing their reputations by Goguen's false statements to law enforcement and other persons about Marshall's character.

552.   Defendant Valladao violated 18 U.S.C. §1962(d) by conspiring to violate the preceding sections of U.S.C §1962(c) when, as described above, she knowingly agreed to facilitate as scheme which includes the operation or management of the Goguen Sexual Enterprise, and by engaging in the following conduct:

**A.** Using Wickr or travelling to meet Goguen or Marshall in-person instead of using electronic-mail or other written record in order to conceal the communications Valladao was having about the nature of the payments made in furtherance of the Goguen Sexual Enterprise;

**B.** Directing the establishment of for-profit and non-profit entities that were used in furtherance of the Goguen Sexual Enterprise, including to conceal the operation of the Goguen Sexual Enterprise by facilitating hush-money payments, directly or indirectly paid to Amber Baptiste, Shawn Lewis, Shane Erickson, PAM DOE, Eric Payne, Larry Woods, Kendall Gislason, Whitefish Frontiers, LLC and countless members of Goguen's "harem" or others (and DOE Defendants and entities) who had damaging information about Goguen's illicit sexual activities or were used in furtherance of it. In so doing, Valladao agreed to participate with Goguen in the commission of the above-described predicate acts in furtherance of the Goguen Sexual Enterprise.

**C.** Creating false expense "deductions" to fraudulently deduct payments and expenses used in furtherance of the Goguen Sexual Enterprise as legitimate business deductions when they were not.

**D.** Creating false and back-dated "loan" documents to cover-up payments to persons within the Goguen Sexual Enterprise knowing that such persons would not be paying back the funds given to such persons.

**E.** Creating amended tax returns for Goguen or others reflecting "gifts" made to women and others to conceal and misrepresent the illicit nature of the payments made on behalf of the Goguen Sexual Enterprise.

553.   Defendant Frank, Rimerman violated 18 U.S.C. §1962(d) by conspiring to violate the preceding sections of U.S.C §1962(c) when Frank, Rimerman oversaw and participated, through its employees, in the activities of Valladao and agreeing to participate with Valladao in the commission of overt predicate acts in furtherance of the Goguen Sexual Enterprise.

554.   Defendant Casey's Management violated 18 U.S.C. §1962(d) by conspiring to violate the preceding sections of U.S.C §1962(c) when, as described above, Casey's bar knowingly agreed to facilitate the Goguen Sexual Enterprise by permitting the operation of a "boom boom" room under locked keycode for use by

Eric Payne and Michael L. Goguen to engage in illicit sexual affairs and commit other unlawful acts.

555.   Defendants Whitefish Frontiers, LLC and Valley Oak, LLC knowingly agreed to facilitate the Goguen Sexual Enterprise by assisting in the interstate transportation of young women to engage in the unlawful activities arising from the Goguen Sexual Enterprise through the use of private jet and related transportation payments.

556.   Defendant Two Bear Security, LLC knowingly agreed to facilitate the Goguen Sexual Enterprise through the use of intimidation by its agents and employees at the direction of Goguen, and by supplying assets and resources in furtherance thereof.

557.   Defendant Crystal Slopeside, LLC owns and uses two safe houses in Whitefish, Montana and knowingly agrees, through its principals and agents, to use these properties and others in furtherance of the Goguen Sexual Enterprise.

558.   Defendants Two Bear Air 1, LLC and Two Bear Air Rescue Foundation procured and used a StingRay device, and thereby knowingly facilitated the Goguen Sexual Enterprise by targeting Plaintiffs and others who potentially have incriminating evidence about the Goguen Sexual Enterprise.

559.   Defendant PROOF RESEARCH, INC. knowingly agreed to facilitate the Goguen Sexual Enterprise by unlawfully agreeing to remove and retaliate against Plaintiff Marshall from his executive and board positions at the direction of Goguen.

560.   Defendant Shane Erickson knowingly agreed to facilitate the Goguen Sexual Enterprise by accepting items of value from Goguen in exchange for his dereliction of duty investigating PAM DOE, for relaying the information he had learned during his investigation of the PAM DOE allegations, and informing Goguen that Marshall was attempting to provide information to the FBI relating to the Goguen Sexual Enterprise and other unlawful activity committed by Goguen.

561.   The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of any 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 19 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

562.   At all relevant times, Defendants and their co-conspirators were aware of the essential nature and/or scope of the Goguen Sexual Enterprise and intended to participate in it directly or indirectly.

563.   As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

564.   Defendants have sought to and have engaged in the violations of the above state and federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## VI.   <u>STATEMENT OF DAMAGES</u>

Matt Marshall:

      Future Lost Income and Wages: $153,050,000.00

      Reputational Harm: $20,000,000.00

      Other Consequential Damages: $TBD

John Maguire:

      Future Lost Income and Wages: $35,210,000.00

      Reputational Harm: $20,000,000.00

      Other Consequential Damages: $180,000.00

Anthony Aguilar:

Future Lost Income and Wages: $6,400,000.00

Other Consequential Damages: $120,000.00

Keegan Bonnet:

Future Lost Income and Wages: $750,000.00

Other Consequential Damages: $45,000.00

Summary of Actual Damages (partial list):

Plaintiffs' Past Wages: $1,000,000.00

Punitive Damages: $TBD

Treble Damages: $TBA

Summary of Consequential Damages: $235,755,000.00

Summary of Reasonable Counsel's Fees: $65,000,000.00

TOTAL DAMAGES (minimum): $301,755,000.00

## VII.   PRAYER FOR RELIEF

Plaintiffs request judgment in their favor against Defendants as follows:

**A.** For all compensatory, punitive and/or exemplary damages in an amount to be

determined by the jury.

**B.** For pre- and post-judgment interest on all such amounts to the extent

permitted by law;

**C.** For injunctive or other relief including divestment or dissolution to prevent or enjoin against future violations;

**D.** For costs and disbursements incurred by Plaintiff in these proceedings and to the extent permitted by law; and

**E.** For all civil remedies available under 18 U.S.C. § 1964(c), including to recover threefold the damages Plaintiffs sustained and the cost of the suit, including a reasonable attorney's fee.

**F.** For such other and further relief as this Court finds appropriate and warranted.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial as to all issues properly triable before a jury.

Dated this 12th day of February 2021.

> GRANITE PEAK LAW, PLLC
> Attorneys for Plaintiffs
>
> By: ___/s/ Adam H. Owens_____
> 201 W. Madison Ave., Suite 450
> Belgrade, MT 59714
> T: 406-586-0576
> F: 406-794-0750
>
> By: ___/s/ Gregory G. Costanza___
> 201 W. Madison Ave., Suite 450
> Belgrade, MT 59714
> T: 406-586-0576
> F: 406-794-0750