Granite Peak Law, PLLC
Adam H. Owens, Esq.
Gregory G. Costanza, Esq.
201 W. Madison Ave., Ste. 450
Belgrade, MT 59714
T: 406.586.0576
*adam@granitepeaklaw.com*
*gregory@granitepeaklaw.com*
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| MATTHEW MARSHALL, JOHN MAGUIRE, KEEGAN BONNET, AND ANTHONY AGUILAR, Individuals; and MATTHEW MARSHALL Derivatively on Behalf of Amyntor Group, LLC | 9:21-CV-00019-DWM |
| Plaintiffs | VERIFIED FIRST AMENDED AND FIRST SUPPLEMENTAL COMPLAINT |
| v. | |
| MICHAEL L. GOGUEN, an individual; The Trustee of the MICHAEL L. GOGUEN TRUST, a California Trust; WHITEFISH FRONTIERS, L.L.C., a Delaware limited liability company; TWO BEAR SECURITY, LLC; PROOF RESEARCH, INC, a Delaware Corporation; KAREN VALLADAO, an individual; FRANK, RIMERMAN + CO. LLP, believed to be a California limited liability partnership; SHANE ERICKSON, an individual; SHAWN LEWIS, an individual; | JURY TRIAL DEMANDED |

NIC MCKINLEY, an individual;
RICHARD HEGGER, an individual;
Amyntor Group, LLC, a nominal
Defendant; and DOES 1 through 100.

               Defendants.

---

Plaintiffs Matthew Marshall, John Maguire, Keegan Bonnet, and Anthony Aguilar ("Plaintiffs") hereby re-allege as follows:

## I.      INTRODUCTION

1.      Michael L. Goguen ("Goguen") induced Matthew Marshall ("Marshall") to leave his high integrity position at the U.S. State Department for a job with Goguen's company, Two Bear Security, LLC ("Two Bear Security") and based on a promise by Goguen to fund a private security contracting business to be built on Marshall's personal network and expertise.

2.      While at Two Bear Security, Marshall started a private security contracting business with Goguen called Amyntor Group, LLC ("Amyntor"), which Goguen promised to fund until it was profitable.

3.      Marshall recruited Plaintiffs John Maguire, Anthony Aguilar, and Keegan Bonnet to help Marshall build Amyntor's business.

4.      Together, Marshall and Plaintiffs invested five years of their time and attention between 2013 and 2018 to grow Amyntor into a flourishing business.

5.      During this time, Goguen was involved in a nefarious racketeering Scheme involving prolific sexual and criminal misconduct (the "Goguen Sexual Scheme").

6.      Goguen frequently compromised Plaintiffs' activities by repeatedly seeking to commandeer and use Marshall's skills and contacts; Maguire's contacts; Amyntor's physical, technical, and personnel resources; and Goguen's numerous entities and employees to further this racketeering Scheme.

7.      Goguen has sought to destroy the credibility and reputation of anyone who has attempted to expose this Scheme.

8.      When Goguen's sexually deviant behavior and participation in the Goguen Sexual Scheme compromised Goguen's personal ability to obtain a U.S. government security clearance, based on independent legal analysis and other information, Marshall and Maguire became concerned that the Scheme would jeopardize Amyntor's business dealings and professional reputation that Plaintiffs had built over five years and ultimately prevent Amyntor from obtaining a U.S. government facility security clearance.

9.      Marshall and Maguire raised these concerns to Goguen, to no avail.

10.    Goguen's sexual misconduct, crimes, and participation in the Goguen Sexual Scheme jeopardized the business and reputation that Plaintiffs had built between 2013-2018.

11.    After five years of increasingly fruitful investments of time, resources, and collaboration with their professional network, Amyntor was achieving profitability. At this time Plaintiffs sought to buy-out Goguen's total investment at four times what he invested as a means to salvage the company before it was hopelessly compromised by the Goguen Sexual Scheme and Goguen's and others' efforts to acquire, maintain, and control Amyntor for Goguen's personal benefit.

12.    Knowing Plaintiffs had provided extensive services and property for Goguen's benefit, Goguen ignored their offer and maliciously:

a.    Disregarded the relationships and agreements Plaintiffs entered on behalf of Amyntor which were based on Marshall's and Maguire's contacts.

b.    Impugned and defamed Marshall's and Maguire's character, integrity, and credibility through a pattern of lies and deceit before local, state, and federal law enforcement officials in furtherance of the Goguen Sexual Scheme's purpose to destroy anyone who could or would expose Goguen for his prolific sexual and criminal misconduct.

c.      Disrupted the right of Marshall and Maguire to the legitimate fruits of

their labor and toil within the security, defense, and intelligence community

by compromising their performance track record and having Marshall

indicted on false charges and by associating Maguire with such illicit charges;

d.      Retaliated against and destroyed Amyntor by corruptly dissolving the

Company in September of 2018 to harm Plaintiffs' business and property.

13.      By orchestrating a corrupt Scheme to use Goguen's business

operations, including Amyntor's, to commit illegal acts as part of the Goguen Sexual

Scheme, Defendants injured the business and property of Plaintiffs.

## II.      JURISDICTION AND VENUE

14.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §

1331 because this action arises under the laws of the United States, and 18 U.S.C. §

1964(c), because this action alleges violations of the Racketeer Influenced Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962.

15.      Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because,

*inter alia*, substantial parts of the events or omissions giving rise to the claim

occurred in the District and/or a substantial part of property that is the subject of

this action is situated in the District and under 18 U.S.C. § 1965 because Goguen

and many of the Defendants reside in the District of Montana or in and around

Flathead County, Montana.

## III.    PARTIES

16.    Plaintiff Matthew Marshall ("Marshall") is an individual residing in

Flathead County in the State of Montana.

17.    Plaintiff John Maguire ("Maguire") is an individual residing in

Whitefish, Montana.

18.    A 23-year veteran of the CIA, John Maguire served as a Clandestine

Service Operations Officer and Specialist in Counter Terrorism. Maguire served in

command leadership positions in numerous global trouble spots including Beirut,

Cairo, Jordan, Afghanistan, El Salvador, Honduras, Iraq, and Europe. He was a

Senior Intelligence Service officer at the CIA and assisted in the creation of the

CIA's Counter Terrorism Center (CTC), first as the Deputy, and then the Chief of

the Counter Terrorism Incident Response Team (IRT). In this position he had

regular contact with the Principals and Deputies committee as well as Presidential

access. In 1996, Maguire was directed to the Counter Espionage Group and

Washington FBI Field office for a special assignment. Because of his success in a

sensitive Counter-Intelligence operation he was named the Directorate of

Operations Manager of the Year. This achievement resulted in him being named an

instructor at the Clandestine Services Covert Training Facility and then designated Chief of the Clandestine Operations Training Program.

19.     The day after the 9-11 attacks in 2001, Maguire was tasked to develop and lead the Iraq Operations Group (IOG), first serving as Deputy Chief before assuming Chief of the IOG. His experience in intelligence and covert action programs supported Operation Iraqi Freedom (OIF) and in 2004 Maguire was assigned as the Chief of Operations and Deputy Chief of Station in Baghdad.

20.     Following the Iraq assignment, Maguire became the Deputy Chief of the Clandestine Services Training Base, where he managed all operational and paramilitary training programs delivered by the CIA to all staff, contract case officers and operations officers, as well as all JSOC and SOCOM Tier One SOF personnel and other government agencies. Maguire served in this position until he retired from active duty with the Agency as a member of the Senior Intelligence Service (SIS) in September 2005.

21.     John Maguire has been awarded the Distinguished Intelligence Medal, Intelligence Medal of Merit, and four Meritorious Unit Citations: Serving in Northern Iraq in the 90's; the IOG; Joint Operations in OIF with the United States Marine Corps; and the CTC Incident Response Team. Mr. Maguire currently holds an active TS/SCI clearance inside JPAS.

22.     Marshall met Maguire at a restricted U.S. government training facility in the United States where Maguire supervised Marshall's training and work for the U.S. government in Iraq and Afghanistan.

23.     Plaintiff Keegan Bonnet ("Bonnet") is an individual residing in Flathead County in the State of Montana. After working for Frontier Builders in Whitefish, Montana, Bonnet served as Executive Assistant to Amyntor's CEO, Matthew Marshall.

24.     Plaintiff Anthony Aguilar ("Aguilar") is an individual residing in Flathead County in the State of Montana. Aguilar has a background in information technology ("IT") services and was hired by Amyntor to provide such services.

25.     Defendant MICHAEL L. GOGUEN ("Goguen") is an individual residing in Flathead County in the State of Montana.

26.     Defendant TRUSTEE OF THE MICHAEL L. GOGUEN TRUST DATED 03/28/2003 is believed to be Michael L. Goguen himself and/or other(s) who controlled the Michael L. Goguen Trust for various purposes required by the Goguen Sexual Scheme; this trust is believed to have been formed in California when Michael L. Goguen resided there.

27.     Defendant TWO BEAR SECURITY, LLC is a domestic Montana limited liability company with its principal place of business in Flathead County, Montana where Michael L. Goguen is the sole member and managing member.

28.     Goguen used Two Bear Security to provide his personal security and to fund the personnel and operating expenses of Amyntor Group, LLC.

29.     Defendant WHITEFISH FRONTIERS, L.L.C. is a Delaware limited liability company with its principal place of business in Flathead County, Montana; Goguen is believed to be the sole member.

30.     VALLEY OAK, LLC is a Delaware limited liability company and is believed to have its principal place of business in Flathead County, Montana, with Goguen believed to be the sole member.

31.     Valley Oak, LLC is a sham company used by Defendant Goguen to pay for private jet travel to transport prostitutes in interstate commerce and to pay off prostitute(s) and others having knowledge of Goguen's sexually deviant behavior, crimes, and participation in the of the Goguen Sexual Scheme.

32.     Defendant PROOF RESEARCH, INC. ("PROOF") is a Delaware corporation with its principal place of business in Flathead County, Montana. PROOF is a composite and carbon-fiber barrel rifle company based in Columbia Falls, Montana; Goguen is the majority shareholder.

33.     Defendant KAREN VALLADAO ("Valladao") is a partner with Defendant FRANK, RIMERMAN + CO. LLP in their firm's Tax Accounting Practice, working primarily out of their Palo Alto office.

34.     Valladao provides tax and financial accounting services to Goguen and his many businesses and serves in numerous oversight and management roles for Goguen's businesses, including for Two Bear Security, Amyntor, and other entities described herein.

35.     Defendant FRANK, RIMERMAN + CO. LLP ("Frank, Rimerman") is a California certified public accounting firm and a member of the global network of Baker Tilly International Ltd.

36.     Frank, Rimerman oversaw and assisted Valladao and other agents or employees of Frank, Rimerman with respect to certain Goguen transactions that partially comprise the Goguen Sexual Scheme.

37.     Defendant SHANE ERICKSON ("Erickson") was a City of Whitefish, Montana Police Detective who was tasked with investigating the alleged criminal aggravated sexual assault of PAM DOE[1] by Goguen.

---

[1] For privacy, the actual name of PAM DOE and others has been redacted from this Complaint.

38.     Mr. Erickson was forced to resign from his position as a Police Detective with the Whitefish Police Department for failing to investigate the alleged conduct by Goguen and improperly accepting gifts and other compensation from Defendant Goguen while employed with the Whitefish Police Department.

39.     Defendant SHAWN LEWIS ("Lewis") was hired by Marshall as President of Amyntor to establish and initiate required corporate registrations, identify, procure and manage the U.S. government contracts available for open bid or which did not require security clearances.

40.     On information and belief, Lewis and his wife personally used Amyntor and Two Bear Security company credit cards to embezzle five to six figure sums from Amyntor and up to a seven-figure sum from Two Bear Security by purchasing vacations, jewelry, designer clothing, Tiffany & Co. crystal wine glasses, high-end furniture, and other luxury goods for personal gain.

41.     Lewis often exceeded his monthly credit card limits, initially concealing his unauthorized purchases from Marshall by contacting Frank, Rimerman directly and informing them that Marshall had authorized the purchases and directed them to pay off his company credit card early; this arrangement allowed Lewis to make monthly purchases far exceeding the limit of his card.

42.     Defendant Richard Hegger ("Hegger") is an attorney and member of the State Bars of Montana and New York. Hegger was hired by Goguen and acted in furtherance of the Goguen Sexual Scheme by making false reports about Marshall to local, state, and federal law enforcement agencies and maliciously defaming Marshall.

43.     Defendants Hegger, Valladao, and others conspired with Goguen to dismantle Amyntor, including by wrongfully transferring Amyntor assets to Two Bear Security, as part of their efforts to punish Marshall, Maguire and Plaintiffs for their involvement exposing Goguen's crimes and the Goguen Sexual Scheme.

44.     Defendant Nic McKinley is Founder and Executive Director for DeliverFund, an anti-sex trafficking non-profit organization, who participated or conspired in the criminal theft of trade-secrets and assets of Amyntor Group at the direction of Goguen.

45.     DOE Defendants 1-100 are comprised of currently unknown individuals or entities who, with reckless or negligent indifference to the business and property of Plaintiffs, conspired or participated in the racketeering Scheme orchestrated by Defendants (collectively "Defendants") in the predicate acts alleged herein.

## IV.   THE GOGUEN SEXUAL SCHEME

46.     The Goguen Sexual Scheme consists of a group of entities and individuals, including but not limited to all Defendants, who engaged in the Scheme and sought to profit or benefit from Goguen or companies associated with Goguen, while engaging as principals, co-conspirators, or accessories after the fact, in a pattern of prohibited racketeering activities in violation of 18 U.S.C. § 1962.

A.     THE ASSOCIATION IN FACT

47.     The Goguen Sexual Scheme is an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4), consisting of, but not limited to, the following "persons":

a.     The Defendants Michael L. Goguen; the Trustee of the Michael L. Goguen Trust; Whitefish Frontiers, LLC; Two Bear Security, LLC; PROOF Research, Inc.; Karen Valladao; Frank, Rimerman + Co LLP; Shane Erickson; Shawn Lewis; Nic McKinley; Richard Hegger; and Amyntor Group, LLC, a nominal defendant; and all of their employees and agents who participated in the Goguen Sexual Scheme directly or indirectly;

b.     Entities that own or owned "safe houses" within which Goguen and others had sexual rendezvous with numerous women including strippers, escorts, prostitutes, young women, and others, including but not limited to

Crystal Slopeside, LLC which owns two residential condominiums located in Whitefish, Montana and is managed by its sole member Goguen;

c.      Goguen, individually, and as Trustee of the Michael L. Goguen Trust, Goguen's accounting firm Frank, Rimerman, Karen Valladao, and Valley Oak, LLC, all helped to (1) pay off victims or others involved in the Goguen Sexual Scheme, (2) conceal the activities of the Goguen Sexual Scheme; or (3) deduct payments as false business expenses or false donations that were used to perpetuate the Goguen Sexual Scheme;

d.      Intelligence Participants consisting of Gavin De Becker & Assoc. and Paul McCaghren & Assoc. Inc. and other DOE defendants, which relied on the resources of Amyntor, Two Bear Security, Goguen and other entities to target individuals who could expose the Goguen Sexual Scheme;

e.      Goguen's Trust(s), the trustees of which are named herein as Defendants, from which some payments in connection with the Goguen Sexual Scheme were made or used as a basis to falsely accuse Marshall of wire fraud, money laundering, and tax evasion to the FBI and IRS;

f.      DOE Defendants, including attorneys and law enforcement officials whom Goguen has paid and/or suborned to his will to perpetuate or cover-up the Goguen Sexual Scheme.

g.      Females who have been solicited or trafficked by Goguen or his

associates to perform sexual acts for Goguen unlawfully in exchange for

payment.

48.     All Defendant "persons" are distinct from each other, Goguen, and the

Goguen Sexual Scheme.

49.     Defendant entities are associated with the Goguen Sexual Scheme,

sometimes through common ownership by Goguen himself, or through financial

means that Goguen has paid to such entities, in return for favorable treatment,

resources, money, housing, real property, investments, loans or other benefits arising

from their direct or indirect participation in the Goguen Sexual Scheme.

50.     The Defendants misused or sought to misuse the resources of Plaintiffs

and the operation of Plaintiffs' business through Amyntor, Two Bear Security, or

through other entities in furtherance of the Goguen Sexual Scheme.

51.     The Goguen Sexual Scheme likely continues to this day, having already

occurred over a substantial period of time as it preceded Plaintiffs' relationship with

Goguen and continued throughout the whole time period that Plaintiffs sought to

do business with Mr. Goguen.

52.     On information and belief, Goguen and Defendants continue to

perpetuate the Goguen Sexual Scheme by destroying, stealing, altering and

fabricating evidence; by paying or threatening, or otherwise corruptly influencing current or former law enforcement officials complicit in the Goguen Sexual Scheme; by using attorneys to unlawfully silence women who knowingly participated in the Goguen Sexual Scheme, and through other nefarious means.

53.     Each person involved in and associated with the Goguen Sexual Scheme participated therein in a manner more fully described below.

B.     THE COMMON PURPOSE

54.     The Goguen Sexual Scheme "persons" listed above, including but not limited to the Defendants, associated together for the common purpose to protect Goguen and prevent any harm to his reputation arising from (1) his sexual crimes and misconduct; and (2) his unlawful conduct committed to cover-up such sexual crimes and conduct.

55.     Goguen desires to protect and preserve his reputation and image as a philanthropist.

56.     The non-Goguen Defendants desire to protect Goguen's reputation to profit from Goguen, and his businesses and entities, while knowing of but ignoring or being recklessly indifferent to the crimes Goguen commits, and by participating in the crimes Goguen commits to protect Goguen and the funds they receive from him directly or indirectly.

57.     The non-Goguen Defendants facilitated Goguen's common practice of using his position of wealth and power to target women for unlawful sexual acts.

58.     Goguen and the non-Goguen Defendants associated together through acts meant to protect Goguen's reputation in furtherance of the Goguen Sexual Scheme and in ways that caused injury to Plaintiffs.

59.     Goguen and the non-Goguen Defendants agreed to injure Plaintiffs' business and property once Goguen alerted them to their disfavored status after Goguen discovered the risk of Plaintiffs exposing Goguen's sexual crimes and misconduct when in 2018 Plaintiffs learned the foreseeability that Goguen's sexual crimes and unlawful conduct would frustrate Amyntor's business.

60.     The Goguen and Non-Goguen defendants jointly engaged in acts or aided in and abetted acts by Goguen, including but not limited to:

a.      Intimidating, threatening, extorting, bribing, or misleading Goguen's victims, law enforcement, and the media to prevent the reporting, disclosure, or prosecution of his sexual affairs, crimes, and misconduct in the Goguen Sexual Scheme;

b.      Destroying, mutilating, altering, or concealing records, documents, or other evidence to prevent the use of such evidence to report or prosecute

Goguen's sexual offenses and the offenses of other persons or entities that participated in the Goguen Sexual Scheme;

c.      Breaking and entering multiple residences for the purposes of destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report or prosecute Goguen's sexual offenses and the offenses of other persons or entities that participated in the Goguen Sexual Scheme;

d.      extorting Plaintiffs and others;

e.      dismantling Amyntor's ability to operate, in retaliation to Plaintiffs' exposure of the Goguen Sexual Scheme and at the direction of Goguen;

f.      other unknown acts in furtherance of the Goguen Sexual Scheme.

## C.      THE ROLES OF THE PARTICIPANTS

61.      The Defendants and others participated in the Goguen Sexual Scheme to fulfill the common purpose above.

62.      Each non-Goguen Defendant benefitted financially from Goguen, while knowing that Goguen and, at times each other, were engaging in other unlawful acts as part of the Goguen Sexual Scheme.

63.      Each non-Goguen Defendant had a role in helping Goguen conceal his acts as part of the Goguen Sexual Scheme.

64.     Thus, Defendants were aware of Goguen's misconduct and worked to conceal it so that they could continue to benefit from their lucrative collaborations or associations with Goguen.

65.     Defendants interacted with and regularly reported their activities to Goguen and received further direction from him in furtherance of protecting Goguen, his reputation, and the Goguen Sexual Scheme.

66.     Defendants have knowledge of the other participants and some of their unlawful acts in furtherance of the Goguen Sexual Scheme.

D.      PATTERN OF RACKETEERING ACTIVITY AND PREDICATE ACTS

67.     Defendants have been employed by or have associated with the Goguen Sexual Scheme or the activities thereof which affect interstate or foreign commerce.

68.     Defendants have conducted or participated, directly or indirectly, in the conduct of the Goguen Sexual Scheme's affairs through a pattern of racketeering activity.

69.     The pattern of racketeering activity of the Goguen Sexual Scheme is comprised of, but not limited to, the specific predicate acts described below.

E.      AFFECTED INTERSTATE COMMERCE

70.    The Goguen Sexual Scheme engaged in and affected interstate commerce, because, *inter alia*, Goguen and Defendants used the instrumentalities of interstate commerce, including but not limited to:

a.    funding third parties to investigate, pay-off, intimidate, threaten, travel to violate the privacy of, and harm the reputation and lives of Goguen's victims and enemies who had information about Goguen's sexual misconduct, crimes, and the Goguen Sexual Scheme;

b.    communicating through wire communications in interstate commerce by phone voice, text, encrypted messaging, and email to protect Goguen and preserve his reputation from harm arising from Goguen's participation in transporting, trafficking, harboring or facilitating women who would have sex with Goguen or engage in other illicit acts for money or other items of value from Goguen.

71.    On information and belief, Goguen was using the Amyntor NetJets account, other private jet accounts, and his personal private jet to fly prostitutes, strippers, escorts, or other extramarital women into Whitefish or other places within the United States for sexual encounters (with such occurrences contributing to and partially comprising the "Goguen Sexual Scheme").

72.     Goguen would traffic and pay for his harem of women to have sex with him, or to birth illegitimate children with him, often by purchasing for them through means of interstate commerce, cars, houses, and by giving cash or other items of value for these women to be a part of the Goguen Sexual Scheme.

73.     Casey's Bar, which is operated by Casey's Management, LLC, of which Goguen is believed to be the sole member, was used to lure women to participate in the sexual conduct with Goguen and be part of the Goguen Sexual Scheme, by providing the "boom boom" room as a space that could be used to harbor, sequester, or maintain women for the purpose of committing illicit sexual activity in exchange for items of value given by Goguen or Defendants' employees or third-party hires.

74.     In these ways and through other means of communication in interstate commerce, including cellular phone and email communications, financial transactions, and other means of procurement, the Goguen Sexual Scheme affected interstate commerce.

F.      OPERATION AND MANAGEMENT

75.     Defendants each exerted some measure of control or management over the affairs of the Goguen Sexual Scheme.

76.    Within the Goguen Sexual Scheme, there was a common communication network by which Defendants shared information on a regular basis, including by text message, Wickr, burner phones, and other encrypted messaging systems, which enabled them to secretly cooperate for the purpose of evading discovery of their criminal activities.

77.    The Defendants used this common communication network for the purpose of enabling and facilitating the sexual activities of Goguen, Payne, and others who participated in the Goguen Sexual Scheme.

78.    The Defendants had a systematic linkage to each other through corporate or non-profit ties, contractual relationships, financial ties, or the continuing direct or indirect coordination of their activities through encrypted and unencrypted wire communications in interstate commerce, with Goguen often but not always as a center node, which enabled the Defendants to accomplish a level of cooperation to protect the Goguen Sexual Scheme and each other's role in it.

79.    Each participant in the Goguen Sexual Scheme, including Defendants, committed acts which rose above the level of cooperation inherent in normal commercial transactions between third parties.

80.    Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal Goguen Sexual Scheme.

81.    To achieve their common goals, the Defendants and their co-conspirators hid from the public and law enforcement the unlawfulness of Goguen's conduct and suppressed or ignored warnings from third parties, including Marshall, about his conduct.

82.    Each racketeering activity engaged in by Defendants was related to perpetuating or protecting the Goguen Sexual Scheme or retaliating against those who threatened to expose Goguen's sexual misconduct and crimes in the Goguen Sexual Scheme.

83.    Each Defendant acted with a similar purpose, each participant acted at Goguen's direction or on their own initiative, each Defendant effectively covered up for Goguen's unlawful acts with women, and each Defendant acted to injure Plaintiffs' business or property, in exchange for payment or other benefits stemming from Goguen's financial influence.

## V.    FACTS COMMON TO ALL CLAIMS

### A.    Marshall's Employment Background

84.    Marshall is a highly trained former Marine with specialized skills and extensive knowledge in Anti-Terrorism/Counter-Terrorism operations, overseas and domestic personal security operations and operating in austere and non-permissive environments.

85.    Marshall has served in various senior leadership roles for the U.S. State Department Diplomatic Security Service, High Threat Protection Program as Team Leader, Deputy Detail Leader, Detail Leader for specialty teams and as the Senior Lead Instructor for the High Threat Protection Program.

86.    Marshall served the U.S. government in both domestic and overseas roles including duty assignments where he was introduced to numerous high-level government contacts and gained valuable insight into the resources necessary to plan and implement missions to protect persons and property.

87.    At the time Marshall and Goguen met, Marshall worked on contract for the United States Department of State (the "State Department") as the in-country Team Leader for the Global Ani-Terrorism Assistance Program ("GATA") in Mexico City, Mexico. Marshall also served in this leadership role in Amman, Jordan; Bogota, Colombia; and Erbil, Iraq.

**B.    Marshall's Introduction to Goguen**

88.    Goguen is a former partner of the Silicon Valley venture capital firm Sequoia Capital in California where he worked to fund cybersecurity and networking companies. Many of these companies went public during his tenure at Sequoia.

89.     In or around early 2012, while working in the GATA program in Mexico City with the State Department, actor Huntley Ritter ("Ritter"), an acquaintance of Marshall's, told him that Goguen was looking for someone to provide a professional comprehensive threat assessment.

90.     In November of 2012, the CEO of PROOF Research, Inc., Pat Rainey ("Rainey"), and Goguen invited Marshall to come to the next *Shot Show* event in January of 2013; a shooting, hunting and outdoor trade show in Las Vegas, for Marshall to provide his professional assessment on the quality of PROOF's rifles and carbon fiber barrels based on Marshall's extensive firearms knowledge.

91.     During this visit to *Shot Show* in 2013, Marshall was personally introduced to Defendant Michael L. Goguen by Ritter for the first time.

92.     After the *Shot Show,* Marshall attended a private press event hosted by PROOF executives at an indoor facility known as "The Range 702" in Las Vegas.

## C.     Goguen's Offer of Employment to Marshall

93.     Ritter set up an early morning 30-minute coffee meeting between Marshall and Goguen. The meeting lasted several hours and ended with Goguen inviting Marshall to dinner and drinks later that evening.

94.     Per Goguen's request, Marshall met Goguen for drinks at the Spearmint Rhino, a well-known and exclusive Las Vegas topless strip club.

95.    Marshall and Goguen discussed Goguen's desire for Marshall to travel to Whitefish, Montana and provide a comprehensive threat assessment for Goguen.

96.    Throughout January of 2013, Marshall and Goguen emailed and texted each other and in this correspondence Goguen offered Marshall a job for $195,000 per year to be the CEO of Two Bear Security, LLC in Whitefish, Montana if he left his U.S. Department of State job.

97.    Goguen further promised Marshall platinum level health insurance for Marshall and his family, a vehicle of her choosing for Marshall's wife, a vehicle of Marshall's choosing for himself, a yearly vacation for Marshall and his family fully paid for by Goguen, employment and performance bonuses, paid gym membership for Marshall and his family, a retirement program, and other perks.

98.    Marshall's duties included providing Goguen with a comprehensive threat assessment, making recommendations on how to increase his physical and personal security, evaluating current security personnel working for Two Bear Security, LLC, and doing a vulnerability assessment on a massive, 31,000 square foot fortified bunker project that was in the initial design and construction phase.

99.    Additionally, once on board, Marshall and Goguen would partner to form a new defense, security, and cyber-security company ("NewCo") which Marshall would manage as Chief Executive Officer. Marshall could use his skills, experience

and network and Goguen would fund the project until NewCo's revenue was sufficient to sustain the business after a reasonable period of years.

100.   In February of 2013, Goguen invited Marshall to visit him in Whitefish, Montana and Marshall accepted. Over the course of several days, Goguen gave Marshall a "grand tour of his kingdom," all the while renewing the Two Bear Security job offer as well as the NewCo opportunity.

101.   Marshall told Goguen that he would think about Goguen's offer, speak to his wife, and get back to him regarding the Two Bear Security employment and offer to start NewCo.

102.   In late February or early March of 2013, Marshall and his wife visited Whitefish, Montana. It was during this trip that Marshall agreed to accept Goguen's offer of employment with Two Bear Security and future partnership in NewCo.

103.   Subsequently, Marshall returned to Mexico City, resigned from his position with the Unites States Department of State, helped transition new staff and collected his belongings.

**D.   Marshall's Initial Employment with Goguen**

104.   On or about March 15, 2013, Marshall returned to Whitefish, Montana to perform Goguen's threat assessment and to begin the process of forming NewCo.

105.    Initially, Marshall stayed at the three-bedroom guest suite in the main house of Goguen's residence in Whitefish, Montana.

106.    Goguen's 3,200-acre property is located outside of Whitefish and contains an approximate 75,000 sq. ft. main house, an additional 25,000 sq. ft. underground bunker equipped with several Andair AG nuclear blast doors and accommodations for twenty to twenty-five people for up to a year. There is also a 10,000 sq. ft. lake house and three other houses used for family and employee housing.

107.    At that time Goguen employed around thirty to thirty-five people at his residence, including chefs, nannies, house keepers, and security personnel, a house manager, plus a couple hundred vendors and contractors who routinely worked on the property due to the numerous construction projects going on each day.

108.    Goguen also owned a dozen or more pieces of real property in and around Flathead County, Montana that were used and maintained by various employees, vendors, and contractors. These properties also housed employees of Goguen's multiple businesses.

109.    However, some of Goguen's properties were also used as "safe houses" for Goguen to have extra-marital sexual encounters with numerous women, some of

whom Goguen trafficked to Montana either with his personal $42 million private jet or some other contracted private jet service companies.

110.   Generally, when Marshall arrived in March of 2013, Goguen had extensive business dealings outside of Montana, resulting in Goguen being in California or elsewhere on business during the week and typically only in Montana on the weekends.

111.   From the beginning of their relationship, Goguen expressed his intention for Marshall to be his "right-hand man" and introduced Marshall to many people by that title.

112.   Part of Marshall's compensation package included an agreement by Goguen to purchase and provide physical security upgrades and other renovations for a home where Marshall and his family would live, on the condition that if Marshall stayed as an employee of Goguen for longer than three-years, Goguen would transfer title of the home to Marshall.

113.   Based on this agreement, Goguen and Marshall immediately began looking for a house for Goguen to purchase for Marshall's family.

114.   Goguen also promised Marshall a $200,000 signing bonus to cover his moving expenses, to purchase a new vehicle for both Marshall and his wife, a vacation for Marshall's family with a $40,000 budget, and to cover the earnest

money down payment and some of the renovation expenses to be incurred at the home Goguen was to purchase for Marshall's family.

115.   Marshall received the $200,000 signing bonus on March 18, 2013, by wire from the Michael L. Goguen Trust into his Old National Bank checking account.

116.   Concerned with the potential tax liability arising from the $200,000 initial signing bonus, Marshall inquired with Karen Valladao, Goguen's personal and business accountant, who assured Marshall that the total payment would be increased to offset any tax liability, with such payments to be reflected on Marshall's tax disclosure forms issued by Goguen's accountants at Defendant FRANK, RIMERMAN + CO. LLP.

