IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MATTHEW MARSHALL, et al., | CV 21–19–M–DWM |
| Plaintiffs, | |
| vs. | OPINION<br>and ORDER |
| MICHAEL L. GOGUEN, et al., | |
| Defendants. | |

Plaintiffs—former employees of a private security contractor—allege

Defendants—individuals and entities associated with venture capitalist Michael

Goguen—engaged in a course of illegal conduct under the Racketeer Influenced

and Corrupt Organization Act ("RICO").  (Doc. 51.)  Defendants seek to dismiss

the First Amended Complaint for its prolixity under Rule 8(a) of the Federal Rules

of Civil Procedure and for its failure to plausibly allege RICO liability under Rule

12(b)(6).  (Docs. 60, 62, 64, 66, 68, 74, 90.)  Because Defendants' arguments are

sound and correct, Plaintiffs' RICO claims are dismissed with prejudice and the

Court declines to exercise supplemental jurisdiction over the remaining state law

claims.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

When measuring the adequacy of the pleadings, the factual allegations in the complaint "are taken as true and construed in the light most favorable to the plaintiffs." *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001) (quotation marks and alteration omitted). Nevertheless, Plaintiffs' pleading must be stripped of all conclusory legal statements. *Iqbal,* 556 U.S. at 679. Once trimmed of "legal conclusions" and "[t]hreadbare recitals of a cause of action," *id.* at 678, in this case Plaintiffs' argument boils down to the allegation that Goguen's alleged sexual misconduct prevented their private security firm from being successful.

## I.   Legal Framework

RICO is designed to prohibit a person from utilizing a pattern of unlawful activities to infiltrate an interstate enterprise.  As a result, "RICO is to be read broadly . . . [and] liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497–98 (1985) (quotation marks omitted).  While originally designed to be "used against mobsters and organized criminals," "Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises[, as t]he former enjoy neither an inherent incapacity for criminal activity nor immunity for its consequences." *Id.* at 499.  Nevertheless, this liberal mandate "is not an invitation to apply RICO to new purposes that Congress never intended." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

"Broadly speaking, there are two parts to a civil RICO claim.  The civil RICO violation is defined under 18 U.S.C. § 1962, while 'RICO standing' is defined under 18 U.S.C. § 1964(c)." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (footnote omitted).  RICO standing under § 1964(c) requires a plaintiff to show "(1) that his alleged harm qualifies as an injury to business or property; and (2) that his harm was 'by reason of' the RICO violation." *Id.*  To state a substantive RICO claim under § 1962, a plaintiff must allege: (1) that a "person" within the scope of the statute (2) has utilized a "pattern of racketeering activity"

3

or the proceeds thereof (3) to infiltrate an interstate "enterprise" (4) by, *inter alia*,

acquiring or maintaining an interest in the enterprise through the pattern of

racketeering activity (§ 1962(b)); conducting the affairs of the enterprise through a

pattern of racketeering activity (§ 1962(c)); or conspiring to commit any of the

above (§ 1962(d)).  These elements are briefly introduced below.

### A.     Enterprise

"Enterprise" is defined as "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated

in fact although not a legal entity."  18 U.S.C. § 1961(4).  Although two of

Plaintiffs' RICO claims allege a company—Amyntor—is the enterprise, the

remaining claims rely on an "association-in-fact" enterprise that Plaintiffs have

dubbed the "Goguen Sexual Scheme."  To show the existence of such an enterprise

"plaintiffs must plead that the enterprise has (A) a common purpose, (B) a

structure or organization, and (C) longevity necessary to accomplish the purpose."

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir.

2014) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

### B.     Racketeering Activity

"Racketeering activity is defined in RICO to mean any act or threat

involving specified state-law crimes, any act indictable under various specified

federal statutes, and certain federal offenses."  *H.J. Inc. v. Bell Tel. Co.*, 492 U.S.

4

229, 232 (1989) (quotation marks omitted).  As a result, racketeering activity requires predicate acts, *see* 18 U.S.C. § 1961(1), such as extortion, *id.* § 1951, or wire fraud, *id.* § 1343.  To the extent any predicate acts sound in fraud, pleading those acts must satisfy the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, meaning "the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986); *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065–66 (9th Cir. 2004).  Here, Plaintiffs' wire fraud predicates as well as those claims based on Defendants' allegedly false statements to authorities must be examined under Rule 9(b).  Even so, the non-fraud aspects of Plaintiffs' claims are not subject to Rule 9(b). *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1080–81 (C.D. Cal. 2009).

### C.    Pattern

A "pattern of racketeering activity" "requires at least two acts of racketeering activity" that occur within ten years of one another.  18 U.S.C. § 1961(5); *see H.J. Inc.*, 492 U.S. at 237 ("[Section 1961(5)] does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern.").  Nevertheless, "while two acts are necessary, they may not be sufficient." *H.J. Inc.*, 492 U.S. at 237–38 (quotation marks

omitted).  "Section 1961(5) concerns only the minimum *number* of predicates

necessary to establish a pattern; and it assumes that there is something to a RICO

pattern *beyond* simply the number of predicate acts involved." *Id.* at 238.

Accordingly, "[i]t is not the number of predicates but the relationship that they

bear to each other or to some external organizing principle" that matters. *Id.*

While "Congress . . . had a fairly flexible concept of pattern in mind," a pattern

cannot be formed by "sporadic activity"; "[i]t is the factor of *continuity plus*

*relationship* which combines to produce a pattern." *Id.* at 239 (quotation marks

omitted).  With this in mind, "to prove a pattern of racketeering activity a plaintiff .

. . must show that the racketeering predicates are related, *and* that they amount to

or pose a threat of continued criminal activity." *Id.*  These two elements are

referred to as "relatedness" and "continuity." *Id.* at 239–40.  "Relatedness"

considers the relationship of the defendant's criminal acts one to another, focusing

on whether the acts "have the same or similar purposes, results, participants,

victims, or methods of commission, or otherwise are interrelated by distinguishing

characteristics and are not isolated events." *Id.* at 240 (quoting 18 U.S.C.

§ 3575(e)).  "Continuity," on the other hand, is "temporal concept" that "is both a

closed- and open-ended . . . , referring either to a closed period of repeated

conduct, or to past conduct that by its nature projects into the future with a threat of

repetition." *Id.* at 241–42.

## II.    The Parties

This case centers on the conduct and associations of two individuals,

Michael Goguen and Matthew Marshall.  Goguen is a former partner of a Silicon

Valley venture capital firm and is now a wealthy business owner living in

Whitefish, Montana.  (*See* Doc. 51 at ¶¶ 25, 88, 95, 100, 106.)  Although his

qualifications and experience are disputed, Marshall served some in the military

and has experience in the defense and private security arena.  (*See id.* ¶¶ 84–87).

In early 2013, Goguen hired Marshall to be the CEO of Two Bear Security, a

personal security firm owned by Goguen.  (*Id.* ¶¶ 96, 102.)  Goguen and Marshall

also agreed to partner to form a new private defense and security company, which

Marshall would manage as the CEO, (*id.* ¶ 99), and Goguen would fund, (*id.* ¶¶ 2,

151).  That company, Amyntor Group, LLC, is central to this litigation.

On October 24, 2013, Amyntor was formed in the State of Delaware.  (*Id.* at

¶ 145.)  Between 2013 and 2018, Marshall hired John Maguire, Anthony Aguilar,

and Keegan Bonnet to work for Amyntor (collectively "Plaintiffs").  (*Id.* ¶¶ 3–4,

156.)  With Goguen's funding, (*see id.* ¶¶ 184, 521, 542(b), 547), Plaintiffs built

Amyntor into a flourishing business, (*id.* ¶ 4).  Amyntor expanded until it had

offices in Montana, Virginia, Texas, Iraq, and Mexico City.  (*Id.* ¶¶ 153, 166–67,

170, 173, 193.)  The primary goal of Amyntor was to obtain high-paying private

and governmental security contracts.  (*Id.* ¶ 146.)  Although Amyntor had early

7

success gaining smaller contracts and contracts with the Mexican government, (*id.* ¶¶ 155, 168), it was seeking larger contracts in 2017, contracts that would require the company and its principals to obtain security clearances, (*id.* ¶¶ 186, 199).

Plaintiffs eventually became concerned about Amyntor's association with Goguen. This unease was based on two inter-related worries: Goguen's use of Plaintiffs' and Amyntor's resources to perpetuate the "Goguen Sexual Scheme" and the impact that conduct would have on Amyntor's ability to obtain defense contracts. (*See id.* ¶¶ 5, 8.) The fundamental allegation is that Goguen was involved in numerous sexual trysts across the country and that he used Marshall and Amyntor to manage his women, make hush payments, target his enemies, and cover up his conduct. (*See, e.g., id.* ¶¶ 310–11.) At least some of that conduct became public, however, (*see, e.g., id.* ¶ 306), and when Marshall sought a security clearance for Amyntor, he was informed that Goguen's ownership interest made it unlikely that the United States government would grant Amyntor clearance, (*id.* ¶¶ 201, 203, 206, 211–12), that in turn would prevent Amyntor from securing high value government contracts, (*id.* ¶ 186).

As a result, Marshall and Maguire unsuccessfully attempted to buy Goguen's interest in Amyntor in 2018. (*Id.* ¶¶ 205–09.) In response, Goguen "storm[ed] out of the room and refuse[d] to continue the conversation with Marshall." (*Id.* ¶ 208.) Then, in September 2018, "Goguen sent out a blanket

dissolution notice, abruptly pulling out of Amyntor out of fear that his sexual misconduct and crimes" were "at risk of exposure." (*Id.* ¶ 213.)  Amyntor was dissolved in the fall of 2018.  (*Id.* ¶¶ 521–23.)  Around this same time, Plaintiffs allege that Goguen and other defendants provided false and fraudulent financial information about Marshall to law enforcement in an effort to obfuscate Goguen's criminal conduct and incriminate Marshall.  (*See, e.g.*, *id.* ¶¶ 532–33.)  In November 2021, after criminal indictment and after the First Amended Complaint was filed, Marshall pled guilty to three federal felonies: wire fraud, money laundering, and tax evasion.  *See United States v. Marshall*, 9:20-cr-32-M-DWM.  The implications of those convictions are discussed below.

The other defendants in this case are all associated with Goguen.[1]  Goguen is the sole managing member of both Defendant Whitefish Frontiers—a private jet service, (*id.* ¶¶ 29, 159–61)—and Defendant Two Bear Security—a personal security company, (*id.* ¶¶ 27–28).  Plaintiffs claim that Goguen used both businesses to conduct his personal affairs and leverage financial control of Amyntor.  (*See id.* ¶¶ 294, 492, 661, 808.)  Similarly, the Accountant Defendants—Frank, Rimerman + Co. LLP and Karen Valladao—provided

---

[1]  Goguen is the trustee of the Goguen Trust, which provided funding to a number of Goguen's interests.  (*See, e.g.*, Doc. 51 at ¶¶ 26, 115.)  Although the Goguen Trust is named as an individual defendant, its conduct is rarely distinguished from that of Goguen.  As a result, they are collectively referred to as "Goguen."

business management and accounting services to Goguen and were involved in the financial affairs Two Bear Security, Amyntor, and Whitefish Frontiers. (*Id.* ¶¶ 33, 35, 492.) According to Plaintiffs, the Accountant Defendants helped conceal payments Goguen made to various women and assisted Goguen in making hush payments to individuals that learned of his conduct. (*Id.* ¶¶ 494, 498.) They also backdated tax documents, (*id.* ¶¶ 503–04), accused Marshall of committing tax fraud, (*id.* ¶ 505), and reclassified Amyntor assets as belonging to other Goguen entities, (*id.* ¶ 494). Defendant Richard Hegger is one of Goguen's attorneys who spoke to both the authorities and the press about Marshall. (*Id.* ¶¶ 42, 533.)