117.   Marshall began looking for the home Goguen would purchase for him when he moved to Montana in March of 2013. Goguen eventually found a property located at 151 Missy Lane, Whitefish, Montana, which Goguen agreed to purchase.

118.   On or around April 19, 2013, Goguen, through the Crystal Tamarack Trust, closed on 151 Missy Lane in Whitefish, Montana, which was purchased as a residence for Marshall and his family for $2,150,000.

119.   Over the next few years, Marshall significantly renovated, improved, and hardened the 151 Missy Lane property using personal funds that were occasionally reimbursed by Goguen.

120.   Upon arriving in Montana, Marshall immediately began familiarizing himself with the inner workings of Goguen's life, including the operation of his home, personal and business activities, travel, businesses, employees, vendors, contractors, information technology, security systems, background checks, etc.

121.   As part of the threat assessment, Marshall initially had background checks conducted on Goguen's employees who had the most unrestricted access to Goguen and his immediate family. Thereafter, Marshall focused on vetting the vendors and contractors who had unfettered access to the Property.

122.   It took approximately six months for Marshall to familiarize himself with Goguen's personal and family life, household operations, business operations, and to run thorough background checks on all personnel working for Goguen or persons who routinely visited the Property.

123.   Marshall learned that Goguen's household operations and security in general had weak points that needed to be remedied; due to security concerns, two employees with full access to Goguen and his family required immediate intervention.

124.   In a short period of time, Marshall had made many changes to Goguen's household security and business operations, including but not limited to firing several employees, hiring highly qualified security personnel, hardening access points to the property, and improving security hardware and communications, all of which significantly improved Goguen's security.

**E.     Unexpected Additional Responsibilities**

125.   Marshall's initial success improving Goguen's security prompted Goguen to task Marshall with an ever-increasing amount of responsibility over matters that went far beyond the scope of what Marshall had initially agreed.

126.   Before long, Marshall was tasked with ensuring that each of Goguen's businesses and Goguen's household ran smoothly, including overseeing and assisting in the management of Goguen's extensive real estate holdings in Montana, Goguen's staff, employees, vendors, contractors, and a number of Goguen's businesses.

127.   Marshall was appointed by Goguen to the following:

a.     Vice President of Casey's Management, LLC, which operated Casey's Bar in Whitefish;

b.     Trustee to the Michael L. Goguen Trust;

c.     Managing Member of, Amyntas Ventures, LLC;

d.      Vice President and appointed agent of Crystal Slopeside, LLC;

e.      Vice President of Two Bear Services Group, LLC;

f.      Project Manager of NUH Strategically and Fortified Environments bunker project;

g.      Trustee of Old Towne Unit 250 Land Trust;

h.      Trustee of Old Towne Land Trust;

i.      Trustee of Agema Property Trust;

j.      Board Member, Chairman of the Board, and later acting interim Chief Executive Officer of PROOF Research, Inc.;

k.      Board Member of Defiance Machine; and

l.      Manager Goguen's extensive real estate holdings in and around Flathead County.

128.   Marshall's influence over Casey's Management, LLC, PROOF Research, Inc., Defiance Machine, and Goguen's many other businesses resulted in much needed reform, which helped to turn these businesses into more secure and successful enterprises.

129.   Despite his long duty list, Marshall was not compensated for the work he performed for Goguen's side projects and these other entities.

130.   By 2014, Marshall was spending most of his time managing Goguen-related businesses and properties in Montana, including Goguen's household security.

131.   At times, Marshall was working 80 hours per week managing Goguen's affairs, with the majority of duties falling outside Marshall's intended work scope at Two Bear Security or as Managing Member of Amyntor.

**F.     Marshall's Payment of Goguen's Expenses and Reimbursements**

132.   Maintaining Goguen's extensive real estate holdings in Montana was a challenging task, requiring coordination and payment arrangements for plumbers, electricians, cleaners, landscapers, contractors, interior designers, and other vendors who were consistently providing services to Goguen's properties and businesses.

133.   Usually, when Marshall was unable to reach Goguen to arrange advance payment for these property services, Marshall often used personal funds or, at Goguen's direction, funds from Amyntor to cover Goguen's expenses.

134.   Goguen was often unavailable to handle day-to-day management activities and unavailable to communicate with Marshall regarding Goguen's immediate capital needs to sustain his business and property affairs.

135.   When he spent funds on Goguen's behalf, Marshall would seek reimbursement from Goguen by requesting them from Karen Valladao.

136.   At times, Marshall's advances which covered Goguen's expenses would exceed $100,000 or more before reimbursement from Goguen was received, which Goguen typically sent by wiring cash to Marshall's personal checking account or by having Valladao cut checks from the Michael L. Goguen Trust.

137.   Many times, Goguen's wires would be comprised partially of reimbursements for funds already paid by Marshall from his personal account and would include additional funds to cover expected future expenses not yet incurred because of the frequency with which Marshall was making expenditures for Goguen.

138.   These reimbursements and funds for future expenses were typically discussed initially by Marshall and Valladao, and then approved by Goguen, who would personally wire the funds into Marshall's account.

139.   The arrangement was not ideal for Marshall because Marshall was uncertain how Valladao would account for such payments, a concern Marshall expressed to Valladao, but it was the way that Goguen preferred, which allowed Goguen to maintain a degree of influence and control over Marshall through their creditor-debtor relationship.

140.   Valladao and Goguen again confirmed to Marshall that these payments would be properly accounted for to prevent Marshall from incurring any tax consequences therefrom.

141.   Marshall and Goguen agreed that Marshall could spend up to $1,000,000 at any given time to manage Goguen's entities before having a budget discussion.

142.   Goguen informed Marshall it was best to have him pay the property expenses, especially any expenses that were solely for Goguen's "safe houses," out of Marshall's personal account to avoid his then-wife Jordana, who had access to Goguen's accounts, from discovering that Goguen owned a number of properties that he used extensively for extramarital affairs.

143.   In addition to the real property expenses, at Goguen's direction, Marshall was being asked to purchase, out of his personal accounts, vehicles, jewelry, earnest money deposits on properties, and to provide cash or other items for Goguen's mistresses, or as hush-money payoffs to Goguen's acquaintances and employees who had "learned too much" about Goguen's sexual misconduct and crimes, and the Goguen Sexual Scheme.

## G.     Formation and Operation of Amyntor Group

144.   By the Fall of 2013, Marshall started developing the branding and began the process of forming NewCo, which Marshall decided to name Amyntor Group, LLC ("Amyntor").

145.   On October 24, 2013, Amyntor was formed in the state of Delaware.

146.    Goguen and Marshall's plan was for Amyntor to be a defense, security, and cyber security company that would seek contracts with corporate and government clients, including the U.S. government.

147.    Marshall's background in intelligence work, his work with the State Department's GATA program and Advisory Task Force and the Diplomatic Security Service High Threat Protection Program for the U.S. State Department created a unique opportunity for Amyntor.

148.    GATA assists foreign partners to develop the capability for antiterrorism planning and coordination in support of U.S. antiterrorism and counterterrorism objectives.

149.    Marshall's work with GATA gave him insight into contemporary government objectives that sought third party contracts from companies such as Amyntor.

150.    Goguen indicated to Marshall he understood that Amyntor would not be immediately profitable due to the start-up costs associated with hiring personnel, building infrastructure, logistics, acquisition of equipment, and obtaining the experience Amyntor needed to be able to bid on larger security contracts.

151.    Goguen expressed to Marshall Amyntor's immediate profitability was not a concern, which gave Marshall the confidence that Goguen was willing and able

to fund Amyntor while Marshall and Plaintiffs like Maguire pursued higher value and longer-term security contracts.

152.   By the end of 2013 and early 2014, Marshall began developing Amyntor, including but not limited to hiring employees, purchasing computers, communications equipment and tactical hardware, setting up secure communications and information technology systems, securing U.S. government contacts, reaching out to corporate contacts, vetted foreign nationals, and elsewhere for the purpose of obtaining defense and security contracts for Amyntor.

153.   Goguen's initial $1.1M wire transfer investment in Amyntor was used, at Goguen's insistence, to remodel, paint, and set up an office in Whitefish which included purchasing equipment, computers, servers, hardware and office furniture, as well as hiring personnel and to otherwise establish the company.

154.   Marshall first hired Shawn Lewis ("Lewis") as Amyntor's President to establish and initiate required corporate registrations, identify, procure and manage the U.S. government contracts available for open bid as well as other U.S. government contracts that did not require security clearances.

155.   Lewis was able to secure minor Department of Defense and private sector contracts within a short time of being hired. These contracts, valued up to $100,000, were not considered high value contracts, however they provided good

exposure to support the past performance metrics required for obtaining further higher value U.S. government contracts moving forward.

156.   In Mid-2014, Marshall hired John Maguire ("Maguire") because of his background with the Clandestine Services branch of the Central Intelligence Agency ("CIA") from 1982 to 2005 in the Middle East, Africa, South Asia, and Central America.

157.   As Amyntor's Vice President of Special Programs, Maguire worked on acquiring CIA, Department of Defense and other sensitive program contracts.

158.   It was around this time that Marshall and Goguen discussed Amyntor's capability of flying personnel and VIPs to and from time-sensitive secure meetings in Whitefish, Montana.

159.   To that end, Marshall suggested setting up a private jet service account with NetJets, with Goguen capitalizing Amyntor for the amount of such NetJets contract.

160.   On information and belief, the NetJets buy-in was approximately $2M or more, plus an annual subscription and per flight charges.

161.   However, instead of capitalizing Amyntor for this ongoing expense, Goguen decided Whitefish Frontiers, LLC would pay for the NetJets buy-in and gave Marshall account authorization to approve flights on that account.

162.   By the end of 2014, a number of viable contracts had been identified and Amyntor was showing early signs of success. This required Marshall to expand the personnel needed to fill critical positions which would prepare the company for the growth required to qualify for larger U.S. government contracts.

163.   At Goguen's direction, Marshall personally paid for many employee gifts and expenses such as Rolex and Panerai watches and vacations with the understanding that based on their previous dealings, Marshall would be reimbursed by Goguen for these expenses.

164.   However, Goguen did not reimburse Marshall for many of these out-of-pocket expenditures used for Amyntor and Two Bear Security employees.

165.   Due to Marshall and Maguire's U.S. government and Middle East contacts, by the end of 2014, Amyntor's Iraq office had been set up.

166.   By mid-2015, Marshall's connections with the GATA program facilitated the establishment of Amyntor's Mexico City office.

167.   Amyntor then hired Jaime D. Lopez Buitron, a former high-level Mexican government official to connect Amyntor to the Mexican government. Lopez's wife, Christina Reider, the former Director at Price Waterhouse Coopers, Mexico ran the Amyntor Mexico City Office.

168.    Shortly after the Mexico City office was established, López secured three contracts from the Mexican government with a combined value of $2,500,000. Marshall welcomed these contracts as Amyntor's Mexico City office had a modest annual overhead cost.

169.    By this time, Amyntor was invited to bid on a number of domestic and foreign contracts, including intelligence, logistics, security, and helicopter support.

170.    In June 2015, Amyntor set up a liaison office in Fairfax, Virginia for the purpose of securing State Department contracts.

171.    Amyntor hired Tom Williams and Dale E. "Chip" McElhattan to run the Virginia office as they both had previously worked for the U.S. State Department.

172.    Through Tom Williams, the Virginia office was able to secure a number of sensitive contracts through government subcontractors and through McElhattan, a number of contract opportunities with the State Department were secured.

173.    In 2016, Marshall set up an Amyntor office in Texas where certain corporate and high net worth security contracts had been secured. Marshall then transferred Shawn Lewis to lead the Texas office.

174.    In late 2016, Maguire received information from a high-level government official that the Trump administration was looking for private defense contractors to provide intelligence services to the CIA on a few projects.

175.    Based on information provided by the late Duane "Dewey" Clarridge, a retired CIA Senior Operations Officer and others, Maguire and Marshall prepared proposals for three of these projects which were to be presented to the Director of Central Intelligence ("DCI").

176.    DCI knew the administration was looking for proposals for these projects and agreed to meet with Amyntor personnel in the Fall of 2017.

177.    Maguire and Charlie Seidel presented these proposals at the Fall of 2017 meeting, and impressed with Amyntor's proposals, DCI wrote a handwritten note authorizing the contracting officer to prepare project budget numbers to start the process of getting the programs running.

178.    An unnamed person made a copy of DCI's handwritten note, which eventually landed in the hands of Pulitzer Prize winning author Aram Roston ("Roston"), a national security reporter for BuzzFeed.

179.    Subsequently, on November 30, 2017, Roston published and released an article about Amyntor and its proposals to the CIA entitled *The Trump Administration is Mulling a Pitch for a Private 'Rendition' and Spy Network.*"

180.   The publication of this article frustrated Amyntor's immediate but not long-term ability to secure these three projects.

181.   Fortunately, at that time Amyntor had secured other ongoing contracts, including security work for a corporate client in Mexico City and computer hardening and threat assessment for Mexico's national tax administration, the Servicio de Administracion Tributara ("SAT").

182.   When Roston's article brought international attention to Amyntor, Roston spoke with Goguen about his involvement and Goguen downplayed his role as an "early investor." On information and belief, Goguen then pressured Roston to write a favorable article about him regarding the Baptiste affair, which Roston declined.

183.   At that time Amyntor held ongoing personal security contracts for corporate executives worth approximately $50,000 a month per assignment. With bank deposits totaling over $2.5M, by 2017 Amyntor was starting to pull in significant revenue.

184.   When Goguen was informed that Amyntor was securing multiple international contracts that would bring in substantial revenue, Goguen expressed his excitement to Marshall that his funding of Amyntor would soon not be necessary.

185.    However, despite its emerging success, in order to bid on larger contracts, Amyntor required Goguen's ongoing financial backing and investment to prove to the U.S. government that it had the financial means to fulfill its contracts.

186.    Amyntor required Goguen to be eligible for a security clearance in order to secure high value contracts that were currently pursued by Maguire and others within Amyntor.

187.    Marshall sought a U.S. government facility security clearance for Amyntor in 2017, and Goguen understood that he would need to receive a U.S. government personal security clearance in order for Amyntor to obtain the U.S. government facility security clearance.

188.    Marshall communicated these financial and security clearance requirements to Goguen on multiple occasions throughout the operating history of Amyntor.

189.    Despite knowing what it would be require to help the company achieve success, including by being able to receive a personal security clearance, Goguen used his financial backing as part of his Scheme to undercapitalize Amyntor in an effort to extort Marshall's involvement in the Goguen Sexual Scheme.

**H.     The Goguen Sexual Scheme Frustrates Plaintiffs' Business**

190.   When Marshall refused to use personal and Amyntor resources to hack into social media accounts, email accounts and the computers of Goguen's enemies and sexual liaisons or perform other illegal acts for Goguen in furtherance of the Goguen Sexual Scheme, Goguen began executing a plan to destroy Marshall and dismantle Amyntor.

191.   By January of 2018, communications between Goguen and Marshall became even less frequent; Marshall noticed Goguen failed to respond to messages, emails and phone calls.

192.   Marshall became concerned with Goguen's behavior as he had seen Goguen act similarly to other employees before they were terminated.

193.   Marshall trimmed Amyntor's overhead to increase efficiency by closing the Texas, Iraq, Virginia and Mexico City offices.

194.   Despite the negative impact on Amyntor from the Roston article, Amyntor still had a positive dialogue with DCI regarding implementing the projects that Amyntor had proposed to the DCI in the Fall of 2017.

195.   At this time Amyntor continued to receive assurances from high level government officials that if Amyntor stayed afloat, it would get the contract for one of the proposals presented to DCI.

196.    By the Spring of 2018, Marshall was preparing to apply for a Facility Clearance ("FCL") from the U.S. Defense Security Services ("DSS"), now known as the Defense Counterintelligence and Security Agency, so Amyntor could qualify to bid on Secret and Top-Secret U.S. government contracts.

197.    There were also a number of other government contracts pending which, to be approved, required Amyntor to obtain an FCL.

198.    Marshall sought an FCL on behalf of Amyntor and began the application process.

199.    Marshall informed Goguen of the FCL application and Goguen's need to obtain a personal security clearance as a principle of Amyntor.

200.    Marshall understood that Goguen attempted to complete his application for a personal security clearance when Goguen asked him about the scope of disclosure that would be required.

201.    Later during Amyntor's FCL application process, Marshall was informed that Goguen's ownership interest in Amyntor would make it highly unlikely DSS would grant Amyntor an FCL.

202.    Marshall immediately contacted a longtime attorney advisor, who is "of counsel" with a prominent Washington D.C. area law firm, which specialized in

DSS FCL applications, to obtain their opinion on the likelihood of Amyntor receiving an FCL from DSS.

203.   Marshall obtained the opinion, which was consistent with what Marshall suspected; it was not likely DSS would issue an FCL to Amyntor while Goguen was a principal.

204.   With hundreds of millions of dollars from CIA contracts, as well as other funding from third-party contracts at stake, Marshall and Maguire tried to figure out how to detach Goguen from Amyntor so the company could obtain an FCL and avoid jeopardizing the contracting business Plaintiffs had built.

205.   To salvage the company, Marshall and Maguire agreed to approach Goguen and offer to buy him out of Amyntor for $40M, a generous return on Goguen's investment in Amyntor.

206.   In late June or early July of 2018, Marshall met with Goguen and informed him, based on the legal opinions he had obtained, that the pending U.S. government defense and intelligence contracts would not be approved because the DSS would likely never approve Amyntor's FCL in light of Goguen's ongoing sexual proclivities and the current public information available on Goguen, including the highly publicized Amber Baptiste lawsuit.

207.   As such, Marshall offered to purchase Goguen's interest in Amyntor for $40,000,000 to solve the FCL problem posed by Goguen's inability to obtain a security clearance.

208.   Goguen's response was to storm out of the room and refuse to continue the conversation with Marshall.

209.   Goguen was incensed that Marshall had informed him that his sexual misconduct and conduct in furtherance of the Goguen Sexual Scheme compromised Amyntor's ability to effectively operate.

210.   After Goguen's refusal, in July of 2018, Marshall requested written legal memorandums from the Washington D.C. law firm on the likelihood of Amyntor obtaining an FCL from the DSS.

211.   Marshall received two legal memorandums on July 26, 2018, entitled "Facility Clearance Process" and "Facility Clearance Process Part II – Majority Owner-Specific" which provided:

> To obtain an FCL, in addition to other requirements, all Key Management Personnel ("KMP") of the government contractor FCL applicant, must be eligible for a personnel security clearance ("PCL"). As the majority owner of Amyntor, Goguen would have been required to obtain a PCL at the clearance level of the Company's FCL on the basis that majority owners typically have the ability to bind the company, or overrule managers in key decisions, and thus exercise "control" as to its classified contracts. Essentially, the granting of an FCL would be

dependent on the granting of PCLs to the required KMPs, such as Goguen and Marshall.

The PCL application process involves the Office of Personnel Management performing an extensive background investigation of the PCL applicant, "focusing on thirteen areas; (i) allegiance to the U.S.; (ii) foreign influence; (iii) foreign preference; (iv) sexual behavior; (v) personal conduct; (vi) financial considerations; (vii) alcohol consumption; (viii) drug involvement; (ix) possible emotional, mental, and personal disorders; (x) criminal conduct; (xi) security violations; (xii) outside activities; and (xiii) misuse of information technology systems."

212.   Based on the above criteria, the conclusion was that, based on the information publicly available about Goguen, including the $40M Amber Baptiste lawsuit and the $10M hush-payment Goguen had made to her, the OPM will likely conclude that Goguen may be susceptible to exploitation, coercion, or duress and that, as a result, DSS will likely reject Goguen's PCL application, thus jeopardizing Amyntor's FCL application. At a minimum, the complexity of Goguen's PCL application would likely cause a material delay in an already lengthy FCL application process.

213.   Though Amyntor still had a number of revenue earning contracts on the books and many other valuable domestic and foreign agreements under negotiation, on September 6, 2018 Goguen sent out a blanket dissolution notice, abruptly pulling out of Amyntor out of fear that his sexual misconduct and crimes

and the Goguen Sexual Scheme was again at risk of exposure by persons who "knew too much" about Goguen's lurid affairs.

## I.      Marshall's equity involvement in PROOF Research

214.   In late 2013, Goguen appointed Marshall as a Board Member to PROOF Research and by March of 2015, Marshall was appointed as Chairman of the Board.

215.   While Marshall was Chairman of the Board of PROOF, Marshall advised Goguen that immediate and dramatic intervention was required to salvage the company from the risk of massive lawsuits due to the inappropriate behavior of PROOF's then executive(s).

216.   As majority owner, Goguen authorized Marshall to do whatever was necessary to salvage the company. With Goguen's full support, Marshall began terminating several PROOF executives starting with the CEO.

217.   As a stop gap measure, Marshall was appointed interim CEO of PROOF to facilitate a more efficient process of conducting terminations, offering severance packages and facilitating the eventual transfer of authority to the incoming CEO who would manage the company with Marshall's assistance and support.

218.   The removal and damage control process took several months and was an enormous undertaking that consumed a significant amount of Marshall's time from his primary role as the CEO of Amyntor Group.

219.   In the above-described officer and board roles, Marshall was promised equity ownership in the company, however Marshall never received any monetary compensation for his efforts on behalf of PROOF Research, Inc.

220.   Then, on August 15, 2018, Goguen removed Marshall from his role in PROOF Research Inc. out of fear that Goguen's sexual misconduct and the Goguen Sexual Scheme was again at risk of being exposed by someone who "knew too much" about Goguen's lurid affairs.

221.   Marshall suffered harm when Goguen retaliated against him by removing him from PROOF Research without compensating him for the services he provided for the company and/or the equity he was promised.

**J.      Wrongful Commandeering of Amyntor Assets**

222.   On or about March 8, 2019, Goguen, Hegger, Erickson and McKinley trespassed or conspired to trespass into a 1,400 to 1,600 sq. ft. Sunrise Plaza storage unit rented and controlled by Amyntor to store equipment and confidential information for the company's operations.

223.   The Amyntor storage contents were to be liquidated as part of Amyntor's winding up under Marshall's exclusive direction.

224.   Only Marshall and Daniel Linder, another Amyntor employee, had key access to the storage unit, while the owner of the unit, John Dyck, also held a key.

225.   The Goguen, Hegger, Erickson, and Hegger were not authorized by Amyntor or Marshall to enter the Amyntor storage unit.

226.   On information and belief, Defendant Richard Hegger communicated false information to John Dyck at the Sunrise Plaza storage facility that Hegger and Two Bear Security personnel were allowed into the Amyntor storage unit.

227.   On information and belief, Defendant Richard Hegger, directly or indirectly through John Dyck, directed or permitted others to change the locks on the Amyntor storage unit to prevent access by Marshall or Linder based on similar false pretenses of who was allowed access to the storage unit and the reason why these individuals would need access.

228.   On information and belief, Defendant Hegger gave false information to the Flathead County Sheriff's Office, including officer Travis Smith, that it was legal for Two Bear Security "employees" Nic McKinley and Shane Erickson to trespass into the Amyntor storage unit.

229.    On information and belief, Nic McKinley and Shane Erickson were not employees of Two Bear Security at the time of the trespass but were employed by DeliverFund, which Goguen funds and is a member of its board of directors as a means to disguise his sexual misconduct and the existence of the Goguen Sexual Scheme.

230.    Coincidentally, through Daniel Linder, who had the other key to the Amyntor storage unit, Marshall learned on March 8th that unknown individuals were going inside the Amyntor storage unit without permission.

231.    Marshall dialed 911 and reported a trespass in progress at Amyntor's Sunrise Plaza storage unit #5, and then proceeded to drive to the storage unit to assess the situation.

232.    On information and belief, Defendants Shane Erickson and Nic McKinley identified themselves to Flathead Sheriff's Officer Travis Smith and provided false information to Smith that they were associated with Two Bear Security and had authorization to enter the Amyntor storage unit from Mr. Goguen as majority shareholder.

233.    Daniel Linder was able to enter the storage facility based on his status as a law enforcement officer, and informed Marshall that he observed two men inside who he believed to be McKinley and Erickson.

234.   Officer Travis Smith prevented Marshall from approaching the storage unit despite Marshall's insistence that he had the lawful right to enter Amyntor's storage unit as manager of the company and as the person who paid for the unit.

235.   When Marshall did later enter the storage unit, he observed that numerous items had been rummaged through and were missing.

236.   While trespassing into Amyntor's storage unit, it is believed that Erickson and McKinley unlawfully absconded with computer and server equipment, and likely other equipment and trade secrets related to Amyntor's operations.

237.   On information and belief, Defendants Erickson and McKinley sought to conceal their efforts to access the Amyntor storage unit by renting a car and wearing hooded sweatshirts as part of their Scheme to trespass into the Amyntor storage unit and steal company property.

238.   Marshall later found out from the manager of the storage facility that Defendant Richard Hegger had fraudulently informed the manager that Marshall had stolen Amyntor assets and was storing them in the storage unit and convinced the manager to change the lock on Amyntor's unit so that Defendants Shane Erickson and Nic McKinley would be able to access the storage unit so they could rummage through and steal Amyntor assets.

239.    By trespassing or conspiring to trespass Amyntor's storage unit and stealing or conspiring to steal Amyntor assets, Goguen, Hegger, McKinley, and Erickson effectively commandeered Amyntor assets and looted Amyntor of its remaining ability to carry out its performance under valuable third-party security and defense contracts or to wind up its affairs in a legal and orderly manner.

240.    Thus, the Defendants Goguen, Hegger, McKinley, and Erickson were able to continue to maintain their acquisition and control of Amyntor and its affairs through their theft or misappropriation of company assets.

241.    These acts by Goguen, Hegger, McKinley, and Erickson were conducted to further the Goguen Sexual Scheme and retaliate against Marshall by disrupting Marshall's ability to effectively wind up and manage the affairs of the company and resulted in Amyntor suffering damages.

**K.    Breaking and Entering of Marshall's Residence and Theft of Confidential Documents at Goguen's Direction.**

242.    In July of 2020, Marshall and Maguire organized a large number of printed documents relating to the Goguen Sexual Scheme into eight (8) large three-ring binders in anticipation of litigation.

243.    The week prior to an August 10th meeting with counsel, Marshall and Maguire changed the meeting due to a scheduling conflict.

244.   On Sunday, August 9, 2020, Marshall and his daughter were preparing to leave home to run errands and were gone for a couple of hours. Prior to leaving the house, Marshall noticed one of Goguen's Two Bear Air Rescue Foundation helicopters circling the area around his home for about 10 minutes.

245.   Upon returning home from running his errands, Marshall discovered only one of the three-ring binders sitting on top of a garbage can in his garage. Marshall immediately checked his office, and the remaining seven binders were missing.

246.   Without touching the binder in the garage, Marshall immediately called the Whitefish Police Department and reported the burglary and theft of the seven three-ring binders.

247.   On information and belief, Goguen learned Marshall had compiled a large set of evidentiary documents for the meeting scheduled for August 10, 2020 with Marshall's attorneys, either through unlawfully monitoring Marshall's communications or through other unlawful means.

248.   On information and belief, Goguen's Two Bear Air Rescue Foundation helicopter was used to monitor Marshall to assist the burglar on when to enter Marshall's home to steal the evidentiary documents and when to exit Marshall's home without being caught in the act.

249.   Whitefish Police responding officers collected evidence at the scene of the crime, including the binder that was left behind by the burglar.

250.   An investigation of the burglary of Marshall's home is currently pending with the Whitefish Police Department.

## VI.   PATTERN OF RACKETEERING ACTIVITY & PREDICATE ACTS.

### A.   "The Harem"

251.   In 2013, Goguen started probing Marshall to see if Marshall would be accepting of Goguen's extramarital sex life involving tens of women at any given time, which Goguen referred to as "the harem."

252.   Marshall initially "played along" with Goguen to get more information from him and determine the operational risk Goguen's activities posed to their business.

253.   By March of 2014, Goguen volunteered more information about "the harem," sending Marshall graphic pictures and sexually explicit descriptions of his encounters with certain women.

254.   Goguen admitted and showed to Marshall, which Marshall also previously learned from Huntley Ritter, that Goguen had a spreadsheet with some 5,000 women with whom he had sexual relations across multiple States for two decades or longer.

255.   Goguen also admitted to Marshall that he had numerous phone numbers, "burner" phones, email accounts, alias accounts such as "batman 234" on Wickr, and apartments and condominiums that supported his sexual activities and extra-marital affairs with numerous women.

256.   Goguen commonly gave "gifts" of vehicles, jewelry, cash, vacations, air travel, accommodations, alcohol, homes, education expenses, health care expenses, and other high value items, directly or indirectly in exchange for women to "strip" and have sex with him, to perform other deviant sexual acts with him, or to maintain their silence as participants in Goguen's sexual misconduct and the Goguen Sexual Scheme.

257.   It was also at this time that Goguen began to confide in Marshall regarding numerous issues that he was having with some of these women (his "most volatile list") and requested Marshall become involved to remedy these issues and to act as a "fixer" for the Goguen Sexual Scheme.

258.   By 2014, Goguen was giving Marshall's phone number to women in the harem "if anything went wrong."

259.   Marshall started fielding calls from the harem regularly.

260.   In one early example, two women from the harem, Playboy "Playmates," were on a safari in Africa and claimed their passports were lost or

stolen. Goguen offered to send Marshall to Africa to rescue them; Marshall refused but did request his African contacts to help the women for free.

261.   After that incident, Goguen increasingly sought Marshall's assistance when dealing with his harem and the fallout from Goguen's sexual misconduct and the Goguen Sexual Scheme.

**B.     Vanessa Doe**

262.   Vanessa Doe ("VANESSA DOE") was a close friend of one of Goguen's family members.

263.   On information and belief, Goguen met VANESSA DOE at his previous home in Atherton, California while she was visiting Goguen's family member.

264.   On information and belief, VANESSA DOE was under the age of California's age of consent of 18 years old when Goguen and VANESSA DOE met each other.

265.   On information and belief, Goguen had sexual intercourse with VANESSA DOE in or around 2011 when she was approximately 16 years old, in violation of California Penal Code section 261.5.

266.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen

Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.   Specifically, Defendant Goguen violated California Penal Code section 261.51 as described above.

**C.   Kim Doe**

267.   Kim Doe ("KIM DOE") was married to a prominent Whitefish businessman.

268.   Goguen met KIM DOE at a bar in downtown Whitefish in approximately 2012, prior to Marshall's arrival in Whitefish.

269.   After meeting, Goguen and KIM DOE started having a sexual affair and meeting in public for drinks, dinner, etc. in and around Whitefish.

270.   By the summer of 2013, Marshall was introduced to KIM DOE by Goguen.

271.   Goguen repeatedly told Kim Doe that he would divorce his then current wife and marry Kim Doe, which encouraged Kim Doe to continue her relationship with Goguen.

272.   Shortly thereafter, after unsuccessful attempts to reach Goguen to request money, KIM DOE asked Marshall if he had any cash she could have to help with living expenses.

273.   Marshall, feeling sorry for KIM DOE due to her being involved in a relationship with Goguen, provided KIM DOE approximately $400 to $500.

274.   Goguen's and KIM DOE's affair continued through November of 2013 and into 2014, when on information and belief, KIM DOE's husband discovered the affair and filed for divorce.