Goguen is the majority shareholder of Defendant Proof Research, a rifle company based in Columbia Falls, Montana. (*Id.* ¶ 32.) Plaintiffs allege Marshall was not adequately compensated for work he did for Proof. (*Id.* ¶¶ 214–21.) Defendant Shawn Lewis was President of Amyntor, (*id.* ¶¶ 39, 154), who allegedly embezzled money from the company, (*id.* ¶¶ 40–41, 435–37), but was still retained because he allegedly knew too much about Goguen's sexual misconduct to be fired, (*id.* ¶¶ 441, 450). Defendant Shane Erickson was a police detective for the City of Whitefish and he supposedly covered for Goguen in a sexual assault investigation in exchange for expensive gifts and travel. (*Id.* ¶ 411.) Finally, Defendant Nic McKinley is a business associate of Goguen's who was allegedly involved in the "wrongful commandeering of Amyntor assets," when he and

10

Erickson entered a storage unit belonging to Amyntor and removed computers and server equipment. (*Id.* ¶ 236.)

## III.   The RICO Claims

Plaintiffs assert six RICO claims, but offer identical allegations regarding the enterprise, (*id.* ¶¶ 47–83), the predicate acts (*id.* ¶¶ 84–534), and claimed injury, (*id.* ¶ 941, pp. 233–36), as foundation for each. The core claim is that Defendants formed an "association-in-fact" enterprise—the Goguen Sexual Scheme—that involved "prolific sexual and criminal misconduct," (*id.* ¶ 5), with the "common purpose" of "protect[ing] Goguen and prevent[ing] any harm to his reputation" and profiting from affiliation with Goguen, (*id.* ¶¶ 46, 54). Plaintiffs contend that all the defendants jointly engaged in, or aided and abetted, criminal acts by Goguen. (*Id.* ¶ 60.) Of Plaintiffs' six RICO claims, two are brought under 18 U.S.C. § 1962(b), three under 18 U.S.C. § 1962(c), and one under 18 U.S.C. § 1962(d). They are briefly outlined below.

**Claim One** is brought by Marshall against Goguen, alleging violations of § 1962(b). He alleges Goguen acquired and maintained an interest in Amyntor, (*id.* ¶ 540), through predicate acts of extortion, (*id.* ¶¶ 554–56); wire fraud, (*id.* ¶ 572); and retaliation, (*id.* ¶¶ 581–82). Marshall seeks to recover damages due to his loss of employment, lost past and future wages and financial distributions from

11

Amyntor, (*id.* ¶¶ 589–90), as well as funds he used to keep Amyntor afloat, (*id.* ¶¶ 564–65).

**Claim Two** also alleges a violation of § 1962(b), brought derivatively by Marshall on behalf of Amyntor against Goguen and McKinley.  Plaintiffs allege Goguen maintained influence over Amyntor through predicate acts of extortion, (*id.* ¶¶ 650–51); wire fraud, (*id.* ¶¶ 675–89); theft of trade secrets, (*id.* ¶¶ 693–94); and retaliation, (*id.* ¶ 699).  The damages claimed include Amyntor's loss of cash, personnel time, business opportunities, and the ability to compete.  (*Id.* ¶¶ 674, 702.)

**Claim Three** is brought by Marshall against Goguen, the Accountant Defendants, and Hegger under § 1962(c).  Marshall claims that the Goguen Sexual Scheme forced him to use Amyntor's assets for criminal activities, including attempted murder-for-hire, cyberhacking, bribery, and pay-offs to victims.  (*Id.* ¶¶ 715–20.)  Marshall alleges predicate acts of extortion, (*id.* ¶¶ 726–27); wire fraud, (*id.* ¶¶ 728–34, 41, 46, 58), obstruction of justice by providing false and misleading information to the government, (*id.* ¶¶ 761–66); and retaliation, (*id.* ¶ 767).  For damages, Marshall claims costs incurred on Goguen's behalf and attorney fees incurred after his indictment.  (*Id.* ¶¶ 770–72.)

**Claim Four** involves claims by Maguire, Bonnet, and Aguilar against Goguen under § 1962(c).  Although the allegations are opaque, Plaintiffs appear to

assert that Goguen's conduct caused them to lose salary and benefits as a result of Amyntor's dissolution. (*Id.* ¶¶ 774–84.) The alleged predicate acts are retaliation, (*id.* ¶ 780), and wire fraud related to the retaliation, (*id.* ¶ 781). The alleged damages include lost past and future wages, lost commissions, and lost prospective business opportunities following Amyntor's failure. (*Id.* ¶ 784.)

**Claim Five** is brought derivatively by Marshall on behalf of Amyntor against Goguen under § 1962(c). Here the claim is that the Goguen Sexual Scheme damaged Amyntor by undercapitalizing it; intertwining Two Bear Security and Amyntor operations; using Amyntor cash, assets, and personnel in furtherance of the Scheme; aiding and abetting theft of trade secrets; unlawfully transferring assets; commandeering the wind-up process; and interfering with Amyntor contracts. (*Id.* ¶ 794.) Plaintiffs allege predicate acts of extortion, (*id.* ¶¶ 805, 812–16); wire fraud, (*id.* ¶¶ 823–24); embezzlement, (*id.* ¶¶ 831–37), and retaliation, (*id.* ¶ 845); and claim damages of lost cash, lost personnel time, lost assets, lost revenue, lost profits, lost business opportunities, and harm to reputation, (*id.* ¶¶ 851–55).

**Claim Six** alleges a violation of § 1962(d) by all Plaintiffs against all Defendants for RICO conspiracy. Plaintiffs allege Goguen was the "primary perpetrator" of the conspiracy, which was intended to (1) conduct the affairs of the Goguen Sexual Scheme and (2) exert control over Amyntor. (*Id.* ¶¶ 865–68.)

Plaintiffs claim damages in the form of lost wages, bonuses, and the like.  (*Id.* ¶¶ 889–93.)  Additionally, Marshall claims he was harmed by his criminal indictment, (*id.* ¶ 889), and that Amyntor lost cash, assets, business prospects, and the ability to carry on as a business, (*id.* ¶ 888).

## IV.    Non-RICO Claims

The First Amended Complaint also contains two state law claims, defamation (Claim 7) and alter ego (Claim 8).  **Claim Seven** asserts a claim for defamation by Marshall against Goguen and Hegger.  The claim is based on statements Goguen and Hegger made to federal authorities, Hegger's communications with the Whitefish City Attorney, and comments Hegger made to NBC Montana about Marshall's criminal conduct.  **Claim Eight** asserts a claim for alter ego by all Plaintiffs against Goguen, the Goguen Trust, Two Bear Security, and Amyntor.  Plaintiffs allege that Goguen abused the corporate forms of Two Bear Security and Amyntor to perpetuate fraud, leading Plaintiffs to be deprived of revenue, wages, and other contractual payments.  (*Id.* ¶¶ 924–39.)  Plaintiffs claim Two Bear Security should be deemed the alter ego for Amyntor for the purpose of obtaining Two Bear Security assets allegedly wrongfully withheld.  (*Id.* ¶ 940.)

## V.    Procedural History

Plaintiffs initially filed this action in February 2021, alleging a single RICO claim against a slightly different set of defendants.  (*See* Doc. 1.)  Plaintiffs filed

the First Amended Complaint on September 1, 2021. (Doc. 51.) Although it took

some doing, (*see, e.g.*, Doc. 86), all the defendants were ultimately served and all

have appeared except Lewis, (*see* Doc. 88). There are seven pending motions to

dismiss. (Docs. 60, 62, 64, 66, 68, 74, 90.)

### SUMMARY CONCLUSION

Deciphering Plaintiffs' 236-page, 941-paragraph First Amended Complaint

is, as argued by Erickson, about as easy as completing "a 10,000-piece jigsaw

puzzle of a polar bear in a snowstorm." (Doc. 65 at 7.) Instead of providing a

plausible "short and plain statement" of the case and informing the defendants of

exactly what they are alleged to have done to cause damage, Plaintiffs' protracted

pleading makes it almost impossible for the defendants and the Court to accurately

understand, address, and respond to each claim. The slow wade through this

morass is exacerbated by the inherent complexity of civil RICO actions. *See*

*Flinders v. Datasec Corp.*, 742 F. Supp. 929, 936 n.12 (E.D. Va. 1990) ("It is a

rare civil RICO case that does not raise a number of difficult questions the terms of

the statute do little to answer. This often leads, not surprisingly, to tortuous, if not

tortured, analysis and inelegant, if not astonishing, results."). Despite its breadth,

the First Amended Complaint does not contain sufficient factual allegations to state

a plausible RICO claim. For ease of review, a brief summary of the primary

disposition of Plaintiffs' claims is provided below.

The first inquiry is whether the First Amended Complaint complies with the strictures of Rule 8(a). It does not. Because "the very prolixity of the complaint ma[kes] it difficult to determine just what circumstances were supposed to have given rise to the various causes of action," *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996), dismissal is appropriate on this ground alone. Furthermore, the substantive flaws in Plaintiffs' claims render amendment futile.

First, Plaintiffs lack RICO standing because while some of their alleged injuries are actionable under RICO, they fail to show proximate cause through a "direct relation" between the alleged misconduct and the alleged harm. *Painters & Allied Trades*, 943 F.3d at 1248–49. This causal shortcoming fatally undermines all six RICO claims.

Second, as it relates to the § 1962(b) claims (Claims One and Two), "Plaintiffs have failed to state a claim for a violation of § 1962(b) because they have not alleged an injury separate and distinct from the injury flowing from the predicate acts." *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 921 (C.D. Cal. 2011).

Third, as it relates to the § 1962(c) claims (Claims Three, Four, and Five), Plaintiffs fail to establish that Defendants had either the necessary common purpose or relationships required to make the "Goguen Sexual Scheme" a RICO enterprise. *Boyle*, 556 U.S. at 946. Even if that were not the case, however,

16

Plaintiffs fail to show most Defendants "conducted" the affairs of that enterprise, *Reves*, 507 U.S. at 179, 184, or engaged in the requisite pattern of racketeering activity, *H.J. Inc.*, 492 U.S. at 237–42.

Fourth, as it relates to the § 1962(d) claim (Claim Six), "Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).

Finally, in the absence of a viable federal claim, there is no good reason to exercise supplemental jurisdiction over Plaintiffs' state law defamation (Claim Seven) or alter ego (Claim Eight) claims.

**ANALYSIS**

Although there are common themes in the pending motions to dismiss, they each identify unique deficiencies in the First Amended Complaint. The discussion below addresses preliminary issues—pleading standard, judicial notice, statute of limitations, and derivative claims—before considering the substance of Plaintiffs' RICO allegations. When all is said and done, there are myriad grounds to dismiss this action, each as compelling as the first.

## I. Pleadings

Defendants raise two challenges regarding the pleadings overall. First, Defendants argue that the First Amended Complaint violates the basic pleading

17

requirements of Rule 8(a).  Second, Defendants argue that Plaintiffs cannot rely on allegations that are "inconsistent" with Marshall's November 2021 federal convictions for wire fraud, money laundering and tax evasion.

### A.    Rule 8

At the outset, Defendants argue that "Plaintiffs' flagrant violation of Rule 8 alone warrants dismissal of their pleading."  (Doc. 61 at 23; *see also* Doc. 92 at 7; Doc. 65 at 7; Doc. 67 at 7; Doc. 91 at 12; Doc. 94 at 6.)  In response, Plaintiffs justify their exposition on the "factually complex maelstrom of misconduct" perpetrated by the twelve defendants over the course of five years.  (Doc. 84 at 15.) Plaintiffs also condemn Defendants' focus on the "sheer length of the document" and emphasize their tedious pleading is necessitated by the heightened pleadings standards imposed by Rules 9(b) and 23.1.  (*Id.* at 13.)  Ultimately, as argued by Defendants, the First Amended Complaint "is not just verbose—it is inscrutable." (Doc. 92 at 7; *see also* Doc. 94 at 6 (describing both the filings as "long on rhetoric and short on substance").)