275.   On or about December 31, 2014, Goguen purchased an 8,254 square foot, 5 bedroom and 7.5 bath home in Kalispell for KIM DOE through Kienas Property Trust that Goguen had set up for this particular transaction.

276.   Shortly after Goguen purchased KIM DOE's home, he set up a Capital One credit card in her name that she could use for living expenses, personal expenses, etc.

277.   KIM DOE almost immediately began spending up to $30,000 per month on vacations, travel, luxury goods, utilities, living expenses, etc.

278.   Due to the large purchase amounts and purchases made while travelling without having first informed Capital One of her travel plans, KIM DOE's credit card was routinely shut off due to potential fraud.

279.   Each time the credit card was shut off, KIM DOE would attempt to reach Goguen to have him turn it back on with little to no success.

280.   After this became a routine issue, Goguen added Marshall as an authorized account administrator to allow Marshall to be able to assist KIM DOE with turning on the credit card.

281.   At this point KIM DOE would instead contact Marshall, rather than Goguen, to assist in having her credit card turned back on and to request Marshall to provide her with cash until the card was turned back on. Marshall always complied with her requests.

282.   On or about July 29, 2015, Goguen requested Marshall to purchase on his behalf a brand-new Chevrolet Suburban for KIM DOE that she had picked out at Eisinger Motors in Kalispell, Montana.

283.   On August 3, 2015, Goguen wired $62,590 into Marshall's personal checking account for the purchase of KIM DOE's Suburban.

284.   On or about August 5, 2015, Marshall withdrew $2,500 in total from two of his personal accounts for floor mats, paint treatment, interior treatment and other extras for KIM DOE's Suburban.

285.   On or about August 5, 2015, Marshall met KIM DOE at Eisinger Motors and provided Eisinger with a personal check out of his personal checking account in the amount of $58,500 plus approximately $4,000 in cash for the purchase of KIM DOE's Suburban and add-ons. The purchase agreement lists the

buyer of the Suburban as Lakestream Properties, LLC, a Goguen owned entity of which Marshall was installed as Manager.

286.   KIM DOE's Suburban was insured under Two Bear Security, LLC's insurance policy.

287.   On April 21, 2017, at Goguen's direction, Marshall executed a bill of sale on Lakestream Property, LLC's behalf selling the Suburban to KIM DOE in the amount of $1.00.

288.   After witnessing their relationship over several years, Marshall came to understand that Goguen had placed KIM DOE and her children in a position of utter dependence based on false promises and emotional manipulation to satisfy his sexual appetite.

289.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are indictable offenses under 18 U.S.C.

a.   Defendant Goguen has violated § 45-5-704, MCA in relation to sexual servitude by purposely or knowingly using fraud, coercion, or deception to compel Kim Doe to engage in commercial sexual activity.

**D.    Amber Baptiste**

290.   The following facts regarding Amber Baptiste were learned by Marshall through conversations with Goguen.

291.   Goguen groomed Baptiste to perform sex acts with him since she was a young woman after meeting her in a strip club in Texas where she was a dancer.

292.   Baptiste told Goguen that she had been trafficked to the United States from Canada as a teenager to be a stripper. Goguen promised to help Baptiste to get out from underneath the control of the sex traffickers.

293.   Goguen plied her with money, gifts, flights, and expensive accommodations and promised to pay for Baptiste's higher education expenses as a means to wield control over her to continue his sexually dominant relationship with her.

294.   On information and belief, Goguen provided Baptiste with such money, gifts, flights, and expensive accommodations through the use of Michael L. Goguen Trust, Valley Oak, LLC, and Whitefish Frontiers, LLC bank accounts and assets.

295.   Baptiste grew frustrated over Goguen's false promises and the physical and mental abuse she was subjected to by Goguen over the years and confronted him about it.

296.    Goguen, in multiple conversations with Marshall orally and by text, discussed the issues he was having with Amber Baptiste.

297.    On or about May 29, 2014, Goguen texted Marshall that he paid Baptiste "a zillion dollars to go away."

298.    Goguen told Marshall that he had Baptiste setup an LLC and a 501(c)(3) in her name in order to pay her to remain silent.

299.    On information and belief, on May 30, 2014, Goguen made a wire transfer from his Valley Oak, LLC bank account of $9.7M to a Canadian bank where Baptiste was the beneficiary.

300.    Goguen made a separate transfer of $300,000 to another entity controlled by Baptiste.

301.    Goguen continued to keep Marshall apprised of issues he was having with Baptiste after he paid her the $10M portion of the $40M agreed upon settlement to "go away."

302.    When their affair did not quiet down Goguen sought Marshall's assistance targeting Baptiste through cyber operations, reporting of immigration fraud, and other means.

303.   Goguen informed Marshall in person and on the phone on separate occasions that he was advised by his attorneys that if he could get Baptiste deported then his case with Baptiste would go away.

304.   On August 20, 2015, Goguen sought Marshall's help conducting his "first move" against Baptiste, which was to have her investigated for felony immigration fraud which "was left in limbo." Marshall did not assist in this request.

305.   Marshall observed the psychological pain and pressure that Goguen relentlessly applied to Baptiste.

306.   As their relationship deteriorated further, on March 8, 2016, Baptiste filed a lawsuit against Goguen that immediately garnered worldwide press coverage.

307.   The day after returning from a flight with Goguen to Los Angeles regarding Baptiste's complaint, Marshall visited Goguen's house in his office where Goguen told Marshall that he wanted "this," referring to Baptiste, "finished."

308.   Because Goguen had previously and similarly solicited Marshall to kill another individual discussed below, Bryan Nash, Marshall interpreted Goguen's statement that he wanted "this finished" as an instruction or encouragement for Marshall to kill Baptiste.

309.   Marshall did not follow through with Goguen's instruction or encouragement to kill Baptiste.

310.   About a week after the lawsuit was filed, on March 16, 2016, Goguen sent Marshall a Wickr text message where he asked Marshall to be his "full time … general, 1000x more aggressive than Patton was, to coordinate and make sure everything is happening that should be happening – PR firms, private investigators, criminal side, local PR, everything" with respect to the targeting of Amber Baptiste.

311.   In the same message, Goguen states to Marshall that he wants Marshall to "dedicate as many of the folks at Amyntor to it as well and get as many resources as you can or need, use Amyntor as HQ and let's get this bitch!"

312.   Goguen sought to have the intelligence and security resources of Amyntor target Amber Baptiste, and asked Marshall to use his expertise to "become absolutely obsessed with doing this … full time …"

313.   Through his conduct, Goguen indirectly threatened to have Ms. Baptiste harmed or murdered through the coordination and instrumentalities of Marshall, using the resources of Amyntor, Defendants and others.

314.   Instead of violating the law, Marshall sought other legal avenues to investigate Baptiste on Goguen's behalf, principally by hiring and overseeing the work of Gavin De Becker & Assoc. ("Gavin De Becker"), a private investigation firm located in Glendale, California.

315.   The expenses incurred by Gavin de Becker were paid for out of Amyntor bank accounts as directed by Goguen.

316.   When Amber Baptiste filed her civil complaint in the Superior Court of California, San Mateo County in March of 2016, including allegations that Goguen sexually abused her during their ten (10) year extra-marital relationship, Goguen was terminated by Sequoia Capital, with whom he was working at the time.

317.   During the litigation, on information and belief, Baptiste reported Goguen to federal law enforcement for sexual assault and other crimes related to sex trafficking and prostitution.

318.   On information and belief, Goguen had knowledge of Baptiste reporting him to federal law enforcement based on Baptiste's communications to him and others about her reports to law enforcement.

319.   During the litigation Goguen employed a number of litigation tactics and surveillance tactics to instill fear in and intimidate Baptiste, resulting in Baptiste not being able to effectively bring her case against Goguen or to properly defend against Goguen's fraudulent allegations.

320.   The intimidation by Goguen resulted in a default judgment in San Mateo court against Baptiste in favor of Goguen on all of Baptiste's claims and Goguen's counterclaims; awarded Goguen the $10M he paid her pursuant to the

settlement agreement; enjoined Baptiste from using, sharing, or publicizing any recording or transcription of her private telephone conversations with Goguen; and granting a civil harassment restraining order that protects Goguen and his current wife Jamie Goguen.

321.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.   Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging, or facilitating Marshall, knowing that Marshall was capable of doing so, to cause the homicide of Baptiste, an offense chargeable under state law § 45-5-102, MCA.

322.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.   Defendants Goguen, individually and as Trustee of the Michael L. Goguen Trust, and Whitefish Frontiers, LLC, and Valley Oak, LLC have violated 18 U.S.C. § 1952 relating to interstate and foreign transportation in

aid of the Goguen Sexual Scheme by paying for the transportation of and

transporting Baptiste domestically and internationally for prostitution;

b.      Defendant Goguen has violated 18 U.S.C. § 1513 relating to

retaliation of a witness, victim, or informant of Goguen's sexual misconduct

and the existence of the Goguen Sexual Scheme, including by targeting

Baptiste to harass, intimidate and extort her silence around March 16, 2016;

c.      Defendants Goguen, individually and as the Trustee of the Michael L.

Goguen Trust, and Whitefish Frontiers, LLC, and Valley Oak, LLC have

violated 18 U.S.C. § 2421 relating to interstate travel of Baptiste with the

intent for her to engage in prostitution and 18 U.S.C. § 2422 relating to

persuading or inducing someone to travel in interstate commerce to engage in

prostitution;

**E.      Bryan Nash**

323.    Goguen, in multiple conversations with Marshall, discussed the issues

he was having with Bryan Gregg Waterfield Nash ("Nash").

324.    Nash knew Goguen from Goguen's past association with Sequoia

Capital and they were good friends for a long period of time.

325.    During the time that Goguen lived in California and had a friendly

association with Nash, Goguen, while married to his first then his second wife,

started asking Nash to go to strip clubs and engaging in illicit sexual activity that made Nash increasingly uncomfortable.

326.   One day, Goguen brought his high school aged babysitter and his two daughters to Nash's house. Upon arriving, Goguen disappeared with the high school babysitter to Nash's guest cottage to engage in sexual acts.

327.   Nash later confronted Goguen over this incident, calling Goguen a "pedophile," which permanently soured their relationship.

328.   Goguen threatened to kill Nash if he "said anything to anybody" about his "character flaw," later telling Nash that he "owns Montana" and "supplies law enforcement."

329.   Goguen then began investigating Nash, had sex with Nash's then wife with whom Nash was divorcing, and paid for Nash's wife's legal expenses in the divorce, making Nash's divorce longer and more expensive than it would have been otherwise.

330.   Goguen directed Marshall to carry out and supervise some of the activities against Nash, including overseeing the work of Gavin de Becker & Associates, who tracked Nash's whereabouts and harassed him and his children.

331.   Nash reported Goguen's actions to local, state and federal authorities in Montana, to no avail.

332.   On information and belief, Goguen had knowledge of Nash reporting Goguen's alleged crimes to federal law enforcement.

333.   Former detective Defendant Shane Erickson, on Goguen's behalf, threatened Nash, telling him he would be arrested if he came to Montana.

334.   Goguen discussed with Marshall his concerns about Nash and Goguen's desire to investigate and silence Nash because of Nash's knowledge of the Goguen's sexual misconduct and the existence of Goguen Sexual Scheme, including Nash's personal knowledge that Goguen had an illicit sexual relationship with a high school aged girl and other young or underage women/girls.

335.   On September 19, 2014, Goguen wrote to Marshall under the Wickr alias batman234, where he stated: "Nash[REDACTED] has pushed me too far and his occasional reminders he might help blow the lid off my personal life requires an extreme response. The cyber route isn't having the impact on him that I was hoping to achieve. Buddy, he's [REDACTED] with my life, career, etc. and the potential for me being destroyed if he gets traction with the authorities or press is significant. This requires an extreme response. He will [REDACTED] destroy the "bigger picture" for us if he's not stopped. He needs to be killed. I know that's a VERY big ask but we are in defcon 5. We can discuss details in person but we do NOT have conversations about this on our cell phones. Wickr only…"

336.   On the same day of September 19, 2014, Goguen seeks to have Marshall target Nash's burner phone number and regular cell phone number for cyber-crimes and inquires whether Marshall can find out Nash's other numbers "without leaving a trail." Goguen then states: "As a reminder, the burner phone number is: [REDACTED] his real cell phone number is: [REDACTED]. He may have other phones registered to his name (I wonder if you had a channel to find out without leaving a trail?). Part of the mind fucking for these same message(s) we craft to go to both his burner phone and his real phone (or all his real phones, to freak him out even more)."

337.   Goguen then sent Marshall three addresses for Nash in California, telling Marshall "That last one is up in Lake Tahoe, which is a lot less populated than his other loc."

338.   Marshall did not follow through on Goguen's solicitation to have Nash hacked or murdered at "a lot less populated" location.

339.   Marshall explained to Goguen that it "doesn't work this way" and sought to dissuade Goguen from going to extreme measures against his enemies.

340.   Goguen found other means to silence Nash by accusing Nash, like he had successfully accused Baptiste, of trying to extort him based on the information

they possessed about Goguen's sexual misconduct and the existence of the Goguen Sexual Scheme.

341.   Goguen's efforts reporting Nash to the FBI and other law enforcement for alleged extortion resulted in Nash being indicted federally based substantially on information provided to law enforcement by Goguen.

342.   Nash subsequently entered into a plea deal wherein he plead guilty to one Claim of blackmail in violation of 18 U.S.C. § 873 based on an email between he and Goguen, wherein Nash offered to invest money for Goguen.

343.   Paragraph 10 of Nash's plea agreement states: "**<u>Voluntary Plea</u>**: The defendant and the Defendant's attorney acknowledge that no threats, promises, or representations have been made to induce the defendant to plead guilty, and that this agreement is freely and voluntarily endorsed by the parties."

344.   On information and belief, Goguen has, over at least the past ten (10) plus years, before, during and after Nash's plea deal, intimidated and harassed Nash.

345.   Notwithstanding the "Voluntary Plea" statement within Nash's plea deal, due to the immense amount of stress resulting from Goguen's decades long campaign of intimidation, threats, harassment, stalking, and instilling of fear, among others, Nash believes he had no choice but to enter his guilty plea in an effort to end Goguen's campaign of intimidation and harassment against him.

346. The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a. Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging or facilitating Marshall, knowing that Marshall was capable of doing so, to cause the homicide of Nash, an offense chargeable under state law § 45-5-102, MCA.

b. Defendant Goguen violated § 45-5-203, MCA involving intimidation when, under circumstances that reasonably tend to produce a fear that it will be carried out, threatened to kill or otherwise inflict harm on Nash, or meant to cause reasonable apprehension of bodily injury in Nash.

347. The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a. Defendants Goguen violated 18 U.S.C. § 1513(b) relating to retaliation of a witness, victim, or informant of his sexual misconduct and the Goguen Sexual Scheme, by threatening Nash with the intent to retaliate against him for his providing information relating to the commission or possible

commission of a federal offense arising from the Goguen Sexual Scheme to federal law enforcement officers.

b.      Defendants Goguen violated 18 U.S.C. § 1958 relating to murder-for-hire, by using the mail or other facilities of interstate commerce (electronic communications), with intent that murder be committed in violation of § 45-5-102, MCA as consideration for the receipt of money and other things of value received, or to be received, by Marshall.

## F.      Lisa and Larry Wood

348.    Goguen invested money in a business plan that Larry and Lisa Wood, husband and wife, brought to him for cancer research.

349.    Goguen relocated the Woods and their children to Whitefish, Montana, bought them a home, and set up a company by the name of Left Side Research, LLC ("LSR") and capitalized LSR with at least one and a half million dollars ($1.5M).

350.    Within approximately six months after the Woods moved to Whitefish, Goguen started asking Larry Wood to cyber-hack, digitally surveil, and harass victims and enemies of Goguen.

351.    Goguen informed Marshall that Larry Wood was an exceptionally gifted hacker and that he had aimed Larry Wood at some of his problem women.

352.   Within a short time after Larry Wood started helping Goguen, Larry started to realize the criminal nature of what Goguen had requested.

353.   Shortly after, Larry Wood contacted Marshall and Jordan White, one of Goguen's employees, telling them he was very disturbed by what he was finding and that he could not continue to do this type of work for Goguen.

354.   Around this same time, Larry Wood confronted Goguen and told him that he was no longer going to do what Goguen had tasked him to do.

355.   When Goguen pushed back on Larry Wood for refusing to assist him with cyber-hacking, Larry threatened to report Goguen to law enforcement.

356.   Goguen immediately started applying as much pressure as he could on Larry and Lisa Wood.

357.   Goguen was also simultaneously enlisted the help of LSR employees to give statements against Larry and Lisa Wood.

358.   Goguen promised the LSR employees that if they assisted in dissolving LSR and forcing the Wood family to move out of the state of Montana, Goguen would pay all of the LSR employees a substantial severance package.

359.   Goguen made an additional cash payment to a particular LSR employee in the approximate amount of $185,000.00.

360.    Goguen instructed Marshall to use Amyntor resources to have Larry Wood surveilled 24 hours a day, 7 days a week until further notice.

361.    Marshall, per Goguen's instructions, outsourced approximately 12 contractors to perform 24-hour surveillance on Larry and Lisa Wood.

362.    The cost of the Wood's surveillance crew was paid out of Amyntor funds per Goguen's instructions, in an approximate amount exceeding $100,000.

363.    Goguen also reached out to Sheriff Chuck Curry who tried to apply some pressure on Larry Wood via the Sheriff's Office.

364.    This inflamed the situation and Larry started getting unpredictable and making additional threats of reporting Goguen to law enforcement.

365.    Goguen next reached out to the FBI, accusing Larry and Lisa Wood of a multitude of crimes with regards to the funding Goguen provided LSR.

366.    Goguen effectively had enormous pressure applied to the Woods through use of the surveillance team, the FBI, and attorney Randy Cox, from Missoula and the LSR company accountant, Jim Rucker.

367.    A local FBI agent did an in-depth investigation on the Woods that Marshall assisted with on Goguen's behalf.

368.    Often times Marshall would communicate directly with the FBI Agent giving him updates on activity and movements of the Woods.

369.    During the ongoing FBI investigation, Larry Wood communicated to Goguen the information he had, which caused Goguen to panic.

370.    In response, on or about December 16, 2015, on behalf of the Michael L. Goguen Trust, Goguen directed attorney Randy Cox to send a prepared lawsuit and demand for jury trial to attorney Gary Crowe, who was representing the Woods in the matter, accusing the Woods of 10 counts of criminal conduct.

371.    Goguen asked Jordan White to apply enormous pressure on Larry, evict him and his family at Christmas time from the home Goguen had purchased for the Woods, and give Larry the ultimatum that he needed to pack up and leave the state.

372.    On December 3, 2015, Lisa Wood stated on Larry Sticka's (Larry Wood's) Facebook page that Goguen had pulled the plug on LSR, that the Woods were not going to "stand for his strong-arm bullying tactics" including from the "entire Two Bear Team" and that the Woods possessed information about Goguen's "personal antics" that was likely related to Goguen's sexual misconduct and participation in furtherance of the Goguen Sexual Scheme.

373.    When Larry refused to pack up and leave the state of Montana, Goguen knew he could not risk Larry revealing the information he had uncovered, so Goguen asked Marshall to accompany Jordan White to Larry's residence to provoke and intimidate Larry further.

374.   On November 30, 2015, Goguen communicated the following plan to Marshall: First, Jordan White was to attempt to talk Larry Wood out of releasing the information he had on Goguen; then if that was unsuccessful, Goguen directed that Marshall, since Larry was known to be armed and aggressive, to "gun him down."

375.   Based on Goguen having previously directed Marshall to kill Bryan Nash, Marshall interpreted Goguen's directing him to "gun Larry down" as Goguen soliciting him to commit deliberate premeditated homicide of Larry Wood.

376.   Marshall did not follow through with Goguen's solicitation to kill Larry Wood.

377.   It was common knowledge that Larry was almost always armed and emotionally charged because of the pressure Goguen was applying on Lisa and Larry Wood and their two young children during Christmas time.

378.   Goguen suggested Marshall take other Amyntor employees with him as "witnesses" and to further intimidate Larry.

379.   Goguen directed Marshall to make sure that they were heavily armed since Wood was in possession of several weapons, including several high-powered rifles.

380.   Marshall elected to take only one Amyntor employee, Gabriel Ruff, in an effort to minimize the possibility of provoking a violent response from Larry.

381.   Marshall reached out to Sheriff Curry because this was outside of the norm. Sheriff Curry told Marshall that he had talked to Goguen, and he was comfortable with Amyntor's involvement should there be a violent confrontation with Larry and to call him directly if Marshall needed additional resources.

382.   Marshall and Ruff accompanied Jordan White to the Wood's residence.

383.   Marshall informed Amyntor employee Ruff what they were asked to do by Goguen but that they would not be getting out of the back of the Chevy Suburban since the windows were darkly tinted and Larry would be unable to see them inside of the vehicle.

384.   Marshall reconfirmed the rules of engagement to White and Ruff as they were turning into the driveway of the Wood's residence and further clarified that unless White was in imminent danger, he and Ruff would stay concealed inside of the SUV to avoid further escalating the situation.

385.   Goguen knew Larry was heavily armed and requested Marshall to provoke a response from Larry, which Marshall did not respond to because of the potential harm that could befall the Woods, White, Marshall, Ruff, and the Wood's two young children.

386.   At the conclusion of the incident, Larry had been aggressive and angry with White, but did not become violent. Marshall attributes a peaceful outcome to the skilled handling of Larry by Jordan White. White's many years of law enforcement experience and de-escalation techniques were invaluable.

387.   The entire Woods debacle was resolved when Goguen offered and paid Larry and Lisa Wood money and moving expenses provided they entered into a non-disclosure and non-disparagement agreement that was drafted by Goguen's attorneys.

388.   On information and belief, Goguen paid Larry Wood money and moving expenses out of the Michael L. Goguen Trust as its trustee.

389.   When Marshall questioned Goguen on what Larry Wood was doing and what Larry could possibly have on him, Goguen refused to discuss any specifics with Marshall.

390.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.   Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging, or facilitating Marshall

and others, knowing that they were capable of doing so, to cause the deliberate homicide of Larry Wood, an offense chargeable under state law § 45-5-102, MCA.

b.      Defendant Goguen and Two Bear Security, LLC violated § 45-5-203, MCA involving intimidation when, under circumstances that reasonably tend to produce a fear that it will be carried out, threatened to inflict harm on Larry Wood, or meant to cause reasonable apprehension of bodily injury in Larry Wood.

c.      Defendant Goguen, the Trustee of the Michael L. Goguen Trust, and Two Bear Security, LLC have violated § 45-7-206, MCA for tampering with a witness for purposely or knowingly attempting to induce or otherwise cause Larry Wood to withhold testimony, documents, or information from an official proceeding.

391.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.      Specifically, Defendant Goguen and the Trustee of the Michael L. Goguen Trust violated 18 U.S.C. § 1510 by willfully endeavoring by means of bribery to obstruct, delay, or prevent Larry Wood's communication of

information to a criminal investigator in relation to crimes committed by Goguen in violation of criminal statutes of the United States.

b.      Defendants Goguen violated 18 U.S.C. § 1958 relating to murder-for-hire, by using the mail or other facilities of interstate commerce (electronic communications), with intent that murder be committed in violation of § 45-5-102, MCA as consideration for the receipt of money and other things of value received, or to be received, by Marshall and other Two Bear Security, LLC personnel.

## G.      Shane Erickson and the Cover-up of Crimes involving PAM DOE

392.    On April 24, 2018, Detective Shane Erickson ("Defendant Erickson") of the Whitefish Police Department ("WFPD") informed Marshall that he was investigating allegations that Goguen had participated in the sexual assault of a teenage female, (referred to herein as "PAM DOE"), who had been provided alcohol, cocaine, and money by Goguen, Eric Payne, and a third individual.

393.    Defendant Erickson told Marshall that PAM DOE was introduced to Goguen by Eric Payne, who at the time was a friend and business associate of Mr. Goguen, with the intent to "party."

394.    Detective Erickson indicated that during the course of his interview with Goguen, he confirmed PAM DOE was consuming alcohol, snorting cocaine supplied by Mr. Payne and stripping because she was being paid a large sum of cash.

395.    Upon further questioning by Det. Erickson, Goguen admitted that towards the end of the evening he had sexual intercourse with PAM DOE and paid her $1,200.

396.    Erickson informed Marshall that he intended on following up with another interview of PAM DOE to complete a formal investigative report.

397.    Marshall told Erickson he would like Erickson to go with him to speak with the Federal Bureau of Investigation regarding information he had discovered about Goguen's conduct relating to the alleged sexual assault of PAM DOE and related matters.

398.    During the course of April, May and June 2018, Det. Erickson openly shared with Marshall the fact that he was spending time with Goguen, including having dinner at his house, spending time on Whitefish Lake, going on a coyote hunt and doing other leisure activities with their families.

399.    Erickson also informed Marshall that Goguen had offered to take him on his yearly week-long $20,000 elk hunt in Colorado with private guides.

400.   Det. Erickson was adamant to Marshall that he would never accept a trip like that because it was inappropriate, and he could never afford to go on a hunting trip that was so expensive.

401.   Marshall cautioned Det. Erickson that he was treading in dangerous waters with Goguen, and it could be used to influence Det. Erickson's criminal investigation into PAM DOE. Det. Erickson reassured Marshall that he had full command of the situation and that Goguen would never be able to compromise him.

402.   Marshall later saw Erickson at Goguen's one-year wedding anniversary party for Goguen's fourth marriage at the Goguen residence.

403.   Ultimately Erickson did accept the $20,000-dollar Elk hunting trip from Goguen in September of 2018, traveling with Goguen to Colorado via private jet.

404.   On Sept. 1, 2018, Marshall inquired to Whitefish PD Chief Bill Dial ("Chief Dial") about the PAM DOE case Detective Erickson had shared with him. Chief Dial indicated that he had no idea about any PAM DOE case.

405.   Marshall related to Chief Dial what he had learned about the matter from Erickson and later gave a statement around October 1st and 2nd 2018 to the Whitefish Police Department.

406.    Marshall later received corroborating evidence in the form of an email from PAM DOE to attorney Patricia Glaser who represented Amber Baptiste in her breach of contract lawsuit against Goguen. In the email Pam Doe stated Goguen paid her $1,200 to have sex with him when she was 17 years old.

407.    On information and belief, PAM DOE recanted her story through the execution of a sworn declaration after being threatened by an attorney of Goguen, was forced to sign a non-disclosure and non-disparagement agreement and was paid indirectly by Goguen for the purpose of maintaining PAM DOE's silence or complicity.

408.    On information and belief, PAM DOE's signing of the sworn declaration was secured by Bruce Van Dalsem of Quinn Emanuel Urquhart & Sullivan, LLP, who personally flew to Montana, met with PAM DOE, and had her sign a pre-prepared declaration recanting her allegations.

409.    Additionally, on information and belief, PAM DOE received legal assistance from Goguen through an attorney paid for by Goguen.

410.    PAM DOE was involved in the Goguen Sexual Scheme because Goguen paid her to have sex with him, and then Goguen paid her again to keep their illicit relationship quiet.

411.   Shane Erickson participated in the Goguen Sexual Scheme when, in violation of his duty as a Whitefish Police Detective, he cooperated with Goguen to conceal the sexual crimes alleged by PAM DOE against Goguen by intentionally failing to investigate those crimes.

412.   Shane Erickson's cooperation with Goguen was obtained by Goguen offering and Shane Erickson accepting things of value and other consideration and was above the level of cooperation inherent in a normal transaction between a police detective and an alleged suspect.

413.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.      Specifically, Defendants Goguen and the Trustee of the Michael L. Goguen Trust violated § 45-7-101, MCA by knowingly offering or conferring upon then Det. Shane Erickson and Shane Erickson knowingly accepting a pecuniary benefit in the form of an all-expense paid $20,000 hunting trip via private jet travel to Colorado and other financial benefits as consideration for Det. Erickson's failure to perform his duty to investigate the alleged sexual assault of PAM DOE by Defendants Goguen and Eric Payne, as part of a

pattern of racketeering activity to conceal Goguen's sexual misconduct and the Goguen Sexual Scheme.

b.      Defendant Goguen and Eric Payne have violated § 45-5-601, MCA relating to patronizing prostitution from PAM DOE, who at the time was a child under the age of 18, an offender of which shall be punished by imprisonment in a state prison for a term of 100 years.

c.      Defendant Goguen and Eric Payne have violated § 45-5-602, MCA and §45-5-603, MCA related to promoting prostitution by encouraging, inducing, or otherwise purposely causing PAM DOE, who at the time was a child under the age of 18, to become a prostitute and aggravated promotion of prostitution by compelling PAM DOE to engage in prostitution under fraud or coercion, an offender of which shall be punished by imprisonment in a state prison for a term of 100 years.

414.    The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.      Specifically, Defendants Goguen, individually and as the Trustee of the Michael L. Goguen Trust, have violated 18 U.S.C. § 1510 by having willfully endeavored by means of bribery to obstruct, delay, or prevent Shane Erickson

from communicating information Marshall and Erickson had discovered
about Goguen's conduct relating to the alleged sexual assault of PAM DOE
and related matters to the FBI.

b.      Defendants Goguen, individually and as the Trustee of the Michael L.
Goguen Trust, have violated 18 U.S.C. § 1512(b) by corruptly persuading or
attempting to persuade or by engaging in misleading conduct toward Shane
Erickson with the intent to hinder, delay, or prevent Shane Erickson from
communicating information relating to Goguen's sexual misconduct, the
Goguen Sexual Scheme, and the alleged sexual assault of PAM DOE to the
FBI.

c.      Defendants Goguen, individually and as the Trustee of the Michael L.
Goguen Trust, and Whitefish Frontiers, LLC, and Valley Oak, LLC have
violated 18 U.S.C. § 1952 relating to interstate transportation of Shane
Erickson via Goguen's private jet, believed to be paid for and maintained by
Valley Oak, LLC, Whitefish Frontiers, LLC and Goguen, individually and as
the Trustee of the Michael L. Goguen Trust, to promote, manage, establish,
carry on, or facilitate the promotion, management, establishment, or carrying
on, of the unlawful activity, among others, of bribing Erickson and in
furtherance of the Goguen Sexual Scheme.

**H.    Eric Payne**

415.   Eric Payne is the former owner of Frontier Builders of Montana, LLC, which performed several construction projects for Goguen over the years, including building his large homes in Montana, and construction projects for PROOF Research, Casey's Bar, Two Bear Ranch, and a multitude of other large projects.

416.   Payne and Goguen were close friends for years.

417.   Goguen gave Payne an "office" in the basement of Casey's Bar that was passcode protected, had a built-in full size stripper pole, and was commonly referred to as the "boom boom" room where Goguen and Payne could procure young women to engage in sexual acts with them for money, drugs or other items of value as part of the Goguen Sexual Scheme.

418.   When Marshall arrived in Whitefish in 2013, he was informed that Payne had been overcharging Goguen for years by tens of millions of dollars on the construction projects performed by his company Frontier Builders.

419.   Marshall and others approached Goguen about Payne stealing from Goguen. Goguen informed Marshall that he was aware of the overcharging by Payne but that exposing Payne through a lawsuit was too risky, given their extensive past relationship.

420. At that time Marshall was still trying to orient himself to the Goguen organization so he did not press Goguen for an explanation; it took him a couple of years to figure out what Goguen meant by this comment.