Pursuant to Rule 8(a)(2), "[a] pleading that states a claim for relief must contain[] a short and plain statement of the claim showing that the pleader is entitled to relief."  In doing so, the plaintiff must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotation marks omitted).

18

Such notice is largely absent here. "To form a defense, a defendant must know what he is defending against; that is, he must know the legal wrongs he is alleged to have committed and the factual allegations that form the core of the claims asserted against him. Deciphering even that much from the [First Amended Complaint] is next to impossible." *Stanard v. Nygren*, 658 F.3d 792, 799–800 (7th Cir. 2011). Instead of providing notice of plausible claims and the facts upon which they are based, the First Amended Complaint is a torrent of accusatory factual allegations generally divorced from the specific requirements for a RICO action. "Despite the complaint's length—or perhaps in part because of it—it remains unclear what constitutes the core of the claims against . . . the . . . defendants." *Id.* at 799. Thus, while Plaintiffs are correct that "length alone is generally insufficient to justify rejecting a complaint, unintelligibility is certainly a legitimate reason for doing so." *Id.* at 797–98.

Nor do Rule 9 or Rule 23.1 justify or implicate the sheer volume of the document. To be sure, the mandates of Rule 9(b) can result in more capacious pleadings. That is because claims sounding in fraud or mistake are subject to a heightened pleading standard. But the purpose of Rule 9(b), consistent with the purpose of Rule 8(a), is to provide notice to the defendants. Fraud allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged," and where the allegations include false

statements, "plaintiffs must set forth what is false or misleading about a statement, and why it is false." *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019) (quotation marks omitted).

In this case, the First Amended Complaint repeatedly maligns Goguen and his cohorts without specifically connecting them to Plaintiffs' alleged injuries. Thus, while compliance with Rule 9(b) may require a more thorough pleading, Plaintiffs by-and-large fail to differentiate between the alleged misconduct of the individual defendants. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." (cleaned up)).  Moreover, "[a] heightened pleading standard is not an invitation to disregard Rule 8's requirement of simplicity, directness, and clarity . . . . If the pleading contains prolix evidentiary averments, largely irrelevant or of slight relevance, rather than clear and concise averments stating which defendants are liable to plaintiffs for which wrongs, based on the evidence, then [Rule 9's] purpose is defeated." *McHenry*, 84 F.3d at 1178; *see, e.g.*, *Old Time Enters., Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1220 (5th Cir. 1989) (attributing the "confusion and incomprehensibility" of a RICO complaint to the "fervid desire to cover all even remotely conceivable theories while retaining a

20

level of generality and indefiniteness that would mask any legal deficiencies and preclude effective challenge").

Nor does the heightened pleading standard of Rule 23.1 justify Plaintiffs' verbose pleading. Indeed Rule 23.1(b) requires a plaintiff to allege status in the organization and state with particularity actions taken in that capacity. It does not, however, license unbridled repetition of those allegations. The First Amended Complaint states approximately twenty times that Marshall is a managing member of Amyntor, (*see* Doc. 51 at ¶¶ 131, 445, 541, 552, 594, 596, 600, 603, 614, 616, 645, 657, 757, 787, 792, 825, 858, 860, 923), but it then actually omits that same allegation from the one paragraph that summarizes Marshall's corporate appointments, (*see id.* ¶ 127). The First Amended Complaint also contains four identical disclaimers that this action is not collusive. (*See* ¶¶ 595, 786, 859, 922.)

Plaintiffs were also previously warned about the dictates of Rule 8, (*see* Doc. 50), and are apparently either unwilling or unable to comply. As mentioned above, dismissal is appropriate where the "very prolixity of the complaint ma[kes] it difficult to determine just what circumstances were supposed to have given rise to the various causes of action." *McHenry*, 84 F.3d at 1178 (affirming dismissal of complaint that was "argumentative, prolix, replete with redundancy and largely irrelevant"); *see also Glenn v. First Nat'l Bank in Grand Junction*, 868 F.2d 368, 371 (10th Cir. 1989) ("The law recognizes a significant difference between notice

pleading and 'shotgun' pleading."); *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) ("[T]he complaint must be anchored in a bed of facts, not allowed to float freely on a sea of bombast.").  Because that is the case here, the First Amended Complaint is dismissed for its noncompliance with Rule 8(a).  In light of the liberal amendment standard, however, the substantive shortcomings of Plaintiffs' pleading are discussed below.

### B.    Marshall's Criminal Conviction

The First Amended Complaint alleges that Defendants—specifically Goguen, Hegger, and the Accountant Defendants—provided false information or statements to law enforcement regarding Marshall's conduct in order to obstruct any investigation into Goguen's finances and to retaliate against Marshall.  (*See, e.g.*, Doc. 51 at ¶¶ 12, 735–40, 761–71, 889.)  In November 2021, however, Marshall pled guilty to three federal felonies: tax fraud, wire fraud, and money laundering. *See United States v. Marshall*, 9:20-CR-32-DWM.  In doing so, under oath, he admitted the elements of each offense.  Much of the charged conduct was consistent with what Defendants allegedly told law enforcement.  Consequently, Defendants argue that Marshall should not be permitted to maintain pleadings that are inconsistent with his admitted federal convictions.  While fairly simple on its face, this argument tangles an already complex web.

Review of a Rule 12(b)(6) motion is generally limited to the pleadings, but a district court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "The court may judicially notice a fact that is not subject to reasonable dispute because it[] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). This Court has already taken judicial notice of Marshall's plea agreement, (*see* Doc. 99), and shall also take judicial notice of his conviction, *see Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). In this case it is the scope of judicial notice, not the ability to take such notice, that presents an issue here.

The propriety of judicial notice is based on whether a fact is "subject to reasonable dispute." Fed. R. Evid. 201(b); *see Lee*, 250 F.3d at 689. Thus, there is a distinction between "*undisputed* matters of public record" and "*disputed* facts stated in public records." *Lee*, 250 F.3d at 690. The dispositive status of a guilty plea precludes a reasonable dispute of the facts contained therein. *See United States v. Davis*, 452 F.2d 577, 578 (9th Cir. 1971) ("The effect [of a guilty plea] is the same as if appellant had been tried before a jury and had been found guilty on evidence covering all of the material facts."). Judicial notice of these facts is

appropriate.  But such notice does not extend to facts surrounding Marshall's

conviction that remain reasonably subject to dispute.  *See Quinones v. Cnty. of

Orange*, 2021 WL 5855113, at *2 (9th Cir. 2021) ("[W]hile the district court

properly took judicial notice of [the plaintiff]'s guilty plea and her statements, it

did not (and could not) take judicial notice of the underlying fact of her mental

state.").  Thus, in this case judicial notice is constrained to those facts contained in

Marshall's plea agreement or colloquy that were essential to his convictions.  *See*

*United States v. Li*, 2013 WL 147803, at *4 (D. Ariz. Jan. 14, 2013).  The

following facts are therefore subject to judicial notice:

- Count 1 (wire fraud): Marshall was convicted of one count of wire fraud for defrauding Goguen into wiring him $255,000 on March 21, 2016 "under the belief that [the] money was being used to conduct paramilitary operations in Mexico and . . . it wasn't true." (*See* CR Doc. 185 at 34.)

- Count 7 (money laundering): Marshall was convicted of one count of money laundering for taking the proceeds from Count 1 and loaning part of it to another person. (*See id.* at 35.)

- Count 8 (tax evasion): Marshall was convicted of one count of tax evasion for failing to pay federal income tax in 2013 on payments he received from Goguen as part of the operations scheme. (*See id.*)

*See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("A

court must . . . consider—and identify—which fact or facts it is noticing[.]").  The

existence of these facts undercuts Plaintiffs' ability to state a plausible claim based

on Defendants' alleged "false" reports to law enforcement.  *See Olenicoff v. UBS*

*AG*, 2012 WL 1192911, at *10–11 (C.D. Cal. Apr. 10, 2012) ("Like a bad

foundation undermining a building's structure, [the plaintiff]'s Plea Agreement places nearly every room of his legal house of cards in jeopardy.").

## II.    Statute of Limitations

The Accountant Defendants argue that because their alleged conduct occurred in March 2016 or earlier, Plaintiffs' claims against them are time barred. Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). Plaintiffs' allegations against Accountant Defendants state a timely claim under the "injury discovery rule" that applies to RICO actions, so this challenge fails.

Under the "injury discovery rule," "[t]he limitations period for civil RICO begins to run when a plaintiff knows or should know of the injury which is the basis for the action." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005). This "rule creates a disjunctive two-prong test of actual or constructive notice[.]" *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001). "The plaintiff is deemed to have constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Id.* (quotation marks omitted). However, a plaintiff need not discover that the injury is part of a "pattern of racketeering" for the period to begin to run. *Rotella v Wood*, 528 U.S. 549, 554 (2000). Neither party's argument squares precisely with this rule. Plaintiffs, for example, focus almost

exclusively on the dissolution of Amyntor in 2018, ignoring what they did know or should have known earlier. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (explaining that the operative date on which the RICO statute of limitations began to run is when a plaintiff learns of the wrong, not the date on which it sustained the loss). Accountant Defendants, on the other hand, emphasize the timing of their actions alone, asserting that all of their conduct occurred in March 2016 or earlier and assuming the coincidence of Plaintiffs' injury. Because the actual accrual date falls somewhere in the middle, dismissal is inappropriate.

Contrary to Plaintiffs' briefing, the only substantive RICO claim that is squarely pled against the Accountant Defendants is Count Three,[2] which alleges that the Accountant Defendants made false reports and false statements to law enforcement regarding Marshall, committing wire fraud in violation of 18 U.S.C. § 1343, (Doc. 51 at ¶ 734), and obstruction of justice in violation of 18 U.S.C. § 1503, (*id.* ¶ 765). Claim Six alleges a RICO conspiracy based on the same conduct. (*See id.* ¶ 869.) Setting aside the substantive problems with these claims, dismissal is not warranted on timeliness grounds because the law enforcement reports that underlie Claim Three occurred in 2018. (*See id.* ¶¶ 728, 734.)

---

[2] The Court will not rewrite the First Amended Complaint to include substantive claims against the Accountant Defendants under Claim Two. If those claims were considered, however, they would succumb to the timeliness challenge raised by Defendants and also fail to implicate a discrete injury as discussed below.

## III.  Derivative Claims

As a final matter, Defendants argue that Plaintiffs cannot bring derivative claims on behalf of Amyntor—primarily Claims Two and Five, although also parts of Claims Six and Eight—because Amyntor was cancelled under Delaware law in June 2021.  This challenge is no longer persuasive because Plaintiffs have since revived the company, which would solve any capacity issue if Plaintiffs were given the opportunity to amend.  *See Farina Focaccia & Cucina Italiana, LLC v. 700 Valencia St. LLC*, 2015 WL 4932640, at *5 (N.D. Cal. Aug. 18, 2015) (distinguishing lack of capacity from lack of jurisdiction); *Rosales v. Wells Fargo Bank, N.A.*, 2014 WL 4770572, at *4 (N.D. Cal. Sept. 24, 2014) (allowing plaintiffs leave to amend to cure capacity defect).

## IV.  RICO Standing

RICO standing requires Plaintiffs to show that they are (1) a "person," (2) who sustained injury (3) to "business or property" (4) "by reason of" the defendant's violation of RICO's substantive provisions, i.e., proximate causation. 18 U.S.C. § 1964(c); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–68 (1992); *Painters & Allied Trades*, 943 F.3d at 1248.