421. In or around 2013 or 2014, the Northwest Montana Drug Task Force turned its scrutiny on Casey's Bar, owned by Goguen, because of information that narcotics were being sold on and in the premises.

422. When Cody Payne, Eric Payne's son was implicated in the narcotics scrutiny received by Casey's Bar, Goguen used the implication as leverage against Eric Payne and forced him to sell his interest in Frontier Builders of Montana, Inc., to Walter Wilkinson and move out of state, to not return. Within weeks, Payne moved to Arizona where he lived for a number of years.

423. A few years after Payne was forced out of town by Goguen, Marshall was riding with Goguen in Goguen's truck while Goguen was having a phone conversation with Payne about returning to Whitefish.

424. At this time, Goguen was under scrutiny regarding allegations that he participated in the sexual assault of PAM DOE.

425. Goguen expressed to Marshall how concerned he was about the allegations, especially with the increasing stress he was under regarding the Amber

Baptiste affair. Goguen further informed Marshall that Payne was with him the night of the alleged sexual assault on PAM DOE.

426.   During Goguen's call with Payne in Marshall's presence, Goguen offered to fund a start-up construction company for Payne in Whitefish if in return, Payne agreed to back Goguen's version of the PAM DOE sexual assault story should he be questioned by law enforcement, or if it came up in a deposition in the Baptiste case.

427.   Payne accepted Goguen's offer, moved back to Whitefish shortly after his conversation with Goguen, and now owns nuWest Builders, Inc., which has done several large-scale projects for Goguen and is believed to be working on additional current projects for Goguen.

428.   After Goguen's phone call with Payne ended, Marshall asked Goguen if the allegations that he had sex with PAM DOE were true, to which Goguen responded affirmatively.

429.   Marshall also asked Goguen how old PAM DOE was, with Goguen responding "maybe 17 or 18."

430.   During Marshall's conversation with Goguen after his call with Payne, Goguen also informed Marshall that PAM DOE had made a couple of attempts to

report the sexual assault to the Flathead County Sheriff's Office, but the reports were not pursued by the former Sheriff, Chuck Curry.

431.   According to Goguen, former Sheriff Curry informed him of PAM DOE's attempts to report the sexual assault to the Sheriff's Office, which prompted the series of phone calls between Payne and Goguen, resulting in Goguen's offer to help Payne with starting a company in Whitefish in exchange for Payne's support with Goguen's version of the story regarding the PAM DOE sexual assault.

432.   On information and belief, Goguen repaid former Sheriff Curry for this act of loyalty and others by giving Curry, when he retired from the Sheriff's Office, his current job working for Goguen at Two Bear Air Rescue.

433.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.     Specifically, Defendant Goguen and Eric Payne have violated §§ 45-5-601, 602, and 603, MCA relating to the patronizing, promotion, and aggravated promotion of prostitution.

b.     Defendant Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-7-206, MCA for tampering with a witness by purposely or

knowingly attempting to induce Payne to withhold testimony, documents, or information from an investigation in exchange for Goguen funding Payne's nuWest Builders, Inc.

c.      Payne, and Defendants Michael L. Goguen, and the Trustee of the Michael L. Goguen Trust have violated § 45-6-341, MCA for money laundering by receiving a benefit from Defendants Goguen or the Trustee of the Michael L. Goguen Trust in the form of money invested into a new construction business derived from the unlawful activity of and Payne being tampered with as a witness in violation of § 45-7-206, MCA.

d.      Defendant Goguen violated § 45-5-203, MCA involving intimidation when, under circumstances that reasonably tend to produce a fear that it will be carried out, threatened to inflict harm on Eric Payne and with the intent to cause reasonable apprehension of bodily injury in Eric Payne by putting pressure on Payne to sell his company and move to Arizona.

434.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.      Defendants Goguen and the Trustee of the Michael L. Goguen Trust and Eric Payne have violated 18 U.S.C. § 1956 relating to laundering of

monetary instruments in aid of the Goguen Sexual Scheme, by knowingly

participating in financial transactions involving proceeds derived from the

illegal conduct of Goguen and the Trustee of the Michael L. Goguen Trust

tampering with Payne as a witness in violation of § 45-7-206, MCA.

## I.     Shawn Lewis

435.   In or around May of 2015, Marshall discovered that Shawn Lewis was

using Amyntor and Two Bear Security, LLC funds to purchase expensive jewelry,

clothing, artwork, furniture, and vacations for himself and his then girlfriend, now

wife.

436.   Lewis was using Two Bear Security and Amyntor company credit cards

to embezzle these funds.

437.   It is believed that Lewis embezzled between $1M and $2M from Two

Bear Security and Amyntor.

438.   Marshall had also purchased a truck for Shawn's son out of his own

personal funds ($31,419 on February 24, 2015) and an engagement ring for Shawn's

fiancé, now wife (which Shawn partially paid back but still owes $15,000) per

instructions received from Goguen to take care of Lewis "because he knew too

much."

439.   Marshall expected to be reimbursed for the funds he spent on Lewis, based on promises made by Goguen, but when his relationship with Goguen deteriorated, Marshall was never reimbursed by Lewis or Goguen.

440.   Marshall informed Goguen that Lewis was embezzling Amyntor and Two Bear Security funds and discussed his desire to fire Lewis, which Goguen refused to do because in Goguen's opinion Lewis had too much disparaging information on Goguen's sexual proclivities and illegal activities.

441.   As relayed by Goguen to Marshall, firing Lewis would create too high of a risk that Lewis could expose information he had about Goguen's sexual misconduct and crimes and the existence of the Goguen Sexual Scheme to the press or law enforcement.

442.   Marshall was left with no other recourse to remedy the issue other than a stern discussion with Lewis.

443.   After another incident of misconduct and unprofessional behavior by Lewis at a charity event in Whitefish, Marshall demoted Lewis from his role as President of Amyntor Group, cut his salary and transferred him to Texas where his only responsibility would be to manage the Mexico City, Mexico office.

444.   Goguen found out after the fact when Lewis informed him that he had been transferred to Texas.

445.   Goguen asked Marshall why he had not informed him of the demotion of Lewis and Marshall responded that as the CEO and Managing Member of Amyntor, Marshall acted in the best interests of the company.

446.   Shortly thereafter, Lewis set up a company in Guadalajara named Amyntor Guadalajara that Lewis owned outright without Marshall's knowledge.

447.   As a result of Marshall learning the existence of Amyntor Guadalajara and the many other issues involving Lewis, Marshall requested Lewis to resign and sign a separation agreement.

448.   When the relationship between Goguen and Marshall had irreconcilably deteriorated, Lewis called Marshall panicked, stating, "Goguen is all over me." Lewis also stated Goguen told him Marshall had made accusations that Lewis had embezzled money from Two Bear Security and Amyntor.

449.   Lewis told Marshall he felt pressured by Goguen to support Goguen's efforts to damage Marshall's integrity and reputation by fabricating evidence against Marshall.

450.   Approximately six months after Lewis was forced to resign, at Goguen's direction, Lewis kept approximately $150,000 in Amyntor assets, including a company vehicle in exchange for Lewis' silence regarding his knowledge of Goguen's sexual misconduct and the Goguen Sexual Scheme.

451.   On information and belief, Goguen also paid Lewis an additional undisclosed amount of cash to secure Lewis's help to turn other Amyntor employees against Marshall and to silence Lewis from disclosing information about Goguen's sexual activities and the Goguen Sexual Scheme.

452.   When Goguen dissolved Amyntor, Marshall attempted to retrieve the approximately $150,000 in Amyntor assets that Lewis had taken and the vehicle Marshall had purchased for Lewis's son and the remaining amount Lewis owed for the engagement ring Marshall purchased for Lewis, to no avail.

## J.   MARK DOE

453.   In or around July of 2015, Goguen asked Marshall to resolve a problem he was having with a member of his harem named EMILY DOE[2] who was living in New York.

454.   EMILY DOE's boyfriend, MARK DOE, had caught Goguen in an affair with EMILY DOE and called Goguen extremely angry.

455.   MARK DOE threatened to contact Goguen's third wife and tell her about the affair and how much money Goguen had secretly been paying his girlfriend EMILY DOE to have sex with him and then remain silent.

---

[2] For privacy, the actual names of Mark Doe and Emily Doe have been redacted from this complaint.

456.    MARK DOE also threatened to reveal Goguen's payments to the Internal Revenue Service and to contact Goguen's then current employer, Sequoia Capital.

457.    When MARK DOE found more evidence of what was occurring, he called Goguen several times and told Goguen he needed to stop seeing his girlfriend.

458.    Goguen continued to see EMILY DOE and wire her money despite MARK DOE's angry pleas, and Goguen nearly got caught red-handed in New York by MARK DOE with EMILY DOE on one occasion in or around May or June of 2015.

459.    On July 20, 2015, Goguen came to Marshall and told him that he was trying to help EMILY DOE and that MARK DOE was making threats to manipulate Goguen into giving him more money.

460.    On July 20, 2015, Goguen provided Marshall with copies of MARK DOE's New York State Driver's License and his permanent residence card, as well as email addresses and phone numbers for MARK DOE, and gave them to Marshall.

461.    Goguen asked Marshall to conduct cyber-attacks against MARK DOE "like w/ Nash."

462.    Marshall did not conduct cyber-attacks against MARK DOE.

463.   MARK DOE continued calling Goguen and threatened Goguen that if he did not stop contacting and seeing his girlfriend then he was going to contact Goguen's wife and Sequoia Capital to tell Goguen's colleagues about the unscrupulous behavior of Goguen.

464.   This threat by MARK DOE enraged Goguen and Goguen then told Marshall that if the cyber route was not working, he wanted Marshall to go pay MARK DOE a personal visit in New York and put an end to the situation.

465.   Marshall asked Goguen to be more specific and Goguen said he just wanted MARK DOE to be "put out of play, permanently."

466.   Based on Goguen's previous command for Marshall to kill Nash and others, Marshall interpreted Goguen's request to put MARK DOE out of play permanently as an instruction or solicitation for Marshall to kill or harm MARK DOE.

467.   Marshall did not follow through with Goguen's instruction and solicitation to kill or harm MARK DOE.

468.   Soon after, Marshall was on a business trip to New York for Amyntor.

469.   Marshall arranged to meet with MARK DOE over a beer in an upper east side pub that Marshall knew.

470.   After buying MARK DOE a beer and having a cordial conversation with him at the pub, Marshall was able to convince MARK DOE to stop making threats against Goguen.

471.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.   Specifically, Defendant Goguen violated § 45-4-101, MCA involving solicitation of murder by commanding, encouraging, or facilitating Marshall, knowing that Marshall was capable of doing so, to cause the deliberate homicide of MARK DOE, an offense chargeable under state law § 45-5-102, MCA.

b.   Defendant Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-5-601, MCA related to patronizing prostitution of EMILY DOE by paying EMILY DOE hundreds of thousands of dollars in exchange for sexual services.

c.   Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-5-602, MCA related to promoting prostitution of EMILY

DOE by paying EMILY DOE hundreds of thousands of dollars in exchange for sexual services.

d.      Defendants Goguen and the Trustee of Michael L. Goguen have violated § 45-6-341, MCA for money laundering by facilitating the transfer of funds to EMILY DOE for an unlawful activity consisting of patronizing prostitution in violation of § 45-5-601, MCA and N.Y.P.C. Article 230.02; and prostitution in violation of N.Y.P.C. Article 230.00.

472.    The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.      Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments derived from the proceeds of the above-described unlawful activity of prostitution and patronizing prostitution in violation of the laws of New York and Montana.

b.      Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated 18 U.S.C. § 1952 relating to interstate commerce, specifically transportation of Defendant Goguen with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management,

establishment, or carrying on, of prostitution in violation of New York Penal Code Article 230.00 and patronizing prostitution in violation of New York Penal Code Article 230.02 in furtherance of the Goguen Sexual Scheme.

## K.     AUDREY DOE[3]

473.   Goguen met AUDREY DOE in or around 2010 at a strip club in Las Vegas where she worked and lived.

474.   On information and belief, AUDREY DOE was an exotic dancer, stripper and prostitute when Goguen met her.

475.   Upon meeting her, Goguen started having a sexual relationship with AUDREY DOE and in exchange, provided her with money, expensive gifts and jewelry.

476.   Goguen continued to maintain this relationship with AUDREY DOE, which likely continues to this day.

477.   Over the years, Goguen has paid AUDREY DOE tens of millions of dollars, including many times when Goguen had current events that affected Goguen's family, other mistresses, or issues with Amber Baptiste, Bryan Nash, etc. which AUDREY DOE used as leverage to apply pressure on him.

---

[3] For privacy, the real name of Audry Doe has been redacted from this complaint.

478.   AUDREY DOE is listed as number one on Goguen's spreadsheet of women as Goguen identified her as the most volatile member of his "harem."

479.   In February of 2015, at the request of Goguen, Marshall used the Amyntor NetJets account (funded and managed by Whitefish Frontiers, LLC) to fly to Miami and meet AUDREY DOE at the Setai Miami Beach to pay her $250,000 in cash, which was given to him by Goguen in a leather duffle bag.

480.   AUDREY DOE was accompanied by two men whom AUDREY DOE identified as her cousin and uncle. Goguen told Marshall that he believed these men were potentially associated with organized crime.

481.   Marshall handed AUDREY DOE a leather duffle bag containing the $250,000 in cash.

482.   AUDREY DOE, not satisfied by the pay-off, told Marshall she also wanted expensive watches for each of her "family" members "for their trouble" and Tiffany earrings for herself.

483.   Marshall called Goguen informing him of the jewelry request and received approval from Goguen to purchase the requested items.

484.   Marshall used funds from his own personal account to purchase said items for AUDREY DOE and her supposed family associates, costing approximately

$48,000 for the two watches and the set of earrings, with the expectation to be reimbursed by Goguen.

485.   Within a couple of days, Marshall again met with AUDREY DOE and gave her the requested jewelry.

486.   Goguen also bought AUDREY DOE a multi-million-dollar home in Santa Monica, California through the Michael L. Goguen Trust.

487.   AUDREY DOE was part of the Goguen Sexual Scheme by engaging in prostitution or other lewd or immoral acts with Goguen.

488.   On information and belief, AUDREY DOE traveled in interstate commerce to Whitefish, Montana, staying at one of Goguen's safe houses owned by Crystal Slopeside, LLC, as recently as December 28, 2020.

489.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.   Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-6-341, MCA for money laundering by facilitating the transfer of funds to AUDREY DOE for unlawful activity consisting of

patronizing prostitution in violation § 45-5-601, MCA and prostitution in violation of Florida Statute § 796.07.

b.      Defendant Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-5-601, MCA related to patronizing prostitution of AUDREY DOE.

c.      Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated § 45-5-602, MCA related to promoting prostitution of AUDREY DOE.

490.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.      Defendants Goguen and the Trustee of the Michael L. Goguen Trust have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments derived from the proceeds of the above-described unlawful activity of prostitution and patronizing prostitution in violation of State of Florida and State of Montana law.

b.      Defendants Goguen and the Trustee of the Michael L. Goguen Trust violated 18 U.S.C. § 1952 relating to interstate commerce, specifically by the transportation of Defendant Goguen and AUDREY DOE with the intent to

otherwise promote, manage, establish, carry on, or facilitate the promotion,

management, establishment, or carrying on, of prostitution in violation of

Florida Statute § 796.07 for prostitution and promotion of prostitution in

violation of § 45-5-602, MCA in furtherance of the Goguen Sexual Scheme.

**L.     Karen Valladao and Frank, Rimerman +Co. LLP**

491.   On information and belief, Goguen has made tens to hundreds of

millions of dollars in wire transfers to women over the years to enable or cover-up

the Goguen Sexual Scheme.

492.   Defendants Valladao and Frank, Rimerman provided business

management and accounting services to help manage Goguen's financial affairs,

including the affairs of the Michael L. Goguen Trust, Two Bear Security, Amyntor,

Whitefish Frontiers, LLC, Valley Oak, LLC, and numerous other entities by

working with Marshall and Goguen.

493.   Karen Valladao and the other employees of Defendant FRANK,

RIMERMAN + CO. LLP, and therefore Frank, Rimerman, had broad visibility into

and control over the financial affairs of Goguen and the various trusts and entities

created by Goguen.

494.   Defendant Frank Rimerman, through its partner Karen Valladao and

other employees of FRANK, RIMERMAN + CO. LLP, had knowledge of Goguen's

sexual misconduct and crimes and that Goguen was perpetuating the Goguen Sexual

Scheme, a fact that Karen Valladao and FRANK, RIMERMAN later helped to

conceal by disguising Goguen's payments for sexual services as "donations" to

various women and by reclassifying Amyntor assets as belonging to Two Bear

Security.

495.    Despite their knowledge of the Goguen Sexual Scheme, Valladao and

Frank, Rimerman helped Goguen perpetuate the pattern of racketeering activity by

actively managing Goguen's businesses and trusts that were used in the furtherance

of the Goguen Sexual Scheme.

496.    Defendant Frank, Rimerman, through payments from Goguen and his

entities, and Defendant Karen Valladao, through her salary from Frank, Rimerman

and other financial benefits received from Goguen, financially benefited from their

participation, and conduct in furtherance of the Goguen Sexual Scheme.

497.    Defendants Valladao and Frank, Rimerman, by accepting payment

from Goguen, allowed and implicitly agreed to carry out acts in furtherance of the

Goguen Sexual Scheme.

498.    Defendants Valladao and Frank, Rimerman assisted Goguen to make

hush-payments to individuals having knowledge of Goguen's sexual misconduct and

the Goguen Sexual Scheme and even set up entities for profit and non-profit to be used by individuals as a way to conceal the hush-money payments.

499.   Valladao and Frank, Rimerman have reported fraudulent deductions to the Internal Revenue Service for payments that Goguen made through multiple business entities, including through Defendants and other DOE Defendants, which were used in furtherance of the Goguen Sexual Scheme.

500.   Karen Valladao over the years became concerned that Goguen was violating federal tax law each time he made a transaction involving his harem for failing to file federal gift tax returns, or for other tax fraud related offenses.

501.   When visiting Whitefish, Montana, Valladao expressed these concerns to Marshall in person and requested Marshall's help to persuade Goguen to either stop making such payments or to start paying taxes on any future payments.

502.   Marshall repeatedly informed Goguen to be careful with these transactions and to start filing tax returns.

503.   After the Baptiste lawsuit was filed against Goguen, which included allegations of federal tax crimes against him, Valladao decided to and subsequently did draft backdated loan documents for tens to hundreds of millions of dollars in wire transfers Goguen had sent to women and others in furtherance of the Goguen

Sexual Scheme in an effort to assist Goguen in mitigating his civil and criminal

exposure arising from his sexual misconduct and from the Goguen Sexual Scheme.

504.   On information and belief, in an effort to "tidy up" Defendant

Goguen's years of concealing immoral activities and attempts to bribe witnesses and

victims of Goguen's sexual misconduct, crimes, and the Goguen Sexual Scheme and

Goguen's other nefarious activities related thereto, Goguen agreed with his

accountants, including Defendants Karen Valladao and Frank, Rimerman, to amend

four years of prior tax returns to reflect over $30M in payments made to at least

thirty women, including strippers, escorts, prostitutes, married women and others.

505.   Valladao and Frank, Rimerman also assisted Goguen in falsely accusing

Marshall of wire fraud, money laundering, and tax evasion to U.S. government law

enforcement.

506.   Valladao and Frank, Rimerman participated in the Goguen Sexual

Scheme by conducting the affairs of the Goguen Sexual Scheme through a level of

cooperation which arose above the level of cooperation inherent in normal

commercial transactions between an accountant and its client.

507.   The conduct and acts described above and elsewhere herein constitute

racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen

Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.      Defendants Valladao, Goguen, the Trustee of the Michael L. Goguen Trust, and Frank, Rimerman, have violated § 45-6-341, MCA for money laundering by facilitating the transfer of funds to Goguen's harem in furtherance of the Goguen Sexual Scheme and for unlawful activity consisting of patronizing prostitution in violation § 45-5-601, MCA and other state and federal statutes.

508.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.      Specifically, Goguen, Trustee of the Michael L. Goguen Trust, Valladao and Frank, Rimerman violated 18 U.S.C. § 1512(c) relating to tampering with a witness, victim or informant by corruptly altering, destroying, mutilating, or concealing a record, document, or other object or attempting to do so, with the attempt to impair the object's integrity or availability for use in any official proceeding or otherwise obstruct, influence or impede an official proceeding or attempts to do so by creating false business documents and

amending tax records as a means to conceal the activities of the Goguen Sexual Scheme.

b.      Defendants, Goguen, the Trustee of the Michael L. Goguen Trust, Valladao and Frank, Rimerman have violated 18 U.S.C. § 1956 relating to laundering of monetary instruments in aid of the Goguen Sexual Scheme to numerous women by directing the formation of entities used by Goguen to deposit pay-offs as described herein;

c.      Defendants Goguen, the Trustee of the Michael L. Goguen Trust, Valladao, and Frank, Rimerman violated 18 U.S.C. § 1952 by using a facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the establishment of an unlawful activity, including but not limited to, prostitution, witness tampering, and money laundering in furtherance of the Goguen Sexual Scheme.

## M.      Procurement of StingRay Device

509.   Sometime in 2016, Goguen's Two Bear Air Rescue helicopter participated in two joint exercises with the FBI, during which the FBI brought onto the helicopter a cell site simulator device (aka, a "StingRay"), which masquerades as a cell tower in order to intercept, locate, collect phone usage data, and monitor

communications, to test whether it would function properly on the helicopter without interference therefrom.

510.   After learning of the FBI's test of StingRay device, Goguen became interested in obtaining a StingRay for himself because of its capabilities to locate, intercept, collect phone usage data, and monitor cellular phone communications.

511.   In or around the end of 2016, Goguen asked Marshall to look into obtaining a StingRay for him.

512.   Goguen later directed the head of Two Bear Air Rescue, Jim Pierce, to persuade Marshall to obtain a Stingray device for Goguen. Jim Pierce then texted Marshall on February 16, 20, and 21, 2017 about whether Marshall could obtain the StingRay.

513.   Goguen contacted Sheriff Chuck Curry at the Flathead County Sheriff's office and requested whether they would provide authorization for Goguen to use the StingRay device in the Two Bear Air Rescue Helicopter.

514.   On February 21, 2017, Marshall confirmed to Pierce and Goguen that a StingRay device is restricted government technology and that procuring and using a cell site simulator in the manner sought by Goguen is not permitted by law.

515.   On information and belief, Goguen was subsequently able to obtain a Stingray device through Jim Pierce's contacts from a European source.

516.   Thereafter, at Goguen's direction, the StingRay device was imported into the United States, potentially in violation of the U.S. International Traffic in Arms Regulations ("ITAR").

517.   Marshall later observed a StingRay device mounted inside of a Two Bear Air Rescue helicopter, which is used to assist the Flathead County Sheriff's Office and conduct search and rescue operations.

518.   It is believed that employees of Two Bear Air, Two Bear Air Rescue Foundation or Two Bear Security routinely and unlawfully use the StingRay device to monitor and track cell phones, listening to conversations of individuals residing in Flathead County, Montana, including Marshall, Maguire, Whitefish Police Chief Bill Dial, and others who possess damaging information about Goguen's sexual misconduct and the Goguen Sexual Scheme.

519.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year.

a.   Defendants Goguen and the Trustee of the Michael L. Goguen Trust, Two Bear Air Rescue, Jim Pierce, and Two Bear Air 1, LLC have violated § 45-8-213, MCA by purposely violating privacy in communications by

repeatedly intercepting the electronic communications of Marshall, Maguire and others, and recording those conversations without their knowledge.

520.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.   Specifically, by attempting to obtain a StingRay device in a corrupt manner, by obtaining the StingRay device, by importing the StingRay device into the United States and by using the StingRay device to monitor individuals' cell phone communications, Defendants Goguen and the Trustee of the Michael L. Goguen Trust, Two Bear Air 1, LLC, and Two Bear Air Rescue Foundation violated 18 U.S.C. § 1029 based on acts of fraud and related activity in connection with access devices as part of Goguen's Scheme to carry out or conceal the existence of the Goguen Sexual Scheme.

b.   Such conduct by Defendants Goguen and the Trustee of the Michael L. Goguen Trust, Two Bear Air 1, LLC and Two Bear Air Rescue Foundation, violates 18 U.S.C. § 1952 by using any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the establishment of an unlawful activity, specifically by Goguen and others as a Scheme to use the StingRay device to monitor the

communications of those, including Plaintiffs, who possess information about Goguen's sexual misconduct and the Goguen Sexual Scheme.

## N.    Fraudulent Dissolution of Amyntor

521.   Despite knowing that Plaintiffs were continuing to provide services and spending personal and business property to promote Amyntor's business around the world, by the fall of 2018, Goguen stopped funding Amyntor for the purpose of retaliating against Plaintiffs and destroying the company they had built.

522.   Goguen then encouraged other Defendants to drain or transfer Amyntor resources to destroy Plaintiffs' investment of time and money expended to promote Amyntor's activities.

523.   When Marshall confronted Goguen regarding the likelihood that Amyntor would not receive a facility security clearance as a result of Goguen's sexual misconduct and participation in the Goguen Sexual Scheme, instead of working with his business partner to agree on a fair financial buyout plan, Goguen maliciously retaliated against Plaintiffs by dissolving Amyntor and removing Marshall from all Amyntor responsibilities

524.   During Amyntor's winding up phase, Defendant Hegger was extensively involved in wrongfully commandeering Amyntor's assets

525.   As a result of the forced and fraudulently induced dissolution of Amyntor by Defendants, Plaintiffs lost past business wages and were forced to obtain judgments against Amyntor from the Montana Department of Labor and Industry ("DOL").

526.   The DOL filed Applications for Enforcement and Judgments for each of the Plaintiff's wage claims against Amyntor in the Montana Eleventh Judicial District Court, Flathead County.

527.   Judgments for Plaintiffs were entered as follows:

a.     John Maguire: By order in Cause No. DV-19-184B on March 8, 2019, in the amount of $40,126.17.

528.   Matt Marshall: By order in Cause No. DV-19-413 on May 14, 2019, in the amount of $352,275.38.

529.   Anthony Aguilar: By order in Cause No. DV-19-185 on March 11, 2019, in the amount of $27,138.48.

530.   Keegan Bonnet: By order in Cause No. DV-19-129 on February 19, 2019, in the amount of $13,956.91.

531.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen Sexual Scheme and which are indictable offenses.

a.     By dissolving Amyntor in the manner described herein, Defendant

Goguen violated 18 U.S.C. § 1513 by retaliating against Plaintiffs and

Amyntor as witnesses, victims, or informants of the Goguen Sexual Scheme.

**O.     Goguen's False Statements to the FBI**

532.   Goguen and other Defendants, including Goguen's attorney

Defendant Richard Hegger, out of fear of Plaintiffs' knowledge regarding Goguen's

sexual misconduct and the Goguen Sexual Scheme, sought to destroy Plaintiffs'

reputations by filing a false sworn affidavit alleging mismanagement and Fraud by

Plaintiffs with the Federal Bureau of Investigation ("FBI").

533.   Goguen and Hegger falsely told the FBI that Marshall did not have the

requisite experience, had stolen and then laundered funds from Goguen, and

testified in other ways meant to obstruct law enforcement's discovery of the

Goguen's sexual misconduct and the existence of Goguen Sexual Scheme.

534.   The conduct and acts described above and elsewhere herein constitute

racketeering activities under 18 U.S.C. § 1961(1)(B) in furtherance of the Goguen

Sexual Scheme and which are indictable offenses.

a.     Defendant Goguen violated 18 U.S.C. § 1510 by willfully endeavoring

by means of bribery to obstruct, delay, or prevent the communication of

information relating to violations of criminal statutes of the United States by

seeking to corruptly influence the investigation by the FBI into Goguen's sexual misconduct and crimes and the Goguen Sexual Scheme through offers of beneficial mutual association directly or indirectly funded or supported by Goguen;

b.      Goguen violated 18 U.S.C. § 1513 by knowingly retaliating, including interfering with the lawful employment or livelihood of Plaintiffs, arising from Plaintiffs' exposure of Goguen's sexual misconduct and the Goguen Sexual Scheme in which Defendants agreed to remain complicit enablers.

c.      Goguen violated 18 U.S.C. § 1512(c) relating to tampering with witnesses, victims or informants by corruptly altering, destroying, mutilating, or concealing a record, document, or other object or attempting to do so, with the attempt to impair the object's integrity or availability for use in any official proceeding or otherwise obstruct, influence or impede an official proceeding, specifically to impair, obstruct, or influence the investigation or proper administration of an FBI and other U.S. law enforcement investigation;

d.      Goguen has violated 18 U.S.C. § 1952 by using interstate commerce or using the mail or any facility in interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the Goguen Sexual Scheme.

## VII.   CAUSES OF ACTION

### CLAIM ONE

### VIOLATION OF 18 U.S.C. § 1962(b)

### (PLAINTIFF MATTHEW MARSHALL VERSUS DEFENDANT MICHAEL GOGUEN, INDIVIDUALLY AND AS TRUSTEE OF THE MICHAEL L. GOGUEN TRUST)

535.   Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

536.   This Claim One is against Defendant Michael Goguen individually and as Trustee of the Michael L. Goguen Trust.

537.   Amyntor Group, LLC ("Amyntor") is an enterprise engaged in and whose activities affect interstate commerce.

538.   18 U.S.C. § 1962(b) makes it "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

539.   Under 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 ... may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee..."

540.   Marshall has been injured in his business and property by reason of a violation of 18 U.S.C. § 1962(b) when Defendant Goguen sought to maintain his interest in or control over Amyntor through a pattern of racketeering activity.

541.   Goguen's pattern of racketeering activity targeted Marshall, as CEO and Managing Member of Amyntor, and as an employee of Two Bear Security, to use his know-how and the resources of these and other companies to further the Goguen Sexual Scheme.

542.   Defendant Goguen acquired and maintained interests in and control of Amyntor through a pattern of racketeering activity that included:

a.     Defendant Goguen undercapitalized Amyntor from its inception as a means to coerce Marshall to use both Marshall and Amyntor's time, resources, and property to conceal and cover-up Goguen's sexual misconduct and crimes and his conduct in furtherance of the Goguen Sexual Scheme.

b.     Goguen enticed Marshall to come work for him in Whitefish, Montana and to leave his stable employment in Mexico City with the U.S. State Department based on Goguen's promise that he would help fund a legitimate security and intelligence contracting firm to be managed by Marshall.

c.      Using his control over Two Bear Security and other entities solely

owned by Goguen to fund the operations of Amyntor instead of using the

company structure agreed to with Marshall

d.      By corruptly dissolving and commandeering the winding-up process of

Amyntor in retaliation against Marshall

543.   Defendant Goguen's acquisition and maintaining interests in and

control of Amyntor through a pattern of racketeering activity damaged Marshall.

544.   Defendant Goguen's chronic underfunding of Amyntor to coerce

Marshall in furtherance of the Goguen Sexual Scheme was not the product of a valid

exercise of business judgment by Defendant Goguen or his associates.

545.   Defendant Goguen's primary interest was to further the Goguen Sexual

Scheme and not to invest in and grow Amyntor's business for long-term success;

Defendant Goguen was not a mere disinterested and independent Non-Managing

Member of Amyntor, as evidenced by Goguen's means of financing Amyntor and

his method of controlling its dissolution.