### A.  Injury

Courts "must carefully examine the nature of the asserted harm" to confirm whether a plaintiff has pled "concrete financial loss . . . to business or property

within the meaning of RICO." *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quotation marks omitted). "[S]peculative injuries do not serve to confer standing under RICO, unless they become concrete and actual." *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 71 (9th Cir. 1994). To determine whether a plaintiff has alleged facts that are sufficient to show a RICO injury, it is necessary to consider whether a plaintiff has shown "harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005). A plaintiff must also show "some tangible financial loss" connected with the harm to his business or property interest. *Id.*

Montana recognizes a property interest in personal property and business assets. *See Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 201 P.3d 8, 26 (Mont. 2008). The State also recognizes the torts of intentional interference with business relations or prospective economic advantage and tortious or intentional interference with contractual relations. *Wingfield v. Dep't of Public Health & Human Servs.*, 463 P.3d 452, 454 (Mont. 2020). Taking Plaintiffs' allegations as true, there appear to be three bases upon which they seek to establish injury: first, Amyntor's loss of profits, assets, goodwill, reputation, and contractual opportunities, (Doc. 51 at ¶¶ 701, 702, 703, 704, 847, 850, 851, 853, 854); second, Plaintiffs' lost wages, business opportunities, and commissions, (*id.* ¶¶ 590,

773(c), (f), (g), 784); and third, Marshall's loss of personal money and resources,
(*id.* ¶¶ 558, 770), honest services, (*id.* ¶ 577), equity ownership in Proof Research,
(*id.* ¶ 773(e)), and previous employment with the State Department, (*id.* ¶ 589), as
well as the attorney fees and expenses associated with Marshall's criminal case,
(*id.* ¶ 771). (*See id.* at 233–35.) Even if inartfully pled, most of these alleged
injuries are concrete enough to survive at this stage of the litigation. *See Nat'l
Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) ("[A]t the pleadings
stage, general factual allegations of injury resulting from the defendant's conduct
may suffice, for on a motion to dismiss [courts] presume that general allegations
embrace those specific facts that are necessary to support the claim." (quotation
marks omitted)). Three types of claimed injury are problematic: attorney fees,
honest services, and future defense contracts and commissions.

### 1. Attorney Fees

"Whether incurring legal fees constitutes an injury to a plaintiff's business or
property is a question as yet unanswered by the Ninth Circuit." *In re Outlaw Lab.,
LP Litig.*, 2020 WL 1953584, at *9 (S.D. Cal. Apr. 23, 2020) (quotation marks
omitted) (collecting cases). In a 2009 unpublished memorandum decision, the
Ninth Circuit stated that it "has not recognized the incurment of legal fees as an
injury cognizable under RICO." *Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir.
2009). Since then, however, district courts have taken issue with both the breadth

and nonbinding nature of *Thomas*. *See Dunmore v. Dunmore*, 2013 WL 5569979, at *6 (E.D. Cal. Oct. 9, 2013) (collecting cases). As a result, a number of courts have reached a more nuanced determination that attorney fees that were "caused by defendants' RICO violation" qualify. *See In re Outlaw*, 2020 WL 1953584, at *9 (quoting *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1100 (2d Cir. 1993)). Here, taking the allegations in the First Amended Complaint as true, the attorney fees were incurred in litigating the fallout from the Scheme and the result of alleged predicate acts of extortion, retaliation, and wire fraud. As such, the fees alleged here probably created an injury compensable under RICO, consistent with some district court decisions since *Thomas*. *See Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1084 (C.D. Cal. 2009) ("This court concludes that plaintiff's RICO claim should not be dismissed on [the] basis [that no injury is alleged] because plaintiff adequately alleges that defendants' racketeering activity proximately caused . . . the expenditure of attorneys fees' and legal expenses in the [resulting] criminal proceedings[.]"). Thus, this claimed injury is sufficiently cognizable to survive at this point in the litigation.

## 2. Honest Services

The Ninth Circuit has specifically held that the deprivation of honest services alone "does not constitute concrete financial loss" for the purposes of pleading RICO's statutory standing requirement. *Ove v. Gwinn*, 264 F.3d 817, 825

(9th Cir. 2001); *see also Portfolio Invs., LLC v. First Sav. Bank Nw.*, 583 F. App'x

814, 816 (9th Cir. 2014).

### 3. Future Government Contracts and Commissions

Probably the most significant drawback to Plaintiffs' damages theory stems

from the rule that Montana has refused to recognize a property interest in future

participation in a governmentally regulated activity.  More specifically, the

Montana Supreme Court held that "[a]n expectation of profitability in a highly

regulated field of business, where a license or permit is required for participation,

is virtually never, in and of itself, considered a compensable property interest."

*Kafka*, 201 P.3d at 26.  In so concluding, the Court relied on *Mitchell Arms, Inc. v.*

*United States*, where the Federal Circuit Court of Appeals found that an arms

dealer had no cognizable property interest in an expectation of selling assault rifles

in domestic commerce, because the right was dependent upon the government's

granting him a license to sell those weapons.  7 F.3d 212, 217 (Fed. Cir. 1993)

(addressing property rights under the Fifth Amendment).  Plaintiffs' asserted

interest in both the future profitability of Amyntor and its ability to obtain future

defense contracts is analogous.  *See also Germann v. Stephens*, 137 P.3d 545, 551

(Mont. 2006) (holding business owner did not have a property interest in a liquor

license she had yet to obtain).  As a result, Plaintiffs' alleged injury in the loss of

prospective Amyntor contracts and the commissions Marshall and Maguire would

receive from those contracts are not cognizable RICO injuries. Even if a property interest in such intangible assets existed under Montana law, Defendants persuasively argue that any loss is purely speculative for essentially the same reason: Plaintiffs do not allege that Amyntor ever actually applied for or was denied a security clearance or denied a government contract for lack of such clearance. (*See* Doc. 51 at ¶¶ 196–98 (indicating Marshall "began the application process")); *cf. Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002) ("Injury to mere expectancy interests or an 'intangible property interest' is not sufficient to confer RICO standing."). As a result, the primary injury asserted by Plaintiffs is not a cognizable RICO injury.

### B.   Causation

The "by reason of" requirement under § 1964(c) requires both proximate and but-for causation. *Painters & Allied Trades*, 943 F.3d at 1248. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Supply Corp.*, 547 U.S. 451, 461 (2006). Because "the proximate cause requirement generally bars suits for alleged harm that is 'too remote from the defendant's unlawful conduct, . . . it demands some direct relation between the injury asserted and the injurious conduct alleged." *Painters & Allied Trades*, 943

32

F.3d at 1248–49 (quotation marks and alterations omitted).  This "direct

relationship" analysis is based on three factors, known as the *Holmes* factors:

> First, the less direct an injury is, the more difficult it becomes to
> ascertain the amount of a plaintiff's damages attributable to the
> violation, as distinct from other, independent, factors. Second, quite
> apart from problems of proving factual causation, recognizing claims
> of the indirectly injured would force courts to adopt complicated rules
> apportioning damages among plaintiffs removed at different levels of
> injury from the violative acts, to obviate the risk of multiple recoveries.
> And, finally, the need to grapple with these problems is simply
> unjustified by the general interest in deterring injurious conduct, since
> directly injured victims can generally be counted on to vindicate the
> law as private attorneys general, without any of the problems attendant
> upon suits by plaintiffs injured more remotely.

*Id.* at 1249 (quoting *Holmes*, 503 U.S. at 269–70).  As discussed in *Painters &*

*Allied Trades*, three Supreme Court decisions provide useful guideposts in

assessing the relationship between a plaintiff's alleged injury and a defendant's

alleged injurious conduct.  *See id.* at 1249–51.

In *Anza*, the plaintiff—a steel mill product retailer in New York—alleged

that a competitor caused it economic harm by failing to charge customers

applicable state sales taxes, thereby defrauding the New York state tax authority.

547 U.S. at 457–58.  The plaintiff alleged that this conduct allowed the defendant

to offer lower prices and attract more customers, in turn causing the plaintiff to

lose customers and profit.  *Id.*  The Supreme Court ultimately determined the

plaintiff's allegations failed under Rule 12(b)(6) because the "direct victim of this

conduct was the State of New York, not [the plaintiff]" and the plaintiff's asserted

harms were "entirely distinct from the alleged RICO violation (defrauding the state)." *Id.* at 458.

Similarly, in *Hemi Group, LLC v. City of New York*, the Supreme Court once again held that a plaintiff failed to sufficiently allege damages proximately caused by the defendant's RICO actions where an out-of-state online cigarette retailer failed to comply with a federal law that required out-of-state vendors to submit customer information to the states into which it shipped cigarettes. 559 U.S. 1, 4–5 (2010). The City argued that failure not only made it more difficult to track cigarette purchasers, but constituted mail and wire fraud, causing the City to lose millions of dollars in uncollected taxes. *Id.* at 4. The Supreme Court disagreed, holding that the retailer's failure to submit customer information to the State of New York was too attenuated from the City's loss of cigarette tax proceeds to satisfy the requirements of proximate cause. *Id.* at 11. The Court explained that "the conduct directly causing the harm"—i.e., the customers' failure to pay their taxes—"was distinct from the conduct giving rise to the fraud"—i.e., the retailer's failure to submit customer information to the State of New York. *Id.* The Court also emphasized that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," not foreseeability. *Id.* at 12. But most importantly for this case, the Supreme Court reiterated, "the general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Id.* at

10 (quotation marks and alteration omitted).  "Because the City's theory of

causation requires us to move well beyond the first step, that theory cannot meet

RICO's direct relationship requirement."  *Id.*

      In contrast, in *Bridge v. Phoenix Board of Indemnity Co.*, the Supreme Court

held that the plaintiffs adequately alleged proximate cause in asserting that the

defendants' use of agents to submit bids during county tax lien auctions was a

deceptive practice that resulted in the defendants receiving a disproportionately

higher share of tax liens at the auctions.  553 U.S. 639, 643–45 (2008).  In doing

so, the Court rejected the defendants' argument that any alleged misrepresentation

was to the county, not the plaintiffs, concluding that the plaintiffs' "alleged

injury—the loss of valuable liens—is the direct result of [the defendants'] fraud.  It

was a foreseeable and natural consequence of [the defendants'] scheme to obtain

more liens for themselves that other bidders would obtain fewer liens."  *Id.* at 658.

And, unlike in *Anza* and *Hemi Group*, where other parties suffered more direct

injuries than the plaintiffs, in *Bridge*, the county—which sold the tax liens at prices

not dependent on the identity of the buyer—was not injured; rather, the plaintiffs

were the immediate victim of the defendants' fraud.  *Id.*

      The problem here, and one that was not an issue in *Anza*, *Hemi Group* or

*Bridge*, is that it is unclear what alleged conduct is to have caused what alleged

harm.  Fundamentally, it seems that Plaintiffs were unwilling participants in the

alleged Scheme, not its direct victims.  At best then, Plaintiffs became victims

when they threatened the Scheme's existence, which caused them to experience

economic losses when Goguen retributively pulled the plug on Amyntor.  But even

this muddled causal explanation gives too much credit to the abstract mosaic

painted by Plaintiffs.  Thus, while the Court in *Hemi Group* could say with some

certainty that "the conduct directly causing the harm was distinct from the conduct

giving rise to the fraud," 559 U.S. at 11, readers of the First Amended Complaint

are left wondering how Goguen's sexual tryst with a married woman in New York

relates to Marshall's claim for lost wages.  The complete inability to pinpoint the

alleged conduct and the alleged harm undercuts a finding of proximate cause in the

RICO context.

Even accepting Plaintiffs' causal theory at face value—Goguen's sexual

misconduct ended the golden goose that was Amyntor—does not make the

connection any less attenuated.  To the contrary, Plaintiffs' claim requires

> that the alleged misconduct of a "Sexual Scheme" targeting third-party
> victims damaged Goguen's reputation, which would have prevented
> him from getting a security clearance, which made it unlikely that
> Amyntor would have received a security clearance, which deprived
> Amyntor of the benefits of contracts for which it never bid, which
> prevented Amyntor from becoming highly profitable and successful,
> which prevented Plaintiffs from getting rich as Amyntor personnel.