546.   Marshall discovered during the end of his course of his dealings with

Defendant Goguen that Goguen's contributions to Amyntor's capital accounts were

calculated to maintain only monthly payroll expenses and came with ever-increasing

strings attached where Marshall had to contribute resources from Amyntor back to

Defendant Goguen to support his unlawful purposes in furtherance of the Goguen Sexual Scheme.

547.   By the time Amyntor began earning significant revenue in 2017, Goguen realized Marshall would not participate in the affairs of the Goguen Sexual Scheme; Goguen was likewise losing the ability to use Amyntor as leverage against Marshall, so Goguen thereafter in 2018 stopped funding Amyntor and began to raid its assets

548.   After his last capital contribution in July of 2018, without informing Marshall of his intentions, Defendant Goguen ceased funding Amyntor.

549.   On September 6, 2018, Defendant Goguen sent Marshall an email titled Amyntor Dissolution Notice which contained a letter advising Marshall that "pursuant to Section 6 of the Operating Agreement of Amyntor Group, LLC (the 'Company'), the Non-Managing Member (Amyntas Ventures, LLC) has elected to dissolve the Company effective immediately."

550.   Defendant Goguen provided the funding for Amyntor and had the means to reimburse Marshall for ongoing expenses Marshall was incurring on Defendant Goguen's behalf.

551.   Marshall, in an effort to maintain minimal funding to continue to operate Amyntor, expended his personal funds to protect the business relationships

he established, keep the Company functioning, and prevent the Company from completely souring due to Goguen's corruption of the Company in furtherance of the Goguen Sexual Scheme.

552.   Marshall, as Amyntor's Managing Member, relied upon Defendant Goguen to continue providing funding to Amyntor until Amyntor's revenue was sufficient to self-sustain the business.

553.   Marshall and the other Plaintiffs exercised reasonable diligence in discovery of the nefarious pattern of racketeering by the Goguen Sexual Scheme and related injuries that arose therefrom or from the predicate acts committed by Defendants to acquire and maintain control of Amyntor and have continued to suffer injury since the closing and dissolution of Amyntor.

A.   **Goguen Extorted Marshall in Violation of the Hobbs Acts with Threats of Economic Loss to Marshall if Marshall did not use Amyntor's Resources in Furtherance of the Goguen Sexual Scheme**

554.   Defendant Goguen acquired and maintained control of Amyntor, in violation of 18 U.S.C. § 1951, by attempting or conspiring to obtain property from Marshall, with his consent, in the form of written or electronic communications, legal documents, documents evidencing or relating to Goguen's sexual misconduct and the Goguen Sexual Scheme, reports by witnesses to law enforcement about Defendant Goguen, and other information from Marshall.

555.   Defendant Goguen attempted to obtain this information by coercing Marshall to use his personal resources and those of Amyntor to hack the electronic devices and social media accounts of Larry and Lisa Wood, Bryan Nash, Amber Baptiste, Goguen's then wife Jordana, Mark Doe, and Emily Doe (collectively the "Hacking Victims") and to perform surveillance and other investigative work on Goguen's enemies, all in furtherance of the Goguen Sexual Scheme.

556.   Defendant Goguen wrongfully attempted to obtain this information and property from Marshall through the wrongful use of actual or threatened fear of Amyntor and Marshall incurring economic loss by Defendant Goguen's refusal to adequately fund Amyntor or reimburse Marshall for his significant out-of-pocket expenses, and thereby causing Marshall to further incur significant costs to personally fund Amyntor, including rent, utilities, employee payroll, employee medical insurance, and other overhead expenses in order to keep Amyntor afloat; costs which Marshall was not reimbursed by Defendant Goguen or Amyntor.

557.   Defendant Goguen wrongfully intended to deprive and "string along" Marshall and Amyntor as a means to pressure Marshall to do his bidding in the Goguen Sexual Scheme.

558.   At times, Marshall complied with requests by Goguen to pay third party members of the harem or to settle blowback Goguen was receiving from the harem or their angry partners.

559.   Defendant Goguen acquired and maintained control of Amyntor, in violation of 18. U.S.C. § 1962(b) and 18. U.S.C. § 1951, by attempting or conspiring to obtain property from Marshall, with his consent, in the form of personal funds that Marshall used to pay for personal expenses of Goguen, including real property maintenance and improvement expenses, "safe house" expenditures, the purchases of vehicles, jewelry, earnest money deposits on real properties, providing cash and other items for Defendant Goguen's mistresses, and for hush-money payoffs to his acquaintances and employees who had "learned too much" about Goguen's sexual misconduct in the Goguen Sexual Scheme.

560.   Defendant Goguen attempted to obtain Marshall's personal funds to pay Defendant Goguen's personal expenses as part of the Goguen Sexual Scheme, as a means to maintain financial leverage over Marshall.

561.   Marshall feared that, should he not follow through with Goguen's demands to participate in the Goguen Sexual Scheme, Goguen would refuse to reimburse him and adequately fund Amyntor or trigger the dissolution of Amyntor.

562.    Defendant Goguen's extortion of Marshall in violation of 18 U.S.C. §
1951 and in furtherance of the Goguen Sexual Scheme constitutes a pattern of
racketeering activity pursuant to 18 U.S.C. § 1961(5).

563.    Through his extortive acts, Defendant Goguen has directly and
indirectly acquired and maintained interests in and control of the Amyntor
enterprise through the pattern of racketeering activity described herein, in violation
of 18 U.S.C. § 1962(b).

564.    As a direct and proximate result of Defendant Goguen acquiring and
maintaining interests in and control of Amyntor through extortion of Marshall and
concomitant underfunding of Amyntor, Plaintiff Marshall incurred significant costs
to personally fund Amyntor expenses, including paying for Amyntor's rent, utilities,
employee payroll, employee medical insurance, and other overhead expenses in
order to keep Amyntor afloat.

565.    Marshall was further damaged as a direct and proximate result of
Defendant Goguen acquiring and maintaining his interests in and control of
Amyntor when Marshall was deprived of money expended to pay personal expenses
of Goguen, including real property maintenance and improvement expenses, "safe
house" expenditures, the purchases of vehicles, jewelry, earnest money deposits on
real properties, and providing cash and other items for Defendant Goguen's

mistresses and for hush-money payoffs to his acquaintances and employees who had "learned too much" about Goguen and the Goguen Sexual Scheme.

566.   As a result of Goguen's extortion of Marshall and Goguen's acquiring and maintaining interests in and control of Amyntor, Marshall also became a creditor for other entities, such as PROOF Research, Inc. and others for whom, at Defendant Goguen's direction, Marshall provided services and for which Marshall incurred expenses on Defendant Goguen's and/or the entities' behalf.

567.   To this day, Goguen has failed to reimburse Marshall or pay Marshall for the full measure of his services and personal cash outlays spent to benefit Goguen or the entities he directly or indirectly controlled.

568.   Goguen used the financial dependence he cultivated in Marshall, including through the underfunding or means of funding Amyntor, as a means to extort Marshall to perform personal acts for him, which deprived Marshall of personal property, in furtherance of the Goguen Sexual Scheme and in violation of 18 U.S.C. § 1951.

**B.    Defendant Goguen Committed Multiple Acts of Wire Fraud as a Means to Control or Maintain the Affairs of Amyntor in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1962(b).**

569.   18 U.S.C. § 1343 provides: "[w]however having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by

means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

570.   After his meeting at *Shot Show* in Las Vegas in early 2013, Goguen enticed Marshall, through wire communications in interstate commerce, to come work for him and to leave his stable employment in Mexico City with the U.S. State Department based on Goguen's promise to Marshall that he would fund the company and help him form a legitimate security and intelligence contracting firm.

571.   Marshall repeatedly discussed with Goguen the commitments of human and financial capital to develop and turn Amyntor into a successful venture and confirmed with Goguen that he was willing to commit financially over a period of years to help Amyntor get off the ground.

572.   After Marshall began working with Defendant Goguen, Goguen communicated, through means of interstate wire, to Marshall that he would fund Marshall's security and intelligence contract firm.

573.   After Amyntor was formed and began operations, Defendant Goguen repeatedly communicated to Marshall through interstate wire that he was willing to spend the resources it was going to take to build and fund Amyntor.

574.   Goguen instructed Marshall that he wanted the highest quality of equipment when building out Amyntor and did not place limits on the amount of expenses he was willing to incur to build Amyntor Goguen's way.

575.   Defendant Goguen's motive and intent was not to build a legitimate security and intelligence firm, but instead to use Marshall's resources, capabilities and contacts, assembled through Amyntor, to target those who could expose Goguen's crimes in the Goguen Sexual Scheme.

576.   Defendant Goguen, by misrepresenting to Marshall that he would fund the company's operations when instead he intentionally created circumstances meant to pressure Marshall to use his and Amyntor's resources in furtherance of the Goguen Sexual Scheme, engaged in a Scheme or artifice to defraud and deprive Marshall and Amyntor of property, business competitiveness, and honest services by false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. § 1343.

577.   Starting in 2012, Defendant Goguen transmitted, through interstate commerce, wire communications to Marshall for the purpose of and with the intent

to execute such Scheme or artifice to defraud Marshall and Amyntor of their property, business competitiveness, and honest services in violation of 18 U.S.C. § 1343.

578.   By violating 18 U.S.C. § 1343 and commandeering Marshall's honest services and property, Defendant Goguen thereby sought to directly or indirectly acquire or maintain control of Amyntor in violation of 18 U.S.C. § 1962(b).

579.   As described herein, Defendant Goguen also sought to commandeer Marshall and Amyntor's property and personnel resources using Wickr, text messages, and other electronic communications sent through means of interstate commerce to Marshall in furtherance of the Goguen Sexual Scheme in violation of 18 U.S.C. § 1343 to direct Marshall to use his resources and the resources of Amyntor to target Amber Baptiste, Bryan Nash, Lisa and Larry Wood, Mark Doe, and numerous others, and as a means to control or maintain control over the affairs of Amyntor, all in violation of 18 U.S.C. § 1962(b).

580.   In this manner, Marshall suffered damages arising from Defendant Goguen's intent to and then later pressuring Marshall to use Marshall's honest services and human and physical resources of Amyntor to comply with his demands to participate in the Goguen Sexual Scheme.

### C.   Goguen Retaliated Against Marshall in Violation of 18 U.S.C. § 1513

581.   In or around March of 2018, Marshall reported to an IRS special agent in the Criminal Investigative Division crimes of tax fraud by Defendant Goguen in relation to his payment of tens to hundreds of millions of dollars in hush-money payoffs to stripper prostitutes and others, for the purpose of preventing the public release of information possessed by these individuals and the ensuing harm to Defendant Goguen that would arise therefrom.

582.   It was around this time that Marshall sought the assistance from then Whitefish Police Det. Shane Erickson to report Defendant Goguen's crimes of tax fraud and other sexual crimes to the FBI.

583.   Within weeks after Marshall reported Defendant Goguen to the IRS for his tax crimes, Marshall informed Det. Erickson that he no longer needed Det. Erickson's assistance to get in touch with the FBI because he had recently reported Defendant Goguen to federal law enforcement.

584.   On information and belief, starting in November or December 2017, Defendant Goguen had already bribed and/or otherwise compromised Det. Erickson as a police detective in violation of 18 U.S.C. §§ 1510 and 1512(b) and § 45-7-101, MCA, as further described herein.

585.   On information and belief, having been compromised by Defendant Goguen, Det. Erickson was actively providing Goguen the information he obtained

from conversations with Marshall regarding Marshall's attempts to report Goguen to federal law enforcement authorities.

586.   On information and belief, Det. Erickson informed Goguen that Marshall had reported to federal law enforcement Goguen's illegal activities.

587.   On information and belief, Defendant Goguen, knowing Marshall had reported him to federal law enforcement, retaliated against Marshall in violation of 18 U.S.C. § 1513 through acquiring and maintaining interests in and control over Amyntor by:

a.   After July 2018, refusing to make any more needed capital contributions to Amyntor;

b.   Corruptly dissolving and commandeering the winding-up process of Amyntor beginning in September of 2018; and

c.   Directing or conspiring with Valladao to make accusations of fraud, identity theft and other tax charges against Marshall to the FBI.

**D.   RICO Damages and Relief**

588.   As a direct and proximate result of Defendant Goguen acquiring and maintaining interests in and control of Amyntor from his racketeering activities, specifically the extortion of Marshall and Amyntor for their resources and property in violation of 18 U.S.C. § 1951, concomitant underfunding of Amyntor, and

retaliation against Marshall in violation of 18 U.S.C. § 1513, Plaintiff Marshall was damaged by:

      a.     Incurring significant costs to personally fund Amyntor expenses, including rent, utilities, employee payroll, employee medical insurance, and other overhead expenses in order to keep Amyntor afloat, costs for which Marshall was not reimbursed by Defendant Goguen or Amyntor;

      b.     Being deprived of money expended to pay the personal expenses of Goguen as described herein; and by

      c.     becoming a creditor for other entities, such as PROOF Research, Inc. and others for whom, at Defendant Goguen's direction, Marshall provided services and for which Marshall provided business services for and incurred expenses on Defendant Goguen's and/or the entities' behalf.

589.   As a direct and proximate result of Defendant Goguen's racketeering activities, including Defendant Goguen's Scheme or artifice to defraud in violation of 18 U.S.C. § 1343, Marshall was damaged by:

      a.     leaving his stable and lucrative employment in Mexico City with the U.S. State Department to work for Defendant Goguen, leaving behind a lucrative salary, employment benefits, and significant promotions, based and relying on Goguen's false pretenses.

b.      becoming a creditor to Defendant Goguen for expenses Marshall paid on Defendant Goguen's behalf in furtherance of the Goguen Sexual Scheme and as a creditor to Amyntor for the operating expenses Marshall paid on Amyntor's behalf.

590.    As a direct and proximate result of Defendant Goguen's racketeering activities, including Defendant Goguen's retaliation against Marshall in violation of 18 U.S.C. § 1513, Marshall was damaged by:

a.      Incurring significant costs to personally fund Amyntor expenses as described herein;

b.      Losing past wages resulting in Marshall obtaining a judgment against Amyntor from the Montana Department of Labor and Industry;

c.      Losing future wages; and

d.      Losing direct personal distributions Marshall would have otherwise received from Amyntor;

## CLAIM TWO

## VIOLATION OF 18 U.S.C. § 1962(b)

## (PLAINTIFF MATTHEW MARSHALL DERIVATIVELY ON BEHALF OF AMYNTOR GROUP, LLC VERSUS DEFENDANT GOGUEN, INDIVIDUALLY AND AS TRUSTEE OF THE MICHAEL L. GOGUEN TRUST, NIC MCKINLEY, AND NOMINAL DEFENDANT AMYNTOR GROUP, LLC)

591.    Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

592.    The facts stated herein are true and correct and are based on Plaintiffs' personal knowledge.

593.    Amyntor Group, LLC is an enterprise engaged in and whose activities affect interstate commerce.

594.    Plaintiff Marshall is a Member and Managing Member of Amyntor, LLC and Amyntas, LLC from the date of their formation through the time Defendant Goguen sought to dissolve these entities, and at all times during the transactions complained of herein.

595.    This action is not a collusive one intended to confer jurisdiction that the court would otherwise lack.

596.    This derivative Claim II is brought by Marshall as Member of Amyntor to enforce a right of damages arising from the Goguen Sexual Scheme that Amyntor could have but has failed to enforce because of the circumstances described herein, particularly the control over Amyntor obtained by Goguen and his associates.

597.    Both during Amyntor's operational history and into its winding up phase, when Goguen unilaterally cut off communication with Marshall, Goguen

used his leverage as sole financier to maintain persistent influence and control over Amyntor.

598.   Goguen also leveraged Marshall's access to communication with him to force Marshall to spend his and Amyntor's resources to satisfy Goguen's desire to target various individuals who could expose his acts in the Goguen Sexual Scheme.

599.   Goguen's control of Amyntor involved other Defendants, including the Trustee of the Michael L. Goguen Trust, Karen Valladao, Richard Hegger, (collectively with the nominal Defendant Amyntor, the "Claim II Defendants"), all of whom interfered in the rights of the company when Goguen sought to "dissolve" Amyntor in September of 2018 in retaliation to and while bypassing the authority of Marshall to wind up its affairs in a reasonable or orderly manner.

600.   Into the Spring and Summer of 2019, Defendants Valladao, Hegger and Goguen commandeered the winding up process of Amyntor without coordinating their actions with Marshall or seeking permission from Marshall as Managing Member.

601.   Instead, Defendants Valladao, Hegger and Goguen sought to siphon resources away from Amyntor to obstruct and disrupt the company's operations.

602.   Goguen knew that Amyntor had many outstanding contractual commitments or prospects but underfunded then terminated Amyntor when it no longer served his purposes in furtherance of the Goguen Sexual Scheme.

603.   During Amyntor's operating history, Marshall sought from Goguen the ability to have Amyntor operate free and clear of operational compromises and obstructions from the Goguen Sexual Scheme that would prevent Marshall from seeing a return on the time and financial investment that he made as a Member and Manager of the company.

604.   Despite Marshall's best efforts to guide Amyntor on path of growth through medium- and long-term security contracts, of which he obtained many, Goguen's persistent commandeering of resources while underfunding the Company at critical junctures effectively doomed Amyntor's ability to survive.

605.   Once Marshall sensed by mid-2018 that Goguen was distancing himself from Marshall and Amyntor, Marshall sought to shield and mitigate the harm to Amyntor's employees and the prospective business relationships that were endangered because of Goguen's disruptive involvement in Amyntor through the Goguen Sexual Scheme.

606.   To mitigate the fallout from Goguen's ultimate inability to obtain a personal security clearance, which was preventing Amyntor from obtaining its

facility security clearance, due to Goguen's direction and involvement in the Goguen Sexual Scheme, by mid-2018 Marshall searched for other investors to wholly buy-out Goguen's interest in Amyntor.

607.   Goguen seemed willing at that time to allow Marshall to search for buyers while continuing to fund the minimal operational needs of the Company.

608.   However, when presented with Marshall's proposal for Goguen to be bought-out of Amyntor, Goguen flatly refused any buy-out scenario and walked out of the room.

609.   Marshall's efforts to mitigate the harm to Amyntor and its employees have been futile as Goguen, after electing to "dissolve" the company in September of 2018, thereafter, directed his attorneys and accountants to commandeer the remaining assets of Amyntor by reclassifying them as "Two Bear Security, LLC" assets or by allowing them to be siphoned off to certain individuals described herein.

610.   For example, on April 25, 2019, Defendant Hegger falsely accused Marshall of embezzling funds from Amyntor to the Whitefish attorney Angela Jacobs, based on threadbare information about 9mm ammunition that the Whitefish Police Department had purchased from Amyntor.

611.   Hegger based this reckless accusation on information provided by Defendant Valladao about Amyntor's banking transactions, without any consultation with Marshall as to the transactions in question.

612.   Valladao previously admitted to Marshall that she was not fully aware of the debts she was making on Amyntor's behalf, but nonetheless, when winding up the affairs of the Company in 2018-2019, extensively assisted Goguen, Hegger and others in falsely reporting how transactions were expensed or characterized.

613.   By 2019, Hegger also spread false information about Amyntor's assets and the ownership rights of Goguen to gain access to Amyntor's storage unit.

614.   Such assets could have been used to fund the winding-up of Amyntor's operations, including to pay for legal counsel to assist in such efforts, but the acts described in this Claim II by Goguen and others in furtherance of the Goguen Sexual Scheme deprived Amyntor of its ability to effectively operate and to dissolve in a reasonable manner as directed by Marshall as the Managing Member of both Amyntor and Amyntas.

615.   With Goguen being the Non-Managing Member who had agreed to fund the company, Marshall knew that Goguen would not support funding any lawsuit that would expose his conduct in the Goguen Sexual Scheme, thereby making it futile for Amyntor to seek Goguen's agreement for Amyntor to enforce its

rights against him and necessitating this Claim II derivative claim by Marshall on behalf of Amyntor.

616.   This derivative claim by Marshall as Member of Amyntor fairly and adequately represents the interests of non-RICO members and those with contractual interests in Amyntor such as Maguire, Bonnet and Aguilar because they have each been harmed in their business and property by reason of the Goguen Sexual Scheme.

617.   Defendant Goguen, and as Trustee of the Michael L. Goguen Trust, and the Claim II Defendant(s), acquired and maintained interests in and control of Amyntor through a pattern of racketeering activity that included the following acts:

a.     Deliberately undercapitalizing Amyntor, including selectively paying for certain expenses while ignoring other Company obligations, despite capital calls from Marshall and futile attempts by Marshall to plan with Goguen for the Capital needs of the Company;

b.     The use or attempted use of Amyntor cash, assets, and personnel, in furtherance of the Goguen Sexual Scheme;

c.     Aiding and abetting in the theft of company assets from Amyntor's Columbia Falls' storage unit on multiple occasions, including on March 8,

2019, when Marshall reported the incident to the Flathead County Sheriff's Office;

d.      Unlawfully leaking Company trade secrets to the media;

e.      Unlawfully transferring, reclassifying, and harboring assets used and paid for by Amyntor to Two Bear Security in 2018-2019 to put these assets out of the reach of Amyntor's creditors;

f.      Unlawfully commandeering the winding up process of Amyntor by Goguen directing Defendants Valladao, Hegger, Shane Erickson, and Nic McKinley to take unlawful control over the assets and affairs of Amyntor;

g.      Unlawfully interfering with the contracts Amyntor sought to perform or obtain but could not because of the Defendants' retaliatory conduct against Marshall and Plaintiffs;

h.      Other acts with respect to reporting to relevant state and federal tax authorities information about Amyntor, Amyntas, and Two Bear Security that was not based on reasonable consultation with Marshall.

618.   Amyntor has been injured in its business and property by reason of a violation of 18 U.S.C. § 1962(b) when Defendant Goguen and the Claim II Defendants sought to maintain interest in or control over Amyntor through a pattern of racketeering activity.

619.   Since its inception, Amyntor has been hamstrung by Goguen's obsession with using Marshall and Amyntor to further his objective to conceal and cover-up Goguen's crimes and the Goguen Sexual Scheme.

620.   Goguen undercapitalized Amyntor from its inception to coerce Marshall to use the resources of Amyntor in furtherance of the Goguen Sexual Scheme.

621.   One way that Goguen kept Amyntor undercapitalized was by using Two Bear Security, LLC to fund the operations of Amyntor instead of making cash contributions to Amyntor, via Amyntas, to pay for Amyntor's operations.

622.   Through this means, Goguen was able to exercise control over Amyntor personnel and assets for his personal benefit as the sole owner of Two Bear Security and contrary to the agreed structure through Amyntas

623.   In fact, Amyntas Ventures, LLC was not formed as an entity until March 28, 2016.

624.   Pre-formation, Amyntas was merely a DBA of Defendant Goguen, who exerted significant control over Amyntor through Two Bear Security and through his strings-attached funding of Amyntor.

625.   Defendant Goguen used Two Bear Security to purchase assets such as automobiles and equipment used by Amyntor and used Two Bear Security to pay

the salary and housing of Amyntor personnel, from the time of Amyntor's founding in 2013 through a transition period in 2016-2017.

626.   Defendant Goguen allowed Marshall and Two Bear Security personnel to use Two Bear Security credit cards for all of Amyntor's operational needs during most of the time that Amyntor remained in business.

627.   In July of 2016, Karen Valladao advised Goguen that his intermingling of company assets complicated the tax accounting and recommended that Amyntor employees and assets be moved over to Amyntor payroll from Two Bear Security.

628.   Valladao and Marshall worked to transition company assets to Amyntor, with this process occurring over time starting around the autumn of 2016 and into 2017, but never fully occurring as Two Bear Security continued to supply resources on behalf of Amyntor.

629.   As sole funder of Amyntor, Goguen then used his control over Two Bear Security to burden Amyntor with employees and objectives for his personal security that Goguen wanted Amyntor to pay for, but whose purpose was exclusively for Goguen's personal security or as part of the Goguen Sexual Scheme.

630.   Marshall was pressured into complying with Goguen's demands under the threat that if he did not comply, Goguen would discontinue funding Amyntor

and fail to reimburse Marshall for the out-of-pocket expenses he was incurring on Goguen's behalf for numerous entities connected to Goguen.

631.   By October of 2018, Defendants Goguen, and Hegger used their control over Two Bear Security and Amyntor to deprive Amyntor of its assets during its winding up process by claiming that certain assets, such as vehicles purchased and used by Amyntor employees and insured by Amyntor, belonged to Two Bear Security.

632.   Goguen's chronic underfunding of Amyntor to coerce Marshall in furtherance of the Goguen Sexual Scheme and Goguen's coercion of Marshall to use the resources of Amyntor in furtherance of the Goguen Sexual Scheme was not the product of a valid exercise of business judgment by Goguen or his associates.

633.   Goguen's commandeering of the winding up process of Amyntor in furtherance of the Goguen Sexual Scheme was not the product of a valid exercise of business judgment by Goguen or his associates, including Defendants Valladao and Hegger.

634.   With his primary interest being to further the Goguen Sexual Scheme and not to invest in and grow Amyntor's business for long-term success, Goguen was not a mere disinterested and independent Non-Managing Member of Amyntor.

635.   Defendant Goguen sought, through the means described herein, to acquire or maintain his interest in Amyntor in a manner designed to pressure and coerce Marshall to use the resources of Amyntor in furtherance of the Goguen Sexual Scheme.

636.   Goguen engaged in a pattern of extortion, wire fraud, and then retaliation against Amyntor to maintain, directly or indirectly, his interest in or control over Amyntor, so that Marshall would use Amyntor to protect Goguen from being exposed by his acts in furtherance of the Goguen Sexual Scheme.

637.   Despite Marshall's repeated requests for greater financial support to place Amyntor on stable footing, Goguen leveraged his status as sole investor in Amyntor and as *debtor* to the financially dependent Marshall, as a means of coercing Marshall to do Goguen's bidding in furtherance of the Goguen Sexual Scheme.

638.   By the time Amyntor gained significant revenue in 2017, Goguen sought ways to undermine Marshall as he was losing the ability to leverage Marshall and realized that Amyntor would not participate in the affairs of the Goguen Sexual Scheme.

639.   Thereafter, Goguen ceased funding Amyntor and withdrew the contributions being made by Two Bear Security to punish Marshall for his attempt to alert authorities about Goguen's crimes and the Goguen Sexual Scheme and

Marshall's attempt to extricate Amyntor from the fallout therefrom by informing Goguen of Amyntor's findings regarding his security clearance and their discussion of Goguen's exit strategy.

640.   Goguen acted with malice and contempt by abruptly dissolving Amyntor without planning or communicating with Marshall on how best to maintain company agreements and relationships, including contracts with third parties and agreements with Amyntor employees.

641.   By late 2017 and into 2018, Amyntor had multiple, high-value, medium-term (3-5 year) confidential contracts with private parties that Amyntor could no longer pursue or satisfy because of the extortion, wire fraud, and retaliatory manner in which Goguen, and others sought to disrupt Amyntor's legitimate business activities.

642.   By 2018, Defendant Karen Valladao began to reclassify funds paid into Two Bear Security for Amyntor's operations as "revenue" to Amyntor and backdated this revenue to make it appear that Two Bear Security had operations independent from Amyntor when in fact these companies did not.

643.   On September 6, 2018, Goguen requested dissolution of Amyntor on behalf of Non-Managing Member, Amyntas Ventures, LLC, "effective immediately."

644.   This action by Goguen, using Amyntas Ventures, LLC to dissolve Amyntor, was a fraudulent act as part of the Goguen Sexual Scheme, calculated to harm Marshall and the company to cover-up Goguen's abuse of Amyntor's resources for his personal illicit purposes.

645.   Goguen did not have the authority to dissolve Amyntor on behalf of Amyntas, as Marshall was the Managing Member of Amyntas and the only one with the authority to trigger Amyntor's dissolution.

646.   At the time he sent the dissolution notice to Marshall, Goguen was not the Managing Member nor the Non-Managing Member of Amyntor; nor was Goguen the Managing Member or Non-Managing Member of Amyntas.

647.   Goguen's representation to Marshall that he was the "Non-Managing Member" of Amyntas was false, but Marshall relied on this false representation to Amyntor's detriment.

648.   Marshall, in reliance on Goguen's fraudulent dissolution notice, thereafter, told the employees of Amyntor that the company could no longer continue operations and they would all be losing their jobs with the company.

649.   Marshall then began to wind up the affairs of Amyntor.

A.   **Goguen Extorted Amyntor by Using Threats of Economic Loss to Amyntor if Marshall did not use Amyntor's Resources in Furtherance of the Goguen Sexual Scheme in Violation of 18 U.S.C. § 1951**

650.   Defendant Goguen obstructed, delayed, or affected the operation of Amyntor, or attempted or conspired to obstruct, delay or affect the operations of Amyntor, through means of extortion in violation of 18 U.S.C. § 1951.

651.   Defendant Goguen sought to acquire or maintain control of Amyntor in violation of 18 U.S.C. § 1962(b) through extortive acts targeted at Amyntor in violation of 18 U.S.C. § 1951.

652.   Defendant Goguen's extortion of Amyntor and the additional racketeering activities listed above in relation to the Goguen Sexual Scheme constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

653.   Goguen sought to leverage Amyntor in furtherance of his personal needs because of the fallout arising from the Goguen Sexual Scheme.

654.   Goguen justified his chronic underfunding of Amyntor by blaming it on personal liquidity issues when, on information and belief, he was paying tens of millions of dollars of hush-money to numerous women within the Goguen Sexual Scheme over the course of Amyntor's operating history.

655.   Goguen could well afford to fund Amyntor's yearly operating budget, but instead he chose to fund the company on a monthly basis to maintain closer financial and operational control to exert pressure on Marshall.

656.   Goguen provided funding to Amyntor by wiring funds as Trustee of the Michael L. Goguen Trust, and through Whitefish Frontiers, LLC and Valley Oak, LLC, or through the intermingling of assets with, or transfer of assets from, Two Bear Security, LLC; Whitefish Frontiers, LLC; and other entities used to house Amyntor employees.

657.   The funding for Amyntor was supposed to come from the Non-Managing Member Amyntas, based on the Amyntor Operating Agreement, with Marshall also serving as the Managing Member of Amyntas to maintain Goguen's confidentiality.

658.   Under the Amyntas Operating Agreement, the funding for Amyntas would come from either the Arete Trust or the Virvespertilio Trust (*Vir Vespertilio* means "batman" in Latin). Such funding mechanism was designed to conceal Goguen's direct financial involvement in Amyntor for operational security.

659.   However, no payments were made to Amyntor from dedicated Amyntas accounts, or from any dedicated Arete Trust or Virvespertilio Trust accounts.

660.   Later, Goguen stated to Valladao that he did not wish to operate through Amyntas, but when it came time to dissolve Amyntor in 2018, Goguen once again reasserted that his authority was derived from Amyntas.

661.   By funding Amyntor and non-Amyntor employees through Two Bear Security, and by relying on the NetJets resources of Whitefish Frontiers, LLC, Goguen was able to exert further control over Amyntor as the sole funder of the Company, as the sole member of Two Bear Security, and as the sole member of Whitefish Frontiers, LLC.

662.   Marshall relied on Goguen's funding of Two Bear Security and Whitefish Frontiers to further Amyntor's business objectives; Goguen knew Marshall relied in this manner and used this reliance to pressure Marshall to use Two Bear Security and Amyntor resources to achieve his objective to protect him from the fallout he was getting from the exposure of his sexual conduct and the Goguen Sexual Scheme.