(Doc. 92 at 17–18.)  Because this theory requires action "well beyond the first step,

[it] cannot meet RICO's direct relationship requirement." *Id.* at 10.

The *Holmes* factors also weigh against permitting Plaintiffs' RICO claims to proceed.  As to the first factor, any scrutiny would need to determine the extent to which Plaintiffs' losses were the result of the Scheme's alleged criminal conduct as opposed to say, poor business practices, the independent actions of others, or market fluctuation.  But "it would be too difficult to ascertain what damages are attributable to Defendants' alleged RICO violation, as opposed to factors other than, and independent of, Defendants' alleged misrepresentations." *Painters & Allied Trade*, 943 F.3d at 1251; *see Hemi Grp.*, 559 U.S. at 15 (criticizing a "theory of liability [that] rests on the independent actions of third and even fourth parties").  For example, the United States government could have denied Amyntor's security clearance or failed to award contracts to Amyntor for "any number of reasons unconnected to the asserted pattern of fraud." *Anza*, 547 U.S. at 458.  Similarly, Goguen could have decided to dissolve Amyntor for a wide range of business reasons unrelated to his supposed personal grievances with Marshall.  It would therefore be impossible to calculate Plaintiffs' losses "attributable to the alleged pattern of racketeering activity." *Id.* at 459.  And, at the end of the day, the Court would be burdened to undertake this Herculean task despite the fact that there are those—not Plaintiffs—that were directly injured by Defendants' alleged conduct who could seek a remedy.  In fact, the First Amended Complaint specifically recognizes that some of the individuals victimized by the Scheme have

acted. (*See, e.g.*, Doc. 51 at ¶¶ 306 (Baptiste filed a lawsuit against Goguen), 331 (Nash reported Goguen to law enforcement).)

In the final analysis, proximate cause requires more than an adverse outcome. *See Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense."). As explained in *Holmes*, "the notion of proximate cause reflects the ideas of what justice demands, or of what is administratively possible and convenient. . . . Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." 503 U.S. at 268–29. Because Plaintiffs' "theory of causation is far too indirect," *Hemi Grp.*, 559 U.S. at 10, it fails under RICO. And because this theory underlies all of Plaintiffs' substantive RICO claims, the flaw is fatal across the board.

## V.    **Section 1962(b) Claims**

Claims One and Two are brought under § 1962(b), which focuses on a defendant's acquisition or maintenance of control over an enterprise. "To state a claim under this subsection, a plaintiff must allege 1) the defendant's activity led to its control or acquisition over a RICO enterprise, and 2) an injury to plaintiff resulting from defendant's control or acquisition of a RICO enterprise." *MH Pillars Ltd. v. Realini*, 2018 WL 1184847, at *7 (N.D. Cal. Mar. 7, 2018) (quoting

*In re Toyota*, 785 F. Supp. 2d at 920).  It is not enough that a defendant "possessed control of the alleged enterprise such that [it was] able to" engage in the predicate acts, *In re Toyota*, 785 F. Supp. 2d at 921; rather, § 1962(b) "requires plaintiffs to allege that the defendants acquired or maintained an interest in or control of the enterprise through their predicate acts," *MH Pillars Ltd.*, 2018 WL 1184847, at *7 (quotation marks and alteration omitted).  It also requires an injury flowing from the defendant's acquisition or control that is "separate and distinct" from the injury flowing from the predicate acts of the racketeering activity itself.  *Id.* at *8; *see also In re Toyota*, 785 F. Supp. 2d at 921.

Here, Defendants argue that Plaintiffs have failed to sufficiently allege either control or independent injury as to both Claims One and Two.  Plaintiffs concede that Claims One and Two "are similar in that they focus on acts by the Goguen Defendants meant to leverage his role as sole financier to maintain his influence in and control over Amyntor."  (Doc. 84 at 20.)  Nonetheless, they maintain that the counts allege distinct injuries insofar as Claim One focuses on injuries sustained by Marshall, while Claim Two focuses on injuries sustained by Amyntor.  That argument, however, misses the mark as to what it means to allege "distinct" injury, and ultimately, Plaintiffs fail to state a claim under § 1962(b).

## A.    Enterprise

The "enterprise" at issue in Claims One and Two is Amyntor, not the Goguen Sexual Scheme.  (*See* Doc. 51 at ¶¶ 537, 593.)  As it relates to Claim Two, McKinley raises the question of how Amyntor could be the plaintiff and the RICO enterprise.  (Doc. 91 at 21 n.4.)  Indeed, courts have recognized what is known as the "distinctness principle" as it relates to the relationship between a defendant and the enterprise under § 1962(c): the "person" who allegedly violates § 1962(c) must be distinct from the "enterprise" whose affairs that person is allegedly conducting or participating.  *See McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) ("[Y]ou cannot associate with yourself, any more than you can conspire with yourself."); *see also Reves*, 507 U.S. at 185.  That limitation, however, does not apply in the context of §1962(b).  *Schreiber Distr. Co.*, 806 F.2d at 1398.  Thus, while the First Amended Complaint continues to sow confusion, this purported inconsistency is a red herring.

## B.    Claim One

In Claim One Marshall alleges that Goguen acquired and maintained an interest in Amyntor through predicate acts of extortion, (Doc. 51 at ¶¶ 554–56); wire fraud, (*id.* ¶ 572); and retaliation, (*id.* ¶¶ 581–82).  At its core, Plaintiffs allege that Goguen leveraged his funding of Amyntor to force Marshall to use his

personal money and resources to fund personal errands for Goguen and keep

Amyntor operating.

"Control" is not defined in § 1962(b), but is assessed "by the circumstances

of each case and does not require formal control such as the holding of majority

stock or actual designation as an officer or director." *Ikuno v. Yip*, 912 F.2d 306,

310 (9th Cir. 1990). Here, Defendants argue that Plaintiffs have failed to allege

control under § 1962(b) insofar as Goguen "had significant *lawful* control over

Amyntor." (Doc. 92 at 11 (emphasis added).) Thus, any "control" Goguen

exercised over the company was through the mechanism of lawful corporate

governance, not the predicate acts alleged by Plaintiffs. *See Acro-Tech, Inc. v.*

*Robert Jackson Family Tr.*, 84 F. App'x 747, 750 (9th Cir. 2003) (holding that

because the stock purchase at issue was legal, it "did not involve the acquiring of

control through racketeering activity"). To be sure, the First Amended Complaint

recognizes that Goguen was Amyntor's "sole financier," (Doc. 51 at ¶ 597), "sole

funder," (*id.* ¶ 629), and "sole investor," (*id.* ¶ 637). However, Plaintiffs

specifically allege that Goguen's control of Amyntor was not maintained through

the proper corporate channels, but through the predicate acts of extortion, wire

fraud, and retaliation. Plaintiffs' essential claims are that Goguen (1) mislead

Marshall about the nature and purpose of Amyntor when it was first established,

(*id.* ¶ 575); (2) leveraged his financial support to force Marshall—and therefore

Amyntor—to do his bidding, (*id.* ¶ 556); and (3) destroyed Amyntor when Marshall reported Goguen to law enforcement, (*id.* ¶ 587). Plaintiffs have therefore pled predicate acts directed towards Goguen's control over Amyntor. At best, the operational authority for Amyntor is a disputed fact, which cannot be resolved at this time. (*See* Doc. 92-1 at 3;³ Doc. 51 at ¶ 657.)

The shift to Defendants' challenge as to injury is compelling. Plaintiffs allege that Goguen's control over Amyntor injured Marshall because he was required to pay out of pocket for both Amyntor's operations and Goguen's personal expenses, (*id.* ¶¶ 564–65, 588), and that Marshall became a creditor for his services to Proof Research, (*id.* ¶ 566), left his prior employment with the State Department, (*id.* ¶ 589), and lost both past and future wages, (*id.* ¶ 590). But these exact same damages are alleged with respect to Plaintiffs' § 1962(c) claims. (*See id.* ¶¶ 727, 749, 751, 767, 770 (out of pocket for Amyntor and Goguen's personal expenses); 744 (left employment with State Department); 773 (lost wages and equity in Proof Research).) Accordingly, "Plaintiffs have failed to state a claim for a violation of § 1962(b) because they have not alleged an injury separate and distinct from the injury flowing from the predicate acts." *In re Toyota*, 785 F. Supp. 2d at 921. Stated differently, Marshall was injured by the Scheme itself, not Goguen's control of Amyntor. Claim One is therefore dismissed.

---

³ *See Ritchie*, 342 F.3d at 908.

## C.   Claim Two

Claim Two also alleges a violation of § 1962(b), brought derivatively by Marshall on behalf of Amyntor against Goguen and McKinley.[4]  Plaintiffs once again allege Goguen maintained influence over Amyntor through predicate acts of extortion, (Doc. 51 at ¶¶ 650–51); wire fraud, (*id.* ¶¶ 675–89); and retaliation, (*id.* ¶ 699).  But this claim differs from Claim One in that Plaintiffs further argue that Goguen, with the assistance of McKinley, sought to maintain control through the theft and dissemination of Amyntor's trade secrets.  (*Id.* ¶¶ 693–94, 696.)  Like Claim One, Claim Two fails as a matter of law.

### 1.   McKinley

Plaintiffs' § 1962(b) claim against McKinley is one of the most bizarre allegations in a sea of dubious pleadings.  McKinley is the Founder and Executive Director of DeliverFund, a Texas nonprofit.  (*Id.* ¶ 44.)  The First Amended Complaint identifies two actions taken by McKinley that allegedly harmed Amyntor.  First, it alleges that on or about March 8, 2019, McKinley trespassed on Amyntor's storage unit and misappropriated its assets, including computers, server equipment, and trade secrets.  (*Id.* ¶¶ 222, 225, 229, 236, 237.)  Second, it alleges that Goguen provided Amyntor's trade secrets to McKinley, who in turn gave them

---

[4] The Accountant Defendants and Hegger are also listed as "Claim II Defendants," (*see* Doc. 51 at ¶ 599), but there are no predicate acts specifically associated with this claim (as opposed to the § 1962(c) claims discussed below).

to a journalist, exposing "Amyntor's sensitive private security contracts to the media." (*Id.* ¶¶ 696, 698.) The defects in Plaintiffs' § 1962(b) claim against McKinley independently support dismissal.

### i.    *Pattern of Racketeering Activity*

Section 1962(b) requires a "pattern of racketeering activity," which includes two or more predicate acts within ten years of one another. 18 U.S.C. § 1961(5); *H.J. Inc.*, 492 U.S. at 237. Here, the only conduct that is plead as a predicate act is the theft of trade secrets in violation of 18 U.S.C. § 1832. (*See* Doc. 51 at ¶¶ 691–98.) McKinley's alleged trespass, on the other hand, is only mentioned in the factual background. (*See id.* ¶¶ 222–41.) More importantly, trespass is not a predicate act under 18 U.S.C. § 1961(1)(A) because it does not fit within the definition of offenses generically classified as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a control substance or listed chemical." *See Wilkie v. Robbins*, 551 U.S. 537, 567 (2007) (holding a state law that did "not fit the traditional definition of extortion" was not a predicate under § 1961(1)(A)).

Recognizing the pleading problem, Plaintiffs unsuccessfully attempt to add a number of other predicate acts in their briefing, more specifically McKinley's conspiring with Goguen, misrepresentations to law enforcement, and use of a "false guise" to enter the storage unit. (Doc. 98 at 22–23.) But contrary to

Plaintiffs' characterization, this conduct is neither pled as predicate acts under

Claim Two, nor do the pleadings—despite their girth—contain a competent and

adequate description of the criminal elements to establish such predicates for RICO

purposes. *See Nutrition Distr. LLC v. Custom Nutraceuticals LLC*, 194 F. Supp.