663.   When Goguen provided funding to Amyntor, it was mainly on a monthly or bimonthly basis to cover Amyntor's payroll and overhead, but Goguen would not provide enough capital to propel Amyntor beyond monthly operating expenses.

664.   Goguen's undercapitalization of Amyntor caused Marshall considerable fear that the company would not obtain the revenue, experience, facility clearances and financial stability necessary for Amyntor to bid on more lucrative contracts before Goguen's minimal funding-with-strings-attached ceased altogether.

665.   Goguen also consistently burdened Amyntor employees with his personal management needs, including Ms. Bonnet coordinating contractors at Goguen's safe houses, and using other Amyntor employees for his personal security.

666.   By burdening Amyntor with personal errands while chronically underfunding the company, Goguen extorted Amyntor by coercing Marshall, as Manager of Amyntor, to use Amyntor's property, with Marshall's consent, to conduct surveillance on, hack, and perform other unlawful racketeering acts against Goguen's personal enemies and sexual liaisons.

667.   Goguen attempted to obtain Amyntor's property by coercing Marshall to use Amyntor's resources to hack the electronic devices and social media accounts of Larry and Lisa Wood, Bryan Nash, Amber Baptiste, Goguen's then wife Jordana, Mark Doe, Emily Doe and others, all in furtherance of the Goguen Sexual Scheme.

668.   Defendant Valladao assisted Goguen by making payments on Goguen's behalf from the Michael L. Goguen Trust to pay for Two Bear Security and Amyntor expenses, including numerous personal expenses that were made as part of the Goguen Sexual Scheme that Goguen sought to spend through these companies.

669.   Defendant Valladao made payments on behalf of Amyntor, Two Bear Security, Whitefish Frontiers, Valley Oak, and numerous other trusts, and thereby exhibited control over the operations of these entities.

670.   Defendant Valladao knew that Goguen was engaging in unlawful acts in furtherance of the Goguen Sexual Scheme, and knew that Goguen was underfunding Amyntor, but nonetheless helped Goguen to burden Amyntor with his personal needs by pressuring Marshall to comply with Goguen's requests to transfer Two Bear Security personnel to Amyntor that were not necessary for Amyntor's business.

671.   Goguen attempted to obtain and did obtain Amyntor's property through the wrongful use of actual or threatened fear that if Marshall did not comply, Amyntor would incur economic loss by Goguen refusing to fund Amyntor.

672.   After Marshall refused to comply with Goguen's demands for Marshall and Amyntor to participate in the Goguen Sexual Scheme, Goguen ultimately carried out his threat by ceasing to fund Amyntor, sending a fraudulent dissolution notice to Marshall, using attorney Defendant Richard Hegger to raid the assets of Amyntor under false pretenses, by using Defendant Valladao to reclassify Amyntor assets and Two Bear Security assets, and through other means.

673.   In this manner, Amyntor suffered damages arising from Goguen's attempt to extort Marshall and use the human and physical resources of the Company to comply with his demands to participate in the Goguen Sexual Scheme.

674.   Amyntor lost cash, personnel time, current and prospective business opportunities, and its ability to effectively compete because of Goguen's extortion and subsequent dissolution of Amyntor.

**B.    Defendant Goguen Committed Multiple Acts of Wire Fraud as a Means to Control or Maintain the Affairs of Amyntor in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1962(b).**

675.   Defendant Goguen sought to directly or indirectly acquire or maintain control of Amyntor in violation of 18 U.S.C. § 1962(b) through means of extortion by wire communications in interstate commerce in violation of 18 U.S.C. § 1343, a racketeering activity pursuant to 18 U.S.C. § 1961(1)(B).

676.   Amyntor was harmed by reason of Goguen's commission of predicate offenses, including Goguen's extortion of Amyntor by using wire communications in interstate commerce in violation of 18 U.S.C. § 1343.

677.   The first act of wire fraud was committed when Goguen enticed Marshall, around January of 2013, to come work for him, as described above.

678.   However, Goguen's fraudulent motive was not to build a legitimate security and intelligence firm, but to instead use the resources and capabilities of Amyntor and Two Bear Security to target those who could expose the Goguen and Goguen Sexual Scheme.

679.   Marshall was not aware at the time he accepted Goguen's offer to work with him in Whitefish that Goguen's motive was to fraudulently use the business and property of Amyntor to further the Goguen Sexual Scheme.

680.   Marshall did not discover the full criminal scope and purpose of the Goguen Sexual Scheme until he was informed of the Pam Doe affair by Det. Erickson in late 2017, and then when Marshall saw Goguen suborn Mr. Erickson to obstruct Erickson's investigation of Goguen's unlawful involvement with Pam Doe.

681.   Defendant Goguen, by representing to Marshall that he would fund the company's start-up operations while creating circumstances meant to pressure Marshall to use Amyntor resources in furtherance of the Goguen Sexual Scheme, engaged in a Scheme to defraud Amyntor or obtain property of Amyntor by false or fraudulent pretenses in violation of 18 U.S.C. § 1343.

682.   Then, as described herein, Goguen sought to commandeer the resources of Amyntor using Wickr and text messages sent through means of interstate commerce to Marshall in furtherance of the Goguen Sexual Scheme and as a means to control or maintain control over the affairs of Amyntor in violation of 18 U.S.C. § 1962(b).

683.   Goguen used Wickr and text messages sent to Marshall, for example as described above regarding Bryan Nash on September 19, 2014, or regarding Amber

Baptiste on March 16, 2016, were part of his Scheme to maintain control and influence over the affairs of Amyntor in violation of 18 U.S.C. § 1962(b).

684.   Amyntor has a legitimate property right in having its assets used for honest services in order to effectively compete and not in furtherance of the Goguen Sexual Scheme.

685.   Amyntor was not meant to be used as a security or intelligence contracting firm to help conduct or conceal Goguen's personal affairs.

686.   Amyntor was not meant to serve the purposes of Two Bear Security but nonetheless was forced to rely on Two Bear Security resources because of Goguen's undercapitalization of Amyntor.

687.   Amyntor was not meant to provide business connections or company assets in furtherance of the Goguen Sexual Scheme, yet despite Amyntor's legitimate business purpose under Marshall's leadership, Goguen used phone calls, text messages and other means of communication to direct Marshall to use Amyntor's or Two Bear Security's assets in furtherance of the Goguen Sexual Scheme.

688.   Goguen used Wickr messages, described above, to direct Marshall to use the resources of Amyntor to target Amber Baptiste, Bryan Nash, Lisa and Larry Wood, and numerous others, in each instance using a wire in interstate commerce in furtherance of the Goguen Sexual Scheme.

689.   Later, Goguen sought to commandeer the resources of Amyntor by seeking to fraudulent dissolve Amyntor on September 6, 2018, also in violation of 18 U.S.C. § 1343 as part of the Goguen Sexual Scheme and as further described herein.

690.   In this manner, Amyntor suffered injuries arising from Goguen's use of Wickr messages and other electronic communications in interstate commerce to extort Marshall to use human and physical resources of the company to comply with his demands to participate in the Goguen Sexual Scheme, and then by retaliating against Amyntor by using electronic communications to fraudulently dissolve the Company.

**C.    Goguen Participated in the Theft of Trade Secrets in Violation of 18 U.S.C. § 1832, which is a Racketeering Activity in Violation of 18 U.S.C. § 1962(b).**

691.   Defendant Goguen also acquired and maintained control of Amyntor, in violation of 18 U.S.C. § 1832, by knowingly, with the intent to convert Amyntor trade secrets to his economic benefit and intending and knowing that doing so would injure Amyntor, Goguen sought to steal, copy, convey, and then conspired to further transmit Amyntor trade secrets to the media.

692.   By violating 18 U.S.C. § 1832, Goguen thereby sought to acquire or maintain control of Amyntor in violation of 18 U.S.C. § 1962(b).

693.   The converted Amyntor trade secrets, stolen, copied, conveyed, and then conspiratorially transmitted to the media by Goguen were Amyntor confidential bank records which identified payments received by Amyntor that arose from confidential security contracts.

694.   The confidential bank record trade secrets were related to services Amyntor provided to third parties in interstate or foreign commerce.

695.   Defendant Goguen was not authorized to leak or transmit to the media confidential security contract and bank records about Amyntor.

696.   Around late 2018, Marshall learned that Goguen had given and communicated, Amyntor trade secrets about Amyntor's private contracts to Nic McKinley of DeliverFund, to in turn give to Aram Roston, which exposed Amyntor's sensitive private security contracts to the media.

697.   Goguen leaked this sensitive and confidential trade secret information about Amyntor as part of his Scheme to retaliate against Marshall and Amyntor and to damage their ability to continue to conduct further business.

698.   By obtaining, copying, and leaking Amyntor trade secrets, Defendants Goguen and McKinley knowing or recklessly disregarded the fact that their actions could injure Plaintiffs' reputation and business prospects.

**D.    Goguen Retaliated against Amyntor in Violation of 18 U.S.C. § 1513**

699.   On information and belief, Defendant Goguen, knowing Marshall had reported him to federal law enforcement, retaliated against Amyntor in violation of 18 U.S.C. § 1513 through acquiring and maintaining interests in and control of Amyntor by:

a.      Corruptly dissolving and commandeering the winding-up process of Amyntor;

b.      After July 2018, refusing to make any more needed capital contributions to Amyntor;

c.      Leaking Amyntor trade secrets as described herein;

d.      Having Valladao reclassify Amyntor assets as Two Bear Security assets, thereby preventing Amyntor from using those assets to satisfy creditors; and

e.      Directing others to remove and commandeer Amyntor assets, thereby preventing Amyntor from using those assets to satisfy creditors.

**E. Harm to Amyntor**

700.   As direct and proximate result of the Claim II Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff Amyntor has been injured in its business and property.

701.   Amyntor has lost countless cash, physical assets, personnel time, current and prospective contractual opportunities, and other business goodwill as a

direct and proximate result of the Claim II Defendants' racketeering activities and corrupt dissolution of Amyntor.

702.   As a direct and proximate result of Claim II Defendants' extortion of Amyntor in violation of 18 U.S.C. § 1951; multiple acts of wire fraud in violation of 18 U.S.C. § 1343; theft of Amyntor trade secrets in violation of 18 U.S.C. § 1832; retaliation against Amyntor in violation of 18 U.S.C. § 1513; and underfunding and fraudulent dissolution of Amyntor; Amyntor was deprived of prospective economic advantage, including performing, acquiring or maintaining private and government contracts that could have been obtained or performed but for the Goguen Sexual Scheme's unlawful control over the affairs of the Company and their maintenance of an interest in the Company.

703.   Goguen's maintenance of an interest in Amyntor, while being unable to obtain a personal security clearance, directly and proximately caused Amyntor to not be able to obtain prospective contracts and caused at least one Amyntor customer to terminate their business with Amyntor due to Goguen's involvement in the affairs of the Company.

704.   Amyntor suffered injury to its business and property by the Claim II Defendants' interference with their current and prospective contractual relations

with private parties and the government that Amyntor either had secured or had a high likelihood of obtaining.

## CLAIM THREE

### VIOLATION OF 18 U.S.C. § 1962(C)

### (MATT MARSHALL VERSUS DEFENDANTS MICHAEL GOGUEN, INDIVIDUALLY AND AS THE TRUSTEE OF THE MICHAEL L GOGUEN TRUST, KAREN VALLADAO, FRANK, RIMERMAN + CO. LLP, AND RICHARD HEGGER)

705.   Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

706.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, among other things, provides a civil cause of action for "any person injured in his business or property by reason of a violation" of RICO's criminal provisions. See 18 U.S.C. § 1964(c).

707.   18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

708.   Under 18 U.S.C. § 1964(c), any person injured in his business or property by reason of a violation of section 1962 of chapter 18 U.S.C. may sue therefor in any appropriate United States district court.

709.   For purposes of this Claim III, the Goguen Sexual Scheme is an association-in-fact enterprise whose activities affect interstate commerce as described herein.

710.   At all times material herein, Defendants Michael Goguen, individually and as Trustee for the Michael L. Goguen Trust, Karen Valladao, Frank, Rimerman + Co., LLP, and Richard Hegger (the "Claim III Defendants") willfully and knowingly directly and indirectly participated in or associated with the Goguen Sexual Scheme, an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

711.   The Defendants, as part of the Goguen Sexual Scheme, engaged in two or more acts that constitute criminal predicate acts meant to conceal evidence or silence persons who knew about or could expose Goguen's illicit sexual conduct.

712.   The non-Goguen Claim III Defendants benefited, directly and indirectly, from the pattern of criminal activity conducted by the Goguen Sexual Scheme by receiving compensation from Goguen and/or entities which Goguen controlled.

713.   Goguen and the Claim III Defendants committed multiple predicate acts in which they perpetuated and protected the Goguen Sexual Scheme, which not only gained control over Amyntor, but directly injured Marshall in his business and property.

714.   At all times material herein, the Claim III Defendants engaged in said pattern of criminal activity that was not isolated but was related to the affairs of the Goguen Sexual Scheme in violation of RICO.

715.   Goguen and his associates used or attempted to use Marshall in furtherance of the Goguen Sexual Scheme and to the detriment of Marshall's legitimate business and property interests by diverting Marshall's assets, time, attention, and the resources of Amyntor, Two Bear Security, and other entities, to target numerous persons described herein.

716.   Goguen pressured Marshall to help him resolve numerous issues, through legal and illegal means, that arose from Goguen's and others' activities in the Goguen Sexual Scheme.

717.   Goguen instructed Marshall to use Two Bear or Amyntor resources and assets for Marshall to silence women, to intimidate angry husbands, boyfriends, and other enemies of Goguen, and for payments by Marshall to purchase jewelry,

vehicles, and other items on Goguen's behalf for Goguen's purpose of furthering the Goguen Sexual Scheme.

718.   Marshall ignored Goguen's solicitations to commit illegal acts to avoid his involvement in the Goguen Sexual Scheme.

719.   However, as Goguen's "right-hand man," Marshall understood that Goguen sought to rely on Marshall and his expertise to quell issues arising from Goguen's sexual proclivities and the Goguen Sexual Scheme, which constantly infringed on the ability of Marshall and others to pursue their legitimate activities in the security contracting business.

720.   In the course of seeking Marshall's assistance in settling his personal affairs, Goguen sought to have Marshall engage in criminal activities on his behalf, including murder, electronic interception, pay-offs to women for sexual acts or their concealment of sexual acts, bribery, and other schemes, each in violation of RICO's racketeering prohibitions as described above.

721.   Goguen knew that Marshall was continuing to solicit and attract security contract funding and despite Marshall's proposal of a legitimate buy-out offer, Goguen maliciously and fraudulently ceased funding Amyntor when he learned that the Goguen Sexual Scheme and payments made to women and others

in relation thereto had deeply compromised the ability of Amyntor to obtain a U.S. government facility security clearance.

722.   Despite the hard work of Marshall and the other Plaintiffs, once it became clear in 2018 that Amyntor's business and property had been frustrated by Goguen's conduct, Goguen then sought to destroy Marshall's character and reputation by lying to federal officials about the purpose behind the payments that Goguen had been making to him.

723.   Goguen made periodic payments to Marshall as reimbursements for the out-of-pocket expenditures Marshall had been making on Goguen's behalf for such things as Goguen's property expenses, business travel, business expenses, and business gifts to others.

724.   To protect Goguen's conduct in the Goguen Sexual Scheme, Goguen maliciously lied to the FBI and IRS about the reason he made these payments to Marshall, as a means to extort Marshall's silence, to harm Marshall's credibility.

## PATTERN OF RACKETEERING ACTIVITY AND PREDICATE ACTS

725.   The predicate acts stated above and below comprise a pattern of racketeering activity through which the Claim III Defendants conducted or participated, directly or indirectly, in the conduct of the Goguen Sexual Scheme's affairs.

A.   **Goguen and the Trustee of the Michael L. Goguen Trust Violated the Hobbs Act under 18 U.S.C. § 1951 by Conducting the Affairs of the Goguen Sexual Scheme in a Manner meant to Extort Marshall's Participation in the Goguen Sexual Scheme.**

726.   As described above, Defendant Goguen individually and as Trustee of the Michael L. Goguen Trust, attempted to obtain property from Marshall in violation of 18 U.S.C. §1951 in the form of information from the electronic devices and social media accounts of Goguen's enemies and in the form of personal funds of Marshall for Goguen's personal expenses as described herein.

727.   As a direct and proximate result of Defendant Goguen's racketeering activities in violation of 18 U.S.C. § 1951, Plaintiff Marshall was damaged when he incurred significant costs to: (1) personally fund Amyntor to keep it afloat, costs which Marshall was not reimbursed by Defendant Goguen or Amyntor; and (2) to pay for personal expenses of Goguen, much of which was not reimbursed by Defendant Goguen.

B.   **The Defendants Violated 18 U.S.C. § 1343 by Committing Wire Fraud in Relation to Making False Statements to Federal Law Enforcement About Marshall**

728.   The Claim III(B) Defendants Michael Goguen, individually and as Trustee of the Michael L. Goguen Trust, Karen Valladao, and Frank, Rimerman + CO. LLP, and Richard Hegger, devised a Scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses or

representations, by transmitting or causing to be transmitted, by wire

communications in interstate commerce, to the FBI, the IRS, the U.S. Attorney's

Office for the District of Montana ("U.S. Attorney's Office")(collectively, "Law

Enforcement"), the Whitefish Police Department, and others law enforcement

agencies, written and oral false statements and forged or fraudulent documents for

the purpose of executing such Scheme or artifice.

729.   The Claim III Defendants' transmission through wire communications

in interstate commerce of written and oral false statements and/or forged and

fraudulent documents to Law Enforcement, were intended to encourage the FBI to

falsely indict Plaintiff Marshall on felony charges of wire fraud, money laundering

and tax evasion and to recover money for Goguen in the form of restitution; that if

Marshall were found or plead guilty, Marshall would be required to repay the alleged

victim Goguen.

730.   In or around June or July of 2018, Defendant Goguen, individually

and on behalf of the Michael L. Goguen Trust, transmitted through wire

communications in interstate commerce written documents (the "Manifesto") to

Law Enforcement, that included false statements, accounting and banking records,

and altered, forged, and fraudulent documents and communications fraudulently

representing that Marshall had committed wire fraud, money laundering, and tax

evasion in relation to approximately $2,355,000 that Defendant Goguen,

individually and as Trustee of the Michael L. Goguen Trust had wired Marshall

during Marshall's time working with Goguen.

731.   The information in Goguen's Manifesto and statements from Goguen

falsely alleged that Goguen, relying on materially false and fraudulent

representations of Marshall, wired the approximate $2,355,000 to Marshall for

Marshall to conduct secret "missions" involving assault teams Marshall would lead

on rescue and other operations in foreign countries; missions that were never carried

out.

732.   Goguen knew that such statements were false, and that Marshall had

not been embezzling or fraudulently inducing Goguen for money, but instead that

Goguen was punishing Marshall for his role in exposing the Goguen Sexual Scheme.

733.   In reality, Goguen wired the $2,355,000 to Marshall to reimburse

Marshall for or pay expenses related to Goguen's personal expenses, including real

property maintenance and improvement expenses, "safe house" expenditures, the

purchases of vehicles, jewelry, earnest money deposits on real properties and

providing cash and other items for Goguen's mistresses and for hush-money

payments to Goguen's acquaintances and employees who had "learned too much"

about Goguen's sexual deviancies and the Goguen Sexual Scheme, among other expenses of Goguen's.

734.   In around July of 2018, Defendants Karen Valladao, Frank, Rimerman + Co., LLP and Richard Hegger provided false and fraudulent statements, information, and/or altered and false accounting documents and other documents to Law Enforcement to support Goguen's false narrative and fraudulent Manifesto, while knowing that Goguen's Manifesto was fraudulent, for the purpose of executing the Claim III Defendants' Scheme or artifice to defraud as described above.

735.   Based on the false and fraudulent information and altered, forged, and fraudulent documents that the Claim III Defendants provided Law Enforcement, on or about December of 2018, the U.S. Attorney's Office served search warrants on Marshall, Amyntor, and potentially others, and filed a ten-count federal indictment against Marshall for wire fraud, money laundering, and tax evasion.

736.   After Marshall was arrested pursuant to the indictment, the Claim III Defendants continued to provide Law Enforcement with fraudulent information, statements, documents, and other evidence through means of wire in interstate commerce, including but not limited to, telephone and email communications, for

the purpose of supporting the fraudulent supported U.S. Attorney's Office's

indictment against Marshall.

737.   As such, the Claim III Defendants have devised or intended to device a

Scheme or artifice to defraud, or for obtaining money or property from Marshall by

means of false or fraudulent pretenses, representations, or promises, on multiple

occasions, transmitted by means of wire communications in interstate commerce,

writings, signs, signals, pictures or sounds for the purpose of executing Claim III

Defendants' Scheme or artifice, all in violation of 18 U.S.C. § 1343.

738.   Defendants Goguen, Karen Valladao, Frank, Rimerman, and Richard

Hegger have participated in the Goguen Sexual Scheme by conducting the affairs of

the Goguen Sexual Scheme through a level of cooperation which arose above the

level of cooperation inherent in normal commercial transactions between an

accountant or an attorney and their client due to each having knowledge that the

information they were providing falsely accused Marshall of crimes he did not

commit.

739.   The Claim III Defendant(s)' Scheme or artifice to defraud in violation

of 18 U.S.C. § 1343 and in furtherance of the Goguen Sexual Scheme along with

the other predicate acts described herein by Claim III Defendants constitutes a

pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

740.   As a direct and proximate result of the Claim III Defendant(s)' racketeering activities, including wire fraud in violation of 18 U.S.C. § 1343, Marshall has suffered damages, in an amount to be determined at trial.

C.   **Defendant Goguen Violated 18 U.S.C. § 1343 By Committing Wire Fraud in Relation to the Inducement of Marshall to Leave his Stable Employment to Start and Operate a Defense Company**

741.   In or around January of 2013, Goguen enticed Marshall to come work for him as described above, but had the unknown motive to use the resources and capabilities of Amyntor and Two Bear Security to target those who could expose Goguen and the Goguen Sexual Scheme.

742.   Defendant Goguen, by representing to Marshall that he would fund the company's start-up operations while creating circumstances meant to pressure Marshall to use Amyntor resources in furtherance of the Goguen Sexual Scheme, engaged in a Scheme to defraud Amyntor or obtain property of Amyntor by false or fraudulent pretenses in violation of 18 U.S.C. § 1343.

743.   Goguen conducted the affairs of the Goguen Sexual Scheme by falsely representing to Marshall that he was willing to fund Amyntor when in fact he sought to use Marshall and Amyntor to further his personal objectives of perpetuating and protecting his conduct in the Goguen Sexual Scheme.

744.   In this manner, Marshall suffered damages arising from Defendant Goguen's use of wire communications in interstate commerce to entice Marshall to leave his stable and lucrative employment in Mexico City with the U.S. State Department to work for Defendant Goguen, leaving behind a lucrative salary, employment benefits, and significant promotions, based and relying on Goguen's false pretenses.

### D.   Defendant Goguen Violated 18 U.S.C. § 1343 By Committing Wire Fraud in relation to Goguen's Extortion of Marshall

745.   As described herein, Goguen sought to commandeer, through extortion, the resources and property of Marshall by using Wickr and text messages, sent through means of interstate commerce, to Marshall and thereby participated in and conducted the affairs of the Goguen Sexual Scheme in violation of in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1962.

746.   Goguen sent wire communications in violation of 18 U.S.C. § 1343 including Wickr and text messages sent to Marshall for the purpose of commandeering the resources and property of Marshall through extortion, for example as described above regarding Bryan Nash on September 19, 2014, or regarding Amber Baptiste on March 16, 2016, which were part of his Scheme to participate or conduct the affairs of the Goguen Sexual Scheme and Goguen's

attempt to extort Marshall and obstruct the operation of Amyntor in violation of 18 U.S.C. § 1951.

747.   Goguen did not have the lawful right to commandeer Marshall's resources and property to perpetuate the Goguen Sexual Scheme.

748.   Marshall had a legitimate property right in providing honest services in order to operate and manage Amyntor and not to provide his services in furtherance of the Goguen Sexual Scheme.

749.   Marshall's acceptance of a position with Goguen and his launching of Amyntor was not meant to help conduct or conceal the Goguen Sexual Scheme, but through Goguen's use of the wires, Marshall was injured when Goguen pressured him to use his property and that of Amyntor's to conduct the affairs of the Goguen Sexual Scheme.

750.   Goguen conducted the affairs of the Goguen Sexual Scheme by fraudulently instructing Marshall to use their property and business resources to further Goguen's personal objectives of perpetuating and protecting his conduct in the Goguen Sexual Scheme.

751.   As a direct and proximate result of Defendant Goguen's racketeering activities, including his violation of 18 U.S.C. § 1343 in relation to Goguen's extortion of Marshall, Plaintiff Marshall was injured when he incurred significant

costs to: (1) personally fund Amyntor to keep it afloat, costs which Marshall was not reimbursed by Defendant Goguen or Amyntor; (2) to pay for personal expenses of Goguen, much of which was not reimbursed by Defendant Goguen; and (3) by being deprived of his right to honest services, earn wages and perform security and intelligence contracting work in an unobstructed manner.

**E.     Goguen Violated of 18 U.S.C. § 1343 By Committing Wire Fraud When He Engaged in Retaliation Against Marshall.**

752.    On September 6, 2018, Goguen sent an email, through wire communications in interstate commerce, containing a letter misrepresenting to Marshall that as Non-Managing Member of Amyntas Ventures, LLC, Goguen had the direct right to dissolve Amyntor Group, LLC. The letter further directed Marshall to commence immediate dissolution of Amyntor.

753.    Goguen's intent on sending the email to dissolve Amyntor was to retaliate against Marshall and Amyntor for their refusal to participate in the concealment of the Goguen Sexual Scheme.

754.    Marshall relied on Goguen's letter and other correspondence thereafter from Hegger to mistakenly believe that Goguen had the authority to immediately dissolve Amyntor and transfer assets to Two Bear Security.

755.    As described herein, pursuant to the Amyntas Operating Agreement, the Non-Managing Member of Amyntas only has the right to dissolve Amyntas[4], and not Amyntor.

756.    At the time, Goguen was not the Managing Member, nor the Non-Managing Member of Amyntor nor Amyntas, but merely a beneficial economic owner in the Trust which controlled by the Trustee, served as the Non-Managing Member of Amyntas.

757.    Thus, as Managing Member of Amyntas, only Marshall had the right to dissolve Amyntor.

758.    Goguen conducted the affairs of the Goguen Sexual Scheme by retaliating against Marshall and Amyntor by falsely representing to Marshall that Goguen had the immediate authority to order the dissolution of Amyntor, thereby causing Marshall to believe that no buy-out or divestiture scenario was possible and that the Company would need to be liquidated in due course.

---

[4] The Amyntas Ventures Operating Agreement does not state that Goguen is the Non-Managing Member of Amyntas, rather, that the Arete Trust is the Non-Managing Member, while the signature block lists the Virvespertilio Trust as the Non-Managing Member. Marshall was the Trustee for both the Arete Trust and the Virvespertilio Trust and signed the Amyntas Operating Agreement as the Trustee for the Virvespertilio Trust.

759.    As a direct and proximate result of Defendant Goguen's racketeering

activities, including violation of 18 U.S.C. § 1343 in relation to Goguen's retaliation

against Marshall, Marshall suffered damages as described below.

**F.      The Claim III Defendants Violated 18 U.S.C. § 1503 by Committing Obstruction of Justice.**

760.    18 U.S.C. § 1503 provides: "[w]however corruptly… endeavors to

influence, intimidate, or impede any grand or petit juror, or officer in or of any

court of the United States… in the discharge of his duty, … or corruptly …

influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the

due administration of justice, shall be punished as provided in subsection (b)."

761.    The Claim III Defendants' acts of providing false and misleading

evidence and fraudulent information and documents to the FBI, IRS, and other law

enforcement agencies was done with the intent to corruptly influence the U.S.

Attorney's Office for the District of Montana to "empanel a grand jury" to

investigate Marshall for the alleged crimes supported by fraudulent evidence,

information and documents provided by the Claim III Defendants.

762.    In reality, the U.S. Attorney's Office, on information and belief, based

almost entirely on the fraudulent evidence, information, and documents provided

by the Claim III Defendants, investigated Marshall, served search warrants, issued

grand jury subpoenas to third parties, and filed a ten-count federal indictment for wire fraud, money laundering, and tax evasion against Marshall.

763.   The Claim III Defendants provided the false and misleading evidence and documents to agents of the FBI and IRS, the U.S. Attorney's Office, the Whitefish Police Department, and other law enforcement agencies with the purpose and intent to corruptly influence, obstruct, and impede the due administration of justice, by attempting to destroy Marshall's credibility with regard to criminal information Marshall was attempting to provide the FBI and had provided the IRS regarding the criminal activity of Goguen.

764.   By providing the Manifesto to the FBI, IRS, and the U.S. Attorney's Office, Goguen, individually and as Trustee of the Michael L. Goguen Trust, has corruptly endeavored to influence and has influenced a grand jury and/or the U.S. Attorney's Office into indicting Plaintiff Marshall for wire fraud, money laundering, and tax evasion, in violation of 18 U.S.C. § 1503, a prohibited criminal racketeering activity as defined by 18 U.S.C. § 1961(1).

765.   By knowingly providing false and fraudulent statements, information, and/or altered and false accounting documents and other documents to the FBI, IRS, and the U.S. Attorney's Office to support Goguen's false narrative and fraudulent manifesto, Defendants Karen Valladao, Frank, Rimerman, and Richard

Hegger have corruptly endeavored to influence and have influenced a grand jury and/or the U.S. Attorney's Office into indicting Plaintiff Marshall for wire fraud, money laundering, and tax evasion, in violation of 18 U.S.C. § 1503, a prohibited criminal racketeering activity as defined by 18 U.S.C. § 1961(1).

766.   By corruptly influencing a grand jury and/or the U.S. Attorney's Office, the Claim III Defendants conducted the affairs of the Goguen Sexual Scheme by acting at Goguen's direction to help tarnish Marshall's credibility to protect Goguen and thereby perpetuate the Goguen Sexual Scheme.

### G.      Goguen Retaliated Against Marshall in Violation of 18 U.S.C. § 1513

767.   On information and belief, Defendant Goguen, knowing Marshall had reported him to federal law enforcement, retaliated against Marshall by:

a.       In or around June or July of 2018, providing the Manifesto to the FBI, IRS, and the Montana U.S. Attorney's Office, that included false statements, accounting, and banking records, and altered, forged, and fraudulent documents and communications that fraudulently represented Marshall had committed wire fraud, money laundering, and tax evasion in relation to approximately $2,355,000 that Defendant Goguen had wired Marshall during Marshall's time working with Goguen.

b.      After July 2018, refusing to make any more needed capital contributions to Amyntor;

c.      Refusing to reimburse Marshall for the various expenses Marshall incurred when paying Amyntor's overhead costs in an effort to make up for Defendant Goguen's underfunding of the company;

d.      Refusing to reimburse Marshall for the expenses he incurred by paying for Goguen's property maintenance, hush-money payments to women, employees, and associates of Goguen, and other payments Marshall made on Defendant Goguen's and his entities' behalf.

e.      On information and belief, instructing the Board of Directors for PROOF Research, Inc., in violation of its bylaws and corporate governance, to remove Marshall from the board and to terminate PROOF's relationship with Marshall and Maguire.

f.      Fraudulently ordering the dissolution of Amyntor by Defendant Hegger, falsely claiming that Goguen, as the Managing Member of Amyntas, had the right to dissolve Amyntor;

g.      Instructing Defendant Hegger to remove Marshall from all positions of power Marshall held within Goguen related entities and trusts without any just compensation to Marshall for the additional roles he was performing;

h.      Instructing Defendant Hegger to evict and evicting Marshall and his family from the property Goguen had purchased for him at Missy Lane in Whitefish.

i.      Instructing Valladao and Hegger to submit false and fraudulent accounting and other written documents to the FBI, IRS, and the Montana U.S. Attorney's Office.