3d 952, 958 (D. Ariz. 2016) ("It is not enough to allege that Defendants have

violated *some* federal law, since not all violations of federal law are RICO

predicates."). Because Plaintiffs' § 1962(b) claim against McKinley is based on a

single predicate act, it does not allege a pattern of activity under RICO. *See*

*Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010). Nor do they

show the necessary continuity. "Predicate acts extending over a few weeks or

months and threatening no future criminal conduct do not satisfy this

requirement[.]" *H.J. Inc.*, 492 U.S. at 242. Plaintiffs have not alleged any sort of

regularity as to McKinley's conduct nor have they shown that McKinley's conduct

went beyond a single event. *See Jarvis v. Regan*, 833 F.2d 149, 152–53 (9th Cir.

1987) (pattern requirement not satisfied by allegations that legal aid organizations

committed three predicate acts of mail and wire fraud in obtaining a single federal

grant). Plaintiffs cannot manufacture continuity by simply relying on the

continuous conduct of the other defendants.

In the absence of a pattern of racketeering activity, Plaintiffs' § 1962(b)

claim against McKinley fails.

### ii.    *Control*

Plaintiffs further fail to show that McKinley took any action—whether trespass or theft of trade secrets—to either acquire or maintain "control" of Amyntor.  The First Amended Complaint alleges that McKinley sought to take "unlawful control over the assets and affairs of Amyntor."  (Doc. 51 at ¶ 617(f).) But this allegation is limited to control of Amyntor's property and trade secrets, not Amyntor itself.  Moreover, the pleadings do not plausibly identify any attempt by McKinley himself to influence corporate action; rather, McKinley's actions were taken at Goguen's direction.  (*See id.* ¶¶ 44 ("[McKinley] participated or conspired in the criminal theft of trade-secrets and assets of Amyntor Group at the direction of Goguen."), 232 (Goguen gave permission to enter storage unit), 696 (Goguen gave trade secrets to McKinley "to in turn give to Aram Rostom").)  Even taking the allegations of the First Amended Complaint as true, Plaintiffs do not adequately allege that McKinley sought to acquire or maintain control of Amyntor through his conduct.  Plaintiffs' claim against McKinley fails on this ground as well.

### 2. Goguen

The analysis for Claim Two as it relates to Goguen tracks closely to that of Claim One.  Plaintiffs sufficiently allege "control" as it relates to Goguen's use of extortion, (Doc. 51 at ¶¶ 650–51); wire fraud, (*id.* ¶¶ 675–89); and retaliation, (*id.*

¶ 699), to leverage Amyntor's finances. Plaintiffs' trade secrets allegation, however, presents a closer question. While Plaintiffs allege that Goguen "leaked this sensitive and confidential trade secret information" in retaliation and to "damage their ability to continue to conduct further business," (*id.* ¶ 697), it is unclear how disseminating Amyntor's private contracts translates into corporate control. Rather, as the allegation itself states, such control was sought through either extortion (to make Amyntor act in a certain way) or retaliation (to punish Amyntor for acting in a certain way).

Even so, the death knell of Claim Two is—like Claim One—the absence of any distinct injury. Plaintiffs' injuries for Claim Two are that "Amyntor lost cash, personnel time, current and prospective business opportunities, and its ability to effectively compete," (*id.* at ¶ 674), as well as "physical assets," "prospective contractual opportunities, and other business goodwill," (*id.* ¶ 701). (*See also id.* ¶¶ 702 (prospective contracts), 703 (loss of customers).) These same injuries are alleged in association with Plaintiffs' § 1962(c) claims. (*See id.* ¶¶ 795 (disqualified for contracts), 818 (loss of "cash, personnel time, assets, revenue, and current and prospective business opportunities"), 828 (same), 850 ("lost business opportunities), 851 (lost profits), 851 (lost ability to effectively compete), 854 (harm to reputation).) In the absence of a distinct injury, Plaintiffs' § 1962(b) claim on behalf of Amyntor fails. *See In re Toyota*, 785 F. Supp. 2d at 921.

## VI.     Section 1962(c) Claims

Section § 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  A claim under § 1962(c) has five elements: "a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity . . . [and] the conduct must be (5) the proximate cause of harm to the victim."  *Eclectic Props.*, 751 F.3d at 997 (citation omitted).  Plaintiffs fail to adequately plead a RICO "enterprise," dooming all of their § 1962(c) claims.  But even if that were not the case, Plaintiffs' § 1962(c) claims fail on other grounds related to the discrete defendants.

### A.     "Association-in-Fact" Enterprise

The First Amended Complaint alleges that the Goguen Sexual Scheme is an "association-in-fact" enterprise under 18 U.S.C. § 1961(4).  (Doc. 51 at ¶ 47.) "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  "To show the existence of [such] an enterprise . . . , plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity

necessary to accomplish that purpose." *Eclectic Props.*, 751 F.3d at 997; *see also*

*Boyle*, 556 U.S. at 945.  Defendants claim that Plaintiffs fail to adequately allege

either "common purpose" or "longevity," which is also known as a "continuing

unit."  *See Boyle*, 556 U.S. at 948.  In the end, whether the Goguen Sexual Scheme

qualifies as a RICO enterprise turns on whether the non-Goguen Defendants'

association with Goguen and his agenda is enough.  It is not.

### 1. Common Purpose

"[A]n association-in-fact enterprise must have . . . a purpose," such as a

common "venture, undertaking, or project." *Boyle*, 556 U.S. at 946 (quotation

marks omitted).  "The facts must demonstrate all the participants acted with the

same purpose in mind pursuant to a unified agenda." *See McCaul v. First Mont.*

*Bank, Inc.*, 2018 WL 6717098, at *4 (D. Mont. Oct. 29, 2018); *see also Comm. to*

*Protect Our Agric. Water v. Occidental Oil*, 235 F. Supp. 3d 1132, 1175 (E.D. Cal.

2017) (finding that plaintiffs had failed to adequately allege a RICO enterprise

where "plaintiffs allege only a series of disconnected incidents, each involving a

subset of the overall group of defendants, with no clear indication of a unified

agenda").  That enterprise conduct must be distinct from the "ordinary business

affairs" of the participants. *McCaul*, 2018 WL 6717098, at *4; *see Fraser v. Team*

*Health Holdings, Inc.*, 2022 WL 971579, at *12 (N.D. Cal. Mar. 31, 2022) ("RICO

liability must be predicated on a relationship more substantial than a routine business relationship.").

According to Plaintiffs, Defendants associated together to engage in "a course of conduct for the purpose of protecting and preserving Goguen's reputation, facilitating his sexual encounters and/or criminal misconduct, while profiting from their association with Goguen and his business entities." (Doc. 84 at 35; *see* Doc. 51 at ¶¶ 54–56.) In response, Defendants argue that Plaintiffs have identified three different purposes—(1) to prevent harm to Goguen's reputation, (2) to cover up Goguen's conduct, and (3) to profit from association with Goguen—and that not *all* participants acted with the *same* purpose, foreclosing a unified agenda. That argument has merit, because even accepting Plaintiffs' allegations as true, Goguen sought to preserve his reputation, (*see id.* ¶ 55), while the non-Goguen Defendants sought to financially benefit off him, (*see id.* ¶ 56). This being so, the financial interest of the other Defendants falls short of a common purpose as "[p]arties that enter commercial relationships for their own gain or benefit do not constitute an enterprise." *In re Countrywide*, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) (quotation marks omitted) (collecting cases). The First Amended Complaint plausibly alleges that most of the defendants had longstanding business relationships with Goguen and performed services for Goguen and his companies. Even crediting Plaintiffs' assertion that

Defendants' actions assisted Goguen in perpetuating his misconduct, the First Amended Complaint makes clear that the assistance was in response to each entity's own incentives, not a unified agenda. *See, e.g.*, *Gianelli v. Schoenfeld*, 2021 WL 4690724, at *12 (E.D. Cal. Oct. 7, 2021) ("To the contrary, it appears that these two sets of defendants were allegedly acting with rather distinct purposes—with [some defendants] working to defraud PG&E to their own profit, while the only identified goal of [the other defendants]'s supervisory actions was to punish plaintiff."). Moreover, some defendants actually raised a concern regarding the legal consequences of Goguen's conduct. (*See, e.g.*, Doc. 51 at ¶ 500.) The fact that all Defendants simply acted within Goguen's orbit is not enough to create a commonality of purpose.

## 2. Relationship as a Continuing Unit

Furthermore, Plaintiffs do not adequately allege that Defendants coordinated their activities as a continuing unit. The First Amended Complaint does not plead facts showing that Defendants acted jointly over a period of time; rather, it alleges isolated incidents involving some, but never all, of the named defendants. *See HMV Props., LLC v. IDC Ohio Mgm't, LLC*, 2011 WL 53166, at *13 (S.D. Ohio Jan. 6, 2011) ("Plaintiffs have alleged only a string of actions taken by Defendants either severally or in small sub-groups, and they have alleged no facts that support any allegation of 'coordinated behavior' among the Defendants."). "RICO is not

intended to address discrete instances of fraud or criminal conduct." *McCaul*, 2018 WL 6717098, at \*6 (quotation marks omitted).  While Plaintiffs are correct that "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence," *Boyle*, 556 U.S. at 948, "association requires both interpersonal relationships and a common interest," *id.* at 946 (alteration and quotation marks omitted).  With the exception of Goguen's interaction with the other Defendants, such relationships are absent here.

### 3.  Conclusion

The First Amended Complaint does not allege an "enterprise" as that term is understood under RICO.  Rather, Plaintiffs allege that a single individual used the services of others to pursue *his* agenda: the concealment and perpetuation of his alleged sexual misconduct and the punishment of Marshall.  The factual allegations do not support a claim of the other Defendants sharing in that purpose.  Consequently, Plaintiffs have not adequately plead that the Goguen Sexual Scheme is an association-in-fact enterprise under RICO.  But even if it were, Plaintiffs fail to establish the remaining elements of a § 1962(c) claim as discussed below.

### B.    Conduct

In *Reves*, the Supreme Court set forth the sort of facts a plaintiff must allege to support the "conduct" element of a § 1962(c) RICO charge: a plaintiff must allege that the defendant "participated in the operation or management of the

enterprise itself," and that the defendant played "some part in directing the enterprise's affairs." 507 U.S. at 179, 184. In *Reves*, for example, the Supreme Court held that an outside accounting firm employed by an enterprise was not subject to civil RICO liability because while it was hired to perform a financial audit of the corporate enterprise, *id.* at 173, it did not participate in the operation or management of the enterprise itself, *id.* at 185. It is not enough that a defendant engaged in a predicate act; rather, a defendant must "direct" an enterprise's affair. *Id.* at 179; *see United Food & Comm. Workers Union & Emplrs. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) ("RICO does not penalize parallel, uncoordinated fraud."). Accordingly, mere participation in the alleged scheme is insufficient, *Reves*, 507 U.S. at 179; *see United Food*, 719 F.3d at 856, as is the existence of a business relationship between defendants, *Forest Ambulatory Surgical Assocs., L.P. v. Ingenix, Inc.*, 2013 WL 11323601, at *6 (C.D. Cal. Dec. 13, 2013) (collecting cases); *Ryan v. Salisbury*, 382 F. Supp. 3d 1031, 1058 (D. Haw. 2019); the performance of services for the enterprise, *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998); or the knowledge of or benefit from the scheme, *Int'l Bus. Machines Corp. v. Brown*, 134 F.3d 377, *1 (9th Cir. 1998).[5] Moreover,

---

[5] Plaintiffs rely on *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980), to argue that the conduct element can be met if a defendant's position within an enterprise "enables" it to commit the predicate acts. But *Scotto* is no longer good law on this

a plaintiff has to show the "defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (quotation marks omitted); *see Fraser*, 2022 WL 971579, at *11–12 (discussing role this plays in both "common purpose" and "conduct" inquiries).