768.    Defendant Hegger and Valladao, having knowledge that Goguen was wrongly retaliating against Marshall, followed Defendant Goguen's instructions providing the FBI, IRS, and the Montana U.S. Attorney's Office with false and fraudulent statements and written documents which damaged Marshall

769.    Defendant Hegger's and Valladao's knowledge that they were providing false and fraudulent documents to the FBI, IRS, and the Montana U.S. Attorney's Office, resulted in a level of cooperation between Hegger, Valladao, and Goguen that arose above the level of cooperation inherent in normal commercial transactions between a client, his attorney, and accountant, and resulted in Hegger, Valladao, and Goguen participating in the operation and management of the Goguen Sexual Scheme.

**H.      RICO Damages & Relief**

770.   As a direct and proximate result of the Defendant Goguen's, individually and as trustee of the Michael L. Goguen Trust, racketeering activities, including extortion in violation of 18 U.S.C. § 1951, the wire communications made in violation of 18 U.S.C. § 1343 related thereto, Plaintiff Marshall was damaged by incurring significant costs to pay for personal expenses of Goguen, much of which was not reimbursed by Defendant Goguen.

771.   As a direct and proximate result of the Claim III Defendants' racketeering activities, including wire fraud in violation of 18 U.S.C. § 1343, obstruction of justice in violation of 18 U.S.C. § 1503, and retaliation in violation of 18 U.S.C. § 1513, Marshall has suffered injury due to being falsely accused of and indicted for criminal activity that he did not conduct, allegations which have resulted in Marshall incurring significant attorney's fees and costs to defend himself against and which have resulted in significant business losses to Marshall.

772.   As a direct and proximate result of Goguen's Wickr messages in interstate wire communications, Marshall has suffered damages by being oppressed in his ability and interest in running Amyntor free from illegal influence by Defendant Goguen.

773.   As a result of Defendant Goguen's retaliation in violation of 18 U.S.C. § 1513, Marshall suffered injury to his property and business by losing:

a.      His ability and interest to run Amyntor free from illegal influence by

Defendant Goguen;

b.      Past wages resulting in Marshall seeking and obtaining a judgment

against Amyntor from the Montana Department of Labor and Industry;

c.      Future wages;

d.      Direct personal distributions Marshall would have otherwise received

from Amyntor and other entities;

e.      Compensation in the form of equity ownership in PROOF that he was

promised by Goguen;

f.      Business commissions and fees charged in the security and defense

contracting industry for the successful solicitation and award of security

contracts, which Amyntor was fully poised to gain in 2018-2019;

g.      Prospective business opportunities Marshall pursued independent of

Amyntor but lost due to damage to his business arising from the false

testimony and forged, altered, and fraudulent documents provided by

Goguen, and the Claim III Defendants calculated to falsely indict Marshall

and corruptly disturb, delay, obstruct the investigation of, and conceal

Goguen's sexual crimes and the crimes arising from the Goguen Sexual

Scheme.

## CLAIM FOUR

## VIOLATION OF 18 U.S.C. § 1962(C)

## (PLAINTIFFS JOHN MAGUIRE, KEEGAN BONNET, AND TONY AGUILAR VS. MICHAEL GOGUEN, INDIVIDUALLY AND AS THE TRUSTEE OF THE MICHAEL L. GOGUEN TRUST)

774.   Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

775.   For purposes of this Claim IV, the Goguen Sexual Scheme is an association-in-fact enterprise whose activities affect interstate commerce as described herein.

776.   At all times material herein, Defendants Michael Goguen, individually and as Trustee for the Michael L. Goguen Trust, PROOF Research, Inc., and Richard Hegger (collectively, the "Claim IV Defendants") willfully and knowingly directly and indirectly participated in or associated with the Goguen Sexual Scheme, an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

## PATTERN OF RACKETEERING ACTIVITY AND PREDICATE ACTS

777.   The predicate acts stated above and below comprise a pattern of racketeering activity through which the Defendant Goguen and others conducted or participated, directly or indirectly, in the conduct of the Goguen Sexual Scheme's affairs.

**A.      The Claim IV Defendants Violated 18 U.S.C. § 1513 By Retaliating against Maguire, Aguilar, and Bonnet After Marshall Reported Crimes of Goguen to Federal Law Enforcement.**

778.    As described in above Section G of Claim III, in or around March of 2018, Marshall reported Defendant Goguen's tax crimes to federal law enforcement.

779.    As described above, Defendant Goguen had knowledge of Marshall reporting him to federal law enforcement, through Marshall informing Erickson and Erickson, having been compromised by Goguen, informing Goguen of Marshall's reporting activities.

780.    Defendant Goguen, knowing that Marshall had reported him to federal law enforcement, retaliated against Marshall, including Plaintiffs Maguire, Aguilar, and Bonnet, by:

a.      Goguen instructing Hegger to seize and then having John Maguire's and Anthony Aguilar's Amyntor company vehicles seized;

b.      Goguen instructing Hegger to evict and then having John Maguire and Anthony Aguilar and his family evicted from their homes, forcing them to incur costs and expenses to relocate;

c.      Wrongfully dissolving Amyntor and interfering with Amyntor's contractual relations, resulting in Plaintiffs Maguire, Aguilar, and Bonnet

losing their jobs, past and future wages, contractual performance payments, and related business and property.

**B.     The Claim IV Defendants Violated 18 U.S.C. § 1343 involving Wire Fraud when they Engaged in Retaliation Against Marshall, Maguire, Aguilar, and Bonnet.**

781.   As mentioned above in Claim III, Goguen sent Marshall a fraudulent email on September 6, 2018, through wire communications in interstate commerce, containing a letter from Goguen which requested Marshall to immediately commence dissolution of Amyntor.

782.   Marshall relied on the misrepresentations contained in Goguen's emailed letter and started dissolution of Amyntor.

783.   As a direct and proximate result of Defendant Goguen's racketeering activities, including violation of 18 U.S.C. § 1343 in relation to Goguen's retaliation against Marshall, Plaintiffs each suffered damages as described below.

**C.     RICO Damages and Relief**

784.   As a result of Defendant Goguen's retaliation in violation of 18 U.S.C. § 1513 and the wire fraud in violation of 18 U.S.C. § 1343 in relation thereto, Plaintiffs have suffered injury to their property and business as follows:

a.      Plaintiffs Aguilar, Maguire, and Bonnet lost past and future wages, resulting in them seeking and obtaining judgments against Amyntor from the Montana Department of Labor and Industry for unpaid wages;

b.      Plaintiffs Maguire lost business commissions and fees charged in the security and defense contracting industry for the successful solicitation and award of security contracts, which Amyntor was fully poised to gain in 2018-2019;

c.      Plaintiff Maguire lost prospective business opportunities he had pursued independent of Amyntor but lost due to damage to his business arising from the false testimony and forged, altered, and fraudulent documents provided by Goguen and others calculated to falsely indict Marshall and corruptly disturb, delay, obstruct the investigation of, and conceal Goguen's crimes.

## CLAIM FIVE

### VIOLATION OF 18 U.S.C. § 1962(c)

### (MATT MARSHALL DERIVATIVELY ON BEHALF OF AMYNTOR GROUP, LLC VERSUS DEFENDANTS MICHAEL GOGUEN, INDIVIDUALLY AND AS THE TRUSTEE OF THE MICHAEL L. GOGUEN TRUST, AND SHAWN LEWIS, AND NOMINAL DEFENDANT AMYNTOR GROUP, LLC)

785.    Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

786.   This action is not a collusive one intended to confer jurisdiction that the court would otherwise lack.

787.   This derivative Claim V is brought by Marshall as Member of Amyntor and derivatively on Amyntor's behalf to enforce a right of damages arising from the Goguen Sexual Scheme that Amyntor could have but has failed to enforce because of the circumstances described herein.

788.   The Goguen Sexual Scheme is an association-in-fact enterprise engaged in and whose activities and affairs affect interstate commerce: by making payments to numerous women around the U.S. for sexual services and by paying such women after-the-fact to remain silent about their affairs with Goguen; and as otherwise described herein.

789.   Defendants Goguen; the Trustee of the Michael L. Goguen Trust; Shane Erickson; Nic McKinley; Shawn Lewis; and Richard Hegger (the "Claim V Defendants") were employed by or associated with the Goguen Sexual Scheme and conducted or participated, directly or indirectly, in the conduct of affairs thereof through a pattern of racketeering activity by virtue of such persons or entities paying or receiving money in exchange for providing services to knowingly assist or facilitate the commission or cover-up of Goguen's crimes.

790.   Marshall's efforts to mitigate the harm to Amyntor and its employees has been futile as Goguen, after electing to "dissolve" the company in September of 2018, thereafter, directed his attorneys and accountants to commandeer the remaining assets of Amyntor by reclassifying them as "Two Bear Security, LLC" assets, and by committing other acts described herein against Amyntor.

791.   With Goguen being the Non-Managing Member who had agreed to fund the company, Marshall knew that Goguen would not support funding any lawsuit that would expose his sexually deviant conduct, crimes, and participation in the Goguen Sexual Scheme, thereby making it futile for Amyntor to have sought Goguen's agreement for Amyntor to enforce its rights against him and necessitating this Claim V derivative claim by Marshall on behalf of Amyntor.

792.   This derivative claim by Marshall as Member of Amyntor fairly and adequately represents the interests of non-RICO members and those with contractual interests in Amyntor such as Maguire, Bonnet and Aguilar because Amyntor and Plaintiffs have been harmed in their business and property by reason of the Goguen Sexual Scheme.

793.   The Claim V Defendants' participation in the conduct and affairs of Amyntor, through the pattern of racketeering activity in the Goguen Sexual Scheme, has damaged Amyntor and the other Plaintiffs.

794.    Defendant Goguen, individually and as Trustee of the Michael L. Goguen Trust, and the Claim V Defendants, conducted the affairs of the Goguen Sexual Scheme through a pattern of racketeering activity that included the following acts:

a.      Defendants Goguen, individually and as Trustee of the Michael L. Goguen Trust, and Valladao deliberately undercapitalized Amyntor, despite capital calls from Marshall and futile attempts by Marshall to plan with Goguen for changes to Company capitalization because of Goguen's persistent lack of communication;

b.      Defendants Goguen and Valladao allowed and facilitated the intertwining of Two Bear Security and Amyntor operations as a means to conduct the affairs of Amyntor;

c.      The Claim V Defendants used or attempted to use Amyntor cash, assets, and personnel, in furtherance of the Goguen Sexual Scheme;

d.      Defendants Goguen and Hegger aided and abetted McKinley and Erickson in the theft of company assets from Amyntor's Columbia Falls' storage unit on multiple occasions, including on March 8, 2019, when Marshall reported the incident to the Flathead County Sheriff's Office;

e.      Defendants Goguen and McKinley unlawfully leaked Amyntor trade secrets to the media;

f.      Defendants Goguen and Lewis colluded to and embezzled funds from Amyntor;

g.      Defendants Goguen, Valladao, Hegger, Lewis, McKinley and Erickson unlawfully transferred assets used and paid for by Amyntor to Two Bear Security to put these assets out of the reach of Amyntor, injuring its ability to operate;

h.      Defendant Goguen unlawfully commandeered the winding up process of Amyntor by directing Defendants Valladao, Hegger, Erickson, McKinley, and Lewis to take unlawful control over the assets and affairs of Amyntor;

i.      Defendants Goguen, Valladao and Hegger unlawfully interfered with the contracts Amyntor sought to perform or obtain but could not because of the Defendants' retaliatory conduct against Marshall and Plaintiffs;

j.      Other acts by Defendants Goguen, Valladao and Frank Rimerman with respect to reporting to relevant state and federal tax authorities certain information about Amyntor, Amyntas, and Two Bear Security that was not based on reasonable informed consultation with Marshall.

795.   The Goguen Sexual Scheme further injured Amyntor by disqualifying Goguen from being eligible for a personal U.S. government security clearance, which prevented Amyntor from being able to receive a U.S. government facility security clearance to advance its legitimate and foreseeable business objectives.

796.   Though Amyntor could have obtained and was well positioned to receive a number of large U.S. Government contracts once its U.S. government facility security clearance was acquired, Amyntor was prevented from doing so by Goguen's nefarious and illegal acts that occurred within the Goguen Sexual Scheme.

797.   Notwithstanding the 2017 *BuzzFeed* news article, Amyntor was nonetheless ready, able, and willing to obtain or fulfill its numerous profitable third-party contracts, but for the extortionate and retaliatory acts of Goguen and Defendants as part of the Goguen Sexual Scheme that frustrated and obstructed Amyntor's ability to effectively operate and compete for business.

798.   In the autumn of 2017, Goguen inquired with Marshall when seeking to complete his personal U.S. government security clearance whether he had to be "completely honest" with the government, implying to Marshall that he intended to be something less than completely honest.

799.   By the summer of 2018, Goguen made it clear to Marshall that he was losing interest in funding Amyntor, despite the revenues Amyntor had obtained up

until that time and the long investment in time, acquisition of assets, and other work that it took for Plaintiffs to position Amyntor for higher value contracts.

800.   Defendant Goguen, by not relinquishing his involvement in Amyntor, even when offered a reasonable buy-out by Marshall, further injured the interests of Amyntor when he retaliated against the company by informing Marshall that he wanted the company to dissolve on September 6, 2018, instead of finding a way to keep Amyntor as a going-concern.

801.   Amyntor's business could have continued but for Goguen's animosity and malicious intent toward Amyntor, due to Plaintiffs continued involvement in Amyntor.

802.   Goguen's interest in dissolving Amyntor was a fraudulent attempt to discredit those affiliated with Amyntor, including Plaintiffs Marshall, Maguire, Bonnet, and Aguilar, because of their personal knowledge of aspects of the Goguen Sexual Scheme.

## PATTERN OF RACKETEERING ACTIVITY

803.   The predicate acts stated herein comprise a pattern of racketeering activity through which the Claim V Defendants conducted or participated, directly or indirectly, in the conduct of the Goguen Sexual Scheme's affairs.

## THE GOGUEN SEXUAL SCHEME ENGAGED IN NUMEROUS PREDICATE ACTS, SOME OF WHICH DIRECTLY HARMED AMYNTOR

A.   **Goguen Extorted Amyntor with Threats of Economic Loss to Amyntor if Marshall did not use Amyntor's Resources in Furtherance of the Goguen Sexual Scheme in Violation of 18 U.S.C. § 1951**

804.   Defendant Goguen participated in and conducted the affairs of the Goguen Sexual Scheme in violation of 18 U.S.C. § 1962(c) through extortive acts targeted at Amyntor in violation of 18 U.S.C. § 1951 for the purpose of Defendant Goguen obstructing, delaying, or affect the operation of Amyntor, including by affecting the unlawful movement of Amyntor assets in commerce, or attempting or conspiring to do the same as described herein.

805.   As described herein, Goguen sought to leverage Amyntor in furtherance of his personal security needs because of the fallout arising from his sexually deviant behavior and participation in the Goguen Sexual Scheme by funding Amyntor in a manner meant to fraudulently pressure Marshall into using Amyntor's resources in furtherance of the Goguen Sexual Scheme.

806.   As described herein, Goguen chronically underfunded Amyntor though he could have easily provided the funds needed by Amyntor for its operations.

807.   The funding that Goguen did provide to Amyntor came through (1) the Michael L. Goguen Trust, or (2) through the intermingling of assets with Two

Bear Security, LLC or (3) through the transfer of assets from Two Bear Security or Whitefish Frontiers to Amyntor.

808.   By funding Amyntor and non-Amyntor employees through Two Bear Security and Whitefish Frontiers, Goguen further conducted the affairs of the Goguen Sexual Scheme as the sole funder and sole member of these companies.

809.   Marshall was reliant on Goguen's funding of Two Bear Security, LLC to further Amyntor's business objectives; Goguen used this reliance to pressure Marshall to use Two Bear Security and Amyntor resources to achieve his objectives within the Goguen Sexual Scheme.

810.   Goguen's undercapitalization of Amyntor caused Marshall considerable fear that the company would not gain the revenue, experience, facility clearances and financial stability that were necessary for Amyntor to qualify to bid on more lucrative contracts before Goguen's minimal funding-with-strings-attached ceased altogether.

811.   By burdening Amyntor with personal errands while chronically underfunding the company, Goguen extorted Amyntor by seeking to coerce Marshall, as Manager and CEO of Amyntor, to use Amyntor's personnel and property, with Marshall's consent, to conduct surveillance on, hack, and perform

other unlawful racketeering acts against Goguen's personal enemies and sexual liaisons.

812.   Goguen attempted to obtain Amyntor's property and personnel, resources, and interfered with Amyntor's business by coercing Marshall to use Amyntor's resources to hack the electronic devices and social media accounts of Larry and Lisa Wood, Bryan Nash, Amber Baptiste, Goguen's then wife Jordana, Mark Doe, Emily Doe, and others, all in furtherance of the Goguen Sexual Scheme.

813.   Goguen attempted to obtain and did obtain Amyntor's assets and use of its personnel through the wrongful use of actual or threatened fear that if Marshall did not comply, Amyntor would incur severe economic loss by Goguen refusing to fund Amyntor.

814.   The Claim V Defendants further attempted or conspired to obtain property from Amyntor, with its consent, in the form of written or electronic communications, legal documents, documents evidencing or relating to his sexual misconduct and participation in the Goguen Sexual Scheme, reports by witnesses to law enforcement about Goguen, and other information from Amyntor.

815.   Defendant Goguen attempted to obtain this information through coercion and the wrongful use of actual or threatened fear of Amyntor incurring

economic loss in violation of 18 U.S.C. § 1951, a prohibited criminal racketeering

activity, by Defendant Goguen refusing to fund Amyntor.

816.   After Marshall refused to comply with Goguen's demands for Amyntor

to participate in the Goguen Sexual Scheme, Goguen ultimately stopped funding

Amyntor and used Hegger, McKinley, Erickson, Valladao and others to dissolve

Amyntor and dissipate Amyntor's assets under false pretenses.

817.   In this manner, Amyntor suffered damages arising from Goguen's

attempt to extort Amyntor and use the human and physical resources of the

company to comply with Goguen's demands.

818.   As a direct and proximate result of Defendant Goguen's extortion of

Amyntor in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 1962(c), and Amyntor's

subsequent dissolution, Amyntor was damaged by losing cash, personnel time,

assets, revenue, and current and prospective business opportunities and by becoming

a debtor to: its former employees for unpaid wages, including for expenses Marshall

incurred on Amyntor's behalf.

### B.   Defendant Goguen Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1962(c).

819.   Defendant Goguen participated in and conducted the affairs of the

Goguen Sexual Scheme in violation of 18 U.S.C. § 1962(c) by wire fraud through

means of wire communications in interstate commerce in violation of 18 U.S.C. § 1343 for the purpose of executing the Goguen Sexual Scheme.

820.   By violating 18 U.S.C. § 1343, Goguen thereby participated in and conducted the affairs of the Goguen Sexual Scheme in violation of 18 U.S.C. § 1962(c).

821.   As described in Claim II.B above, Goguen's motive was not to build a legitimate security and intelligence firm, but instead to instead use the resources and capabilities of Amyntor and Two Bear Security to target those who could expose Goguen's crimes and the Goguen Sexual Scheme.

822.   Defendant Goguen, by representing to Marshall that he would fund the company's start-up operations while creating circumstances meant to pressure Marshall to use Amyntor resources in furtherance of the Goguen Sexual Scheme, engaged in a Scheme to defraud Amyntor or obtain property of from Amyntor by false or fraudulent pretenses in violation of 18 U.S.C. § 1343.

823.   Goguen then conducted and participated in the affairs of the Goguen Sexual Scheme, directly and indirectly, by pressuring Marshall and others using Wickr and text messages, and other means that were sent through means and/or instrumentalities of interstate commerce, to use Amyntor resources to do his personal bidding.

824.   Goguen's use of Wickr, and text messages sent to Marshall, for example as described above regarding Bryan Nash on September 19, 2014, or regarding Amber Baptiste on March 16, 2016, were part of this Scheme to conduct or participate in the affairs of the Goguen Sexual Scheme in violation of 18 U.S.C. § 1962(c) and to defraud Amyntor of honest services.

825.   Goguen used Wickr messages to direct Marshall, as Amyntor's Managing Member, to use the resources of Amyntor to target Amber Baptiste, Bryan Nash, Lisa and Larry Wood, and numerous others, in each instance using a wire in interstate commerce in furtherance of the Goguen Sexual Scheme to defraud Amyntor of honest services, deprive it of its property, and interfere with its ability to compete.

826.   Amyntor has a legitimate property right in having its assets used for honest services so it can compete for business and not have its assets and personnel used in furtherance of the Goguen Sexual Scheme.

827.   In this manner, Amyntor suffered damages arising from Goguen's use of Wickr messages and other electronic communications in interstate commerce to pressure Marshall to use the human and physical resources of Amyntor to comply with his demands to participate in the Goguen Sexual Scheme.

828.   As a direct and proximate result of the Defendant Goguen's racketeering activities, including wire fraud in violation of 18 U.S.C. § 1343 and Goguen's chronic underfunding and subsequent dissolution relating thereto because, Amyntor has been injured by: (1) being deprived of prospective economic advantage, including performing, acquiring and maintaining private and government contracts; (2) becoming a debtor to its former employees for unpaid wages, (3) becoming a debtor to Marshall for expenses he incurred on Amyntor's behalf; (4) losing personnel time, assets, and revenue; and (5) losing its ability to effectively compete for legitimate third-party business.

829.   Amyntor's injuries would not have occurred had Defendant Goguen properly funded Amyntor's operations as represented to Marshall and had Goguen not used wire communications to pressure Marshall to use Amyntor resources in furtherance of the Goguen Sexual Scheme.

**C.    Defendants Shawn Lewis and Goguen Participated in the Embezzlement of Amyntor Assets, which is a Racketeering Activity in Violation of 18 U.S.C. §§ 2312-2315 and 18 U.S.C § 1962(b)**

830.   The Section VI Pattern of Racketeering Activity described above with respect to Defendants Shawn Lewis and Goguen describe their acts in furtherance of the Goguen Sexual Scheme regarding their embezzlement of Amyntor Assets.

831.   On multiple occasions, Defendant Lewis purchased burner cell phones using a girlfriend at Best Buy for Goguen's use in furtherance of the Goguen Sexual Scheme.

832.   Over time, Defendant Lewis gained knowledge about Goguen's sexual activities and the Goguen Sexual Scheme by receiving cash and other things of value from Goguen to "party" with him in Las Vegas and Whitefish.

833.   Around the same time, he was partying with Goguen, Defendant Lewis began to use his credit cards to embezzle funds from Amyntor until it was detected by Marshall, after Marshall started requesting from Valladao copies of all Amyntor and Two Bear Security credit card transactions for each employee.

834.   When Marshall reported news of Lewis' embezzlement to Goguen, Goguen interfered with Amyntor's operations by preventing Marshall from terminating Lewis on Marshall's recommendation.

835.   Goguen sought to curry Lewis' favor by allowing Lewis to keep unlawful proceeds from Two Bear Security or Amyntor in exchange for Lewis not reporting on Goguen's activities as part of the Goguen Sexual Scheme.

836.   On information and belief, Defendant Lewis crossed state lines with Amyntor's embezzled money, assets and a vehicle (A Two Bear Security titled

Chevrolet Suburban that belonged to and was used by Amyntor, now in Texas), with knowledge that these assets were stolen company property.

837.   Defendant Lewis agreed to receive such stolen property from Goguen on the condition that he would not report on Goguen's sexually deviant conduct or the Goguen Sexual Scheme.

838.   The conduct and acts described above and elsewhere herein constitute racketeering activities under 18 U.S.C. § 1961(1)(A) in furtherance of the Goguen Sexual Scheme and which are chargeable under state law and punishable by imprisonment for more than one year, specifically:

a.   Defendant Goguen violated § 45-6-341, MCA by knowingly engaging in transactions involving proceeds from Amyntor and giving, transferring or otherwise making available such assets to Lewis, which Goguen intended to be used for the purpose of furthering the commission of the Goguen Sexual Scheme.

b.   Defendant Lewis violated § 45-6-341, MCA by knowingly receiving or acquiring the proceeds of, or engaging in transactions involving, proceeds that Lewis knew had been derived from the aforementioned unlawful activities in furtherance of the Goguen Sexual Scheme.

c.   Defendant Lewis has violated § 45-6-301, MCA by:

i.      Theft of property by purposely or knowingly obtaining or exerting unauthorized control of Amyntor assets with the purpose to deprive Amyntor of such assets;

ii.     Theft of property by embezzlement by purposely or knowingly obtaining or exerting unauthorized control of Amyntor assets with the purpose to deprive Amyntor of such w

iii.    Theft of property by embezzlement by purposely or knowingly obtaining, by deception, control of Amyntor assets with the purpose to deprive Amyntor of such assets.

839.   Defendants Goguen and the Trustee of the Michael L. Goguen Trust violated § 45-7-206, MCA by tampering with witnesses and informants by purposely or knowingly attempting to induce or otherwise cause Lewis as a witness to withhold testimony, testify falsely, elude testimony, and not appear at any proceeding or investigation to which Lewis has been summoned and in furtherance of the Goguen Sexual Scheme.

840.   Defendants Goguen, the Trustee of the Michael L. Goguen Trust, and Shawn Lewis violated 18 U.S.C. § 1956 relating to laundering of monetary instruments derived from the proceeds of the unlawful tampering of Shawn Lewis in furtherance of the Goguen Sexual Scheme.

841.   Defendants Goguen and Lewis violated 18 U.S.C. §§ 2313 and 2315, by receiving, possessing, concealing, storing, bartering, selling, or disposing of, or conspiring thereto, stolen Amyntor goods, wares, merchandise, or money and vehicles having a value of $5,000 or more which has crossed state lines after being stolen, with knowledge that such assets and vehicles were stolen.

842.   Defendants Goguen and Shawn Lewis have violated 18 U.S.C. §§ 2312 and 2314, by transporting, transmitting, or transferring in interstate commerce or foreign commerce, stolen Amyntor goods, wares, merchandise, or money and vehicles having a value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud.

843.   Defendants Lewis and Goguen's level of cooperation for Shawn Lewis to embezzle funds and abscond with a company vehicle arose above the level of cooperation inherent in a normal commercial transaction between the president and employee of two limited liability company (i.e., Lewis as president of Amyntor and employee of Two Bear Security) and the LLCs' member (i.e., Goguen).

844.   By violating 18 U.S.C. §§ 2312-2315, 18 U.S.C. § 1956 and § 45-6-341, and 45-7-206, MCA, related to interstate transportation of stolen motor vehicles and property money laundering and witness tampering, Defendants Goguen

and Lewis thereby conducted and participated in the operation and management of the affairs of the Goguen Sexual Scheme in violation of 18 U.S.C. § 1962(c).

**D.    Goguen Retaliated against Amyntor in Violation of 18 U.S.C. § 1513**

845.    On information and belief, Defendant Goguen, knowing Marshall had reported him to federal law enforcement, retaliated against Amyntor in violation of 18 U.S.C. § 1513 through participating and conducting the affairs of the Goguen Sexual Scheme as a part of a pattern of racketeering activity by:

a.    Corruptly dissolving and commandeering the winding-up process of Amyntor;

b.    After July 2018, refusing to make any more needed capital contributions to Amyntor;

c.    Leaking Amyntor trade secrets as described herein;

d.    Having Valladao reclassify Amyntor assets as Two Bear Security assets, thereby preventing Amyntor from using those assets to satisfy creditors; and

e.    Removing and commandeering Amyntor assets, thereby preventing Amyntor from using those assets to satisfy creditors.

## RICO INJURY

846.    Plaintiff Amyntor's injuries were directly and proximately caused by the Claim V Defendants' racketeering activity.

847.   Goguen could and should have foreseen that his sexual misconduct and crimes and the Goguen Sexual Scheme would compromise his ability to obtain a security clearance, and by extension, hinder Amyntor's ability to grow and flourish from the acquisition of the security contracts anticipated by the hiring of Maguire and others.

848.   Goguen did nothing to respond to Marshall's warnings about his behavior and Marshall came to understand that Goguen was not making singular errors of judgment but instead was engaging in a pattern of activity with multiple co-conspirators and based on the commission of high crimes or other serious felonies that directly injured Amyntor's business interests.

849.   Marshall exercised reasonable diligence in his discovery of the pattern of the Goguen Sexual Scheme and since that discovery, Marshall has continued to suffer injury since the closing of Amyntor through the participation of the Claim V Defendants in the Goguen Sexual Scheme.

850.   The Claim V Defendants interfered with Amyntor's current and prospective contractual relations as Plaintiffs lost business opportunities cultivated during the term of their work with Amyntor.

851.   Plaintiff Amyntor lost business profits from its past and prospective business opportunities as a result of Goguen's sexually deviant behavior and participation in the Goguen Sexual Scheme.

852.   Plaintiff Amyntor lost its ability to effectively compete for business as a result of Goguen's conduct related to the Goguen Sexual Scheme.

853.   Goguen and those within the Goguen Sexual Scheme have created a poisoned atmosphere which harmed the business of Amyntor and eliminated Amyntor's ability to be successfully awarded security contracts going forward.

854.   Amyntor's reputation, integrity and credibility has suffered injury by the actions of Defendants who acted to perpetuate or conceal the Goguen Sexual Scheme.

855.   Amyntor suffered injury to property and their business as a result of the racketeering activity described herein as part of the Goguen Sexual Scheme.

## CLAIM SIX

### CONSPIRING TO VIOLATE RICO IN VIOLATION OF 18 U.S.C. § 1962(d)

### (ALL PLAINTIFFS VERSUS DEFENDANTS)

### (MATT MARSHALL DERIVATIVELY ON BEHALF OF AMYNTOR GROUP, LLC VERSUS DEFENDANTS)

856.   Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

857.   The facts stated herein are true and correct and are based on Plaintiffs' personal knowledge.

858.   Plaintiff Marshall is a Member and Managing Member of both Amyntor, LLC and Amyntas, LLC from the dates of their formation through the time Defendant Goguen sought to dissolve these entities and at all times during the transactions complained of herein.

859.   This action is not a collusive one intended to confer jurisdiction that the court would otherwise lack.

860.   This Claim VI is partially brought by Marshall as Member of Amyntor, and derivatively on behalf of Amyntor, to enforce a right of damages arising from the Goguen Sexual Scheme that Amyntor could have but has failed to enforce because of the circumstances described herein.

861.   RICO provides a conspiracy cause of action. See 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of [§ 1962]").

862.   The Claim VI Defendants knew about and agreed to facilitate the operation or management of the Goguen Sexual Scheme in violation of 18 U.S.C. § 1962(d).