That said, the reach of § 1962(c) is not limited to upper management and can include "lower-rung participants . . . who are under the direction of upper management." *Reves*, 507 U.S. at 184. While *Reves* expressly declined to decide "how far § 1962(c) extends down the ladder of operations," *id.* at 184 n.9, courts since then have explained this "vertical" relationship, specifically as it relates to an "association-in-fact enterprise," as follows:

> *Reves* is a case about the liability of *outsiders* who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

---

point. *See Napoli v. United States*, 45 F.3d 680, 682 (2d Cir. 1995) ("*Reves* effectively overruled our determination in *Scotto* that proof of participation in the management or control of an enterprise is not necessary for a RICO conviction.").

*United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994); *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978–79 (7th Cir. 1995). Nonetheless, "[o]ne can be 'part' of an enterprise without having a role in its management or operation.  Simply performing services for the enterprise does not rise to the level of direction, whether one is 'inside' or 'outside.'"  *Walter*, 538 F.3d at 1249.  Relevant considerations to whether this element is met include whether a defendant "occup[ies] a position in the chain of command . . . through which the affairs of the enterprise are conducted," whether it was "indispensable to the achievement of the enterprise's goal" and whether it "knowingly implement[ed] the decisions of upper management."  *Id.*  Courts have also considered whether a defendant is subject to discipline for disobedience, *MCM Partners*, 62 F.3d at 978, and whether a defendant has demonstrated independent action inconsistent with the objectives of the enterprise, *see In re WellPoint, Inc.*, 2013 WL 12130034, at *14 (C.D. Cal. July 19, 2013).

Here, Plaintiffs only show that very few of the defendants conducted the Goguen Sexual Scheme.  Such conduct is assessed individually below.

### C.    Pattern of Racketeering Activity

Racketeering activity, the fourth element of a § 1962(c) claim, requires predicate acts.  18 U.S.C. § 1961(1).  A "pattern" of racketeering activity requires evidence of at least two predicate acts within ten years of one another, *id.*

§ 1961(5), which the Supreme Court has interpreted to require a plaintiff to show

similarity between both the acts (relationship) and continuing activity (continuity),

*H.J. Inc.*, 492 U.S. at 239–41.  Within Plaintiffs' causes of action in the First

Amended Complaint, they allege the following predicates: extortion, 18 U.S.C.

§ 1951; wire fraud, *id.* § 1343; obstruction, *id.* §§ 1503 and 1510; retaliation, *id.*

§ 1513; and embezzlement, *id.* §§ 2312–2315.  Elsewhere in the First Amended

Complaint, Plaintiffs allege a number of other federal offenses under § 1961(1)(B)

and some state offenses under § 1961(1)(A).  As discussed above, some of these

state offenses do not qualify as predicate offenses under § 1961(1)(A) because they

do not fit within the definition of offenses generically classified as "any act or

threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion,

dealing in obscene matter, or dealing in a control substance or listed chemical."

*See Wilkie*, 551 U.S. at 567.  Once again, the difficulty in trying to discern exactly

which predicate act Plaintiffs rely on to support their claims is another indication

of inept pleading.  The predicate acts of each defendant are addressed below.

**D.      Section 1962(c) Defendants**

With the exception of Goguen,[6] Plaintiffs' § 1962(c) claims against the other

Defendants fail on the independent grounds of "conduct" and "pattern of

racketeering activity" as outlined below.

### 1. Accountant Defendants

As part of Claim Three, Marshall alleges that the Accountant Defendants

helped Goguen conduct his Sexual Scheme by coordinating his finances to cover

up hush payments and exert financial control over Amyntor, as well as by

providing information about Marshall to law enforcement.  According to Plaintiffs,

the Accountant Defendants "had significant control over Goguen's financial

decisions and played a significant role in executing those decisions, as evidenced

by [the Accountant Defendants] independently taking steps to fraudulently conceal

potential tax crimes and by creating and filing amended IRS tax gift returns and

drafting backdated loan documents for many of the Scheme's transactions." (Doc.

81 at 27 (citing Doc. 51 at ¶¶ 500–04).)  Thus, according to Plaintiffs, the

Accountant Defendants enabled and directed the affairs of the Scheme.  In

---

[6] As it relates to "conduct," there is no real dispute that, to the extent an enterprise
could be alleged, Goguen directed its affairs.  Although whether Plaintiffs have
sufficiently pled Goguen's involvement in a pattern of racketeering activity is a
closer question, Plaintiffs have likely met their burden in sheer volume (the First
Amended Complaint alleges approximately 67 criminal acts by Goguen).

response, however, the Accountant Defendants insist that the First Amended

Complaint establishes only the provision of tax and accountant services, even if

those services benefitted the Scheme.  That argument is persuasive.  "Simply

because one provides goods or services that ultimately benefit the enterprise does

not mean that one becomes liable under RICO as a result.  There must be a nexus

between the person and the conduct in the affairs of an enterprise."  *Univ. of Md. at*

*Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993).

Because that nexus is absent here, Plaintiffs cannot show "conduct" vis-à-vis the

Accountant Defendants.

     Nor have Plaintiffs adequately pled a pattern of racketeering activity by the

Accountant Defendants.  Plaintiffs allege six predicate acts:

1) Money laundering in violation of § 45–6–341, Mont. Code Ann. for "facilitating the transfer of funds to Goguen's harem" and "for unlawful activity consisting of patronizing prostitution," (Doc. 51 at ¶ 507(a));

2) Witness tampering in violation of 18 U.S.C. § 1512(c) by "corruptly altering, destroying, mutilating, or concealing a record, document or other object" by amending Goguen's tax returns, (*id.* ¶ 508(a));

3) Money laundering in violation of 18 U.S.C. § 1956 by directing the formation of entities used by Goguen to deposit pay-offs to his harem, (*id.* ¶ 508(b));

4) Using a facility in interstate commerce to facilitate unlawful activity in violation of 18 U.S.C. § 1952, specifically prostitution, witness tampering, and money laundering, (*id.* ¶ 508(c)).

5) Wire fraud in violation of 18 U.S.C. § 1343 by providing federal authorities "written and oral false statements and forged or fraudulent documents for the

purpose of executing [the] Scheme," (*id.* ¶ 728) specifically statements and document that supported Goguen's financial narrative of Marshall, (*id.* ¶ 734); and

6) Obstruction in violation of 18 U.S.C § 1503 by providing false and fraudulent statements and documents in support of that narrative to influence the grand jury, (*id.* ¶ 765).

While only (5) and (6) are actually pled in conjunction with Claim Three, none of these acts survive review. First, Plaintiffs' state-law money laundering claim, (1) above, does not qualify as a predicate offense under § 1961(1)(A). *See Wilkie*, 551 U.S. at 567. Second, the amendment of Goguen's tax returns does not plead a violation of 18 U.S.C. § 1512(c), as the statute requires "the intent to impair the object's integrity or availability for use in an official proceeding," which—even assuming the amendment of a tax return qualifies—is limited to specific proceedings not at issue here, *see* 18 U.S.C. § 1515(a)(1). Moreover, Plaintiffs themselves allege that "Marshall repeatedly informed Goguen to be careful with these transactions *and start filing tax returns.*" (Doc. 51 at ¶ 502 (emphasis added).) Third, Plaintiffs do not allege that the payoffs Goguen made to his supposed harem were made with "money derived from, or obtained as proceeds from, specified unlawful activity." *United States v. Taylor*, 239 F.3d 994, 999 (9th Cir. 2001); *see also United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009) (discussing the scope of "proceeds"). Fourth, Plaintiffs fail to identify what use of an interstate facility occurred, a requisite element of a Travel Act violation under

59

18 U.S.C. § 1952. *United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981).

Fifth, Plaintiffs fail to plead their wire fraud allegations with specificity as required by Rule 9(b). *Schreiber Distrib. Co.*, 806 F.2d at 1402. Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Id.* at 1400. This means that Plaintiffs are obligated to plead "the who, what, when, where, and how" of the alleged misrepresentation, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation marks omitted), and they failed to do so. "A plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* (quotation marks omitted). Plaintiffs in this case allege that the Accountant Defendants provided false information to federal authorities related to Marshall's finances but do not provide the specifics of those alleged misrepresentations. *See Edwards*, 356 F.3d at 1066 ("While the complaint makes out the time and place [the] purportedly fraudulent [notices] were delivered and names the parties involved, it contains not a word of the notices' specific contents."). And if the underlying conduct is "facially legitimate, . . . a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Eclectic Props.*, 751 F.3d at

997–98.  Here, Marshall pled guilty to wire fraud, money laundering, and tax evasion related to the very "false" statements he alleges were provided to law enforcement.  (*See* Doc. 70-1.)  In doing so, he has cut the legs out from under the claimed false statements.

Finally, Plaintiffs' § 1503 obstruction allegation is also subject to Rule 9(b)'s heightened pleading standard as it is grounded in fraud.  *See Vess*, 317 F.3d at 1104 (explaining that "all averments of fraud" must be stated with particularity).  This claim fails for the same reason as Plaintiffs' wire fraud allegation: Plaintiffs fail to identify the misrepresentation or false statements.  Moreover, Plaintiffs' § 1503 allegation is premised on information provided to the executive branch, not the judiciary.  "In order to violate 18 U.S.C. § 1503(a), a defendant must have acted 'with an intent to influence grand jury proceedings,' not to influence 'an investigation independent of the . . . grand jury's authority.'"  *United States v. Smith*, 831 F.3d 1207, 1215 (9th Cir. 2016) (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).  Accordingly, it does not extend to an investigation an executive agency "may have done . . . independent of the grand jury's authority."  *Id.*  Here, Plaintiffs allege that Defendants influenced an investigation into Marshall that eventually led to a federal grand jury, not the other way around.  Plaintiffs' allegation improperly melds § 1503 (judicial proceedings) with § 1510 (investigations) and, in doing so, fails to plead either one.

Plaintiffs have not adequately plead a single predicate act committed by the Accountant Defendants. Even if that were not the case, however, Plaintiffs fail to plead a "pattern" of such activity. The wire fraud and obstruction allegations both relate to the Accountant Defendants providing false and fraudulent information about Marshall to law enforcement. These acts lack continuity insofar as Plaintiffs allege a single federal investigation into Marshall that culminated in a federal indictment and Marshall's conviction, admitting his guilt by plea to three counts. *See Jarvis*, 833 F.2d at 152–53 (pattern requirement not satisfied by allegations that legal aid organizations committed three predicate acts of mail and wire fraud in obtaining a single federal grant).

Based on this reasoning, Plaintiffs cannot maintain their § 1962(c) allegations against the Accountant Defendants.

### 2. Hegger

As an initial matter, it is unclear which claims implicate Hegger. While Plaintiffs include Hegger in their list of responsible defendants for both Claims Four and Five, (*see* Doc. 51 at ¶¶ 776, 789), those claims do not contain any substantive allegations against Hegger. Claim Three, on the other hand, explicitly names Hegger in the heading and alleges that, as Goguen's attorney, he committed wire fraud, (Doc. 51 at ¶¶ 728, 734), obstructed justice, (*id.* ¶¶ 765), and retaliated against Marshall, (¶¶ 768–69), by making false statements and providing

fraudulent documents to law enforcement about Marshall. Claim Three is the only § 1962(c) claim against Hegger.

Although not pled as a predicate act, the First Amended Complaint also claims that Hegger was involved in the theft from Amyntor's storage unit; specifically, Hegger lied to the storage facility, telling it that he and Two Bear Security personnel were authorized by Goguen to enter and remove items belonging to Marshall, (*id.* ¶¶ 226, 238); got the locks changed on the unit, (*id.* ¶¶ 227, 238); and lied to law enforcement about his authority, (*id.* ¶ 228). The First Amended Complaint also loosely alleges that Hegger was involved in Amyntor's 2018 dissolution. (*See id.* ¶¶ 599–601, 612–13, 617(f), 631, 633, 754, 816, 935.)