863.   Defendants Michael L. Goguen, individually and as trustee of the Michael L. Goguen Trust; Whitefish Frontiers, LLC; Two Bear Security, LLC; PROOF Research, Inc.; Karen Valladao; Frank Rimerman + CO. LLP; Shane Erickson; Shawn Lewis; Nic McKinley, Richard Hegger; (the "Claim VI Defendants") each committed acts in furtherance of the Goguen Sexual Scheme and with knowledge of the essential nature of the Scheme.

864.   Defendant Goguen, individually and as trustee of the Michael L. Goguen Trust, conspired with the other Defendants by knowingly agreeing to facilitate the operation and management of the Goguen Sexual Scheme and by directing and participating in the predicate acts described herein.

865.   One object of the Defendants' conspiracy has been to conduct or participate, directly or indirectly, in the conduct of the affairs of the Goguen Sexual Scheme through a pattern of racketeering activity.

866.   Another object of Defendants' conspiracy has been to exert control over or maintain an interest in Amyntor through predicate acts meant to extort Amyntor or deprive Amyntor of its ability to reasonably operate.

867.   Defendants' conspiracy has injured Plaintiffs' business and property, including by tampering with witnesses who have knowledge of Goguen's sexual misconduct and by participating in the Goguen Sexual Scheme in ways that have frustrated Plaintiffs' attempts to report Goguen to state and federal authorities.

868.   Defendant Goguen has acted as the primary perpetrator and culpable person by seeking to use the time and resources of Plaintiffs and the other Claim IV Defendants to commit racketeering activities as part of the Goguen Sexual Scheme.

869.   Defendant Valladao violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(b) and 18 U.S.C § 1962(c) when, as described above, she knowingly agreed to facilitate a Scheme to maintain control over Amyntor and deprive it of assets and agreed to facilitate the operation or management of the Goguen Sexual Scheme, by engaging in the following conduct:

a.   Using Wickr or travelling to meet Goguen or Marshall in-person instead of using electronic-mail or other written record in order to conceal the communications Valladao was having about the nature of the payments made in furtherance of the Goguen Sexual Scheme;

b.   Directing the establishment of for-profit and non-profit entities, including serving as an officer on certain Goguen entities, that were used in furtherance of the Goguen Sexual Scheme;

c.      Helping to conceal the operation of the Goguen Sexual Scheme by facilitating hush-money payments, directly or indirectly paid to Amber Baptiste, Shawn Lewis, Shane Erickson, PAM DOE, Eric Payne, Larry Wood, KIM DOE, Whitefish Frontiers, LLC and countless members of Goguen's "harem" or others (and DOE Defendants and entities) who had damaging information about Goguen's illicit sexual activities;

d.      Creating false expense "deductions" to fraudulently deduct payments and expenses used in furtherance of the Goguen Sexual Scheme as legitimate business deductions when they were not;

e.      Creating false and back-dated "loan" documents to cover-up payments to persons within the Goguen Sexual Scheme knowing that such persons would not be paying back the funds given to such persons;

f.      Creating amended tax returns for Goguen or others reflecting "gifts" made to women and others to conceal and misrepresent the illicit nature of the payments made on behalf of the Goguen Sexual Scheme;

g.      Transferring or reclassifying Amyntor assets as Two Bear Security assets when they were not; and

h.      Providing false testimony to federal authorities related to Marshall and his activities with Amyntor.

870.   By committing these acts, Defendant Valladao agreed to participate with Goguen in the facilitation and commission of the Goguen Sexual Scheme to injure Plaintiffs' business and property interests.

871.   Frank, Rimerman, through its employees, conspired to violate 18 U.S.C. § 1962(b) by knowingly agreeing to facilitate a Scheme to acquire or maintain control over Amyntor and deprive it of its assets through the predicate acts as described herein.

872.   Frank, Rimerman, through its employees, conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate the operation and management of the Goguen Sexual Scheme through the predicate acts of Valladao and Frank Rimerman as described herein.

873.   Further, Frank, Rimerman, through its employees, conspired to violate 18 U.S.C. § 1962(b) and (c) by knowingly agreeing to participate with Valladao and other employees in the commission of overt predicate acts designed to maintain control over Amyntor in furtherance of the Goguen Sexual Scheme.

874.   Defendant Whitefish Frontiers, LLC conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a Scheme which included the operation and management of the Goguen Sexual Scheme by assisting in the interstate transportation of young women to engage in the unlawful activities of prostitution

in furtherance of the Goguen Sexual Scheme through the use of private jet and related transportation payments as described herein.

875.   Defendant Two Bear Security, LLC conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a Scheme which included the operation and management of the Goguen Sexual Scheme through the use of intimidation by its agents and employees at the direction of Goguen, and by supplying assets and resources in furtherance of the Goguen Sexual Scheme.

876.   Defendant PROOF RESEARCH, INC. conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a Scheme including the operation and management of the Goguen Sexual Scheme by unlawfully agreeing to remove and retaliate against Plaintiff Marshall from his executive and board positions at the direction of Goguen and not through valid business process or based on valid business reasons.

877.   Based on conversation(s) Marshall had with PROOF employees, Defendant PROOF RESEARCH knew that Goguen had corrupt motives for targeting Marshall and removing him from PROOF, but nonetheless bent to the will of its majority shareholder Goguen out of PROOF's own fear of retribution should its CEO fail to comply.

878.   Defendant Shane Erickson conspired to violate 18 U.S.C. § 1962(b) and (c) by knowingly agreeing to facilitate a Scheme including the operation and management of the Goguen Sexual Scheme by accepting items of value from Goguen in exchange for his dereliction of duty investigating PAM DOE, for relaying the information he had learned during his investigation of the PAM DOE allegations, and informing Goguen that Marshall was attempting to provide information to the FBI regarding crimes related to Goguen's sexual conduct, the Goguen Sexual Scheme, and other unlawful activity committed by Goguen.

879.   Defendant Erickson further knowingly agreed to facilitate the Goguen Sexual Scheme by trespassing into Amyntor's private storage unit without authorization and removing items of value therefrom.

880.   Defendant Hegger conspired to violate 18 U.S.C. § 1962(b) and (c) by knowingly agreeing to facilitate a Scheme including the control and management of the Goguen Sexual Scheme by making false reports of embezzlement to a Whitefish Attorney about Marshall; by providing false information to John Dyck to facilitate the trespass and theft of property from Amyntor's storage unit; by fraudulently assisting in the dissolution of Amyntor and unlawfully commandeering Amyntor assets, by making false and defamatory statements about Marshall to NBC Montana; and through other acts outside the scope of mere legal services.

881.   Defendant Shawn Lewis conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a Scheme including the control and management of the Goguen Sexual Scheme by embezzling money from Amyntor and Two Bear Security and embezzling assets and property of Amyntor and Two Bear Security as described herein.

882.   Defendant Shawn Lewis conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a Scheme including the control and management of the Goguen Sexual Scheme by embezzling money from Amyntor and Two Bear Security and embezzling assets and property of Amyntor and Two Bear Security as described herein.

883.   Defendant Nic McKinley conspired to violate 18 U.S.C. § 1962(b) and (c) by knowingly agreeing to facilitate a Scheme including the control and management of the Goguen Sexual Scheme by trespassing into Amyntor's private storage unit without authorization and removing items of value therefrom and by conspiring with Goguen to copy and disseminate Amyntor trade secrets to the national media.

884.   The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of the within described 18 U.S.C. § 1962(d) violation of RICO by

conspiring to violate 19 U.S.C. § 1962(b) or (c) but were also fully aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

885.   At all relevant times, the Claim VI Defendants and their co-conspirators had knowledge of the general nature and scope of the Goguen Sexual Scheme and the conspiracy in furtherance thereof.

886.   The conspiracy extended beyond each Defendants' individual role, but each Defendant intended to participate in the conspiracy and the Goguen Sexual Scheme directly or indirectly.

887.   As a direct and proximate result of Defendants' conspiring to violate 18 U.S.C. § 1962(b) or (c), Plaintiffs have been injured in their business or property.

888.   Derivative Plaintiff Amyntor was injured by overt predicate acts of racketeering in furtherance of Defendants' conspiracy to participate in the Goguen Sexual Scheme by losing its ability to carry-on its security contracting business, losing cash and assets, and tarnishing the reputations and livelihoods of its employees by Defendants' false statements to law enforcement.

889.   Plaintiff Marshall was injured by overt predicate acts of racketeering in furtherance of Defendants' conspiracy to participate in the Goguen Sexual Scheme by being deprived of his right to perform honest services; by spending cash and

personal property to accommodate Goguen; by losing wages, bonuses and other perquisites for performance at Amyntor; and by falling under indictment thus preventing Marshall from future employment where a security clearance would be required and costing him to incur significant attorney's fees and costs in the criminal matter and this action to clear his name.

890.   Plaintiff Maguire was injured by overt predicate acts of racketeering in furtherance of Defendants' conspiracy to participate in the Goguen Sexual Scheme by his loss of wages and contractual payments that he would have earned but for the Goguen Sexual Scheme's disruption of his contractual procurement activities;

891.   Plaintiff Maguire was also injured by being deprived of his right to perform honest services; by losing wages, bonuses and other perquisites for performance at Amyntor; and by falling under negative association with Marshall in his indictment through an accusation of money laundering, thus harming Maguire's prospects for future business.

892.   Plaintiff Bonnet was injured by overt predicate acts of racketeering in furtherance of Defendants' conspiracy to participate in the Goguen Sexual Scheme by being deprived of her right to perform honest services and by losing wages, bonuses and other perquisites for performance at Amyntor.

893.   Plaintiff Aguilar was injured by over predicate acts of racketeering in furtherance of Defendants' conspiracy to participate in the Goguen Sexual Scheme by being deprived of his right to perform honest services and by losing wages, bonuses and other perquisites for performance at Amyntor.

894.   Defendants have engaged in the violations of the above state and federal laws and the effects detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## CLAIM SEVEN

## DEFAMATION

### Pursuant to §§ 27-1-802 & 803, MCA

### (PLAINTIFF MATT MARSHALL VS. DEFENDANT RICHARD HEGGER AND DEFENDANT MICHAEL GOGUEN)

895.   Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

**A.     Defendants Goguen and Hegger Provided Defamatory False and Misleading Statements, Altered Documents and Fraudulent Information to the FBI, IRS, U.S. Attorney's Office, and Other Law Enforcement Agencies**

896.   Defendant Michael Goguen and his attorney Defendant Richard Hegger, out of fear of Plaintiffs' knowledge regarding the Goguen Sexual Scheme, sought to destroy Plaintiffs' reputations by maliciously filing a false sworn affidavit

and 'manifesto' alleging mismanagement and fraud by Marshall to the Federal Bureau of Investigation ("FBI").

897.   Defendants Goguen and Hegger falsely told the FBI that Marshall did not have military or intelligence experience and had stolen and then laundered funds from Goguen.

898.   Goguen and Hegger have altered or presented altered written communications or other documents between Goguen and Marshall and provided the same to the FBI, in order to pressure the FBI to bring false charges against Marshall.

899.   Hegger and Goguen intended to obstruct law enforcement's discovery of Goguen's crimes and the Goguen Sexual Scheme by giving false statements to the FBI, testify in other ways, and by providing false written statements and altered documents.

900.   To prevent Marshall from providing additional criminal information on Goguen, and to protect the Goguen Sexual Scheme, Goguen attempted to destroy Marshall's credibility with the FBI and IRS by using defamation through libel and slander of Marshall.

901.   Based on Goguen's and Hegger's false statements to the FBI, IRS, U.S. Attorney's Office and other law enforcement agencies, Marshall was arrested

pursuant to a ten-count indictment for wire fraud, money laundering, and tax evasion.

902.   Goguen and Hegger's statements to the FBI, IRS, U.S. Attorney's office, and other law enforcement agencies prior to Marshall's arrest were unsolicited statements and not part of any official proceeding and are therefore unprivileged communications.

903.   After Marshall's arrest, Goguen and Hegger supplied additional false and misleading statements, altered documents and fraudulent information to the FBI, IRS, U.S. Attorney's Office and other law enforcement agencies.

904.   The additional statements Goguen and Hegger made to the FBI, IRS, and the U.S. Attorney's Office after Marshall was arrested are communications that took place prior to Marshall's criminal proceeding, a proposed judicial proceeding.

905.   However, Goguen's and Hegger's underlying intent when providing the subsequent false and misleading statements, altered documents, and fraudulent information to the FBI, IRS, and U.S. Attorney's Office was an attempt to (1) silence Marshall from providing additional criminal information against Goguen, (2) destroy Marshall's credibility with the FBI and IRS with regards to information Marshall had in relation to criminal conduct of Goguen, (3) to protect the Goguen Sexual Scheme.

906.   Therefore, Marshall's criminal proceeding, almost entirely based on Goguen's and Hegger's false and misleading statements, altered documents, and fraudulent information was not instigated in good faith or under serious consideration by Goguen and Hegger, making the post-arrest statements to the FBI, IRS, and U.S. Attorney's office unprivileged defamatory statements.

**B.   Defendant Hegger Falsely Accused Marshall of Embezzlement in Violation of 45-6-301(6) to the City Attorney of Whitefish**

907.   On April 25, 2019, Defendant Hegger emailed Whitefish City Attorney Angela Jabobs and Keni Kopkins, the Legal Assistant for the City of Whitefish regarding the City of Whitefish Police Department's procurement of practice and/or target ammunition from Amyntor.

908.   In that April 25, 2019, email, Defendant Hegger falsely accuses Marshall of embezzling money the Whitefish Police Department used to purchase 9mm practice ammunition from Amyntor as follows:

> "Angela, I wanted to verify with the accountants again whether they had any record of the Amyntor invoices or [Whitefish Police Department ("WPD")] check payments. They confirmed through a review of all of the Amyntor Group LLC bank accounts that the WPD checks made out to Amyntor were never deposited in an Amyntor bank account, nor was there any cash deposit made those correspondences [sic] to the WPD check amounts.
>
> The checks that you provided me have an endorsement signature of "Matt Marshall" on the back of the checks. There are two different numbers (possibly bank account numbers) on the back of the checks,

neither of which are Amyntor bank account numbers. ¶ We believe it is appropriate to refer this matter to you in the context of 45-6-301(6), MCA, particularly because it involves a payment to a WPD vendor and the City certainly would have an interest in protecting the integrity of its public procurements…"

909.   Defendant Hegger, without having significant information to prove that Marshall embezzled funds that WPD provided to Amyntor for practice ammunition, and without talking to Marshall about those funds, acted with malice or reckless indifference to the falsity of the statement when he accused Marshall of embezzlement in the email to the City Attorney for the City of Whitefish.

910.   Defendant Hegger's statement to the City Attorney of Whitefish that Marshall embezzled WPD's funds from Amyntor is a false statement, as Marshall did not embezzle those or any other funds from Amyntor.

911.   Considering the City of Whitefish paid for and received ammunition from Amyntor and is not involved with the management, ownership, or operation of Amyntor, and therefore has no legal interest to bring charges against Marshall for embezzlement, Defendant Hegger's statement that Marshall violated § 45-6-301(6), MCA to the City Attorney of Whitefish was clearly made to retaliate against Marshall and to damage Marshall's reputation with the City Attorney of Whitefish, the City of Whitefish, and WPD.

912.    Plaintiff Marshall learned of Hegger's April 25, 2019, email and therefore discovered Hegger's defamatory statement contained therein on January 29, 2020 after receiving documents produced by the City of Whitefish in response to a Freedom of Information Act request Marshall made to the City of Whitefish on January 27, 2020.

**C.    Defendant Hegger Provided a Defamatory Statement on his and Goguen's Behalf to NBC Montana in Response to the Filing of This Action.**

913.    Further, in response to the initial complaint filed by Plaintiffs in this action, Defendant Hegger made a defamatory statement about Marshall to NBC Montana that was included in an article on NBC Montana's website on February 17, 2021.[5]

914.    Defendant Hegger's statement published in its entirety by NBC Montana on dated February 17, 2021, is as follows:

> "Matthew Marshall is currently under a ten-count federal indictment for massive fraud, tax evasion, and money laundering in which he fabricated a valor-filled story of being a Force Recon Marine and a high-level CIA war hero. Mr. Goguen is a principal witness and victim in the case. The indictment is based on a multi-year investigation by the Federal Bureau of Investigation that culminated in charges being filed in July 2020.

> "Marshall is slated to go to trial in a matter of weeks for being a complete fraud and conman. This lawsuit by Marshall and his

---

[5] https://nbcmontana.com/news/local/lawsuit-accuses-goguen-associates-of-sexual-enterprise-racketeering

associates is an obvious and ludicrously desperate attempt to undermine the U.S. government's case against him. Marshall is using the legal cover of a civil proceeding to put out libelous accusations against the principal victim and witness in his criminal trial. This adds to his history of forging statements falsely attributed to Mr. Goguen, which has been verified and documented in previous legal filings. We are confident that this bizarre and unbalanced attempt at trying to obtain publicity for libelous nonsense will not derail justice being done in federal criminal court."

915.    Defendant Hegger's statement to NBC Montana includes a number of defamatory and false statements, including that Marshall: "fabricated a valor-filled story of being a Force Recon Marine and a high-level CIA war hero" and "[Marshall is] a complete fraud and conman."

916.    Additionally, the following statements by Mr. Hegger are also defamatory and false:

a.       "This lawsuit by Marshall and his associates is an obvious and ludicrously desperate attempt to undermine the U.S. government's case against him. Marshall is using the legal cover of a civil proceeding to put out libelous accusations against the principal victim and witness in his criminal trial. This adds to his history of forging statements falsely attributed to Mr. Goguen, which has been verified and documented in previous legal filings. We are confident that this bizarre and unbalanced attempt at trying to obtain

publicity for libelous nonsense will not derail justice being done in federal

criminal court."

917.   While Defendant Hegger's statement to NBC Montana was made in

relation to Marshall's criminal proceedings, its relation is to the facts thereof or the

evidence expected to be given therein, which are not yet part of the judicial

proceeding. Therefore, Defendant Hegger's statement is unprivileged and

defamatory.

**D.    Marshall was Damaged by Defendants' Defamatory Statements.**

918.   As a proximate result of Defendant Hegger's statement to the City

Attorney of Whitefish that Marshall has violated § 45-6-301(6), MCA, Marshall has

suffered damage to his reputation.

919.   As a proximate result of Goguen's and Hegger's unprivileged and

defamatory pre-arrest and post-arrest false and misleading statements, altered

documents, and fraudulent information provided to the FBI, IRS, and the U.S.

Attorney's Office, the subsequent criminal indictment based thereon, and numerous

media articles and publications that broadcasted Goguen's and Hegger's false

allegations to the public on a local and national level, Marshall has suffered the

following injuries:

a.    Marshall's reputation has been severely injured;

b.      Marshall has been injured with respect to his profession, trade, and business by the imputation that Marshall is a fraud and doesn't have military, security, or intelligence experience, which has chilled Marshall's ability to seek further business in the security industry;

c.      Marshall has been falsely accused of a crime; and

d.      Marshall has incurred significant attorney's fees, costs and expenses to defend against the fraudulent criminal indictment and to bring this civil action to hold Goguen and others accountable for causing the fraudulent indictment and make those responsible be accountable for the severe damage to his reputation;

920.   As a result of Hegger's unprivileged and defamatory statement to NBC Montana, Marshall's reputation has been injured.

## CLAIM EIGHT

### ALTER EGO

#### Pursuant to § 27-8-202, MCA

**(ALL PLAINTIFFS VERSUS DEFENDANT MICHAEL GOGUEN, INDIVIDUALY AND AS THE TRUSTEE OF THE MICHAEL L. GOGUEN TRUST; TWO BEAR SECURITY, LLC; AND AMYNTOR GROUP, LLC, A NOMINAL DEFENDANT)**

921.   Plaintiffs restate, reallege, and incorporate by reference all paragraphs contained in this first amended complaint as if fully set forth herein.

922.   This action is not a collusive one intended to confer jurisdiction that the court would otherwise lack.

923.   This derivative Claim VIII is brought by Marshall as Member of Amyntor to enforce a right of damages arising from the Goguen Sexual Scheme that Amyntor could have but has failed to enforce because of the circumstances described herein; specifically Marshall is asserting Amyntor's right to pay creditors Plaintiffs Marshall, Maguire, Aguilar and Bonnet the wages and damages that were ordered by the Montana Department of Labor pursuant to judgements therefrom, and for the ability of Amyntor to pay other creditors in due course.

924.   Defendant Two Bear Security, LLC and nominal Defendant Amyntor Group, LLC both shared common majority ownership by Defendant Goguen or through funding by the Michael L. Goguen Trust.

925.   Defendant Two Bear Security, LLC and nominal Defendant Amyntor Group, LLC operated as a single economic entity by sharing a sole investor in Michael Goguen, by having many of the same employees, by Amyntor using Two Bear Security credit cards for operating expenses, by the entities sharing common

vehicle and housing resources, by both entities being 'security' companies, and through other means.

926.   Defendant Goguen abused the corporate form of both Two Bear Security and Amyntor when he used these entities to perpetuate a fraud and promote injustice by conducting the affairs of these companies through a pattern of racketeering activities meant to conceal and perpetuate the Goguen Sexual Scheme.

927.   Defendants Goguen and Two Bear Security, LLC abused the Amyntor corporate form by mingling the assets of Two Bear Security and Amyntor in furtherance of Goguen's private objectives and under circumstances meant to pressure Marshall to use Amyntor resources in furtherance of the Goguen Sexual Scheme.

928.   Amyntor, being inadequately capitalized by Goguen for the duration of its operations, was dependent during its start-up years on Two Bear Security to provide capital to the company, despite the lack of any written contract between them governing the terms of Two Bear Security investments in Amyntor or for the expenditures Two Bear Security was making on Amyntor's behalf.

929.   Two Bear Security and Amyntor failed to follow any legal formalities when contracting with each other such that Marshall reasonably believed Two Bear Security to be a consolidated entity with Amyntor.

930.   On information and belief, Two Bear Security, LLC did not earn any revenue apart from the funding provided by Goguen.

931.   Two Bear Security's primary purpose was to serve the private interests of Goguen and not to conduct a legitimate business; however, this primary purpose was to simply function as a façade for its dominant shareholder Defendant Goguen to use a private security force to do his bidding in furtherance of the Goguen Sexual Scheme.

932.   For Goguen, Amyntor functioned primarily as a façade for him to perpetuate his objectives within the Goguen Sexual Scheme.

933.   Defendant Karen Valladao exerted control over Amyntor's and Two Bear Security's affairs by accounting for and reclassifying funds used by Two Bear on behalf of Amyntor as Amyntor's "revenue," despite any arm's length contractual arrangement governing such payments.

934.   Initially, Goguen repeatedly sought to have Marshall siphon Amyntor corporate funds for his own personal ends within the Goguen Sexual Scheme.

935.   Later, Defendant Hegger and others sought to further commandeer the resources of Amyntor during the winding up phase in late 2018 and into 2019, including by having automobiles used by Amyntor remain titled with Two Bear

Security despite extensive history indicating that such vehicles should have been the property of Amyntor.

936.   Those in control of Two Bear Security, including Defendants Goguen and Valladao, did not treat Two Bear Security and Amyntor as distinct entities for the majority of the operational history of Amyntor.

937.   Defendants' conduct, including stealing assets from Amyntor or reclassifying Amyntor assets as Two Bear Security assets, each in furtherance of the Goguen Sexual Scheme, amounted to a fraudulent misuse of the Two Bear Security and Amyntor corporate forms.

938.   The Two Bear Security and Amyntor entities operated as a single economic entity between 2013 through 2018, such that it would be inequitable to uphold a legal distinction between them.

939.   Plaintiffs Marshall, Maguire, Bonnet, Aguilar and Marshall, derivatively on behalf of Amyntor, have been wronged by Defendant Goguen, as common owner of Two Bear Security and Amyntor, when Goguen and the other Defendants engaged in the predicate acts herein to maintain control over the affairs of both of the companies, as such acts effectively deprived Plaintiffs of revenues, past and future wages, and other contractual payments.

940.   Two Bear Security should be found as the alter ego of Amyntor for the purpose of Amyntor obtaining those Two Bear Security assets wrongfully withheld from Amyntor's ownership, use and possession.

## VIII.  STATEMENT OF DAMAGES

941.   Plaintiffs suffered damages as follows:[6]

### a.   DERIVATIVE PLAINTIFF AMYNTOR GROUP, LLC:

| Description of Consequential Damages | Amount (at least) |
|---|---|
| Misappropriated company cash: | $300,000 |
| Misappropriated company assets, electronics, computer and server, equipment: | $1,300,000 |
| Misappropriated company firearms and tactical gear: | $250,000 |
| Misappropriated company vehicles: | $150,000 |
| Lost Amyntor man-hour value to Goguen Sexual Scheme, including all benefits, etc.: | $8,837,863 |
| Lost Future Profits (5 Years at $23,040,000 profit/yr.) | $115,200,000 |
| Lost Value of Going Business Concern (5X Multiplier): | $115,200,000 |
| SUBTOTAL | $241,237,863 |

### b.   PLAINTIFF MATT MARSHALL:

| Description of Consequential Damages | Amount (at least) |
|---|---|
| Future Lost Wages including Full Benefits (Over 5 Years) | $2,514,500 |
| MT Dept of Labor Unpaid Wage Judgment | $352,275 |
| Funds Loaned to Amyntor (approx.) | $400,000 |
| Unreimbursed Expenses Paid by Marshall on Goguen's Behalf | $400,000 |
| Attorney's Fees for Criminal Matter | TBD |
| Other Consequential Damages | TBD |

---

[6] As this action is in the early stages of litigation with discovery having not taken place, Plaintiffs reserve the right to amend this Statement of Damages.

| | SUBTOTAL | $3,666,775 |
|---|---|---|

c.     **PLAINTIFF JOHN MAGUIRE:**

| Description of Consequential Damages | Amount (at least) |
|---|---|
| Future Lost Wages including Full Benefits (Over 5 Years) | $1,275,000 |
| Future Contract Commissions on Known Contracts (10% on DCI Contracts) | $30,000,000 |
| MT Dept of Labor Unpaid Wage Judgment | $40,126 |
| Lost Performance Bonuses | $180,000 |
| Other Consequential Damages | TBD |
| SUBTOTAL | $31,495,126 |

d.     **PLAINTIFF ANTHONY AGUILAR:**

| Description of Consequential Damages | Amount (at least) |
|---|---|
| Future Lost Wages including Full Benefits (Over 5 Years) | $1,240,000 |
| MT Dept of Labor Unpaid Wage Judgment | $27,138 |
| Lost Performance Bonuses | $120,000 |
| Other Consequential Damages | TBD |
| SUBTOTAL | $1,362,138 |

e.     **PLAINTIFF KEEGAN BONNET:**

| Description of Consequential Damages | Amount (at least) |
|---|---|
| Future Lost Wages including Full Benefits (Over 5 Years) | $503,000 |
| MT Dept of Labor Unpaid Wage Judgment | $13,957 |
| Lost Performance Bonuses | $45,000 |
| Other Consequential Damages | TBD |
| SUBTOTAL | $561,957 |

f.     **CONSEQUENTIAL DAMAGES TOTAL:**

| Description | Amount (at least) |
|---|---|
| Amyntor Damages | $241,237,863 |
| Marshall Damages | $3,666,775 |

| | |
|---|---:|
| Maguire Damages | $31,495,126 |
| Aguilar Damages | $1,362,138 |
| Bonnet Damages | $561,957 |
| Other Consequential Damages | TBD |
| **CONSEQUENTIAL DAMAGES TOTAL** | $278,323,859 |

g.   **TOTAL DAMAGES:**

| <u>Description</u> | <u>Amount (at least)</u> |
|---|---:|
| **Treble Damages (3x Consequential Damages)** | $834,970,767 |
| **Attorney's Fees** | $TBD |
| TOTAL | $834,970,767 |

# IX.    PRAYER FOR RELIEF

Plaintiffs request judgment to compensate them for the injuries they have suffered as a result of Defendants' conduct, as follows:

**A.** For all compensatory and/or exemplary damages suffered by Plaintiffs, in amounts to be determined at trial, including but not limited to:

i)      damages to compensate Marshall for the costs and expenses he personally incurred to fund Amyntor and for the personal and business expenses of Goguen for which Marshall was not compensated;

ii)     damages to compensate Plaintiffs for the attorney's fees, costs, and expenses he has incurred defending against the criminal indictment;

iii)    damages to compensate Marshall and Maguire for business losses and lost prospective business opportunities, but for the federal indictment;

iv)     damages to compensate Plaintiffs for the costs they have each personally incurred on behalf of Defendant Goguen's entities, such as PROOF Research, Inc. and others;

v)      damages for the value of lost wages, employment benefits, and promotions Marshall would have continued to receive had he not left his position in Mexico City with the United States Department of State;

vi)     damages for the unpaid wages of Plaintiffs affirmed in judgments issued by the Montana Eleventh Judicial Court as specified in Claim VIII;

vii)    damages for future lost wages of Plaintiffs that were incurred but for the corrupt and fraudulent dissolution of Amyntor;

viii)   damages to Plaintiffs' reputations resulting from Goguen's and Hegger's defamatory statements and acts of retaliation;

ix)     damages to compensate Maguire for lost prospective business opportunities he had pursued independent of Amyntor, but lost due to damage to his business and property arising from the false and fraudulent documents statements, information and documents provided to the FBI, IRS, and the U.S. Attorney's office by Claim IV Defendants;

x)      damages to compensate Marshall for services provided to Proof and other Goguen Entities;

xi)     damages to compensate Marshall for promised equity in Proof that was revoked

**B.** For all compensatory and/or exemplary damages suffered by Amyntor Group, LLC pursuant to 18 U.S.C. § 1964(c).

**C.** For an order pursuant to 18 U.S.C. § 1964(a), to prevent, restrain or otherwise enjoin Defendants in the following manner:

i)      For Defendant Goguen to divest himself of any debt or equity interest, direct or indirect, in Amyntor;

ii)     For Defendants to divest themselves of any direct or indirect financial, legal, or business interest in or control over Amyntor;

iii)    For Defendants to cease future business activities concerning Amyntor;

iv)     For the Amyntor and Amyntas corporate veils be pierced to hold Goguen, as Member of these companies, liable for his extortion, wire fraud, retaliatory conduct, and related acts that injured Amyntor;

v)      For Defendants to cease and desist from committing further illegal acts constituting a pattern of racketeering activity; and

vi)     For Two Bear Security to be held as alter ego of Amyntor and to pierce the corporate veil of Two Bear Security to hold Goguen personally liable for Amyntor's outstanding debts, including Plaintiffs' wage claims.

**D.** For punitive damages arising from Goguen's and Hegger's malicious conduct of providing false and misleading statements, altered documents, and fraudulent information to the FBI, IRS, and U.S. Attorney's office; and

**E.** For treble damages, attorneys' fees and costs of suit as a result of Defendants' injuries to Plaintiffs as provided in 18 U.S.C. § 1964(c) and as otherwise permitted by law; and

**F.** For pre- and post-judgment interest on all such amounts to the extent permitted by law;

**G.** For such other and further relief under 18 U.S.C. § 1964 and as this Court finds appropriate and just.

## X.      DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all issues properly triable before a jury.

Dated this 1ˢᵗ day of September 2021.


GRANITE PEAK LAW, PLLC
Attorneys for Plaintiffs

By: ___/s/ Adam H. Owens, Esq._____


By: ___/s/ Gregory G. Costanza, Esq._____

*Attorneys for Plaintiffs*