As it relates to "conduct," Hegger is correct that the mere provision of legal services cannot support a RICO claim. *See Walter*, 538 F.3d at 1249 (finding that the lawyerly conduct of "writ[ing] emails, g[iving] advice, and t[aking] positions on behalf of [one's] clients" does not constitute "conduct" within the meaning of RICO); *see, e.g., Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (finding that an attorney's preparation of two letters and a partnership agreement in 1982, and assistance in a bankruptcy proceeding in 1987, "[did] not suffice to impute liability under *Reves*"). Nonetheless, courts have found the potential for such liability where allegations against an attorney "repeatedly indicate that firm was 'giving, or

taking, direction' and became 'indispensable to achiev[ing] of [sic] the enterprise's goal.'" *In re Outlaw*, 2020 WL 1953584, at *11 (quoting *Walter*, 538 F.3d at 1249). In *In re Outlaw*, for example, the law firm was involved in the "genesis of the scheme," "became the sole financial beneficiary of the enterprise, sent baseless subpoenas, enforced settlements predicated on fraudulent conduct and, at times, acted without the guidance or direction of [the enterprise]." *Id.* Hegger's alleged conduct falls in between *In re Outlaw* and *Walter*. While Hegger went beyond providing recognized legal services, he did not seek to independently benefit from the enterprise. But ultimately, the pleadings establish that Hegger occupied a position in Goguen's "chain of command" and acted at Goguen's direction. Such contentions are sufficient to plead conduct.

Nevertheless, Plaintiffs do not claim that Hegger was involved in a pattern of racketeering activity. Plaintiffs appear to allege five predicate acts:

1) Wire fraud in violation of 18 U.S.C. § 1343 for transmitting false communications about Marshall to federal and state authorities, (Doc. 51 at ¶¶ 728, 734);

2) Obstruction in violation of 18 U.S.C. § 1503 by "providing false and fraudulent statements, information, and/or altered and false accounting documents and other documents to the FBI, IRS, and the U.S. Attorney's Office to support Goguen's false narrative" of Marshall's finances, (*id.* ¶ 765);

3) Retaliation in violation of 18 U.S.C. § 1513 by providing the above information to federal authorities knowing that "Goguen was wrongly retaliating against Marshall," (*id.* ¶¶ 768–69);

4) Theft of assets from Amyntor's storage unit in March 2019 and transfer of assets from Amyntor to Two Bear Security, (*id.* ¶ 794(d), (g)); and

5) Unlawful interference with Amyntor's contracts, (*id.* ¶ 794(i)).

Because acts (4) and (5) are not actually pled as predicate acts and do not include citations for the underlying crimes as to assess their compliance with § 1961(1)(A), they are an unreliable basis to establish predicate acts. Likewise, (1), (2) and (3) fail for the same reasons as they did in the context of Accountant Defendants: Plaintiffs fail to plead the fraud with specificity, the alleged falsity is problematic in light of Marshall's subsequent guilty plea to criminal charges, and Plaintiffs confuse § 1503 with § 1510. And, similar to the Accountant Defendants, Plaintiffs cannot show a pattern to the extent that Hegger's conduct vis-à-vis the investigation into Marshall lacks continuity. For these reasons, Plaintiffs cannot maintain their § 1962(c) allegations against Hegger.

### 3. Proof Research

The First Amended Complaint includes Proof Research in the "Claim IV Defendants," although it contains no substantive allegations against the company. (*See* Doc. 51 at ¶ 776.) Proof Research is a Delaware corporation based out of Columbia Falls, Montana that makes composite and carbon-fiber rifles. (*Id.* ¶ 32.) Marshall actually met Goguen at an outdoor trade show in Las Vegas after Marshall was invited to attend by Proof's then-CEO. (*Id.* ¶¶ 90–92.) Goguen appointed Marshall as a Board Member, Chairman of the Board, and eventually

interim Chief Executive Officer of Proof. (*Id.* ¶¶ 127(j), 214.) Marshall facilitated

a change in management, (*id.* ¶¶ 215–18), in return for an equity interest in the

company, (*id.* ¶ 219). However, when Marshall and Goguen's relationship soured,

Marshall was removed from his position, (*id.* ¶¶ 220, 767(e)), and did not receive

his equity, (*id.* ¶¶ 221, 773(e)). The only allegation against Proof directly is that

the company knew why Goguen wanted to get rid of Marshall and out of "fear of

retribution" the corporate management facilitated the Scheme "by unlawfully

agreeing to remove and retaliate against Plaintiff Marshall from his executive and

board positions at the direction of Goguen and not through valid business process

or based on valid business reasons." (*Id.* ¶¶ 876–77.)

Accordingly, Proof acted at Goguen's direction and carried out his order to

terminate Marshall. Based on Plaintiffs' own allegation, however, that action was

one of self-preservation, not one taken to further the interests of the alleged

Scheme. Nor does it appear that Proof acted with any other Defendants in the

alleged enterprise. Thus, Proof did not "conduct" the affairs of the enterprise.

And, even if it did, Plaintiffs do not allege that Proof engaged in any predicate acts.

Plaintiffs cannot maintain their § 1962(c) allegations against Proof.

### 4. Erickson

The First Amended Complaint includes Erickson in the "Claim V

Defendants," although it contains no substantive allegations against him. (*See*

Doc. 51 at ¶ 789.)  Erickson was a City of Whitefish Police Detective who did not

investigate Goguen for a sexual assault and he accepted gifts and other

compensation from Goguen.  (*Id.* ¶¶ 37, 38, 392–414, 680, 878–79.)  He also

helped remove assets from Amyntor's storage unit in 2019, (*see id.* ¶¶ 222–41,

794(d)), threatened one of Goguen's enemies, (*id.* at ¶ 333), and informed Goguen

when Marshall went to the authorities to report Goguen, (*id.* ¶¶ 582–86, 779).

Accordingly, the First Amended Complaint establishes that Erickson acted on

Goguen's direction to specifically carry out activities on behalf of the Scheme.

This conduct was not part of a routine or existing business relationship, nor was

Erickson providing an independent service or acting with an independent motive.

Despite being a mere "foot solider[]," this is sufficient to show he participated in

the conduct of the enterprise.  *Oreto*, 37 F.3d at 751.

　　　Nevertheless, Plaintiffs cannot maintain a § 1962(c) claim against Erickson

because they do not allege two predicate acts by Erickson.  The only conduct

specifically alleged as a predicate is that Erickson engaged in bribery in violation

of § 45–7–101, Mont. Code Ann. for accepting a $20,000 paid hunting trip from

Goguen and other financial benefits to look the other way in the Pam Doe sexual

assault investigation. (Doc. 51 at ¶ 413(a).)  All of the other allegations related to

Erickson do not identify a specific underlying crime and/or merely place him in a

facilitating or supporting role for actions taken by Goguen.  (*See, e.g.*, *id.* ¶¶ 333

("Erickson, on Goguen's behalf, threatened Nash, telling him he would be arrested if he came to Montana."), 413–14 (alleging other defendants used Erickson to themselves commit illegal acts).)  Nor does Erickson's conduct vis-à-vis Amyntor's storage unit rise to the level of a RICO predicate. *See Wilkie*, 551 U.S. at 567; (Doc. 51 at ¶ 794(d), (g)).  In the absence of more than one predicate act, Plaintiffs cannot maintain a § 1962(c) claim against Erickson.

### 5. Lewis

The First Amended Complaint alleges a § 1962(c) claim against Lewis in the context of Claim Five.  Lewis has not appeared in this action, and the Clerk entered default against him on February 8, 2022.  (Doc. 88.)  Lewis was the President of Amyntor who embezzled from the company, but was allowed to keep his ill-gotten gains because he allegedly knew too much about Goguen's illicit conduct.  (Doc. 51 ¶¶ 39–41, 435–52, 830–44.)  Lewis presents an interesting question because Plaintiffs have alleged numerous wrongs done by Lewis, (*see id.*), and Lewis was never punished because of his knowledge of Goguen's conduct, but knowledge alone is not enough to make him part of the enterprise. *See Int'l Bus. Machines Corp.*, 134 F.3d at *1 ("Evidence that the defendant knew of the scheme or even benefitted from the scheme is not enough to impose RICO liability.").  As a result, Plaintiffs fail to adequately plead that Lewis engaged in "conduct" on behalf of the Scheme.

68

### 6. McKinley

The First Amended Complaint includes McKinley in the "Claim V Defendants," although it contains no substantive allegations against him. (*See* Doc. 51 at ¶ 789; *see also* Doc. 98 at 13.) As discussed above, McKinley's involvement is limited to his trespass at the Amyntor storage unit, (*see* Doc. 51 at ¶¶ 222–41), and his sharing of Amyntor trade secrets with the media, (*id.* ¶ 296). Like Erickson, both actions were carried out at Goguen's direction with the sole purpose of furthering the Scheme. Plaintiffs have adequately alleged McKinley's conduct on behalf of the enterprise. *But see Baumer*, 8 F.3d at 1344 (holding attorney's conduct insufficient where he joined scheme late and whose "role thereafter was at best sporadic"). Nevertheless, as discussed above, Plaintiffs fail to allege that McKinley engaged in more than one predicate act.

### E.     Conclusion

Based on the foregoing, Plaintiffs have not alleged an adequate § 1962(c) claim against any of the defendants discussed above, nor are such claims brought against Whitefish Frontiers or Two Bear Security.

## VII.   Section 1962(d) Claims

Section 1962(d) of RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." "To establish a violation of section 1962(d), Plaintiffs must allege either

an agreement that is a substantive violation of RICO or that the defendants agreed

to commit, or participated in, a violation of two predicate offenses." *Howard*, 208

F.3d at 751.  "Plaintiffs cannot claim that a conspiracy to violate RICO existed if

they do not adequately plead a substantive violation of RICO." *Id.*; *see also*

*Sanford*, 625 F.3d at 559.  Because Plaintiffs' § 1962(b) and (c) claims fail as a

matter of law, Plaintiffs cannot maintain their RICO conspiracy claim.

**VIII. Amendment**

Where a plaintiff's claim is dismissed for failure to state a claim, "a district

court should grant leave to amend even if no request to amend the pleading was

made, unless it determines that the pleading could not possibly be cured by the

allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.,*

*Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).  Leave to amend should be "freely given"

absent "any apparent or declared reason—such as undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue

of allowance of the amendment, futility of the amendment, etc." *Eminence*

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (quotations

omitted).  As this Opinion and Order recognizes, Plaintiffs have shown that they

are not able to comply with the strictures of Rule 8, despite being given the

opportunity to do so.  Moreover, the deficiencies within Plaintiffs' pleading are

inherent to their theory of the case, meaning that pleading additional facts would not create a viable claim as discussed above.  The failure of the pleadings cannot be cured even if all the facts alleged are accurate.  Amendment is therefore not warranted.

## IX.   State Law Claims

Claim Seven alleges Goguen and Hegger defamed Marshall in violation of Montana law.  Claim Eight seeks a declaratory judgment, pursuant to Montana Code Annotated § 27–8–202, that Two Bear Security is the alter ego of Amyntor.  In the absence of any surviving federal claims, the Court declines to exercise supplemental jurisdiction over these state law claims.  *See* 28 U.S.C. § 1367.

CONCLUSION

For the reasons stated, Defendants' motions to dismiss (Docs. 60, 62, 64, 66, 68, 74, 90) are GRANTED.  Plaintiffs' RICO claims (Claims One through Six) are DISMISSED WITH PREJUDICE.  The Court declines to exercise jurisdiction over Plaintiffs' state law claims (Claims Seven and Eight).  The Clerk is directed to enter a judgment of dismissal and close the case file.

DATED this 24 day of May, 2022.

16:27 P.W.

Donald W. Molloy, District Judge
United States District Court

71